# JUDGE KARAS

  

Michael J. Frevola
Lissa D. Schaupp
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR PLAINTIFF
FRONT CARRIERS LTD.

JUL 1 1 2007
U.S. ____ S.D.N.Y
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FRONT CARRIERS LTD.,

        Plaintiff,

        -against-

TRANSFIELD ER CAPE LTD.,

        Defendant.

---

07 Civ. _____ (_____)

**VERIFIED COMPLAINT**

---

Plaintiff, Front Carriers Ltd. ("Front Carriers" or "Plaintiff"), by and through its attorneys, Holland & Knight LLP, for its verified complaint against Transfield ER Cape Ltd. ("Transfield" or "Defendant"), alleges, upon information and belief, as follows:

1.     This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.     At all times material herein, plaintiff Front Carriers was and is a business entity organized and existing under the laws of Liberia and maintains a place of business at c/o Golden Ocean Management AS, Bryggegata 3, P.O. Box 2005-Vika, 0125 Oslo, Norway.

3.     Upon information and belief, at all times material herein, defendant Transfield is a business entity organized and existing under the laws of the British Virgin Islands.

4.     On or about August 9, 2005, Transfield, as owner, and Front Carriers, as charterer, entered into a Contract of Affreightment on the AMWELSH Coal Charter Form 1979, as amended by the parties, for the carriage of multiple cargoes of coal from various optional ports in Australia to various optional ports in Western Europe (the "COA"). A true copy of the COA is annexed as Exhibit 1.

5.     Front Carriers entered into the COA for the purpose of fulfilling its own lifting requirements under a separate contract of affreightment with a third-party charterer ("Atic"). Stated another way, Front Carriers was contractually bound to provide vessels to Atic on identical terms as the COA, and Front Carriers entered into the COA with Transfield to fulfill its obligations to Atic under that separate contract of affreightment.

6.     Transfield failed to perform its final two liftings under the COA, causing Front Carriers to sustain damages in two fashions related to the first missed lifting and in one fashion related to the second missed lifting.

**The First Missed Lifting**

7.     With regard to the first missed lifting, Transfield initially agreed to perform that lifting which it ultimately failed to perform, but during a time period not agreed to by Front Carriers. Whereas Front Carriers requested that Transfield present its vessel for loading in May 2007, Transfield insisted on nominating its vessel for March 2007. Despite this wrongful nomination, Front Carriers accepted the nomination (while reserving its rights to claim for damages resulting from the wrongful nomination) in an effort to mitigate its damages.

8.      After Front Carriers accepted the wrongful nomination and procured cargo for that nomination, Transfield refused to accept Front Carriers' alternative port nomination for that cargo. Because of this, Front Carriers was obliged to charter in replacement tonnage to carry the cargo originally procured to mitigate damages for Transfield's wrongful nomination. Front Carriers therefore was damaged in an amount presently estimated as $1,908,624.00 as a result of having to cover for the transportation of the substitute cargo intended as mitigation for Transfield's wrongful nomination. A true copy of Front Carriers' calculation of its estimated damages relating to this claim is annexed as Exhibit 2. As the voyage concerning this cargo is still in progress, the estimated damages figure is subject to change and Front Carriers reserves its right to amend its claim and to request increased security in the event that its actual losses are determined to be greater after the completion of the subject voyage.

9.      In addition to the foregoing damages, Front Carriers also was required to procure substitute tonnage at a much higher rate to perform under its contract of affreightment with Atic. Front Carriers therefore was damaged in an amount presently estimated as $6,141,273.00 as a result of having to charter in substitute tonnage to meet its obligations under its contract of affreightment with Atic. Additionally, Front Carriers further was damaged in the amount of $366,712.00 by not realizing its expected profit under its contract of affreightment with Atic that would have been realized had Transfield performed as required under the COA. True copies of Front Carriers' calculation of its estimated damages relating to these claims are annexed as Exhibits 3 and 4, respectively. As the voyage relating to the aforementioned claim is still in progress, the estimated damages figure is subject to change and Front Carriers reserves its right to amend its claim and to request increased security in the event that its actual losses are determined to be greater after the completion of the subject voyage.

**The Second Missed Lifting**

10.    With regard to the second missed lifting, Front Carriers once again has been damaged as a result of its having to procure substitute tonnage at a much higher rate to perform under its contract of affreightment with Atic. Front Carriers therefore has been damaged in an amount presently estimated as $3,829,217.00 as a result of having to charter in substitute tonnage to meet its obligations under its contract of affreightment with Atic. Additionally, Front Carriers further estimates that it has been damaged in the amount of $208,766.00 by not realizing its expected profit under its contract of affreightment with Atic that would have been realized had Transfield performed as required under the COA. True copies of Front Carriers' calculation of its estimated damages relating to these claims are annexed as Exhibits 5 and 6, respectively. As the voyage relating to the aforementioned claim has no yet been performed, the estimated damages figure is subject to change and Front Carriers reserves its right to amend its claim and to request increased security in the event that its actual losses are determined to be greater after the completion of the subject voyage.

11.    The aggregate amount of Front Carriers' claims sustained under both missed liftings, therefore, as best as presently can be estimated, is $12,454,592.00.

12.    Pursuant to the COA between Front Carriers and Transfield, disputes arising in connection with the COA are to be arbitrated in Paris, France under French law. Transfield has advised Front Carriers that arbitration in Paris can be expected to take five years to complete.

13.    Under French law, Front Carriers also is entitled to recover interest at the "legal interest" rate (currently 2.95%) and a portion of its costs and attorneys fees expended while

4

prosecuting its claims to completion, which amount is estimated to be $1,867,052.30, as set forth below:

| | |
|---|---|
| Interest: | $ 1,837,052.30 ($12,454,592.00 x 0.0295/year x 5 years) |
| Attorneys' Fees/Expenses: | $    30,000.00 |
| Total Interest/Fees/Expenses: | $ 1,867,052.30 |
| Total Principal Claim: | $12,454,592.00 |
| Total Sought: | **$14,321,644.30** |

14.    Front Carriers is in the process of preparing its claim for arbitration in Paris.

15.    Transfield is not found within the Southern District of New York but does have assets, good or chattels within the jurisdiction, to wit: funds or accounts held in the name (or names) of Transfield ER Cape Ltd. with, upon information and belief, the following financial institutions: Bank of America, N.A.; The Bank of New York; Citibank, N.A.; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; UBS AG; Wachovia Bank, N.A.; Société Générale; Standard Chartered Bank; BNP Paribas; Calyon Investment Bank; American Express Bank; Commerzbank; ABN Amro Bank; Bank Leumi USA; Fortis Financial Groups; Banco Popular; or any other financial institution within the Southern District of New York.

16.    While all disputes arising out of the COA are to be arbitrated in Paris, France, the action herein is submitted in accordance with Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, as well as 9 U.S.C. §8, and is not and cannot be considered a waiver of the parties' agreement to arbitrate.

**WHEREFORE**, Front Carriers Ltd. demands judgment as follows:

1.      That process in due form of law according to the practice of this Court in the form of a writ of maritime attachment be issued against bank accounts and other property of Transfield ER Cape Ltd. with the financial institutions noted above in paragraph 15;

2.      That Transfield ER Cape Ltd. and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

3.      That judgment be entered in favor of Front Carriers Ltd. and against Transfield ER Cape Ltd. in the amount of US$14,321,644.30 (including estimated interest, expenses and attorneys' fees); and,

4.      That this Court grant Front Carriers Ltd. such other and further relief which it may deem just and proper.

Dated: New York, New York
        July 10, 2007

                            HOLLAND & KNIGHT LLP

                    By:     _____
                            Michael J. Frevola
                            Lissa Schaupp
                            195 Broadway
                            New York, NY 10007-3189
                            Tel:    (212) 513-3200
                            Fax:    (212) 385-9010

                            *Attorneys for Plaintiff*
                            *Front Carriers Ltd.*

## **VERIFICATION**

| | | |
|---|---|---|
| STATE OF NEW YORK | ) | |
| | :ss.: | |
| COUNTY OF NEW YORK | ) | |

MICHAEL J. FREVOLA, being duly sworn, deposes and says:

I am a member of the firm of Holland & Knight LLP, counsel for Front Carriers Ltd. ("Front Carriers"), plaintiff in the foregoing action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Front Carriers and corresponded with Front Carriers' representatives regarding this matter. I am authorized by Front Carriers to make this verification, and the reason for my making it as opposed to an officer or director of Front Carriers is that there are none within the jurisdiction of this Honorable Court.

_____
Michael J. Frevola

Sworn to before me this
10th day of July, 2007

_____
Notary Public

Elvin Ramos
Notary Public, State of New York
NO. 01RA4870243
Qualified in Queens County
Certificate filed in New York County
Commission Expires September 2, 2010

# 4647411_v1

# EXHIBIT 1



ORIGINAL

**AMERICANIZED WELSH COAL CHARTER**
APPROVED BY
ASSOCIATION OF SHIP BROKERS & AGENTS (U.S.A.), INC.
NEW YORK—1953: AMENDED 1979.

*LONDON, 9th August 19*

1   It is this day mutually agreed,   BETWEEN Messrs. ████████████ *E LTD., of B.V.I. as* disponent

2   Owner of the *Vessel to be nominated (See Section 8 "Vessels" of the attached Contract of Affreightment)* Steamship/Motorship

3   of                    , built                         at                    of

4   tons net register, or thereabouts, and about        tons total deadweight inclusive of bunkers, classed

5   m                               length overall             beam

6   draft                         now

7   and Messrs. I████████████., *of Liberia*                                                    Charterer:

8   1.   That the said vessel being tight, staunch and strong, and in every way fitted for the voyage, shall, with all possible dis-
9   patch, sail and proceed to :

10  *DALRYMPLE BAY Coal Terminal, or in Charterers' option*
    *HAYPOINT Central Queensland Coal Associate Terminal, or in Charterers' option*
    *ABBOT POINT Coal Terminal, or in Charterers' option*
    *GLADSTONE RG Tanna Facility, or in Charterers' option*
    *GLADSTONE RG Tanna Facility plus DALRYMPLE BAY Coal Terminal, or in Charterers' option*
    *DALRYMPLE BAY Coal Terminal plus GLADSTONE RG Tanna Facility, or in Charterers' option*
    *NEWCASTLE TWCS Kooragang Carrigton, or in Charterers' option*
    *PORT KEMBLA Coal Terminal*
    and there load, always afloat, in the customary manner from the Charterer, in such dock

11  as may be ordered by him, a ~~full and complete~~ cargo of *nominated* coal ~~not exceeding~~ *as per Section 1 "Cargoes" of the attached*
    *Contract of Affreightment* ~~tons nor less than~~

12                                 ~~tons;~~ quantity at Vessel's option, and not exceeding what she can reasonably stow and carry,

13  over and above her tackle, apparel, provisions and furniture; and being so loaded, shall therewith proceed, with all possible dispatch, to
    *ROTTERDAM Maasvlakte EMO, or in Charterers' option*
    *ROTTERDAM Maasvlakte EMO plus ANTWERP Quay 510 ABT or 750 Delwaide Dock in Charterers' option, or in*
    *Charterers' option*
    *ROTTERDAM Maasvlakte EMO plus DUNKIRK EAST Sollac Berth, or in Charterers' option*
    *ROTTERDAM Maasvlakte EMO plus HANSAPORT, or in Charterers' option*
    *DUNKIRK WEST QPO Berth plus DUNKIRK EAST Sollac Berth, or in Charterers' option*
    *One berth GIJON, or in Charterers' option*
    *FOS Sollac Berth, or in Charterers' option*
    *One berth GIJON plus FOS Sollac Berth*

