Michael J. Frevola
Lissa D. Schaupp
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR PLAINTIFF
FRONT CARRIERS LTD.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRONT CARRIERS LTD., <br><br> Plaintiff, <br><br> -against- <br><br> TRANSFIELD ER CAPE LTD., <br><br> Defendant. | 07 Civ. 6333 (KMK) <br><br> **AMENDED <br> VERIFIED <br> <u>COMPLAINT</u>** |

      Plaintiff, Front Carriers Ltd. ("Front Carriers" or "Plaintiff"), by and through its attorneys, Holland & Knight LLP, for its amended verified complaint against Transfield ER Cape Ltd. ("Transfield" or "Defendant"), alleges, upon information and belief, as follows:

      1.     This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

      2.     At all times material herein, plaintiff Front Carriers was and is a business entity organized and existing under the laws of Liberia and maintains a place of business at c/o Golden Ocean Management AS, Bryggegata 3, P.O. Box 2005-Vika, 0125 Oslo, Norway.

3. Upon information and belief, at all times material herein, defendant Transfield is a business entity organized and existing under the laws of the British Virgin Islands.

4. On or about August 9, 2005, Transfield, as owner, and Front Carriers, as charterer, entered into a Contract of Affreightment on the AMWELSH Coal Charter Form 1979, as amended by the parties, for the carriage of multiple cargoes of coal from various optional ports in Australia to various optional ports in Western Europe (the "COA"). A true copy of the COA is annexed as Exhibit 1.

5. Front Carriers entered into the COA for the purpose of fulfilling its own lifting requirements under a separate contract of affreightment with a third-party charterer ("Atic"). Stated another way, Front Carriers was contractually bound to provide vessels to Atic on identical terms as the COA, and Front Carriers entered into the COA with Transfield to fulfill its obligations to Atic under that separate contract of affreightment.

6. Transfield failed to perform its final two liftings under the COA, causing Front Carriers to sustain damages in two fashions related to the first missed lifting and in one fashion related to the second missed lifting.

**The COA's Nomination Clause**

7. The COA's rider has a "Nomination Clause" (Section 10) that sets forth how Front Carriers was to give notice of its intended liftings under the COA. The initial notice to be given by Front Carriers was approximately 30 days before the beginning of each quarter: "Around 30 (thirty) days prior the beginning of each quarter of first shipment for one year, [Front Carriers] will do their utmost to give [Transfield] a tentative schedule program."

8. After this tentative schedule, Front Carriers was to give Transfield not less than 45 days notice of actual intended laydays/cancelling days (a time window during which Front

Carriers desired a Transfield vessel to arrive at the port designated by Front Carriers): "Not less than 45 (firty-five) days prior beginning of the desired laydays/cancelling dates with 15 days spread, [Front Carriers] will notify [Transfield] of the program i.e. intended loading port and discharging port with combination of loading/discharging ports if any."

9. Upon receiving this 45 day notice, Transfield had the obligation to respond within ten days with a nominated vessel or a substitute vessel that Transfield would charter in to fulfill its obligations under the COA: "[Transfield] to nominate within 10 (ten) days a vessel or substitute."

10. The following section in the COA's rider (Section 11, subsection (a)), specifically details the consequences if Transfield fails to perform as required under the COA:

> *Transfield shall during the terms of this agreement provide sufficient tonnage to perform all the voyages under this agreement. With respect to this obligation, [Transfield] shall not be able to claim force majuere if and as far as the prevention of the performance of this obligation is – wholly or partially – due to risks resulting from [Transfield's] other fleet commitments. [Transfield] shall therefore, if such prevention occurs, be held fully responsible for the performance of this obligation.*

### The First Missed Lifting (Lifting Number Four) and Attempted Mitigation

11. The first three liftings of the five to be completed under the COA were carried out without incident.

12. During the time period from December 2005 to May 2007, however, the daily hire rates for bulk cargo vessels (such as the type to be employed by Front Carriers under the COA) increased drastically. Average rates for a bulker similar to the types of vessels to be nominated under the COA more than tripled during this period. Annexed as Exhibit 2 is a true copy of an index prepared a few weeks ago by Simpson, Spence and Young (a charter broker in

the industry), which shows the calculated index for the type of vessel covered by the COA rising from approximately 6,300 to 20,300 during the recited time period.

