Michael J. Frevola
Lissa D. Schaupp
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 100007-3189
(212) 513-3200

ATTORNEYS FOR PLAINTIFF
FRONT CARRIERS LTD.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| FRONT CARRIERS LTD., | 07 Civ. 6333 (KMK) |
|---|---|
| Plaintiff, | AFFIRMATION OF GILLES GAUTIER PURSUANT TO 28 U.S.C. §1746 IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO VACATE MARITIME ATTACHMENT |
| -against- | |
| TRANSFIELD CAPE LTD., | |
| Defendant. | |

I, the undersigned Gilles GAUTIER, hereby state that I am duly licensed under the laws of the Republique of France to practice law as a French lawyer.

1. I have been practicing maritime law in France, first as an in-house lawyer, between 1979 and 1992 in two major French shipping lines, second as a lawyer after having sworn in front of Paris Bar in June 1992. I am a founding Partner of SCP Gautier Vroom & Partners, Transnational Grouping Agreement with Ince & Co, and a Partner of Ince & Co. I have been a member of the French Maritime Law Association since 1980, where I regularly give lectures and have also lectured at International Conferences on Maritime Law.

2. I have been asked by Front Carriers – hereafter Plaintiffs – to provide an opinion under French law as regards the merits of Transfield's – hereafter Defendants – counterclaim as set out in their Answer with Affirmative Defenses and Counterclaim that was filed with the Court of New York on 5 October 2007.

3. It is clearly understood that this opinion is based on the assumption that Plaintiffs are in breach of the Contract of Affreightment.

4. It must be underlined here, for the sake of completeness and clearness, that Defendants' counterclaim can be granted by the Court only if the Court finds that Plaintiffs are in breach of the Contract of Affreightment. In this case, it must be understood that Plaintiffs' original claim will not succeed. If on the other hand, the Court holds that it is Defendants who are in breach of the agreement, then Plaintiffs would be able to succeed in their claim and Defendants' counterclaim would consequently be rejected.

5. The significant facts which have been taken into account are as follows: on 9 August 2005, Plaintiffs, as charterers, entered into a Contract of Affreightment (CoA) with Defendants, as owners, on the Americanized Welsh Coal Charter Form 1979 for a period of 2 years starting from November 2005. The object of the CoA is the carriage on bulk cargo vessels of cargoes of coal from different optional ports in Australia to different optional ports in Western Europe.

6. Five liftings were scheduled in the framework of the CoA. The first three liftings were completed without the slightest difficulty.

7. Problems arose for the fourth and fifth shipments, at a time the hire rates for bulk cargo vessels increased considerably. I am not dealing here with the fifth voyage as I understand that there would be no counterclaim for this voyage yet.

8. Regarding the fourth shipment, on 22 November 2006, Plaintiffs advised Defendants, but for information only in accordance with Section 10 of the CoA, that they envisaged a laycan for 10 / 15 March 2007. Defendants never replied to this information notice sent by Plaintiffs. On 4 January 2007, Plaintiffs informed Defendants that the above scheduled was changed and gave a laycan for 10 / 25 May 2007. On the same day, Defendants answered that they :

    *"cannot accomodate request to postpone shipment to May"*,

    and subsequently refused to provide Plaintiffs with a vessel for 10 / 25 May 2007.

9. While Plaintiffs responded that there has never been a firm nomination in respect of this fourth shipment, but only an informative advice of the next lifting, they nevertheless accepted the vessel "C March" nominated by Defendants in January 2007 with the aim of mitigating the damage. Accordingly, Plaintiffs went into the market to obtain a cargo for this vessel.

10. On 11 January 2007, Plaintiffs obtained a cargo with Rio Tinto for the "C March", but Defendants refused the port designations on the understood grounds that these ports were not those indicated by Plaintiffs in their information notice of 22 November 2006. As a matter of consequence, the "C March" was not chartered by Plaintiffs who were then compelled to find a substitution vessel to abide by their commitment towards Rio Tinto.

11. On their side, Defendants allege that following Plaintiffs' refusal to accept the "C March", they were compelled to charter her to Swissmarine at a rate of US$ 55,000 per day for 210 days, which resulted in total revenue of US$ 11,655,000. This would have

constituted a loss for them since they allege that had the vessel performed the voyage as initially scheduled with Plaintiffs, she would have:

    (i)      generated a total revenue of US$ 480,000 for 60 days and

    (ii)     she would have been thereafter available for charter from continental Europe around 10 May 2007 and would have likely been chartered at rate of approximately US$ 107,300 per day for about 150 days, which would amount to a total revenue of US$ 16,095,000.

12. Defendants' alleged loss has therefore been calculated as follows:

US$ 16,095,000 – US$ 11,655,000 + US$ 480,000 = US$ 4,920,000,
plus interests of US$ 290,280, which amounts to a total of US$ 5,210,280.

13. In order to be clear, I wish to point out that I have noted a discrepancy in Defendants' position: Defendants say that the vessel was chartered to Swissmarine at the rate of US$55.000 per day for 5-7 months. However, in their calculation, they have applied a rate of US$55,500 per day (US$ 55,500 x 210 days = US$11,655,000). I chose to ignore this discrepancy here for it does not alter the position under French law.