14  ~~or so near thereunto as she can safely get,~~ and there deliver her cargo alongside any wharf *or alongside the berth as nominated* ~~and/or~~
    ~~vessel and/or craft, as ordered.~~

15  where she can safely deliver, always afloat, on being paid freight at the rate of *as per Section 5 ("Freight Rates") of the attached*
16  *Contract of Affreightment*  U.S. currency per ton of 1,000 kilos on bill of lading quantity. The Owner shall furnish, if
17  required, a statutory declaration by the master and other officers that all cargo received on board has been delivered. The freight
18  is in full of loading, *normal* dunnage and trimming *but extra, if any, to be for Owners' account,* and all port charges, pilotages.
19  agency fees and consolages on the vessel. All wharfage ~~dues on the cargo to be paid by the Charterer.~~

20  2.   The FREIGHT is to be paid *in U.S. Dollars by telegraphic transfer to Owners' bank account as per invoice for*
    *relevant shipment*

21  3.   Notice of approximate quantity of cargo required and of vessel's expected date of arrival at port of loading to be given to
22  Charterer or his agents at least *15*   days in advance *(See also Section 18 "Notices and Loading/Discharging Port Orders" of the*
    *attached Contract of Affreightment).*

23  4.   The Cargo to be loaded ~~into vessel~~ *and discharged in 6 (six)*
24                          weather working day(s) of 24 consecutive hours, *all purposes, Sundays and Holidays included*
25  ~~(excluding bunkering time, Sundays, custom house, colliery, legal and/or local holidays, and from noon on Saturday or the day~~
26  ~~previous to any such holiday to 7 a.m. on Monday or the day after any such holiday, unless used in which event only time actually~~
27  ~~used in loading cargo to count)~~ commencing *at sole/first load port 22* hours after vessel tenders and is ready to load, unless sooner
    ~~commenced, in which case only time actually used to count~~ *also Section 8 "Time for Loading and Discharging"*
    ~~worked, whereupon time~~

28  ~~is to commence~~ and written notice is given of the vessel's being completely discharged of inward cargo and ballast in all her holds
29  and ready to load, such notice to be given *whether in berth or not, whether in port or not, whether in free pratique or not,*
    *whether customs cleared or not, any time day or night, Sundays and Holidays included. If upon vessel's arrival at loading*
    *port, loading berth is not available, Notice of Readiness will be tendered at the nearest anchorage and time to count as*
    *above.* ~~between business hours of 9 a.m. and 5 p.m. or 9 a.m. and 1 p.m. on Saturdays.~~ Any time

30  lost through riots, strikes, lockouts, or any dispute between masters and men, occasioning a stoppage of pitmen, trimmers or other
31  hands connected with the working or delivery of the coal for which the vessel is stemmed, or by reason of accidents to mines or
32  machinery, obstructions, embargo or delay on the railway or in the dock: or by reason of fire, floods, frosts, fogs, storms or any cause
33  whatsoever beyond the control of the Charterer affecting mining, transportation, delivery and/or loading of the coal, not to be com-
34  puted as part of the loading time (unless any cargo be actually loaded during such time). In the event of any stoppage or stoppages
35  arising from any of these causes continuing for the period of ~~six~~ *fifteen* running days from the time of the vessel's being ready to load, this
36  Charter shall become null and void; provided, however, that no cargo shall have been shipped on board the vessel previous to such stop-
37  page or stoppages. In case of partial holiday, or partial stoppage of colliery, collieries or railway from any or either of the aforenamed
38  causes, the lay-days to be extended proportionately to the diminution of output arising from such partial holiday or stoppage. If
39  longer detained. Charterer to pay *as per Section 7 "Demurrage and Despatch" of the attached Contract of Affreightment* U.S.
    Currency per running day (or pro rata for part thereof)
40  ~~demurrage. If sooner dispatched, vessel to pay Charterer or his agents~~ *as per Section 7 "Demurrage and Despatch" of the attached*
    *Contract of Affreightment* U.S. Currency per day (or pro rata
41  for part thereof) dispatch money for *lay*                time saved. No deduction of time shall be allowed for stoppage, unless due
42  notice be given at the time to the master or Owner.

43  5.  ~~If any dispute or difference should arise under this Charter, same to be referred to three parties in the City of New York, one~~
44  ~~to be appointed by each of the parties hereto, the third by the two so chosen, and their decision, or that of any two of them, shall~~
45  ~~be final and binding, and this agreement may, for enforcing the same, be made a rule of Court. Said three parties to be commercial~~
46  ~~men.~~ *This Contract will be governed by French Law. The disputes which the present agreement may give rise to, on various*
    *points, including its existence, its interpretation, its fulfilment, its cancellation or its validity shall be resolved by way of*
    *arbitration by the Chambre Arbitrale Maritime de Paris having its office in Paris, 16 Rue Daunou - 75002 Paris, as*
    *provided for in its rules.*

47  6.  The cargo to be loaded, ~~dumped~~ and trimmed by men appointed by the Charterer *free of risk and expense to the Vessel.* ~~at the~~
48  ~~tariff rate of the port at vessel's expense.~~

49  7.  The bills of lading shall be prepared in accordance with the dock or railway weight and shall be endorsed by the master,
50  agent or Owner, weight unknown, freight and all conditions as per this Charter, such bills of lading to be signed at the Char-
51  terer's or shipper's office within twenty-four hours after the vessel is loaded. ~~Master shall sign a certificate stating that the~~
52  ~~weight of the cargo loaded is in accordance with railway weight certificate. Charterer is to hold Owner harmless should any~~
53  ~~shortage occur.~~

54  8.  The Act of God, the king's enemies, restraints of princes and rulers, and perils of the sea *mutually* excepted. Also fire, barratry of
55  the master and crew, pirates, collisions, strandings and accidents of navigation, or latent defects in or accidents to, hull and/or
56  machinery and/or boilers always excepted, even when occasioned by the negligence, default or error in judgment of the pilot, master,
57  mariners or other persons employed by the shipowner, or for whose acts he is responsible, not resulting, however, in any case from
58  want of due diligence by the Owner of the ship, or by the ship's husband or manager. Charterer not answerable for any negligence,
59  default, or error in judgment of trimmers or stevedores employed in loading or discharging the cargo. The vessel has liberty to call
60  at any ports in any order, to sail without pilots, to tow and assist vessels in distress, and to deviate for the purpose of saving life or
61  property, and to bunker. *It is also mutually agreed that this shipment is subject to all terms and provisions of, and all*
    *exemptions from liability in, the Act of Congress of the United States, approved on the 13th day of February, 1893, and*
    *entitled "An Act relating to Navigation of Vessel's, etc..".*

62  9.  The cargo to be discharged by consignee at port of discharge, free of expense and risk to the vessel. *as per above mentioned*
    *Clause 4* ~~at the average rate of~~
63                                     ~~tons per day, weather permitting, Sundays and holidays and after noon on Saturdays excepted~~ provided
64  vessel can deliver it at this rate. If longer detained, ~~consignee~~ *Charterers* to pay vessel demurrage at the rate of *as per Section 7*
    *"Demurrage and Despatch" of the attached Contract of Affreightment* U.S. currency
65  per running day (or pro rata for part thereof). If sooner dispatched. vessel to pay Charterer or his agents *as per Section 7 "Demurrage*
    *and Despatch" of the attached Contract of Affreightment* U.S cur-
66  rency per day (or pro rata for part thereof) dispatch money for *lay* . time saved. Time at *sole/first discharging port* to commence *twelve*
    *(12)* ~~twenty-four (24)~~
67  hours, unless sooner commenced *in which case only time actually used to count*, Sundays and holidays *included*, ~~excepted~~ after
    vessel is ready to unload and written notice given, whether in berth or not. *whether in port or not, whether in free pratique or not,*
    *whether customs cleared or not (See also Section 8 "Time for Loading and Discharging" of the attached Contract of*
    *Affreightment)* ~~even if vessel~~
68  ~~is already on demurrage.~~ and the time allowable for discharging to be calculated on the basis of the bill of lading quantity. In case
69  of strikes, lockouts, civil commotions, or any other causes or accidents beyond the control of the consignee which prevent or delay
70  the discharging, such time is not to count unless the vessel is already on demurrage. *(See also Section 24 of the attached Contract of*
    *Affreightment). Consignee to effect the discharge of the cargo. Vessel to supply at both ends, free of expense to the*
    *Charterers, full light for night work on deck and in the holds as requested.*
71  10  Notice at port of discharge to be given *any time day or night, Sundays and Holidays included.* ~~in writing to consignee's~~
    ~~agent or working day between the hours of 9 a.m. and~~
72  ~~5 p.m. and 9 a.m. and noon on Saturdays.~~
73  11. Shifting time from anchorage place to loading or discharging berth is not to count even if vessel is already on demurrage.
74  12. Opening and closing of hatches at commencement and completion of loading ~~and discharging~~ shall be for Owner's account

and time used is not to count.

13. Lighterage, if any, at discharge port to be at the risk and expense of consignees and time used to count as laytime.

14. In case of average, the same to be settled according to York/Antwerp Rules 1974 *and as amended 1994, and subsequent amendments thereto.* Should the vessel put into any port or ports leaky or with damage, the captain or Owner shall, without delay, inform the Charterer thereof, Captain to telegraph Charterer in case of putting in anywhere.

15. Vessel not to tender before ~~9 a.m.~~ *00.00 hours on* **See Section 9 "Nomination Clause" of the attached Contract of** *Affreightment* and if vessel be not ready at loading port as ordered

before ~~9 a.m.~~ *23.59 hours on* _____, or if any wilful misrepresentation be made respecting the size, position or state of the vessel, Charterer to have the option of cancelling this ~~Charter~~ *Voyage,* such option to be declared on notice of readiness being given.

16. Vessel to be consigned to **Charterers'** _____ agents at port of loading, and to **Charterers'** _____ agents at port of discharge. *Owners/Vessel paying customary agency fees.*

17. Overtime is to be for account of party ordering same. However, if ordered by port authorities, same is to be for Charterer's account Officers and crew overtime expenses to be for Owner's account.

18. *Any* Extra insurance *on cargo.* ~~If any, due~~ *incurred owing* to vessel's age, flag, classification or ownership shall be for Owner's account *and may be deducted from the balance freight in the Charterers' option. The Charterers shall furnish original invoice of insurance company suporting such deduction. It is understood that for tonnage upto/including 15 years old no extra insurance to apply.*

19. No cargo is to be loaded in deeptanks or similar places inaccessible to reach by grabs.

20. ~~Any damage by stevedores shall be settled directly between Owner and stevedores.~~ *See Section 16 "Repairs of Damage Loading and Discharging" of the attached Contract of Affreightment.*

21. Owner shall, at his risk and expense, comply with all applicable rules, regulations and laws relevant to water and/or air pollution at ports of loading and discharging. In cases where vessel calls at a U.S. port, Owner warrants to have secured and carry on board the vessel a Certificate of Financial Responsibility as required under U.S. law.

22. All bills of lading shall include the following three clauses:

NEW JASON CLAUSE; In the event of accident, danger, damage or disaster before or after commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods, and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

CLAUSE PARAMOUNT: This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16th, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any terms of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent but no further.