13.     On or about November 22, 2006, Front Carriers advised Transfield by e-mail that it anticipated its fourth lifting to occur in the window between March 10, 2007 and March 25, 2007 and that lifting would involve a voyage from Dalrymple Bay, Australia to Rotterdam and Antwerp. This notice was the initial "tentative schedule" required of Front Carriers under the COA's rider Section 10.

14.     Transfield did not respond to Front Carriers' November 22, 2006 notice.

15.     On or about January 4, 2007, Front Carriers advised Transfield by e-mail that its original tentative scheduled loading date in March 2007 was to be postponed until a window of May 10-25, 2007. A true copy of this e-mail message given by Front Carriers to Transfield on January 4, 2007 for the fourth lifting is annexed as Exhibit 3.

16.     Later that same day, Transfield responded to Front Carriers' revised tentative notice by stating "*REGRET OWNERS CANNOT ACCOMODATE [sic] [Front Carriers'] REQUEST TO POSTPONE SHIPMENT TO MAY.*" A true copy of Transfield's response through broker's e-mail is annexed as Exhibit 4.

17.     The next day, Front Carriers responded to Transfield's message as follows:

*Please note that there has never been a firm nomination of voyage no:4 under the [COA], only an advice of next lifting. We fully trust that you will honour your obligations once a firm nomination has been given.*

A true copy of Front Carriers' January 5, 2007 e-mail is annexed as Exhibit 5.

4

18. Transfield rejected Front Carriers' position and advised Front Carriers that it was nominating a vessel to perform for Front Carriers in March 2007 (as per the initial tentative schedule). Transfield's refusal to provide a vessel for Front Carriers' fourth lifting request for May 2007 in accordance with Front Carriers' request was a breach of, *inter alia*, Sections 10 and 11(a) of the COA's rider.

19. Transfield has taken the position with Front Carriers that Front Carriers' November 2006 tentative schedule was the 45-day notice required under Section 10 of the COA's rider, and that Transfield only was obliged to provide a vessel in accordance with that notice. If that were truly the case, however, Transfield would have had to provide the name of a nominated vessel within 10 days of the date of Front Carriers' November 22, 2006 e-mail which gave the initial tentative notice. Transfield never nominated a vessel in response to the November 22, 2006 notice, belying its present position to the contrary.

20. When Transfield insisted on presenting its vessel in March 2007, Front Carriers accepted the vessel (while reserving its rights to claim for damages resulting from the wrongful nomination) in an effort to mitigate its damages by making a profit on a voyage using that vessel. The name of the vessel presented by Transfield for March 2007 was the "C MARCH."

21. Front Carriers (through its managers Golden Ocean Group Limited) went into the market to obtain a cargo for the C MARCH. On or about January 17, 2007, Front Carriers reached a fixture with charterer Rio Tinto for the voyage charter of the C MARCH. A true copy of that voyage charter is annexed as Exhibit 6. After obtaining a cargo for the C MARCH, Front Carriers advised Transfield of the designated ports for the Rio Tinto cargo to be carried on the C MARCH.

22. Transfield, however, refused to accept Front Carriers' port designations for the Rio Tinto cargo. Thus, Front Carriers now had committed to carry cargo for Rio Tinto in order to fill the wrongfully nominated C MARCH. After having done so, Transfield then refused to provide its vessel to carry the cargo that Front Carriers had committed to carry aboard the C MARCH.

23. Because of Transfield's refusal to present the C MARCH for the Rio Tinto cargo, Front Carriers was obliged to charter in replacement tonnage to carry the cargo procured to mitigate damages for Transfield's wrongful nomination. Front Carriers (through Golden Ocean) time chartered the vessel ANANGEL SAILOR to perform the carriage of the Rio Tinto cargo, which charter was performed in May 2007 rather than March 2007 by agreement between Front Carriers and Rio Tinto. A true copy of the ANANGEL SAILOR voyage charter dated April 19, 2007 is annexed as Exhibit 7.