14. The position regarding the counterclaim under French law is the following:

15. I once again specify, for the sake of clearness, that I have not been asked to advise whether Defendants may successfully argue that Plaintiffs are in breach of the CoA. I was asked to assume that Plaintiffs are in breach of the agreement. Accordingly, the issue is to advise on the merits of Defendants' counterclaim.

16. Also for the sake of clearness, I repeat that the success or the failure of Defendants' counterclaim depends on the success or failure of Plaintiffs initial claim against Defendants. If it is found that the non performance of the fourth lifting is due to Defendants and accordingly that Defendants are found in breach of the CoA, then Plaintiffs' claim would be admitted in principle and Defendants' claim would accordingly be dismissed. If on the other hand, the Court finds that the non performance of the fourth shipment results from a breach of the CoA by Plaintiffs, then Plaintiffs will not succeed in their claim and Defendants' may be able to succeed in their counterclaim. In this case, the issue is to check whether the couterclaim is grounded.

17. Under French law, when a party is in breach of a contract of affreightment, the other party is entitled to terminate the contract or to continue it. In any case, whether the victim elects to terminate the contract or not, it is entitled to damages provided that it demonstrates that it effectively suffered a damage which resulted from the breach.

18. Article 1150 of the French Civil Code moreover provides that the debtor is liable only for damages which have been foreseen in the contract or which could have been foreseen at the time the contract was concluded, provided that the breach does not result from an act of wilful misconduct, i.e. a deliberate act made with the knowledge that the debtor was acting in breach of contract.

19. French case law on affreightments considers the loss resulting from the difference between the hire rates effectively applied and the rates that could have been applied as a foreseeable damage. But this damage has to be clearly evidenced in order for the victim to be granted damages in consequence.

20. It is insufficient for a party to the affreightment contract to state that it could have chartered the vessel at a better rate after completion of the contract, had the other party not been in breach of its obligations to perform this contract. The claimant must indeed prove that he could have indeed really chartered the vessel at a higher rate. This implies that he produces the evidence that he was on the verge of chartering the vessel at the said higher rate; or that considering the state of the market, it is obvious and undisputable that he would have chartered the vessel at this higher rate. The issue is that the Judge must be convinced that the vessel would have indeed been chartered at this more interesting rate; the mere possibility of such a charter is insufficient.

21. In this specific case, Defendants allege that had the "C March" performed the fourth voyage, she would have been available for charter from continental Europe in May 2007 and therefore, would have been likely been chartered at a very interesting rate of US$ 107,300 per day. This allegation is based on the observation that another vessel, the "Sidris GS", was chartered at that time at a rate of US$120,000 per day for 3-5 months. Defendants conclude that:

    *"The MV 'C March" would probably have been chartered at about US$12,700 less than the "Sidris GS", or at about US$ 107,300 per day for about 150 days, which would have generated total revenue to Defendant of US$107,300 x 150 days = US$16,095,000 on gross basis".*

22. This allegation that the "C March" would have been chartered at US$107,300 per day for 150 days – instead of US$55,000 per day for 5-7 months - is not backed up by any evidence. The term *"probably"* alone shows that this operation was just a possibility and not a certainty and therefore that Defendants have no concrete evidence that the vessel would have been chartered at a higher rate.

23. Furthermore, had there been possibilities for Defendants to charter the vessel upon completion of discharge in Europe at the rates they have mentioned, Defendants would have accepted the Rio Tinto contract which, so far as I understood it, would have permitted to position the vessel in Europe and try to get the fixtures they now claim to have missed. I understood indeed that the port of discharge for the Rio Tinto voyage was Moneypoint, Dunkirk or Taranto.

24. For the above reasons, applying French law, the Court should not in principle accept the counterclaim.

25. But more importantly, the loss alleged by Defendants is in itself very questionable.

26. Indeed, had the fourth voyage been performed, Defendants would not have chartered the vessel to Swissmarine at the rate of US$55,000 (or US$55,500) per day. They would have necessarily applied the contractual rate as provided under the CoA, that was

US$8,000 as acknowledged by Defendants. The fact that the vessel was actually chartered at a better rate (due to the increase of the hire rates in the market), moreover on a longer period – the fourth voyage was indeed due to last only at least 60 days (it would have actually lasted more due to proven congestion in the loading port) and we understand that following the cancellation of this fourth lifting, the vessel was effectively chartered for 210 days to Swissmarine – shows that Defendants eventually made a much better profit.

27. Hence, under French law the fact that

   (i)   Defendants actually made a better profit and

   (ii)  that Defendants do not prove that they would have indeed chartered the vessel at a rate of US$107,300 at the end of the fourth shipment had this shipment taken place

leads me to reach the conclusion that the counterclaim is not justified.

28. Accordingly, a French Judge would not accept such a counterclaim.

29. Of course, should the assumptions above happen to be incorrect, i.e.: for instance Defendants prove that they had a fixture at rate of US$ 107,300, a French Judge could grant them damages, but he would nevertheless be surprised by the ultimate decision of Defendants to refuse the Rio Tinto cargo and therefore, the good opportunity to reposition the vessel in Europe as they wished.

30. I declare under penalty under the laws of the United States of America that the following is true and correct.

Executed in Paris, this 17th day of October 2007