NEW BOTH-TO-BLAME COLLISION CLAUSE: If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

23. PROTECTION & INDEMNITY BUNKERING CLAUSE: The vessel in addition to all other liberties shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this Charter and there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks, deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

24. *See Section 26 "Voywar 1993" Clause of the attached Contract of Affreightment.* ~~C.S.U.K. WAR RISKS CLAUSES 1 & 2: No bills of lading to be signed for any blockaded port and if the port of dis-charge be declared blockaded after bills of lading have been signed, or if the port to which the ship has been ordered to discharge either on signing bills of lading or thereafter be one to which the ship is or shall be prohibited from going by the government of the nation under whose flag the ship sails or by any other government, the Owner shall discharge the cargo at any other port covered by this Charter Party as ordered by the Charterers (provided such other port is not a blockaded or prohibited port an above-mentioned) and shall be entitled to freight as if the ship had discharged at the port or ports of discharge to which she was originally ordered.~~

~~The ship shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destina-tion, delivery or otherwise howsoever given by the government of the nation under whose flag the vessel sails or any department thereof, or any person acting or purporting to act with the authority of such government or of any department thereof, or by any committee or person having, under the terms of the war risks insurance on the ship the right to give such orders or directions and if by reason of and in compliance with any such orders or directions anything is done or is not done the same shall not be deemed a deviation and delivery in accordance with such orders or directions shall be a fulfilment of the contract voyage and the freight shall be payable accordingly.~~

25. Charterer*/Owner* shall have the privilege of transferring part or whole of the Charter Party to others, *subject to the other ~~party~~'s approval.* Charterer*/Owner* guaranteeing to the

Owner *Charterer* due fulfillment of this Charter Party.

138    to    The Charterer's liability shall cease as soon as the cargo is shipped, and the freight, dead freight and demurrage  on loading
139    (if any) are paid, the Owner having a lien on the cargo for freight, demurrage and average.

140    27    Penalty for non-performance of this agreement, proved damages, not exceeding the estimated amount of freight.

141    28    An address commission of *3.75*              percent on the gross amount of freight, dead freight and demurrage is due by  the vessel
142    and Owner to the Charterer on *shipment of cargo.* payment of freight.

143    29    A commission of *1.25*              percent on the gross amount of freight, dead freight and demurrage is due on payment
144    of freight by the vessel and Owner to *Simpson, Spence and Young, London*

*Additional Clauses here attached 1 - 31 to form part of this Charter Party.*

For and on behalf of *ERH.*
Transfield ER Cape Limited

..................................
Authorized Signature(s)

THE CHARTERERS :

For and on behalf of

FRONT CARRIERS LTD. OF LIBERIA

This Charter Party is a computer generated copy of the AMERICANIZED WELSH COAL CHARTER form printed by authority of the Association of Ship Brokers & Agents (U S A), Inc. (ASBA), using software which is the copyright of Strategic Software Ltd. (SSL). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document, and which is not clearly visible, then the original ASBA approved document shall apply. ASBA and SSL assume no responsibility for any loss or damage caused as a result of discrepancies between the original ASBA approved document and this document.

# CONTRACT OF AFFREIGHTMENT

## DATED LONDON, 9TH AUGUST, 2005

### BETWEEN

### MESSRS. TRAN██████ ER CAPE LTD., OF B.V.I.

### OWNERS

### AND

### MESSRS. FRONT CARRIERS LTD., OF LIBERIA

### AS CHARTERERS


It has been this day mutually agreed the following :

## Section 1 : Duration of the Contract :

The duration of this Contract will be for a period of two (2) firm years starting November, 2005.

## Section 2 – Quantity / Cargo Sizes :

Quantity :

██████████████████ two (██████████ of ████A.) plus one (1) optional cargo in Charterers option. Cargoes to be shipped fairly evenly spread as much as Charterers can.

Charterers to declare the optional cargo latest by close of business Oslo 31st December, 2005.

Cargo Sizes :

Each cargo to be 150,000 metric tons 10 percent more or less in Owners' option of Harmless Coal in Bulk. One up to several grades in Charterers' option to be loaded within vessel's natural segregations.

Cargoes to be loaded always in accordance with I.M.O. recommendations.

Present Intended Scheduling :

First cargo is intended December, 2005 without guarantee.


- 1 -

"TRANSFIELD TONNAGE TO BE NOMINATED"

## CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.



### Section 3 – Loading Ports :

One (1) named berth, one (1) or two (2) ports :

DALRYMPLE BAY Coal Terminal.                                          or in Charterers' option

HAYPOINT Central Queensland Coal Associate Terminal.                 or in Charterers' option

ABBOT POINT Coal Terminal.                                           or in Charterers' option

GLADSTONE RG Tanna Facility.                                         or in Charterers' option

GLADSTONE RG Tanna Facility plus DALRYMPLE BAY
Coal Terminal.                                                       or in Charterers' option

DALRYMPLE BAY Coal Terminal plus GLADSTONE RG
Tanna Facility.                                                      or in Charterers' option

NEWCASTLE TWCS Koorogang Carrigton,                                  or in Charterers' option

PORT KEMBLA Coal Terminal.

Owners option via Cape of Good Hope or Suez Canal.

Should the nominated berths become unsafe for whatever reason beyond the control of Owners, then Charterers and Owners to mutually agree on other loading port or other way of solving the problem and ensuring vessel(s) will be loaded at safe ports/places for ships of this size. It is understood and agreed that neither party is to take any undue advantage from such an arrangement and Owners confirm that they will co-operate as much as possible in order to ensure a smooth solution to any possible problem.

### SECTION 4 : DISCHARGING PORTS :

One (1) named berth, one (1) or two (2) ports :

ROTTERDAM Maasvlakte EMO.                                            or in Charterers' option

ROTTERDAM Maasvlakte EMO plus ANTWERP QUAY 510
ABT or 750 Delwaide Dock in Charterers' option,                     or in Charterers' option

ROTTERDAM Maasvlakte EMO plus DUNKIRK EAST
Sollac Berth (*).                                                    or in Charterers' option

ROTTERDAM Maasvlakte EMO plus HANSAPORT,                             or in Charterers' option

- 2 -

"TRANSFIELD TONNAGE TO BE NOMINATED"

CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.



DUNKIRK WEST QPO Berth plus DUNKIRK EAST
Sollac Berth (*).                                                    or in Charterers' option

GIJON.                                                              or in Charterers' option

FOS Sollac Berth.                                                   or in Charterers' option

GIJON plus FOS Sollac Berth.

(*) DUNKIRK EAST as discharging port to be limited to maximum one (1) cargo.

Should the nominated berths become unsafe for whatever reason beyond the control of Owners, then Charterers and Owners to mutually agree on other discharging port or other way of solving the problem and ensuring vessel(s) will be discharged at safe ports/places for ships of this size. It is understood and agreed that neither party is to take any undue advantage from such an arrangement and Owners confirm that they will co-operate as much as possible in order to ensure a smooth solution to any possible problem.

Owners know the restrictions in the above named ports and will nominate vessels of suitable size and draft assuming that conditions at the port and loading installations will not negatively alter during the Contract period.

Should Charterers request an alternative discharging port. Owners then agree to give FIOST rate on same equivalent timecharter (to be substantiated on open book basis) based on Passero-Hamburg Range including United Kingdom, Spain and Eire.  Such calculation to include bunker price differentials for bunker replenishment at ports other than Rotterdam.

Excluded ports :

A)      The vessel shall not be ordered to nor bound to enter any port where fever or epidemics are prevalent or to which the Master, Officers and Crew by law are not permitted to follow the vessel.

        If for any of the above reasons the vessel is unable to enter the loading port, the voyage in question shall be considered cancelled.

B)      Should a quarantine be declared affecting the port of discharge prior the vessel's entering, the Charterers shall request the Owners to order the vessel to another port, where she can safely discharge, such orders to be given 48 hours after the Master or the Owners have given notices to the Charterers of the quarantine at the port of discharge.

        If the Charterers fail to arrange a substitute port or to give orders within 48 hours as stated above, the detention, if any, to be for their account.

C)      If the vessel has already entered the loading or discharging port, detention by quarantine against the performing vessel for reasons related only to said vessel shall not count as time used.

"TRANSFIELD TONNAGE TO BE NOMINATED"

## CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.

Unless the vessel is already on demurrage, half the time lost in loading or discharging by reason of epidemics ashore shall count as time used in loading or discharging as the case may be. The Charterers, however, shall not be responsible for damages caused by the fact that the Owners cannot deliver their vessel within laydays for a following voyage.

## SECTION 5 : FREIGHT RATES / FREIGHT PAYMENT :

All rates in U.S. Dollars, per metric ton F.I.O.S.T. :

| DALRYMPLE BAY loading : | | |
|---|---|---|
| Rotterdam (basic rate) | | U.S.$ 13.00 |
| Rotterdam plus Antwerp | | U.S.$ 13.80 |
| Rotterdam plus Dunkirk East | (+ 1.95) | U.S.$ 14.95 |
| Rotterdam plus Hansaport (*) | (+ 1.50) | U.S.$ 14.50 |
| Dunkirk West plus East | (+ 1.50) | U.S.$ 14.50 |
| Gijon | (- 0.50) | U.S.$ 12.50 |
| Fos | (0.00) | U.S.$ 13.00 |
| Gijon plus Fos | (+ 2.30) | U.S.$ 15.30 |
| | | |
| GLADSTONE loading : | | (- 0.40) |
| | | |
| Rotterdam | | U.S.$ 12.60 |
| Rotterdam plus Antwerp | | U.S.$ 13.40 |
| Rotterdam plus Dunkirk East | | U.S.$ 14.55 |
| Rotterdam plus Hansaport (*) | | U.S.$ 14.10 |
| Dunkirk West plus East | | U.S.$ 14.10 |
| Gijon | | U.S.$ 12.10 |
| Fos | | U.S.$ 12.60 |
| Gijon plus Fos | | U.S.$ 14.90 |
| | | |
| HAYPOINT loading : | | (0.00) |
| | | |
| Rotterdam | | U.S.$ 13.00 |
| Rotterdam plus Antwerp | | U.S.$ 13.80 |
| Rotterdam plus Dunkirk East | | U.S.$ 14.95 |
| Rotterdam plus Hansaport (*) | | U.S.$ 14.50 |
| Dunkirk West plus East | | U.S.$ 14.50 |
| Gijon | | U.S.$ 12.50 |
| Fos | | U.S.$ 13.00 |
| Gijon plus Fos | | U.S.$ 15.30 |

- 4 -

"TRANSFIELD TONNAGE TO BE NOMINATED"

## CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.

| | |
|---|---|
| **ABBOT POINT loading :** | (0.00) |
| Rotterdam | U.S.$ 13.00 |
| Rotterdam plus Antwerp | U.S.$ 13.80 |
| Rotterdam plus Dunkirk East | U.S.$ 14.95 |
| Rotterdam plus Hansaport (*) | U.S.$ 14.50 |
| Dunkirk West plus East | U.S.$ 14.50 |
| Gijon | U.S.$ 12.50 |
| Fos | U.S.$ 13.00 |
| Gijon plus Fos | U.S.$ 15.30 |
| **NEWCASTLE loading :** | (+ 2.75) |
| Rotterdam | U.S.$ 15.75 |
| Rotterdam plus Antwerp | U.S.$ 16.55 |
| Rotterdam plus Dunkirk East | U.S.$ 17.70 |
| Rotterdam plus Hansaport (*) | U.S.$ 17.25 |
| Dunkirk West plus East | U.S.$ 17.25 |
| Gijon | U.S.$ 15.25 |
| Fos | U.S.$ 15.75 |
| Gijon plus Fos | U.S.$ 18.05 |
| **PORT KEMBLA loading :** | (+ 2.50) |
| Rotterdam | U.S.$ 15.50 |
| Rotterdam plus Antwerp | U.S.$ 16.30 |
| Rotterdam plus Dunkirk East | U.S.$ 17.45 |
| Rotterdam plus Hansaport (*) | U.S.$ 17.00 |
| Dunkirk West plus East | U.S.$ 17.00 |
| Gijon | U.S.$ 15.00 |
| Fos | U.S.$ 15.50 |
| Gijon plus Fos | U.S.$ 17.80 |
| **GLADSTONE plus DALRYMPLE BAY loading :** | (+ 1.00) |
| Rotterdam | U.S.$ 14.00 |
| Rotterdam plus Antwerp | U.S.$ 14.80 |
| Rotterdam plus Dunkirk East | U.S.$ 15.95 |
| Rotterdam plus Hansaport (*) | U.S.$ 15.50 |
| Dunkirk West plus East | U.S.$ 15.50 |
| Gijon | U.S.$ 13.50 |
| Fos | U.S.$ 14.00 |
| Gijon plus Fos | U.S.$ 16.30 |

"TRANSFIELD TONNAGE TO BE NOMINATED"

CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.

| DALRYMPLE BAY plus GLADSTONE loading : | (+ 0.35) |
|---|---|
| Rotterdam | U.S.$ 13.35 |
| Rotterdam plus Antwerp | U.S.$ 14.15 |
| Rotterdam plus Dunkirk East | U.S.$ 15.30 |
| Rotterdam plus Hansaport (*) | U.S.$ 14.85 |
| Dunkirk West plus East | U.S.$ 14.85 |
| Gijon | U.S.$ 12.85 |
| Fos | U.S.$ 13.35 |
| Gijon plus Fos | U.S.$ 15.65 |

(*) At Hansaport quay weight and tonnage dues to be for Charterers' account.

Freight Payment :

Ninety (90) percent of freight to be paid within five (5) banking days from Bill of Lading date.

Balance together with demurrage/despatch, if any, to be paid within fifteen (15) days after documents received and calculations of laytime agreed by both parties.

Freight to be deemed earned as cargo loaded on board, discountless and non-returnable, vessel and/or cargo lost or not lost.

Freight to be paid on Bill of Lading weight.

No in lieu of weighing.

Freight to be paid to Owners' bank account as per invoice for relevant shipment.

SECTION 6 : BUNKER CLAUSE :

No Bunker Adjustment freight.

SECTION 7 : DEMURRAGE AND DESPATCH :

Demurrage shall be paid by Charterers in U.S. Dollars as stated hereunder, per day/pro-rata for all time used in excess if laytime allowed :

U.S.$ 20,000

Despatch to be at half demurrage rate on laytime saved per day or pro-rata both ends.

- 6 -

"TRANSFIELD TONNAGE TO BE NOMINATED"

CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.



## SECTION 8 : TIME FOR LOADING AND DISCHARGING :

Cargo to be loaded and discharged in 6 (six) weather working days of 24 consecutive hours, Sundays and Holidays included, all purposes.

Turn Time :

12 (twelve) hours turn time unless sooner commenced when actual time used to count both ends.

In case of two loading ports and/or two discharging ports used, no turn time to apply at second loading port and/or discharging port.

Delays in loading for draft checks ordered by Master shall not count as laytime used.

Ballasting or deballasting not to count as laytime unless not interfering with loading/discharging operations.

Shifting time from anchorage to loading berth not to count as laytime.

Time at loading and discharging ports to be as follows :

a)     If the discharging berth is available on vessel's arrival at or off the discharging port, notice of readiness can only be tendered after vessel's arrival at the discharging berth.

b)     If the discharging berth is not available on vessel's arrival at or off the discharging port or so near thereunto as she may be permitted to approach, the vessel shall be entitled to give notice of readiness on arrival there, unless vessel already on demurrage, with the effect that laytime counts as if she was in all respects ready to discharge provided that the Master warrants that she is in fact ready in all respects.

c)     If after berthing the vessel is found not to be ready in all respects to discharge the actual time from the discovery thereof until she is in fact ready to discharge shall not count as laytime used.

d)     At loading and discharging, any time lost because of the vessel having to wait for the first suitable tide to reach and enter the port and nominated berth not to count as laytime or time on demurrage.

       Shifting time between anchorage/waiting place to loading/discharging berth not to count as laytime nor as time on demurrage. Only time actually used between the second waiting place (anchorage or berth) and the loading/discharging berths shall count as laytime or as time on demurrage.

       Navigation risks always to be for Owners' account. At loading and discharging ports, any time lost at anchorage due to bad weather, delay or pilots, tugs or any reason connected with vessel's navigation before arrival at Charterers' berth shall not count as laytime.

**"TRANSFIELD TONNAGE TO BE NOMINATED"**

**CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.**

Bunkering if delaying loading and/or discharging operations not to count as laytime, even if vessel is already on demurrage.

e)   At load port minor stoppage (i.e. stoppage of more or less ten (10) minutes) due to mechanical or electrical breakdowns to count as laytime.

In case of breakdown of crane(s) at discharging port, laytime shall count pro-rata of cranes used but deduction of time will not exceed 8 hours per call.

Any warping alongside the berth at loading and discharging shall be for Owners' account and time so used shall not interrupt laytime.

f)   Owners guarantee that distance from waterline to top of hatch-coaming will not exceed 13.70 metres at any time throughout discharge operations at DUNKIRK.  If the distance is over, time lost for deballasting not to count.

All expenses, if any, resulting from vessel's non-compliance with above specification to be for Owners' account.

Owners have to comply with Charles de Gaulle break waters regulations which are available at the port authorities of Dunkirk.

g)   Time lost due to "black tides" at Dunkirk to count as laytime used.  Shifting cost between Dunkirk West and Dunkirk East to be for Owner's account but shifting time to count as laytime.

Shifting at Dunkirk East to be for Charterers' account and time to count as laytime.

h)   At loading and discharging ports, time lost for draft checks ordered by Master not to count as laytime or time on demurrage.  Final and intermediate draft survey(s) always to be part of laytime.

i)   In case of storm blowing more than 80 km/h, discharging operations to be stopped and such time lost not to count as laytime.

## SECTION 9 : PERFORMING VESSEL :

All vessels nominated by Owners for use under this Contract shall be vessels owned/managed/chartered or controlled by Owners and will comply in all respects with the requirements of the Charter Party.

Vessels shall be :

- - Maximum 15 years old, but Owners to have on a case by case basis the option, subject to Charterers' prior approval which not to be unreasonably withheld, to nominate vessels upto 20 years of age.  Extra insurance to be for Owners' account.

- 8 -

## "TRANSFIELD TONNAGE TO BE NOMINATED"

## CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.

- Selftrimming geared or gearless single deck bulk carriers / OBO's with holds suitable for normal grab discharge. classed Highest Lloyds 100A1 or equivalent. ISM in order.

- No vessel shall have corrugations in holds. which are arranged horizontally.

### SECTION 10 : NOMINATION CLAUSE :

Nomination of the performing vessel to remain subject to stem/Shippers/Receivers/Charterers approval and receipt and approval of all filled out questionnaire including Arcelor Questionnaire certificates and/or P. and I. wording. to be lifted two (2) working days after proper nominations.

Around 30 (thirty) days prior the beginning of each quarter of first shipment for one year. Charterers will do their utmost to give Owners a tentative schedule program.

Not less than 45 (forty five) days prior beginning of the desired laydays/cancelling dates with 15 days spread. the Charterers will notify the Owners of the program i.e. intended loading port and discharging port with combination of loading/discharging ports if any.

Owners to nominate within 10 (ten) days a vessel or substitute.

On receipt of such nomination. Charterers shall confirm same with stem number within 2 (two) working days.

Owners have the option to provide a substitute vessel upto 15 (fifteen) days prior beginning of laydays and then will nominate performing vessel advising best E.T.A. load port / estimated intake and also will advise vessel's itinerary via Cape or Suez. Owners will also advise approximate E.T.A. at discharging port.

Charterers will confirm the nomination of the performing vessel within 2 (two) working days after receipt of nomination which not to be unreasonably withheld.

When nominating performing vessel. Owners to provide following information :

        Name :
        Built :
        Flag :
        Class :
        Type :
        DWT :
        TPC / TPI :
        LOA :
        Beam :
        GRT :
        NRT :
        Capacity :
        Holds :
        Hatchsizes :

**"TRANSFIELD TONNAGE TO BE NOMINATED"**

**CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.**



Name of Owners :

P. and I. Club :
Confirmation that the vessel has full coverage for intended trade date of entering such membership and until when premiums are paid.

- Vessel to be suitable in construction and cleared for the carriage of coal in bulk and suitable for grab discharge.

- No cargo to be loaded in places inaccessible to grabs, no cargo to be loaded in wing tanks/deeptanks/bunker tanks or water tanks. Any extra expenses caused by Owners not complying with above will be for Owners' account and additional time consumed will be added to loading or discharging allowed laytime as the case may be.

- Vessel is fully ITF or equivalent bona fide acceptable to ITF, classed Lloyds 100 A1 or equivalent as recognised by Charterers' Underwriters.

- Owners guarantee they/their tonnage are not subject to any boycott at any time during the performance of the voyage.

- Vessel to be fully insured for hull and machinery against total loss.

- Owners guarantee that vessel is suitable for the trade and port(s)/berth(s) in all respects and Owners confirm that they are conversant with the trade.

- Owners guarantee that the vessel is in full conformity with latest up to date Australian regulations/rules.

- Neither Owners/Timecharter Owners/vessel's management or the vessel is/are barred by a United Nations embargo.

- Neither Owners/Timecharter Owners/vessel's management or the vessel have relationship with any kind of Yugoslavian interest.

- Owners class always to be member of I.A.C.S.

- P. and I. Wording :
  "Owners warrant that the vessel is fully insured with a P. and I. Club including cargo liabilities. Owners' P. and I. Club who is a member of the International Group of P. and I. Clubs and will remain so for the currency of the Charter Party."

When nominating Owners shall provide a copy of the relevant document of compliance (D.O.C.) and Safety Management Certificate (S.M.C.) to the Charterers.

"TRANSFIELD TONNAGE TO BE NOMINATED"

## CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.



### SECTION 11 :

a)    Owners shall during the terms of this agreement provide sufficient tonnage to perform all the voyages under this agreement. With respect to this obligation, Owners shall not be able to claim force majeure if and as far as the prevention of the performance of this obligation is – wholly or partially – due to risks resulting from Owners' other fleet commitments. Owners shall therefore, if such prevention occurs, be held fully responsible for the performance of this obligation. ╱

b)    Without prejudice to the provision of the other paragraphs of this section, the party concerned shall be excused from the performance of this agreement or an obligation thereof for the duration and in proportion to the extent that such party if prevented by reason of force majeure.