24. Front Carriers was damaged in an amount presently estimated as $1,938,937 as a result of having to cover for the transportation of the substitute cargo intended as mitigation for Transfield's wrongful nomination. A true copy of Front Carriers' calculation of its estimated damages relating to this claim is annexed as Exhibit 8. Front Carriers will explain the damages calculations in the section below entitled "Damages Calculations".

25. Upon information and belief, Transfield intentionally sabotaged Front Carriers' efforts to use a Transfield vessel for the fourth lifting of the COA (as well as the fifth lifting and the mitigation voyage) because daily hire rates had increased so dramatically that Transfield manufactured an excuse to avoid its remaining contractual commitments.

26. In addition to the damages sustained by Transfield's refusal to present the C MARCH in March 2007, Front Carriers was obligated to perform the lifting of Atic's cargo in

May 2007 (which lifting Transfield refused to perform). Front Carriers therefore was required to procure substitute tonnage at a much higher rate than that contained in the COA (because of the aforementioned rise in the market) to perform under its contract of affreightment with Atic. Front Carriers chartered the vessel CHINA STEEL GROWTH to lift the cargo that initially was supposed to be carried by Transfield. A true copy of the CHINA STEEL GROWTH time charter is annexed as Exhibit 9.

27.     Front Carriers therefore was damaged in the total amount of $7,104,189 as a result of having to charter in substitute tonnage to meet its obligations under its contract of affreightment with Atic. That total amount combines the lost profit that Front Carriers would have made had Transfield performed the fourth lifting ($356,900) with the losses that Front Carriers sustained from having to charter in replacement tonnage ($6,747,289). True copies of Front Carriers' claimed damages relating to these claims are annexed as Exhibits 10 and 11, respectively. These damages figures likewise will be discussed below in the "Damages Calculations" section below.

**The Second Missed Lifting (Lifting Number Five)**

28.     The second missed lifting developed in a similar factual progression. Front Carriers gave Transfield notice on June 4, 2007 by e-mail of its tentative schedule to request a Transfield vessel to present for loading in the first half of August 2007 for a voyage from Dalrymple Bay, Australia to Rotterdam and Antwerp.

29.     Transfield did not reply to that notice.

30.     On June 14, 2007, Front Carriers advised Transfield that it had revised its tentative schedule and shifted the presentation window from the first half of August to the first half of September 2007.

7

31. In response to Front Carriers' revised tentative schedule, Transfield once again took the position that Front Carriers' initial tentative schedule was Front Carriers' firm notice and that Transfield only would present a vessel during the August 1-15 window. If that were truly the case, however, Transfield would have had to provide the name of a nominated vessel within 10 days of the date of Front Carriers' June 4, 2007 e-mail, in which Front Carriers provided its tentative schedule. Transfield never gave such a notice.

32. Because of the additional losses subsequently caused by Front Carriers' attempts to mitigate Transfield's failed fourth lifting, and because of Transfield's clear intention to refuse to provide tonnage for Front Carriers regardless of the voyage proposed by Front Carriers, Front Carriers accepted Transfield's repudiation of the fifth lifting.

33. Front Carriers therefore was required to procure substitute tonnage at a much higher rate than that contained in the COA to perform under its contract of affreightment with Atic. Front Carriers chartered the vessel ROYAL CHORALE to lift the cargo that initially was supposed to be carried by Transfield. True copies of the ROYAL CHORALE fixture message for the ROYAL CHORALE time charter, as well as a true copy of the prior time charter on which that fixture was based, are annexed as Exhibit 12.

34. Front Carriers therefore was damaged in the estimated total amount of $5,216,872 as a result of having to charter in substitute tonnage to meet its obligations under its contract of affreightment with Atic. That total amount combines the lost profit that Front Carriers would have made had Transfield performed the fifth lifting ($206,533) with the losses that Front Carriers sustained from having to charter in replacement tonnage ($5,010,339). True copies of Front Carriers' claimed damages relating to these claims are annexed as Exhibits 13 and 14,

8

respectively. These damages figures likewise will be discussed below in the "Damages Calculations" section below.