Such force majeure shall be deemed to exist if the performance of this agreement or an obligation thereof will be partially or wholly prevented as a result of any circumstances that could not be foreseen by the party concerned and has occurred beyond his will or control and that at the same time is not due to negligence of that party itself or of persons or due to defects of objects, which that party used of the fulfilment of this agreement.

c)    A case of force majeure with regard to a voyage in which case the provisions of the attached Charter Party are applicable does only apply to the voyage concerned and does not affect the obligations of the Owners under this agreement, unless fulfilment of these obligations would become impossible for them as a result of such cases.

d)    If one of the following circumstances occurs, Charterers shall be excused from their obligations under this agreement for the duration and in proportion to the extent of such circumstances :

-    a supplier of the coal cannot as result of a cause beyond his will or control produce and/or deliver the coal. Charterers will however do their utmost to nominate another port of loading :
-    stoppages or breakdowns off, or damages to, or destruction of installations and/or machinery and/or plant of Charterers.

e)    If a case of force majeure or circumstances mentioned in paragraph d) of this section occurs, the party concerned shall give written notice thereof to the other party as soon as possible.

f)    Voyages not performed by Owners by reason of force majeure and/or circumstances mentioned in paragraph d) of this section shall be deducted from the annual voyage.

g)    If, as a result of force majeure or circumstances mentioned in paragraph d) of this section, during a period of twelve months or longer, no voyages have been performed under this agreement, each party has the right to cancel the agreement by written notice to be given by means of a registered letter.

h)    In cases mentioned in paragraph b), d), f) and g) of this section, all claims for damages and /or costs from one party to the other will be excluded.

"TRANSFIELD TONNAGE TO BE NOMINATED"

## CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.

### SECTION 12 :

In the event that U.S.A., Great Britain, France, Russia, Japan, China, the Netherlands, Germany, Australia become involved in major war directly between one with another and same affects seriously the shipments under this transport agreement, both Owners und Charterers have to meet in order to mutually decide about the further execution of this agreement.

### SECTION 13 :

Arbitration Clause :

This Contract will be governed by French Law.

The disputes which the present agreement may give rise to, on various points, including its existence, its interpretation, its fulfilment, its cancellation or its validity shall be resolved by way of arbitration by the Chambre Arbitrale Maritime de Paris, having its office in Paris, 16 Rue Dounou – 75002, as provided for in its rules.

General Average :

General Average shall be adjusted, stated and settled in London, according to the York Antwerp Rules 1974, as amended 1994.

### SECTION 14 :

This agreement, as well as the attached Charterers "Amwelsh" Charter Party, shall be governed by French Law.

### SECTION 15 :

At port of loading/discharge, the Master shall apply to and employ Agents nominated by Charterers, Owners paying customary fees.

### SECTION 16 : REPAIRS OF DAMAGE AT LOADING AND DISCHARGING :

Vessel's tank tops and shaft tunnel (if any), ladders and all other fixtures and equipment within the holds are to be customarily protected to prevent damage by grabs and bulldozer, otherwise Owners to be responsible for any consequences.

Charterers shall be free of any liability and not responsible for any damages to the vessel unless such damage is caused by any negligence, default or error of judgement of the stevedores in loading and/or discharging the vessel. In case of damage to vessel during loading and/or discharging, notice must be presented in writing by the Master before the vessel departs or as soon as practicable from loading and/or discharging berth, failing which Charterers are not responsible.

- 12 -

"TRANSFIELD TONNAGE TO BE NOMINATED"

CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.

With a view to establishing damage, if any, solely attributed to the operations of loading and/or discharging fair wear and tear excepted. Charterers' agents are to be notified by the Master or vessel's agents immediately after occurrence time permitting or as soon as practicable and such damage is to be agreed by surveyor appointed by each party. If surveyor not available damage report to be drawn up by the Master and signed by stevedores or Charterers' agents. Said repairs to be carried out at Owners' convenience. Prior to repairs Owners will inform Charterers as to the place and time of repairs and estimated cost.

Any time reasonably required to complete loading and/or discharging damage repairs set out in the surveyor's statement and for which the stevedores are liable shall count as laytime but only if the vessel is delayed after her normal sailing time.

Owners agree to and do hereby hold harmless Charterers for all damages to wharves and installations and loading and/or discharging and other equipment caused by the vessel.

## SECTION 17 : GRAB DISCHARGE :

Owners warrant that the vessel is in every way suitable to enable the entire cargo to be discharged by grabs. Should Owners be in breach of this warranty and should cargo be loaded and trimmed in deep tanks, tween-decks or bunker spaces or in any area not readily accessible to grabs (hereinafter referred to as "inaccessible areas"), any and all extra expenses and any loss of time in such loading and trimming and any and all extra expenses over and above the cost of normal grab discharge and any and all time lost by reason of loading into and discharging from such inaccessible areas shall be for Owners' account.

Charterers' representatives and Master to issue a joint statement at discharge port stating :

a)    tonnage, if any, actually discharged from inaccessible areas,
b)    any and all time lost by reason of discharge from inaccessible areas.

## SECTION 18 : NOTICES AND LOADING / DISCHARGING PORT ORDERS :

Owners to give to :

-    Charterers

-    Messrs. ATIC Services Paris c/o L.S.S. (e-mail : chartering@lsscape.com. or fax no. 33 1 43623489).

-    ATIC Services Asia/Pacific
     Suite 1003, Level 10
     St. Martins Tower
     31 Market Street
     Sydney NSW 2000
     Australia
     Telephone : (61) 2 92690020 / Fax : (61) 2 92618241

- 13 -

**"TRANSFIELD TONNAGE TO BE NOMINATED"**

**CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.**

-        and to Charterers' agents at loading port

notice on fixing, then 15 (fifteen), 7 (seven) and 2 (two) days notice of vessel's expected readiness to load and approximate quantity vessel will lift.

If Owners do not give notice as per Charter Party, they are to be held responsible for all consequences.

Notices at discharging port to be given to :

-        Agents nominated by Charterers

-        Charterers

-        Messrs. ATIC Services Paris c/o L.S.S.

Notice Clause for Discharging Port :

On departure from loading port, Master to advise Charterers and agents at discharging port stating :

-        Communication datas of the vessel (e-mail/Satcom/etc .....)
-        Date of sailing
-        Tonnage loaded
-        E.T.A.
-        Expected fore and aft draft on arrival

The Master is to send to Charterers and their agents his position and E.T.A. once a week (every Monday), and also 15 days/10 days E.T.A. at discharging port.

Seven (7) days before E.T.A., Master to ask confirmation of discharging port. When the discharging port is definitely assigned, Master to send 5 days and 3 days notice followed by 48/24 hours E.T.A. notice to Charterers and agents.

If Owners/Master do not give notices as per Charter Party, they are to be held responsible for all the consequences unless due circumstances beyond Master's/Owners' control.

Failure by Charterers to give timely orders for the first and/or subsequent discharging port(s) does not remove their right to give such orders. Furthermore, Charterers have the right to change discharging port(s) already given and/or to order vessel to interrupt her voyage and anchor at a safe place en route, pending further instructions. In such case, Charterers shall reimburse Owners for extra provided deviation expenses/costs.

**SECTION 19 : ISM CLAUSE :**

Non-compliance with the requirements of the ISM Code shall be deemed a breach of the Charter Party. The requirements of the International Safety Management (ISM) Code are hereby incorporated into the terms of this Charter Party.

## "TRANSFIELD TONNAGE TO BE NOMINATED"

## CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.

Owners warrant that as from the 1st July 1998 a Safety Management System in accordance with the ISM Code is fully implemented. Owners further warrant that they have a valid Document of Compliance (DOC) and that the vessel has valid Safety Management Certificate (SMC).

Upon request the Owners or the Master of the vessel shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

If the vessel is found not to be in compliance with the ISM Code and/or the competent official body or authority having jurisdiction prevents the vessel from conducting cargo operations, and forces the vessel to leave port without loading or unloading cargo, the Owners to take immediate steps in order to rectify such situation.

Failing which the Owners shall indemnify the Charterers for all damages arising from the breach including, but not limited to additional costs of replacement freight, sales contact penalties, and storage charges assessed as a result of delays caused.

In the event of any delay to the vessel caused by non-compliance with the requirements of the ISM Code, laytime or time on demurrage shall not count.

### SECTION 20 : GEAR AND LIGHT :

Whenever required, vessel shall supply, free of expense to Charterers, gear, runners, ropes and slings as on board. Whenever required, vessel shall also supply free use of light as on board, which shall always be sufficient to carry out night work.

### SECTION 21 : GEAR CERTIFICATE :

Deleted.

### SECTION 22 : POLLUTION CLAUSE :

Owners shall at their risk and expense comply with all applicable rules, regulations and laws relevant to water and/or air pollution at ports of loading and discharging.

This Contract has been entered into as of 9th August, 2005, and any regulations and restrictions concerning pollution that will subsequently become applicable at loading and at discharging ports agreed under this Contract, should they adversely affect the performance of the Contract, will be the subject of a meeting between Owners and Charterers in order to find a mutually acceptable solution.

**"TRANSFIELD TONNAGE TO BE NOMINATED"**

**CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.**

### SECTION 23 : FORCE MAJEURE :

Time lost by reason of cases of Force Majeure, war, insurrection, civil commotion, political disturbances, riots, strikes or lockouts, floods, landslides, frost, stoppages on railway, whether partial or total, or river, canal, quay, wharf, jetty, rope or cable way, at loading or discharging plants and equipment, lack of trucks, stoppage of miners or workmen or other hands connected with the mining or handling of the cargo (for which the stem has been granted), breakdown of machinery at the mines, whether partial or general, or by reason of any causes of whatsoever kind or nature beyond he control of the Charterers or their Agents, supplying, loading, discharging or conveying the cargo from the mines to the vessel, shall not be computed in the loading or discharging time.  If a case such as above should last longer than 72 hours, clause "GENCON General Strike Clause" to come into force.

This Clause only reflects cases of Force Majeure and is not applicable for cases of minor technical breakdowns, for instance electrical power failure, stoppages on belts, crane breakdowns, etc....

### SECTION 24 : AMENDED GENCON STRIKE CLAUSE :

Neither the Charterers nor the Owners shall be responsible for the consequences of any strikes or lock-outs preventing or delaying the fulfilment of any obligation under this Contract.

If there is a strike or lock-out affecting the loading of the cargo, or any part of it, when the vessel is ready to proceed from her last port or at any time during the voyage to the port or ports of loading or after her arrival there, the Master or the Owners may ask Charterers to declare that they agree to reckon the laydays as if there were no strike or lock-out.   Unless the Charterers have given such declaration in writing (by telegram, if necessary) within 24 hours, the Owners shall have the option of cancelling this contract.

If part cargo has already been loaded, the Owners must proceed with same (freight payable on loaded quantity only) having liberty to complete with other cargo on the way for their own account.  Such cargo to be properly separated from Charterers' cargo at Owners' risk and expense.

If there is a strike or lock-out affecting the discharge of the cargo on or after vessel's arrival at or off the port of discharge and same has not been settled within 48 hours, the Receivers shall have the option of keeping vessel waiting until such strike or lock-out is at an end against paying half demurrage after expiration of the time provided for discharging, or of ordering the vessel to a port where she can safely discharge without risk of being detained by strike or lock-out.  Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the strike or lock-out affecting the discharge.