**Damages Calculations**

35. The COA provided a schedule of freight rates (per metric ton, FIOST terms) for carriage of cargoes from the various load ports to the various delivery ports named in the COA. This schedule can be found at Section 5 of the COA's rider.

36. At the time that Front Carriers sought Transfield to perform the fourth and fifth liftings under the COA, the COA's freight rates were much less than the prevailing market rates for bulk cargo vessels. This caused Front Carriers to sustain losses each time it had to procure substitute tonnage for a Transfield vessel which should have, but did not, carry the cargoes at issue. Front Carriers will address the fourth and fifth liftings damages claims before addressing the losses sustained in the attempted mitigation effort.

The Fourth Lifting/CHINA STEEL GROWTH

37. When Transfield refused to carry the fourth lifting requested by Front Carriers, Front Carriers chartered the vessel CHINA STEEL GROWTH as substitute tonnage. Exhibits 10 and 11 are Front Carriers' worksheets which sets forth its calculations for its claim of $7,104,189 that will be addressed in this subsection. Each will be addressed in turn:

Exhibit 10

38. Exhibit 10 is entitled "Transfield4," and represents the expected profit ($356,900) that Front Carriers would have enjoyed had Transfield presented its vessel for the fourth lifting as requested by Front Carriers. Exhibit 10 lists in the left hand column, second section from the top, the "Port Rotation" of Dalrymple/CL – Rotterdam – Antwerp. That section also includes (a)

the freight rate that Front Carriers would earn under the Atic COA, which was $15.45 per metric ton, and (b) the total volume of the intended cargo, which was 164,882 metric tons. Multiplying the freight rate by the cargo volume results in a freight figure for the Atic COA of $2,547,427. This figure can be seen at the top of the right hand column on Exhibit 10. Added to that figure is demurrage of 36.25 days (at $23,000 per day) for a total of $833,750, mostly for waiting to load at Dalrymple Bay. Adding the freight and expected demurrage and subtracting the broker's commission gives an expected net revenue under "Transfield4" of $3,254,383.

39. Under the COA, the freight rate for this voyage would have been $13.80 per metric ton (see COA Rider, Section 5, Dalrymple Bay loading section). Multiplying this figure by the cargo volume results in a freight figure for the Transfield COA of $2,190,045 (this figure takes into account a deduction for the charter broker's commission). Credited to Transfield also is a demurrage amount of $707,438, employing the same amount of delay and using the Transfield COA demurrage rate. Subtracting this amount ($2,897,483) from the expected net revenue from the Atic COA under "Transfield4" gives Front Carriers an expected net profit of $356,900 had the "Transfield4" voyage been completed. Because the "Transfield4" voyage was not performed by a Transfield vessel, however, Front Carriers was compelled to charter in replacement tonnage at a much higher rate, as set forth in Exhibit 11.

Exhibit 11

40. Exhibit 11 is entitled "CHINA STEEL GROWTH," and sets forth the costs of chartering in the substitute tonnage to perform the fourth lifting under the COA. The figures referring to the Atic COA remain the same, such as freight rate, cargo volume, and net revenue of $3,254,383. The costs incurred, however, are much more substantial.

41. Because of the aforementioned surge in the market, the substitute vessel, CHINA STEEL GROWTH, was fixed at the daily hire rate of $84,000 per day (see Exhibit 9, Rider, Section 37). As shown by section 3 of the left column of Exhibit 11, the CHINA STEEL GROWTH required 101.54 days to complete the voyage, including 9.03 days for ballast passage, 38.79 days for loaded passage, and 1.5 days for canal passage. It also included 5.81 days for loading, 6.23 days for discharging, and 40.18 extra days waiting in port. These numbers are reflected in Exhibit 11 in the section second from the bottom. Multiplying 101.54 days times $84,000/day results in $8,209,868 in time charter hire (after deducting the charter broker's commission) incurred for Front Carriers' use of the CHINA STEEL GROWTH as a substitute vessel.