On delivery of the cargo at such port, all conditions of this Charter Party and of the Bill(s) of Lading shall apply and the vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

- 16 -

"TRANSFIELD TONNAGE TO BE NOMINATED"

CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.

### SECTION 25 : NEGLIGENCE CLAUSE :

The act of God, perils of the sea, fire, barratry of the Master and/or crew, enemies, pirates and thieves, arrest and restraints of princes, rulers and people, collisions, stranding and other accidents of navigation excepted, even when occasioned by negligence, default or error of judgement of the pilot, Master, mariners or other servants of the Ship-Owners.

Vessel is not responsible for losses through explosion, bursting of boilers, breakage of shafts or any latent defect of machinery or hull not resulting from want of due diligence by the Owners of the vessel or any of them, or by the ship's husband or manager.

### SECTION 26 : VOYWAR 1993 :

1)  For the purpose of this Clause the words :

    a)  "Owners" shall include the Shipowners, bareboat Charterers, Disponent Owners, Managers or other operators who are charged with the management of the Vessel, and the Master; and

    b)  "War Risks" shall include any war (whether actual or threatened) act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades, (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

2)  If at any time before the vessel commences loading, it appears that in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose or is likely to expose the vessel, her cargo, crew or other persons on board the vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage or may refuse to perform such part of it as may expose, or may be likely to expose, the vessel, her cargo, crew or other persons on board the vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports and at the port or ports nominated by the Charterers, the vessel, her cargo, crew, or other persons onboard the vessel may be exposed or may be likely to be exposed, to War Risks; the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

- 17 -

"TRANSFIELD TONNAGE TO BE NOMINATED"

CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.

3)   The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage or on any part thereof, or to proceed through any canal or waterway or to proceed to or remain at any port or place whatsoever where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the vessel, her cargo (or any part thereof), crew or other persons on board the vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage.  The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

4)   If at any stage of the voyage after the loading of the cargo commences, it appears that in the reasonable judgement of the Master and/or the Owners, the vessel, her cargo, crew or other persons on board the vessel may be or are likely to be exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken.  In this event the Owners shall be entitled if the total extra distance exceeds 100 miles to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

5)   The vessel shall have liberty :

   a)   to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any way whatsoever, which are given by the Government of the Nation under whose flag the vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;

   b)   to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risk insurance;

   c)   to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community the effective orders of any other Supernational body which has the right to issue and give the same and with national laws aimed at enforcing the same to which the Owners are subject and to obey the orders and directions of those who are charged with their enforcement;

- 18 -



**"TRANSFIELD TONNAGE TO BE NOMINATED"**

**CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.**

    d)   to discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier;

    e)   to call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to interment, imprisonment or other sanctions:

    f)   where cargo has not been loaded or has been discharged by the Owners under any provisions of this clause to load other cargo for the Owners own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards in a contrary direction to the ordinary or customary route.

    6)   If in compliance with any of the provisions of sub clauses 2) to 5) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage.

## SECTION 27 : CANCELLING CLAUSE :

The Charterers shall have the option of cancelling the voyage in question if the vessel be not ready to load before twelve midnight (24.00 hours) on the cancelling dates.

If it appears that the vessel will be delayed beyond the cancelling date, the Owners shall, as soon as they are in a position to state with reasonable certainty the day on which the vessel should be ready, give notice thereof to the Charterers entitling them either to exercise their option of cancelling the Charter Party within three working days of the receipt by Charterers of such notice, or either not to do so, the fifth (5th) day after the readiness date stated in the Owners' notice being regarded as the new cancelling date.

If the vessel will be further delayed (Owners repeating same regarding notices towards Charterers); and if Charterers are unable to further extend the new cancelling date giving notice hereof to Owners within two working days of receipt of such notice. Owners will endeavour to substitute the nominated vessel by an earlier vessel within five days after receipt of Charterers' reply, otherwise Charterers will have the option to cancel the voyage in question or not to do so, the fifth day after the readiness date stated in the Owners' notice being regarded as the new cancelling date.

The Charterers shall in any event declare whether they exercise any option of cancelling not later than the time of the vessel's readiness to load.

## SECTION 28 : RESPONSIBILITIES AND IMMUNITIES :

    A)   The Hague Rules contained in the International Convention for the Unification of Certain Rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment, shall apply to this Contract and to any Bill of Lading issued hereunder.

**"TRANSFIELD TONNAGE TO BE NOMINATED"**

**CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.**



When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactment are compulsorily applicable, the terms of the said convention shall apply.

B) In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd, 1968 – The Hague Visby Rules – apply compulsorily, the provisions of the respective legislation shall apply.

C) The Owners shall in no case be responsible for loss of or damage to cargo howsoever arising prior to loading into and after discharging from the vessel or while the goods are in the charge of another Owner nor in respect of deck cargo and live animals. This sub-clause shall not detract from the Owners' obligations under Clause 4 of Orevoy Charter Party.

D) Save to the extent otherwise in this Charter Party expressly provided, neither party shall be responsible for any loss or damage or delay or failure in performance hereunder resulting from Act of God, war, civil commotion, quarantine, strike, lockouts, arrest or restraint of princes, rulers and peoples or any other event whatsoever which cannot be avoided or guarded against.

**SECTION 29 :**

Deleted.

**SECTION 30 :**

Each voyage will be governed by the conditions of the attached Charterers' "Amwelsh" Charter Party.

**SECTION 31 :**

Owners/Vessels to comply fully with latest up to date Dalrymple Bay Coal Terminal / Australian Regulations.

Charterers' Questionnaire to be incorporated in Contract of Affreightment / Charter Party.

**OWNERS :**                                    **CHARTERERS :**

For and on behalf of
Transfield ER Cape Limited

..........................................
Authorized Signature(s)

- 20 -

"TRANSFIELD TONNAGE TO BE NOMINATED"

CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.

### CHARTERERS' QUESTIONNAIRE

. When nominating Owners to advise :

Vessel's description :

| | |
|---|---|
| Name | : |
| Flag | : |
| Built | : |
| Where | : |
| Type | : |
| Gear | : |
| Tons Deadweight | : |
| Draft | : |
| LOA | : |
| Beam | : |
| Holds / Hatches | : |
| Type of Hatchcovers | : |
| GT | : |
| NT | : |
| Call Sign | : |
| Satcom / Telex | : |
| TPI / TPC | : |
| P. and I. Club | : |
| Classification Society | : |
| Vessel is fully ITF approved | : |
| Distance from waterline to top of hatchcoaming | : | if required by Charterers not to exceed .. feet both ends |
| Hold cubic breakdown | : | 1 |
| | | 2 |
| | | 3 |
| | | 4 |
| | | 5 |
| | | 6 |
| | | 7 |
| | | 8 |
| | | 9 |
| | | Total |

All space is guaranteed suitable for grab discharge and available in unobstructed clear main holds only.

Owners' Name                        :

Speed                        :        Vessel to perform ballast and laden voyages at full
                                      speed

- 21 -

## "TRANSFIELD TONNAGE TO BE NOMINATED"

## CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.

| | | |
|---|---|---|
| P. and I. Club | : | Name |
| | | Owners guarantee that vessel's P. and I. Club is a member of the International Group of P. and I. Clubs and will remain so throughout the duration of the Charter Party. |
| | | Confirmation that the vessel has full coverage for intended trade at date of entering such membership and until when premiums are paid. |
| Classification | : | Owners guarantee that vessel classification society is a member of the International Association of Classification Societies and will remain so throughout the duration of this Charter Party. |

Hull and Machinery Insured with     :

Insured Value     :

Last Drydock     Where     :
                 When     :

Last Special Survey     Where     :
                        When     :

Casualty and Pollution History     :     Collision, grounding, pollution (oil-bunker spills and others), fire, cargo damage etc ...... over last 2 years).

Last Port State Control Inspection     :
                  Where     :
                  When     :
                  Problem     :
                  Vessel passed without recommendation or detention :

ISM : Document of Compliance (D.O.C.) and Safety Management Certificate (S.M.C.) to be faxed on to the Charterers.

Current Ownership :
How long vessel has been in current Ownership :

Last Charter Party date with ATIC :

Has vessel been in lay up (when/where/period) :

Warranties :
Owners warrant that vessel not be sold for scrap after this voyage :
Owners warrant that officers and crew are fluent in English :

"TRANSFIELD TONNAGE TO BE NOMINATED"

CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.

Last four cargoes and Charterers :
Last vessel dry bulk cargo :
The certificates of P. and I. / Hull and Machinery / Class / ISM to be faxed on nominating final performing vessel.

Performing vessel to be subject to Shipper(s)/Receivers/Charterers and Head-Charterers' approval one (1) working day after Owners' nomination provided all documents/certificates/required information are in Charterers' hands.

(For DUNKIRK only)
Owners when nominating the performing vessel will provide following details for Charterers' approval :

A)  Ship's name (including former name(s), if any).
B)  Ship's type.
C)  Summer deadweight.
D)  Flag.
E)  Extreme breadth i.e. the maximum breadth to the outside of the ship's structure and in paddle ship include the paddle boxes.
     Figure must show two figures after the comma.
F)  Extreme length with two figures after the comma.
G)  Draft.
H)  The following radio must be lower than 10 :

$$\frac{\text{Summer Dwat}}{\text{Total power of the engine (BHP)}}$$

I)  Revolution on full-ahead manoeuvring speed and full astern manoeuvring speed must be the same.
J)  The bridge wings must extend up to the maximum breadth of the ship at the midship section.

* * * * *

- 23 -

EXHIBIT 2

## Voyage Printout (Adjusted)

Printed Date: 29.06.07 13:43
Created By: JF
Page: 1 of 1

| | | | | |
|---|---|---|---|---|
| Start Date | 08.mai.2007 | Reference No. | ANSAI001 | |

| Vessel | ANANGEL SAILOR | | | | | Freight | | 3 792 915 |
|---|---|---|---|---|---|---|---|---|
| Vessel Size | 171 | | | | | Various Revenue | | 0 |
| | 681 | | | | | Demurrage | | 375 000 |
| | Speed | FO | | DO | FO | GROSS REVENUE | | 4 167 915 |
| Ballast | 14,76 | 62,00 | At Sea | 0,00 | | Commission | | 104 198 |
| Loaded | 13,81 | 62,00 | In port | 1,80 | 1,50 | Despatch | | 0 |
| Ballast Port | SHANGHAI | | | | | NET REVENUE | | 4 063 717 |

| | | | | | Port Cost Load | | 65 000 |
|---|---|---|---|---|---|---|---|
| Port Rotation | CAPE LAMBERT / DUNKIRK | | | | Port Cost Dis. | | 310 000 |
| Charterer | Rio Tinto | | | | Port Cost Other | | 0 |
| Broker | | | | | Canal Cost | | 290 000 |
| | | | | | ILOHC | | 0 |
| Cargo Quantity | 168 574MT | | | | Handling Cost | | 0 |
| Commodity | | SF | | 0,0 | Various Cost | | 15 825 |
| Freight | USD 22,50/MT | | | | Freight Cost | | 0 |
| Flat Rate | 0,00 | Min Quantity | | 0,00 | FO | 370/MT | 2 538,299MT | 939 281 |
| Broker Com. | 1,25 | Addr. Com. | | 1,25 | DO | 620/MT | 51,100MT | 31 682 |
| Demurrage Rate | 0 | Despatch Rate | | 0 | TC Equivalent | 35 491 | Contr. | 2 411 950 |
| Terms | 7 D | | | | TC Cost/Day | 66 000 | 3,8% | 4 317 175 |
| | | | | | Ballast Bonus | 0 | 3,8% | 0 |
| Waiting | 0,00 | | | Miles | Breakeven/Day | | 0 |
| Ballast passage | 8,81 | | | 3 273 | Meals and Cables | | 3 398 |
| Loaded passage | 31,17 | | | 9 336 | VOYAGE RESULT | | -1 908 624 |
| Canal Passage | 1,00 | | | | | | |
| Loading | 22,48 | | | | | | |
| Discharging | 3,50 | | | | | | |
| Extra In Port | 1,00 | | | | | | |
| TOTAL DAYS | 67,96 | | | | | | |
| Days Offhire | 0,00 | | | | | | |