42. Not only did the time charter of the CHINA STEEL GROWTH cost in terms of hire payments, it also cost Front Carriers for the variety of port charges, canal costs and fuel costs that it would not have incurred under the COA with Transfield. These additional costs amounted to $1,787,669 (these charges are listed in the right column of Exhibit 11 below the New Revenue amount).

43. Therefore, for the actual voyage that took place, Front Carriers earned $3,254,383. That figure was reduced, however, by the extra charges resulting from the time charter mentioned in paragraph 42, which brought Front Carriers' revenue down to $1,466,714. This left Front Carriers with still having to pay the owners of the CHINA STEEL GROWTH the hire payment of $8,209,868 (plus meals and cables in the amount of $4,135), which resulted in Front Carriers sustaining a loss of $6,747,289 for the actual performance of the fourth lifting.

44. Finally, comparing Front Carriers' losses for the fourth lifting (-$6,747,289) with the profits that it should have earned ($356,900) results in Front Carriers' damage figure for the fourth lifting of $7,104,189.

### The Fifth Lifting/ROYAL CHORALE

45. When Transfield refused to carry the fifth lifting requested by Front Carriers, Front Carriers chartered the vessel ROYAL CHORALE as substitute tonnage. Exhibits 13 and 14 are Front Carriers' worksheets which sets forth its calculations for its estimated claim of $5,216,872 that will be addressed in this subsection. Each will be addressed in turn:

### Exhibit 13

46. Exhibit 13 is entitled "Transfield5," and represents the expected profit ($206,533) that Front Carriers would have enjoyed had Transfield presented its vessel for the fifth lifting as requested by Front Carriers. Exhibit 13 lists in the left hand column, second section from the top, the "Port Rotation" of Dalrymple/CL – Suez – Rotterdam – Antwerp. That section also includes (a) the freight rate that Front Carriers would earn under the Atic COA, which was $14.70 per metric ton, and (b) the total volume of the intended cargo, which was 166,200 metric tons. Multiplying the freight rate by the cargo volume results in a freight figure for the Atic COA of $2,443,140. This figure can be seen at the top of the right hand column on Exhibit 13. Added to that figure is expected demurrage of 25 days (at $23,000 per day) for a total of $575,000, mostly for waiting to load at Dalrymple Bay. Annexed as Exhibit 15 is a current Port Congestion Report from Front Carriers' Australian agents which shows the coal loading delay at Dalrymple Bay as of August 31, 2007 as 30 days. Adding the freight and expected demurrage

and subtracting the broker's commission gives an expected net revenue under "Transfield5" of $2,904,960.

47.  Under the COA, the freight rate for this voyage would have been $13.80 per metric ton (see COA Rider, Section 5, Dalrymple Bay loading section). Multiplying this figure by the cargo volume results in a freight figure for the Transfield COA of $2,207,552 (after deducting the charter broker's commission). Credited to Transfield also is a demurrage amount of $490,875, giving Transfield an extra half day of demurrage (because of the disparity in the COAs on this point) and using the Transfield COA demurrage rate. Subtracting this amount ($2,698,427) from the expected net revenue from the Atic COA under "Transfield5" gives Front Carriers an expected net profit of $206,533 had the "Transfield5" voyage been completed. Because that voyage was not completed, however, Front Carriers was compelled to charter in replacement tonnage at a much higher rate, as set forth in Exhibit 14.

Exhibit 14

48.  Exhibit 14 is entitled "ROYAL CHORALE," and sets forth the costs of chartering in the substitute tonnage to perform the fifth lifting under the COA. The figures referring to the Atic COA remain the same, such as freight rate, cargo volume, and net revenue of $2,904,960. The costs incurred, again, are much more substantial.