**REMARK ( )**

### PORT ROTATION

| Port | RFC | At Sea | Miles | Port Cost | Handling Cost | Arrival date | Departure date | In Port |
|---|---|---|---|---|---|---|---|---|
| SHANGHAI | B | 0,00 | 0 | 0 | 0 | 08.05.07 10:30 | 08.05.07 10:30 | 0,00 |
| SHANGHAI | B | 0,00 | 0 | 0 | 0 | 08.05.07 10:30 | 08.05.07 10:30 | 0,00 |
| PORT WALCOTT | L | 8,81 | 3 273 | 65 000 | 0 | 17.05.07 06:00 | 09.06.07 05:30 | 22,98 |
| SUEZ CANAL | C | 21,34 | 6 080 | 290 000 | 0 | 30.06.07 08:46 | 01.07.07 08:46 | 1,00 |
| DUNKIRK | D | 9,82 | 3 256 | 310 000 | 0 | 11.07.07 03:32 | 15.07.07 03:32 | 4,00 |

### BUNKER PLAN

| Port | FO Arr. | FO Bunk. | FO Price | FO Dep. | DO Arr. | DO Bunk. | DO Price | DO Dep. |
|---|---|---|---|---|---|---|---|---|
| SHANGHAI | 912,930 | 1 410,000 | 379,50 | 2 322,930 | 89,200 | 0,000 | 0,00 | 89,200 |
| SHANGHAI | 2 322,930 | 459,567 | 393,00 | 2 782,497 | 89,200 | 0,000 | 0,00 | 89,200 |
| PORT WALCOTT | 2 229,400 | 0,000 | 0,00 | 2 185,900 | 89,100 | 0,000 | 0,00 | 47,800 |
| SUEZ CANAL | 862,544 | 0,000 | 0,00 | 861,044 | 47,800 | 0,000 | 0,00 | 46,000 |
| DUNKIRK | 251,948 | 700,000 | 370,00 | 944,198 | 46,000 | 45,000 | 700,00 | 83,100 |

# EXHIBIT 3

# Voyage Printout (Adjusted)

Printed Date: 29.06.07 15:24
Created By: JF
Page: 1 of 1

| Start Date | 21.mai.2007 | Reference No. | CSGRO001 |
|---|---|---|---|

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Vessel | CHINA STEEL GROWTH | | | | | Freight | 2 549 250 |
| Vessel Size | 175 | | | | | Various Revenue | 0 |
| | 775 | | | | | Demurrage | 833 750 |
| | | | | | | **GROSS REVENUE** | **3 383 000** |
| | Speed | FO | | DO | FO | | |
| Ballast | 14,76 | 55,00 | At Sea | 0,00 | | Commission | 126 862 |
| Loaded | 13,33 | 57,50 | In port | 0,00 | 3,00 | Despatch | 0 |
| | | | | | | **NET REVENUE** | **3 256 138** |
| Ballast Port | KAOHSIUNG | | | | | | |
| | | | | | | Port Cost Load | 92 500 |
| | | | | | | Port Cost Dis. | 270 000 |
| Port Rotation | DALRYMPLE / CL - ROTTERDAM - ANTWERP | | | | | Port Cost Other | 0 |
| Charterer | Atic | | | | | Canal Cost | 285 000 |
| Broker | Lorentzen & Stemoco | | | | | ILOHC | 0 |
| | | | | | | Handling Cost | 0 |
| Cargo Quantity | 165 000MT | | | | | Various Cost | 6 000 |
| Commodity | COAL | | SF | | 0,0 | Freight Cost | 0 |
| Freight | USD | 15,45/MT | | | | FO | 365/MT | 2 973,910MT | 1 086 229 |
| Flat Rate | | 0,00 | Min Quantity | | 0,00 | DO | 650/MT | 1,800MT | 1 170 |
| Broker Com. | | 1,25 | Addr. Com. | | 2,50 | TC Equivalent | 16 010 | Contr. | 1 515 238 |
| Demurrage Rate | | 23 000 | Despatch Rate | | 11 500 | | | | |
| | | | | | | TC Cost/Day | 84 000 | 3,8% | 7 651 779 |
| Terms | 6,5D | | | | | Ballast Bonus | 0 | 3,8% | 0 |
| | | | | | | Breakeven/Day | | | 0 |
| Waiting | 0,00 | | | | Miles | Meals and Cables | | | 4 732 |
| Ballast passage | 9,03 | | | | 3 414 | | | | |
| Loaded passage | 39,88 | | | | 12 760 | **VOYAGE RESULT** | | | **-6 141 273** |
| Canal Passage | 1,50 | | | | | | | | |
| Loading | 1,50 | | | | | | | | |
| Discharging | 3,25 | | | | | | | | |
| Extra In Port | 39,48 | | | | | | | | |
| **TOTAL DAYS** | 94,64 | | | | | | | | |
| Days Offhire | 0,00 | | | | | | | | |

**COMMENT**
expected waiting days on demurrage 36,25 days

**REMARK ( )**

| PORT ROTATION | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Port | | RFC | At Sea | Miles | Port Cost | Handling Cost | Arrival date | Departure date | In Port |
| KAOHSIUNG | | B | 0,00 | 0 | 0 | 0 | 21.05.07 09:36 | 21.05.07 09:36 | 0,00 |
| TORRES STRAIT | | C | 7,28 | 2 579 | 0 | 0 | 28.05.07 18:18 | 29.05.07 06:18 | 0,50 |
| DALRYMPLE BAY | | L | 1,75 | 835 | 92 500 | 0 | 31.05.07 00:25 | 31.05.07 00:00 | 39,98 |
| SUEZ CANAL | | C | 28,96 | 9 268 | 285 000 | 0 | 07.08.07 16:06 | 08.08.07 16:06 | 1,00 |
| ROTTERDAM | | D | 10,48 | 3 355 | 150 000 | 0 | 19.08.07 02:43 | 22.08.07 20:43 | 3,75 |
| ANTWERP | | D | 0,43 | 137 | 120 000 | 0 | 23.08.07 07:00 | 23.08.07 19:00 | 0,50 |

| BUNKER PLAN | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Port | | FO Arr. | FO Bunk. | FO Price | FO Dep. | DO Arr. | DO Bunk. | DO Price | DO Dep. |
| KAOHSIUNG | | 1 249,700 | 2 340,000 | 354,56 | 3 589,700 | 103,100 | 0,000 | 0,00 | 103,100 |
| TORRES STRAIT | | 3 189,331 | 0,000 | 0,00 | 3 187,831 | 103,100 | 0,000 | 0,00 | 103,100 |
| DALRYMPLE BAY | | 3 053,800 | 0,000 | 0,00 | 2 930,852 | 101,300 | 0,000 | 0,00 | 101,300 |
| SUEZ CANAL | | 1 265,508 | 0,000 | 0,00 | 1 262,508 | 101,300 | 0,000 | 0,00 | 101,300 |
| ROTTERDAM | | 659,657 | 670,000 | 330,00 | 1 311,907 | 101,300 | 0,000 | 0,00 | 101,300 |
| ANTWERP | | 1 287,290 | 0,000 | 0,00 | 1 285,790 | 101,300 | 0,000 | 0,00 | 101,300 |

**EXHIBIT 4**

## Voyage Printout (Adjusted)

Printed Date: 29.06.07 15:25
Created By: JF
Page: 1 of 1

| Start Date | 28.Jun.2007 | Reference No. | TRAN4001 |
|---|---|---|---|

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Vessel** | TRANSFIELD4 | | | | | **Freight** | 2 549 250 |
| **Vessel Size** | 175 | | | | | **Various Revenue** | 0 |
| | 775 | | | | | **Demurrage** | 833 750 |
| | **Speed** | **FO** | | **DO** | **FO** | **GROSS REVENUE** | **3 383 000** |
| **Ballast** | 14,76 | 55,00 | **At Sea** | 0,00 | | | |
| **Loaded** | 13,33 | 57,50 | **In port** | 0,00 | 3,00 | **Commission** | 126 862 |
| | | | | | | **Despatch** | 0 |
| **Ballast Port** | KAOHSIUNG | | | | | **NET REVENUE** | **3 256 138** |

| | | | | | |
|---|---|---|---|---|---|
| **Port Rotation** | DALRYMPLE / CL - ROTTERDAM - ANTWERP | | | **Port Cost Load** | 0 |
| **Charterer** | Atic | | | **Port Cost Dis.** | 0 |
| **Broker** | Lorentzen & Stemoco | | | **Port Cost Other** | 0 |
| | | | | **Canal Cost** | 0 |
| **Cargo Quantity** | 165 000MT | | | **ILOHC** | 0 |
| **Commodity** | COAL | **SF** | 0,0 | **Handling Cost** | 0 |
| **Freight** | USD 15,45/MT | | | **Various Cost** | 697 812 |
| **Flat Rate** | 0,00 | **Min Quantity** | 0,00 | **Freight Cost** | 2 191 612 |
| **Broker Com.** | 1,25 | **Addr. Com.** | 2,50 | **FO** 0/MT 2 681,988MT | 0 |
| **Demurrage Rate** | 23 000 | **Despatch Rate** | 11 500 | **DO** 0/MT 0,000MT | 0 |
| | | | | **TC Equivalent** 6 512 Contr. | 366 712 |
| **Terms** | 6,5D | | | | |
| | | | | **TC Cost/Day** 0 0,0% | 0 |
| | | | | **Ballast Bonus** 0 0,0% | 0 |
| **Waiting** | 0,00 | | **Miles** | **Breakeven/Day** | 0 |
| **Ballast passage** | 9,64 | | 3 414 | **Meals and Cables** | 0 |
| **Loaded passage** | 36,68 | | 11 737 | | |
| **Canal Passage** | 2,00 | | | **VOYAGE RESULT** | **366 712** |
| **Loading** | 3,25 | | | | |
| **Discharging** | 3,25 | | | | |
| **Extra In Port** | 1,50 | | | | |
| **TOTAL DAYS** | 56,31 | | | | |
| **Days Offhire** | 0,00 | | | | |

**COMMENT**
Esr demurrage 36,25 day. Demurrage out as varios cost net comm.

**REMARK ( )**

**CARGO LIST**

| Load-/Discharging Ports | Charterer | Quantity | Cargo | Fr.rate | Freight |
|---|---|---|---|---|---|
| DALRYMPLE / CL - ROTTERDAM - ANTWERP | Atic | 165 000 | COAL | 15,45 | 2 549 250 |
| DALRYMPLE / CL - ROTTERDAM - ANTWERP | Golden Ocean | 165 000 | COAL | 13,80 | 2 191 612 |