49.  Because of the aforementioned surge in the market, the substitute vessel, ROYAL CHORALE, was fixed at the daily hire rate of $77,500 per day (see Exhibit 12, fixture message). As shown by section 3 of the left column of Exhibit 14, the ROYAL CHORALE is anticipated to require 80.53 days to complete the voyage, including 9.64 days for ballast passage, 36.89 days for loaded passage, and 1.0 day for canal passage. It also included 28.25 days in load port, 3.25 days for discharging, and 1.5 extra days waiting in port anticipated. These numbers are reflected

13

in Exhibit 14 in the section second from the bottom. Multiplying 80.53 days times $77,500/day results in $6,241,338 in time charter hire (after deducting the charter broker's commission) incurred for Front Carriers' use of the ROYAL CHORALE as a substitute vessel.

50. Not only will the time charter of the ROYAL CHORALE cost in terms of hire payments, it also will cost Front Carriers for the variety of port charges, canal costs and fuel costs that it would not have incurred under the COA with Transfield. These additional costs are expected to amount to $1,904,790 (these charges are listed in the right column of Exhibit 14 below the New Revenue amount).

51. Therefore, for the actual voyage that will occur, Front Carriers is expected to earn $2,904,960. That figure will be reduced, however, by the extra charges resulting from the time charter mentioned in paragraph 50, which will bring Front Carriers' revenue down to $1,000,170. This leaves Front Carriers with still having to pay the owners of the ROYAL CHORALE the hire payment of $6,007,288 (plus meals and cables in the anticipated amount of $3,221), which will result in Front Carriers sustaining a loss of $5,010,339 for the actual fifth lifting.

52. Finally, comparing Front Carriers' losses for the fourth lifting (-$5,010,339) with the profits that it should have earned ($206,533) results in Front Carriers' estimated damage figure for the fifth lifting of $5,216,872.

53. As the voyage relating to the fifth lifting has not yet been completed, the estimated damages figure is subject to change and Front Carriers reserves its right to amend its claim and to request increased security in the event that its actual losses are determined to be greater after the completion of the subject voyage.

The Attempted Mitigation/ANANGEL SAILOR

54.     As stated above in paragraphs 20-24, Front Carriers attempted to mitigate its expected losses from Transfield's refusal to perform the fourth lifting by accepting Transfield's wrongful nomination of the C MARCH and employing that vessel to carry cargo for Rio Tinto. When Transfield subsequently refused to provide the offered C MARCH, Front Carriers was compelled to charter in the ANANGEL SAILOR to carry the Rio Tinto cargo. Exhibit 8 is Front Carriers' worksheet which sets forth its damage calculation figures which will be addressed in this subsection.

55.     Exhibit 8 is entitled "ANANGEL SAILOR," and sets forth the revenue earned and costs of chartering in the substitute tonnage to perform the Rio Tinto charter. The freight rate for that charter was $22.50 per metric ton and the cargo volume was 168,574 metric tons, amounting to a total of $3,792,915 in freight earned. Adding demurrage in the amount of $546,276 and subtracting the broker's commission of $108,480 resulted in a net revenue of $4,230,711.

56.     From the net revenue of $4,230,711, various port costs, canal costs, fuel charges and other miscellaneous charges of $1,675,689 were incurred to reduce the earnings on the ANANGEL SAILOR charter to Rio Tinto $2,555,021.

57.     The cost of chartering in the ANANGEL SAILOR, however, far exceeded the earnings made from Rio Tinto. Front Carriers fixed the ANANGEL SAILOR at the daily hire rate of $66,000 per day (see Exhibit 7, clause 4). As shown by section 3 of the left column of Exhibit 8, the ANANGEL SAILOR took 70.69 days to complete the voyage, including 8.81 days for ballast passage, 30.67 days for loaded passage, and 0.75 days for canal passage. It also included 22.48 days in load port, 6.98 days for discharging, and 1.0 extra day waiting in port.

These numbers are reflected in Exhibit 8 in the section second from the bottom. Multiplying 70.69 days times $66,000/day results in $4,490,423 in time charter hire (after deducting the charter broker's commission) incurred for Front Carriers' use of the ANANGEL SAILOR as a substitute vessel.