**PORT ROTATION**

| Port | RFC | At Sea | Miles | Port Cost | Handling Cost | Arrival date | Departure date | In Port |
|---|---|---|---|---|---|---|---|---|
| TORRES STRAIT | C | 7,28 | 2 579 | 0 | 0 | 06.07.07 01:20 | 06.07.07 13:20 | 0,50 |
| DALRYMPLE BAY | L | 2,36 | 835 | 0 | 0 | 08.07.07 21:53 | 12.07.07 15:53 | 3,75 |
| TORRES STRAIT | C | 2,61 | 835 | 0 | 0 | 15.07.07 06:31 | 15.07.07 18:31 | 0,50 |
| SUEZ CANAL | C | 23,16 | 7 410 | 0 | 0 | 07.08.07 15:16 | 08.08.07 15:16 | 1,00 |
| ROTTERDAM | D | 10,48 | 3 355 | 0 | 0 | 19.08.07 01:53 | 22.08.07 19:53 | 3,75 |
| ANTWERP | D | 0,43 | 137 | 0 | 0 | 23.08.07 06:10 | 23.08.07 18:10 | 0,50 |

**BUNKER PLAN**

| Port | FO Arr. | FO Bunk. | FO Price | FO Dep. | DO Arr. | DO Bunk. | DO Price | DO Dep. |
|---|---|---|---|---|---|---|---|---|
| TORRES STRAIT | -400,369 | 0,000 | 0,00 | -401,869 | 0,000 | 0,000 | 0,00 | 0,000 |
| DALRYMPLE BAY | -531,496 | 0,000 | 0,00 | -549,246 | 0,000 | 0,000 | 0,00 | 0,000 |
| TORRES STRAIT | -699,285 | 0,000 | 0,00 | -700,785 | 0,000 | 0,000 | 0,00 | 0,000 |
| SUEZ CANAL | -2 032,269 | 0,000 | 0,00 | -2 035,269 | 0,000 | 0,000 | 0,00 | 0,000 |
| ROTTERDAM | -2 638,121 | 0,000 | 0,00 | -2 655,871 | 0,000 | 0,000 | 0,00 | 0,000 |
| ANTWERP | -2 680,488 | 0,000 | 0,00 | -2 681,988 | 0,000 | 0,000 | 0,00 | 0,000 |

**EXHIBIT 5**

## Voyage Printout (Adjusted)

Printed Date: 29.06.07 15:27
Created By: JF
Page: 1 of 1

| Start Date | 29.jun.2007 | Reference No. | TRA5B001 |
|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| **Vessel** | TRANSFIELD5B | | | | | |
| **Vessel Size** | 149 | | | | | |
| | 155 | | | | | |
| | **Speed** | **FO** | | **DO** | **FO** | |
| **Ballast** | 13,33 | 49,00 | At Sea | 0,00 | | |
| **Loaded** | 12,86 | 49,00 | In port | 0,00 | 3,00 | |
| **Ballast Port** | SHANGHAI | | | | | |

| | | | | |
|---|---|---|---|---|
| **Port Rotation** | DALRYMPLE BAY / CL - GH - ROTTERDAM - ANTWERP | | | |
| **Charterer** | Alic | | | |
| **Broker** | | | | |
| **Cargo Quantity** | 141 000MT | | | |
| **Commodity** | COAL | SF | | 0,0 |
| **Freight** | USD | 14,70/MT | | |
| **Flat Rate** | 0,00 | **Min Quantity** | | 0,00 |
| **Broker Com.** | 1,25 | **Addr. Com.** | | 2,50 |
| **Demurrage Rate** | 23 000 | **Despatch Rate** | | 11 500 |
| **Terms** | 4 D/4 D | | | |

| | | | |
|---|---|---|---|
| **Waiting** | 0,00 | | **Miles** |
| **Ballast passage** | 11,89 | | 3 804 |
| **Loaded passage** | 44,33 | | 13 678 |
| **Canal Passage** | 0,00 | | |
| **Loading** | 34,00 | | |
| **Discharging** | 4,00 | | |
| **Extra in Port** | 1,50 | | |
| **TOTAL DAYS** | 95,71 | | |
| **Days Offhire** | 0,00 | | |

| | | | |
|---|---|---|---|
| **Freight** | | | 2 072 700 |
| **Various Revenue** | | | 0 |
| **Demurrage** | | | 690 000 |
| **GROSS REVENUE** | | | 2 762 700 |
| **Commission** | | | 103 601 |
| **Despatch** | | | 0 |
| **NET REVENUE** | | | 2 659 099 |
| **Port Cost Load** | | | 92 500 |
| **Port Cost Dis.** | | | 270 000 |
| **Port Cost Other** | | | 0 |
| **Canal Cost** | | | 0 |
| **ILOHC** | | | 0 |
| **Handling Cost** | | | 0 |
| **Various Cost** | | | 11 000 |
| **Freight Cost** | | | 0 |
| **FO** | 360/MT | 2 911,001MT | 1 047 961 |
| **DO** | 0/MT | 0,000MT | 0 |
| **TC Equivalent** | 12 931 | Contr. | 1 237 638 |
| **TC Cost/Day** | 55 000 | 3,8% | 5 066 855 |
| **Ballast Bonus** | 0 | 0,0% | 0 |
| **Breakeven/Day** | | | 0 |
| **Meals and Cables** | | | 0 |
| **VOYAGE RESULT** | | | -3 829 217 |

**COMMENT**
Basis 30 days on demurrage

**REMARK ( )**

### PORT ROTATION

| Port | RFC | At Sea | Miles | Port Cost | Handling Cost | Arrival date | Departure date | In Port |
|---|---|---|---|---|---|---|---|---|
| DALRYMPLE BAY | L | 11,89 | 3 804 | 92 500 | 0 | 11.07.07 12:01 | 15.08.07 00:01 | 34,50 |
| ROTTERDAM | D | 43,88 | 13 541 | 150 000 | 0 | 27.09.07 13:12 | 02.10.07 01:12 | 4,50 |
| ANTWERP | D | 0,44 | 137 | 120 000 | 0 | 02.10.07 11:51 | 02.10.07 23:51 | 0,50 |

### BUNKER PLAN

| Port | FO Arr. | FO Bunk. | FO Price | FO Dep. | DO Arr. | DO Bunk. | DO Price | DO Dep. |
|---|---|---|---|---|---|---|---|---|
| DALRYMPLE BAY | -582,488 | 0,000 | 0,00 | -719,986 | 0,000 | 0,000 | 0,00 | 0,000 |
| ROTTERDAM | -2 870,246 | 0,000 | 0,00 | -2 887,746 | 0,000 | 0,000 | 0,00 | 0,000 |
| ANTWERP | -2 909,501 | 0,000 | 0,00 | -2 911,001 | 0,000 | 0,000 | 0,00 | 0,000 |

**EXHIBIT 6**

# Voyage Printout (Adjusted)

Printed Date: 29.06.07 15:25
Created By: JF
Page: 1 of 1

| Start Date | 28.jun.2007 | Reference No. | TRAN5001 |
|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| Vessel | TRANSFIELD5 | | | | |
| Vessel Size | 149 | | | | |
| | 155 | | | | |
| | Speed | FO | At Sea | DO | FO |
| Ballast | 13,33 | 49,00 | At Sea | 0,00 | |
| Loaded | 12,86 | 49,00 | In port | 0,00 | 3,00 |
| Ballast Port | SHANGHAI | | | | |

| Freight | 2 072 700 |
|---|---|
| Various Revenue | 0 |
| Demurrage | 690 000 |
| **GROSS REVENUE** | **2 762 700** |
| Commission | 103 601 |
| Despatch | 0 |
| **NET REVENUE** | **2 659 099** |

| Port Rotation | DALRYMPLE BAY / CL - GH - ROTTERDAM - ANTWERP |
|---|---|
| Charterer | Atic |
| Broker | |

| Cargo Quantity | 141 000MT | | |
|---|---|---|---|
| Commodity | COAL | SF | 0,0 |
| Freight | USD 14,70/MT | | |
| Flat Rate | 0,00 | Min Quantity | 0,00 |
| Broker Com. | 1,25 | Addr. Com. | 2,50 |
| Demurrage Rate | 23 000 | Despatch Rate | 11 500 |
| Terms | 4 D/4 D | | |

| Port Cost Load | | | 0 |
|---|---|---|---|
| Port Cost Dis. | | | 0 |
| Port Cost Other | | | 0 |
| Canal Cost | | | 0 |
| ILOHC | | | 0 |
| Handling Cost | | | 0 |
| Various Cost | | | 577 500 |
| Freight Cost | | | 1 872 832 |
| FO | 0/MT | 2 791,003MT | 0 |
| DO | 0/MT | 0,000MT | 0 |
| TC Equivalent | 3 177 | Contr. | 208 766 |
| TC Cost/Day | 0 | 0,0% | 0 |
| Ballast Bonus | 0 | 0,0% | 0 |
| Breakeven/Day | | | 0 |
| Meals and Cables | | | 0 |
| **VOYAGE RESULT** | | | **208 766** |

| | | Miles |
|---|---|---|
| Waiting | 0,00 | |
| Ballast passage | 11,89 | 3 804 |
| Loaded passage | 44,33 | 13 678 |
| Canal Passage | 0,00 | |
| Loading | 4,00 | |
| Discharging | 4,00 | |
| Extra In Port | 1,50 | |
| **TOTAL DAYS** | **65,71** | |
| Days Offhire | 0,00 | |

**COMMENT**
Basis 30 days on demurrage. Demurrage out in various net of comm

**REMARK ( )**

### CARGO LIST
| Load-/Discharging Ports | Charterer | Quantity | Cargo | Fr.rate | Freight |
|---|---|---|---|---|---|
| DALRYMPLE BAY / CL - GH - ROTTERDAM - ANTWERP | Atic | 141 000 | COAL | 14,70 | 2 072 700 |
| DALRYMPLE BAY / CL - GH - ROTTERDAM - ANTWERP | Golden Ocean | 141 000 | COAL | 13,80 | 1 872 832 |

### PORT ROTATION
| Port | RFC | At Sea | Miles | Port Cost | Handling Cost | Arrival date | Departure date | In Port |
|---|---|---|---|---|---|---|---|---|
| DALRYMPLE BAY | L | 11,89 | 3 804 | 0 | 0 | 10.07.07 15:53 | 15.07.07 03:53 | 4,50 |
| ROTTERDAM | D | 43,88 | 13 541 | 0 | 0 | 27.08.07 17:04 | 01.09.07 05:04 | 4,50 |
| ANTWERP | D | 0,44 | 137 | 0 | 0 | 01.09.07 15:44 | 02.09.07 03:44 | 0,50 |

### BUNKER PLAN
| Port | FO Arr. | FO Bunk. | FO Price | FO Dep. | DO Arr. | DO Bunk. | DO Price | DO Dep. |
|---|---|---|---|---|---|---|---|---|
| DALRYMPLE BAY | -582,488 | 0,000 | 0,00 | -599,988 | 0,000 | 0,000 | 0,00 | 0,000 |
| ROTTERDAM | -2 750,248 | 0,000 | 0,00 | -2 767,748 | 0,000 | 0,000 | 0,00 | 0,000 |
| ANTWERP | -2 789,503 | 0,000 | 0,00 | -2 791,003 | 0,000 | 0,000 | 0,00 | 0,000 |