58.  Therefore, Front Carriers' earnings after expenses on the ANANGEL SAILOR charter was $2,555,021, but its costs were $4,493,957 (charter hire plus $3,534 in meals and cables), resulting in Front Carriers sustaining a loss of $1,938,937 for the ANANGEL SAILOR mitigation voyage.

**Aggregate Claims and Requested Relief**

59.  The aggregate amount of Front Carriers' claims sustained under both missed liftings, plus the ANANGEL SAILOR mitigation voyage, as best as presently can be estimated, is $14,259,998.

60.  The COA provides that French law will govern resolution of disputes between the parties. Under French law, Front Carriers also is entitled to recover interest at the "legal interest" rate (currently 2.95%), which amount is estimated to be $841,340, as set forth below:

Interest:                    $   841,340 ($14,259,998 x 0.0295/year x 2 years)

Total Principal Claim:       $14,259,998

Total Sought:                **$15,101,338**

61.  Transfield is not found within the Southern District of New York but does have assets, good or chattels within the jurisdiction, to wit: funds or accounts held in the name (or names) of Transfield ER Cape Ltd. with, upon information and belief, the following financial institutions: Bank of America, N.A.; The Bank of New York; Citibank, N.A.; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; UBS AG;

16

Wachovia Bank, N.A.; Société Générale; Standard Chartered Bank; BNP Paribas; Calyon Investment Bank; American Express Bank; Commerzbank; ABN Amro Bank; Bank Leumi USA; Fortis Financial Groups; Banco Popular; or any other financial institution within the Southern District of New York.

**WHEREFORE**, Front Carriers Ltd. prays:

1. That a summons with process of attachment and garnishment may issue against the defendant, Transfield ER Cape Ltd.; and if defendant cannot be found, then that its goods, chattels and credits within the district, and particularly all bank accounts and other property of Transfield ER Cape Ltd. with the financial institutions noted above in paragraph 61, may be attached in an amount sufficient to answer plaintiff's claim;

2. That a judgment may be entered in favor of Front Carriers Ltd. and against Transfield ER Cape Ltd. in the amount of US$15,101,338 (including estimated interest), and that a decree of condemnation may be issued against the property and credits of the defendant, Transfield ER Cape Ltd., for the amount of plaintiff's claim, with interest; and

3. That this Court grant Front Carriers Ltd. such other and further relief which it may deem just and proper.

Dated: New York, New York
September 5, 2007

                            HOLLAND & KNIGHT LLP

                     By: _____
                            Michael J. Frevola
                            Lissa Schaupp
                            195 Broadway
                            New York, NY 10007-3189
                            Tel:   (212) 513-3200
                            Fax:  (212) 385-9010

                            *Attorneys for Plaintiff*
                            *Front Carriers Ltd.*

## VERIFICATION

STATE OF NEW YORK            )
                             :ss.:
COUNTY OF NEW YORK           )

MICHAEL J. FREVOLA, being duly sworn, deposes and says:

I am a member of the firm of Holland & Knight LLP, counsel for Front Carriers Ltd. ("Front Carriers"), plaintiff in the foregoing action. I have read the foregoing Amended Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Front Carriers and corresponded with Front Carriers' representatives regarding this matter. I am authorized by Front Carriers to make this verification, and the reason for my making it as opposed to an officer or director of Front Carriers is that there are none within the jurisdiction of this Honorable Court.

_____
Michael J. Frevola

Sworn to before me this
5th day of September, 2007

_____
Notary Public

RUDY D. GREEN
Notary Public, State of New York
No. 02GR4952723
Qualified in Queens County
Certificate Filed in New York County
Commission Expires February 26, 2010

**Exhibits to the Amended Complaint to be filed in hard copy with Clerk of the Court pursuant to the following endorsement:**

10/2/2007 (Docket# 23 )ENDORSED LETTER addressed to Judge Richard J. Sullivan from Michael Frevola dated 9/27/07 re: Request by Front Carriers to file the exhibits to the Amended Complaint in hard copy with the Clerk of the Court. ENDORSEMENT: So ordered. (Signed by Judge Richard J. Sullivan on 10/1/07) (cd) (Entered: 10/02/2007)