Michael J. Frevola
Christopher R. Nolan
Lissa D. Schaupp
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY  10007-3189
(212) 513-3200

ATTORNEYS FOR PLAINTIFF
FRONT CARRIERS LTD.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRONT CARRIERS LTD., | 07 Civ. 6333 (RJS) |
| Plaintiff, | |
| -against- | |
| TRANSFIELD ER CAPE LTD., | |
| Defendant. | |

STATE OF NEW YORK        )
                                             ) ss:
COUNTY OF NEW YORK    )

MICHAEL J. FREVOLA, being duly sworn, deposes and says:

1.      I am a member of the law firm Holland & Knight LLP, attorneys for Plaintiff Front Carriers Ltd. ("FCL"), and I am fully familiar with the facts in this case.

2.      This Affidavit is made for the convenience of the Court and in support of FCL's opposition to the application of Defendant Transfield ER Cape Ltd. ("Transfield") for countersecurity under Rule E(7)(a) of the Supplemental Rules for Certain Admiralty and

Maritime Claims of the Federal Rules of Civil Procedure. The statements made in this affidavit are based upon my personal knowledge.

3.      Attached hereto as Exhibit 1 are true and correct copies of five Lloyds List articles dated January 25, 2007, February 8, 2007, February 15, 2007, February 23, 2007, and March 8, 2007, addressing congestion delays at Australian ports.   Lloyds List is perhaps the largest periodical in the maritime industry.

4.      Attached hereto as Exhibit 2 is a true and correct copy of the hearing transcript of the initial conference before the Court on October 10, 2007.

5.      Attached hereto as Exhibit 3 is a true and correct copy of *In re Chia May Navigation Corp. and Seatrek Ltd.*, SMA No. 3546 (July 30, 1999).

6.      Attached hereto as Exhibit 4 is a true and correct copy of *Star S.S. Soc'y v. Beorgradska Plovidba* [1988] 2 Lloyds' Rep. 583.

7.      Attached hereto as Exhibit 5 is a true and correct copy of *In re Precious Capitals Ltd. and Transworld Cargo Carriers S.A.*, SMA No. 3811 (Nov. 3, 2003).

8.      Attached hereto as Exhibit 6 is a true and correct copy of *In re Norelf Ltd. and Georgia Gulf Corp.*, SMA No. 2778 (July 18, 1991).

9.      Attached hereto as Exhibit 7 is a true and correct copy of *In re Seaemblem Marine Ltd. and Jahre Ship Serv. A/S*, SMA No. 3053 (March 7, 1994).

10.     In preparation of FCL's opposition, the undersigned contacted counsel for Transfield requesting (1) the charter by which Transfield chartered in the C MARCH from its owner, and (2) the charter by which Transfield chartered the C MARCH to Swissmarine.  As these charters relate squarely to Transfield's claim, they directly bear on whether Transfield is

2

entitled to counter-security.  Counsel for Transfield responded that they did not have copies of the charters (although they filed counter-claims in this proceeding which were based on data purportedly contained in the Swissmarine charter) and they objected to producing them in this proceeding.  Transfield's counsel subsequently promised to inquire into obtaining the charters but claimed that they could not be produced before FCL's opposition papers were due to be filed.

WHEREFORE, it is respectfully requested that this Court deny the Defendant Transfield's application for countersecurity pursuant to Rule E(7)(a) in its entirety, or substantially reduce the amount of security request, and grant such other and further relief to FCL as may be appropriate.

_____
                    Michael J. Frevola

Sworn to before me this
19th day of October, 2007

_____
              Notary Public

Elvin Ramos
Notary Public, State of New York
NO. 01RA4870243
Qualified in Queens County
Certificate filed in New York County
Commission Expires September 2, 2010

# 4872457_v1

3

**EXHIBIT 1**

Westlaw.                                                                    **News**Room

1/25/07 LLOYDSLI (No Page)                                          Page 1

1/25/07 Lloyd's List Int'l (Pg. Unavail. Online)
2007 WLNR 1410255

LLOYDS LIST
Copyright 2007 Informa Martime Trade and Transport

**January 25, 2007**

Australian **coal** ports **congestion** props up rates

Jamie Dale

AS DRY bulk rates threaten to soften, support is already on hand.

**Congestion** in eastern **Australia's** **coal** export ports has reached its
highest level in almost three years, prompting brokers to predict a strong year
for the dry bulk sector.

Queues at the port of Newcastle, the world's biggest **coal** export terminal, are
tying up available tonnage in the dry bulk sector, helping in part to offset
recent falls.

The backlog is reported at around 60 vessels with waiting times the highest for 12
months at 20.4 days and prospects of any improvement unlikely, at least in the
short term.

Owners are reported to be avoiding Newcastle where possible.

Figures produced by Port Waratah **Coal** Services showed that Newcastle shipped
79.82m tonnes last year, down 0.6% from 2005, as maintenance and system upgrading
caused lengthy outages.

Despite these problems the market's recent dip does not signal a protracted slide,
brokers say.

Dry bulk demand remains strong with rates still historically high.

Steel prices are proving to be robust and demand strong.

Analysts have predicted a recovery in demand for steel in North America after its
dip over the past few months and are again keeping an eye on cement after a
surprise performance last year.

---- INDEX REFERENCES ----

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.                                                             **News**Room


2/8/07 LLOYDSLI (No Page)                                            Page 1



2/8/07 Lloyd's List Int'l (Pg. Unavail. Online)
2007 WLNR 2367610

LLOYDS LIST
Copyright 2007 Informa Martime Trade and Transport

**February 8, 2007**

Newcastle Port capacity woes force 15%  **coal**  export drop


  **COAL** exports through  **Australia's**  Newcastle Port, the world's largest  **coal**
export terminal, declined by 15% last week as a lack of capacity left the vessel
queues hovering around 50 ships and waiting time at close to 20 days, writes Jamie
Dale .

  **Coal**  shipments at the port dropped by 299,000 tonnes to 1.7m tonnes for the
week ending February 5. The port is projected to ship 6.6m tonnes this month, 1.5m
tonnes lower.

Owners are reportedly avoiding the port where possible but the **delays** have left
some with no choice but to charter new tonnage to keep cargo moving.

Meanwhile, demurrage bills hit around $10 per tonne for new spot business at the
end of last month as **congestion** pushed the average demurrage above $4 per tonne
for January according to McCloskey's **coal** report.

Newcastle port appears to be lacking the capacity to handle larger volumes with
one source suggesting that the port is struggling to do much more than 80m tonnes
a year.

Observers suggest that the port needs to return to a system of rationing at the
terminal, which in the short term could have a positive effect on **congestion**.

The Hunter Valley **Coal** Chain logistics team queue forecast for February predicts
the queue could reach a record 62 vessels by mid-February.

The SSY Australian **Coal** Port **Congestion** Index has risen for the fifth consecutive
week and stands at 15.3 days compared with 14.7 last week.

The index takes into account berthing **delays** at all the major **coal** ports in
**Australia**.

---- INDEX REFERENCES ----

REGION:  (Australasia (1AU56); Oceania (1OC40); **Australia** (1AU55))


© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.                                                      NewsRoom

2/15/07 LLOYDSLI (No Page)                                        Page 1


2/15/07 Lloyd's List Int'l (Pg. Unavail. Online)
2007 WLNR 2934699

                          LLOYDS LIST
              Copyright 2007 Informa Martime Trade and Transport

                          **February 15, 2007**

              New    **congestion**  highs at    **Australia**  'big three' ports


  **COAL**  producers are being hit with further    **delays**  as    **Australia's**  'big
three'    **coal**  ports battle    **congestion** , two with record queues this week,
reports Lloyd's List DCN.

Just as Newcastle's queue peaked at 61 ships comes news that the number of
anchored ships waiting to berth at the port of Gladstone has topped 30.

Hay Point queues have also surged in the past month. The combined queue for Hay
Point and Dalrymple Bay was about 25 on January 4.

Both terminals lost valuable loading days during last week's bad weather, with
bulkers at one stage being removed from the berths until conditions improved.

The combined queue at Hay Point is now 46 ships.

Gladstone's queue is believed to be a record and comes after the port experience
its highest January arrival rate in six years 134 vessels loading 5.1m tonnes,
although only 70% of Gladstone's tonnage is **coal**.

News of the long queues is a further complication for producers reeling from
million-dollar demurrage costs at the port of Newcastle.

Central Queensland Ports Authority figures on recent **coal** output were outdated but
showed the RG Tanna **Coal** Terminal loaded, on average, about 920,000 tonnes a week
during January.

Gladstone's **coal** queue was a normal 12 ships just a month ago but has steadily
increased since.

The port had 30 **coal** ships anchored off the coast this morning, including 26
waiting to enter the RG Tanna **Coal** Terminal and four waiting to load at Barney
Point.

A A$600m ($471m) expansion plan at Gladstone is due to push **coal** output to 65m

              © 2007 Thomson/West. No Claim to Orig. US Gov. Works.

tonnes this year.

CQPA chief executive Leo Zussino told Lloyd's List DCN yesterday there continued to be strong demand for **coal** from Gladstone.

The port had scheduled a four-day maintenance shutdown last week and this was complicated by the breakdown of a Barney Point shiploader for several days.

The Barney Point terminal had set a shiploading record of 270,000 tonnes of **coal** last week just before it needed repairs.

Mr Zussino said the downtime and 14 new arrivals last week had a big impact on the queue.

'We expect that by Sunday the queue for RG Tanna will be 20,' Mr Zussino said.

'We have a capacity balance between shiploading capacity and what the **coal** mines want to ship.'

The balance could be disrupted if heavy rain last week delayed production.

Commissioning of a new shiploader by early April could add another 8m tonnes of capacity before a fourth berth is completed in September.

A similar situation is unfolding at the port of Hay Point, where 46 ships are now anchored off the coast waiting to load at either the Dalrymple Bay **Coal** Terminal or Hay Point **Coal** Services.

DBCT's queue is likely to be considerably higher than the 15-20 vessels waiting to berth about a month ago. However, the 46 ships includes vessels expected to berth at Hay Point.

A queue of eight ships for Hay Point **Coal** Services is considered high, meaning either or both terminals are likely to be congested.

DBCT's queue fell as low as five vessels during September last year.

The BHP-Mitsubishi Alliance, which operates the Hay Point terminal, and DBCT owner Babcock ' Brown Infrastructure were unable to be contacted for comment.

DBCT operations manager Greg Smith said last month, when the queue was less than 20, that it was operating at 90% of its capacity.

---- INDEX REFERENCES ----

COMPANY: CENTRAL QUEENSLAND PORTS AUTHORITY

INDUSTRY:  (Transportation (1TR48); Water Transportation (1WA23); Ports & Harbors (1PO28))

REGION:  (Australasia (1AU56); Oceania (1OC40); **Australia** (1AU55))

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.                                                                    **News**Room

2/23/07 LLOYDSLI (No Page)                                              Page 1

2/23/07 Lloyd's List Int'l (Pg. Unavail. Online)
2007 WLNR 3491385

                            LLOYDS LIST
                Copyright 2007 Informa Martime Trade and Transport

                          **February 23, 2007**

                  Newcastle revives    **coal**   quota system

                          Neville Smith

THE port of Newcastle on   **Australia's**   east coast is to reintroduce a quota
system less than six months after it was scrapped.

Record ship queues and increasing   **delays**   have cut   **coal**   export capacity and
taken significant tonnage from the shipping market.

The vessel queue at Newcastle grew further over the past week to 64 ships, the
longest in more than a year, representing waiting time of 19 days to load **coal**.

Exports had also dropped by 10% in a week, data on Monday showed.

Since the quota system was scrapped last September vessel queues have more than
doubled as producers overbooked export tonnage to boost shipments, in the process
over-stretching the port's **coal** throughput.

But the problem is not confined to steam **coal** exports.

Also of concern is worsening **congestion** at **Australia's** coking **coal** ports of
Dalrymple Bay, Hay Point and Gladstone.

The combined queue at Hay Point and Dalrymple Bay was 46 ships last week and is
approaching 30 vessels at Gladstone.

The quota system, first introduced in 2005, gives the leading producers
flexibility in the amounts of **coal** they can ship monthly.

The quotas are based on a fixed proportion of their total output but allow some
leeway to deal with changes in demand.

Newcastle operator Port Waratah **Coal** Services said the system would give producers
up to 180,000 tonnes above their quotas to allow for fluctuations.

The port said it would make an application to the Australian Competition and

              © 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Consumer Commission for the system to be implemented retrospectively from January 1 this year.

It said in a statement it expected interim authorisa- tion to be granted within four weeks of lodging its application.

Shipping analysts have been reluctant to ascribe market support to the **congestion**, mostly because, as a technical issue, it was always expected to be a short-term effect.

---- INDEX REFERENCES ----

COMPANY: PORT WARATAH COAL SERVICES

INDUSTRY:  (Transportation (1TR48); Water Transportation (1WA23); Ports & Harbors (1PO28))

REGION:  (Australasia (1AU56); Oceania (1OC40); **Australia** (1AU55))

Language:  EN

OTHER INDEXING:  (CONSUMER COMMISSION; PORT WARATAH **COAL** SERVICES)  (Hay) (Australasia; **Australia**)

PRODUCT: MOTOR FREIGHT TRANSPORTATION & WAREHOUSING; Transportation Services, NEC; Water Transportation Of Passengers; Marine Cargo Handling; Support Activities For Water Transportation; Support Activities For Transportation; Transportation and Warehousing; Port and Harbor Operations

SIC: 4200; 4789; 4480; 4491

NAICS CODE: 4883; 488; 48; 48831

Word Count: 364
2/23/07 LLOYDSLI (No Page)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.                                                          **News**Room

3/8/07 LLOYDSLI (No Page)                                              Page 1


3/8/07 Lloyd's List Int'l (Pg. Unavail. Online)
2007 WLNR 4334249

                              LLOYDS LIST
             Copyright 2007 Informa Martime Trade and Transport

                            **March 8, 2007**

              Quotas fail to prevent ship queues at Newcastle


HOW high can it go? The queue of ships waiting to load export **coal** at Newcastle
continues to break records, rising from 64 ships last week to a rumoured 73 this
week, with no end in sight despite the reintroduction of a shipment quota system,
writes Neville Smith.

In fact, **congestion** is expected to worsen ahead of the system's introduction on
April 1, according to the Hunter Valley **Coal** Chain (HVCC) Logistics Team which
represents rail and port operators at Newcastle.

The HVCC forecasts that the vessel queue will reach 88 by the end of March.

The vessel queue reportedly reached a new high of 73 ships last week before easing
to 69 this week.

Shipbroker SSY's Australian **Coal** Port **Congestion** Index, which measures average
berthing **delays** at all **coal** ports in **Australia**, climbed to a record 18 days at the
beginning of the week.

The queue won't stop **coal** exports rising overall compared to the shorter month of
February, however.

Planned exports for March have risen by 500,000 tonnes to a predicted 7.1m tonnes.

                     ---- INDEX REFERENCES ----

REGION:  (Australasia (1AU56); Oceania (1OC40); **Australia** (1AU55))

Language:  EN

OTHER INDEXING:  (AUSTRALIAN **COAL**; HUNTER VALLEY **COAL** CHAIN; HVCC; LOGISTICS TEAM)
 (Congestion Index; Neville Smith; Shipbroker SSY)

PRODUCT: Transportation Services, NEC; Water Transportation Of Passengers; MOTOR
FREIGHT TRANSPORTATION & WAREHOUSING; Marine Cargo Handling; Railroads,
Line-Hauling Operations; RAILROAD TRANSPORTATION; Support Activities For Water
Transportation; Support Activities For Transportation; Transportation and

                © 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 2**

7aanfrona                         Argument

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   FRONT CARRIERS LTD.,

4                    Plaintiff,

5             v.                              07 Civ. 6333 (RJS)

6   TRANSFIELD ER CAPE LTD.,

7                    Defendant.

8   ------------------------------x
                                             New York, N.Y.
9                                            October 10, 2007
                                             3:30 p.m.
10
    Before:
11
                       HON. RICHARD J. SULLIVAN,
12
                                             District Judge
13
                              APPEARANCES
14
    HOLLAND & KNIGHT
15       Attorneys for Plaintiff
    BY:  MICHAEL J. FREVOLA
16
    LENNON MURPHY & LENNON, LLC
17       Attorneys for Defendant
    BY:  NANCY R. PETERSON
18

19

20

21

22

23

24

25

7aanfrona                          Argument

1          (Case called)

2          MR. FREVOLA:  Your Honor, Michael Frevola, Holland &

3    Knight for plaintiff front Carriers Ltd.

4          THE COURT:  Mr. Frevola, good afternoon.

5          MR. FREVOLA:  Good afternoon, your Honor.

6          MS. PETERSON:  Nancy Peterson from Lennon Murphy &

7    Lennon representing the defendant Transfield ER Cape Ltd.

8          THE COURT:  Ms. Peterson, good afternoon.

9          All right.  Ms. Peterson, it is your motion, or your

10   order to show cause.  I have boned up on this area of the law.

11   I can't say I am as expert as you folks, so I am happy to be

12   educated.

13          It seems to me that the provisions of the law are

14   fairly straightforward, so I guess I have a couple of questions

15   for you.

16          MS. PETERSON:  Yes.

17          THE COURT:  Which is, it seems to me it is an

18   equitable test that I am supposed to be applying.  It is not

19   automatic, correct?

20          MS. PETERSON:  We would argue that it is automatic

21   unless the defendant shows good cause why the countersecurity

22   should not be ordered.

23          If you look at Rule E(7)(a), it provides that a

24   plaintiff for whose benefit the security has been given must

25   give security for damages in a counterclaim unless the court

7aanfrona                        Argument

1    for cause shown directs otherwise.   We believe it is a

2    mandatory standard unless there is good cause shown, which is

3    not here.

4            THE COURT:   I am going to ask Mr. Frevola to talk

5    about good cause.   I have looked at the Second Circuit's

6    rulings in Result Shipping v. Ferruzzi, and it seems to

7    basically say that a district court has to engage in a

8    balancing process, "a weighing of the interests giving rise to

9    the initial seizure and the burden of posting countersecurity

10   against the potential injustice of requiring the

11   defendant-counterclaimant to post security without affording

12   reciprocal protection."

13           Maybe I should ask Mr. Frevola.   I certainly

14   understand, and I have read the rule.   I have certainly read

15   your papers.

16           MS. PETERSON:   If you Shepardize those cases, if you

17   look at the courts of the Southern District that have

18   interpreted Result v. Ferruzzi, you will see Donbu Express,

19   which provides that countersecurity should be given unless the

20   damages are frivolous, the counterclaim is frivolous.   I

21   believe the standard is a little bit higher than maybe

22   implicated in Ferruzzi.

23           THE COURT:   I will come back to you.   I want to hear

24   from Mr. Frevola first.   I don't think you have had a lot of

25   time to look at the papers.   You probably got them last week or

7aanfrona                     Argument

1    early this week.

2            MR. FREVOLA:  No, your Honor, but I am familiar with

3    the law because I argued this very issue before Judge Stein

4    last Wednesday.

5            THE COURT:  I have no doubt you folks argue these all

6    the time.

7            MR. FREVOLA:  I was understanding from opposing

8    counsel this was merely a conference, and we will be briefing

9    this issue.

10            THE COURT:  We may be briefing this.  I am treating

11    this as sort of a premotion conference.  You are familiar with

12    those.  A lot of judges have those.

13            MR. FREVOLA:  Yes, your Honor.

14            If you go back, I wish I actually had the case in

15    front of me right now, but it is I believe Washington v.

16    Southern Navigation Steamship Co.

17            THE COURT:  I don't think I know that one.

18            MR. FREVOLA:  It is an old one.

19            THE COURT:  Was it George Washington?

20            MR. FREVOLA:  Maybe 1924, your Honor, or somewhere

21    thereabouts.

22            It is a relatively new maritime case.  That case was

23    dealing with the precursor to the present admiralty Rule E(7).

24    I believe it was Admiralty Rule 53, but don't hold me to it.

25    There was an issue that came up to the U.S. Supreme Court about

1    whether or not this countersecurity rule was a mandatory rule.

2              The Supreme Court specifically said that essentially

3    when we promulgated Admiralty Rule 53, we did it in effect to

4    codify or put into a standard rule our previous precedent.

5    That previous precedent has always said that this was an

6    equitable balancing of the right to be afforded to the

7    counterclaimant as opposed to the burden upon the plaintiff.

8              So I would submit to you, your Honor, it has always

9    been an equitable test.  There is a Fifth Circuit case called

10   Titan Navigation, which Result Shipping cites I believe with

11   approval, that talks about this balancing test and there are

12   several cases, your Honor, that speak to Rule E(7).

13             To this juncture your Honor, although I have a feeling

14   it's turning into a hot topic in terms of my last few months,

15   Rule E(7) is a rule upon which very little case law has been

16   created to this point, at least reported case law.

17             THE COURT:  We'll get to make some.

18             I am looking at the rule now.  It basically instructs

19   that any plaintiff shall give security in the usual amount and

20   form to respond in damages to the claims set forth in such

21   counterclaim unless the Court for cause shown shall otherwise

22   direct.

23             So that seems to give the Court discretion.  How much

24   I guess we can debate.  Tell me why under the facts in this

25   case the Court should not direct you to post security for the

7aanfrona                    Argument

1  counterclaim?

2       MR. FREVOLA:  There are four different reasons, your

3  Honor, that I submit create those issues.

4       THE COURT:  OK.

5       MR. FREVOLA:  I think the first one, perhaps the most

6  significant one, is that when you look at the rule of damages,

7  your Honor, it is a law school principle, hornbook principle

8  that while you may have a breach of contract, unless the breach

9  is a breach that causes the plaintiff, or in this case the

10  counterclaimant damage, unless there is a damages result, that

11  claim is essentially a claim without an amount to claim.  It is

12  a zero-sum claim.  There is a technical breach, but there is no

13  loss to the claimant.

14       THE COURT:  Why is there no loss to -- I mean, I am

15  not sure that Ms. Peterson is going to agree with what you just

16  said.  Assuming what you say is true, why is there no loss in

17  this case?

18       MR. FREVOLA:  This charter voyage that we are talking

19  about here was a voyage that Transfield has characterized as a

20  60-day voyage.  We would characterize it probably as an 85-day

21  voyage, but, in any event, I don't think there is a dispute,

22  because of Ms. Peterson's own affirmation or affidavit, it is

23  her declaration --

24       THE COURT:  OK.

25       MR. FREVOLA:  -- that for the time period at issue,

7aanfrona                        Argument

1   when the initial contract between Front Carriers and Transfield

2   was supposed to govern, Transfield actually made somewhere in

3   the area, your Honor, of, I believe somewhere in the area of --

4   the number of $500,000 is coming to me, but they actually made

5   a profit, your Honor, on the period of time that our contract

6   was supposed to govern.

7             THE COURT:  What do you mean?

8             Whether they made a profit or not is not the issue.

9   Isn't the issue that they would have made more if your client

10  had lived up on its obligations under the contract?

11            MR. FREVOLA:  Actually, your Honor, thank you for

12  couching it that way.  That was a more artful way to

13  characterize it.  Under our charter they were going to make an

14  $8,000 a day profit.

15            THE COURT:  OK.

16            MR. FREVOLA:  Under Transfield's own papers they made

17  a $55,000 a day profit on the replacement charter.

18            THE COURT:  To make it clear, they were able to use

19  the resources that would have been otherwise occupied living up

20  to the obligations of the contract and make more money as a

21  result of it, and so no harm, no foul?

22            MR. FREVOLA:  Precisely, your Honor.  They are

23  creative in terms of their claim.  I will give them that.

24            What happened is, they say that -- and Ms. Peterson

25  can dispute this, but I think I've got the nature of their

1    claim correctly -- is that the vessel was being used

2    essentially at a lower profit for this particular voyage to get

3    the vessel from Australia to northern Europe.

4              THE COURT:  Yes.

5              MR. FREVOLA:  The basis for that was because, again,

6    in contemplation that the northern European market was much

7    more lucrative and therefore they take a bit of a hit on the

8    initial portion, but then recover this once the vessel was in

9    the North Atlantic market.

10             THE COURT:  It sounds plausible.  I don't know.

11             MR. FREVOLA:  Again, your Honor, the problem is that

12   they're seeking this recovery for 150 days after the time when

13   this contract governed.  In other words, the time when they had

14   a duty to mitigate, the time when the inquiry about whether

15   they do better or worse, in that time period they did much

16   better.

17             It looks like they may have done 600 percent better.

18   The way the papers are couched now, and again these are papers

19   that are not supported by any market expert or anything like

20   this, but an attorney essentially reciting some numbers, there

21   is a claim that the North Atlantic market was something that

22   Transfield was doing because they saw this as a positioning

23   voyage.

24             There is nothing in the charter party, there's nothing

25   in any contractual negotiations, there's nothing showing that

7aanfrona                    Argument

1    this issue was communicated to Front Carriers at the time when

2    the parties contracted.

3            So I am moving on to the second issue.

4            THE COURT:  The first point is basically that the duty

5    to mitigate resulted in a situation where the mitigation

6    profits exceeded the contract profits?

7            MR. FREVOLA:  Yes, your Honor.  That's item one.

8            THE COURT:  Right.

9            MR. FREVOLA:  Item two, under Hadley v. Baxendale --

10           THE COURT:  It's been a long time since I have heard

11   that one cited.

12           MR. FREVOLA:  In terms of Hadley, your Honor, there

13   have been some inroads made on Hadley.  Again, Ms. Peterson's

14   well versed in this.  Her affirmation talks about Front

15   Carriers' potential knowledge, but what she's saying is

16   essentially that we should have known that they were going to

17   charter it in this market and that the market was going to go

18   crazy two months hence from the time we were agreeing to do

19   this charter.

20           Your Honor, I have got indices showing the

21   fluctuations of the market.  In the May charter period they are

22   talking about, the market went berserk and came back down to a

23   more similar amount to what they're getting right now on the

24   charter they've got right now out of the Pacific.

25           THE COURT:  I am not sure I'm following what the

7aanfrona                          Argument

1    second point is.

2            The second point as to why the Court in its discretion

3    should not require the posting of security is what?

4            MR. FREVOLA:  They are remote and speculative damages

5    that were not contemplated by the parties at the time of

6    contract.

7            THE COURT:  All right.

8            MR. FREVOLA:  So, your Honor, the first two points are

9    actually the legal points, where essentially if we were talking

10   about a failure to state a claim, we would make a

11   failure-to-state-a-claim argument to have the case dismissed if

12   the Court agreed with us.

13           THE COURT:  All right.  Let me hear --

14           MR. FREVOLA:  I am not saying that applies here, but

15   there is a reason I am saying that, because in terms of talking

16   about procedure, your Honor, I think it's going to come up

17   later.

18           THE COURT:  OK.  I understand point number two.

19           What's point number three?

20           MR. FREVOLA:  Point number three is that

21   Ms. Peterson's affidavit or declaration -- I'm sorry, I keep

22   saying the wrong word -- states that the vessel should have

23   reached Europe around May 10, 2007.  That's paragraph 26 of her

24   affidavit.

25           THE COURT:  Yes.  Give me a second.

7aanfrona                          Argument

1          MR. FREVOLA:  Yes, your Honor.

2          THE COURT:  Paragraph 26.  OK.

3          MR. FREVOLA:  The top paragraph on the page.

4          THE COURT:  Yes.

5          MR. FREVOLA:  The window of time when the vessel was

6   to be presented in Australia, your Honor, was I believe the

7   second week of March, and both parties agree that the voyage

8   would have taken 60 days to get to Europe.

9          So those two facts are agreed.  The problem --

10         THE COURT:  So you agree that May 10 is the date?

11         MR. FREVOLA:  There is one more fact, your Honor.

12  It's not really a debatable fact because it is an absolute

13  fact, and that it is occurred and that it was occurring in

14  Australia.  The Australian loading ports we're dealing with

15  here, your Honor, have had a 25-day delay, a queue of vessels

16  where you have to wait for 25 days to load.

17         That has been going on for the last several years.  In

18  fact we put in, in Exhibit 15 to our amended complaint, this

19  listing of the delays in Australia.

20         THE COURT:  You are saying that the 60 days should be?

21         MR. FREVOLA:  85 days.  In other words, the vessel

22  would have gotten to the North Atlantic not on May 10 but

23  instead more around June 5.

24         The indices I have here in terms of the market, your

25  Honor, show that the market dropped drastically between May 10

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7aanfrona                        Argument

1    and June 5.  In terms of when you are looking at the claim

2    that's being made, your Honor, the Court is always allowed to

3    look to see if the claim for security, the quantum is based on

4    some degree of fact.  Here, your Honor, unless they could have

5    beamed the vessel to the North Atlantic, it physically couldn't

6    get there on May 10, which is the time they are seeking to have

7    the Court apply a damages calculation.

8           So even accepting their claim as correct, their

9    damages are way overstated.

10          THE COURT:  How overstated?

11          MR. FREVOLA:  I got the indices this morning, your

12   Honor.  I would say probably maybe four times overstated in

13   terms of the quantum above what they made on -- they were

14   saying they made $55,000 a day.  They should have made $107,000

15   a day.  I believe that the market rate in the North Atlantic

16   was 75,000, maybe 80,000.  So say maybe their claims are

17   overstated by 60 percent.  Maybe they would have taken 40

18   percent of what they're claiming, but not the entire 100

19   percent of what they're claiming in excess.

20          THE COURT:  OK.  But that is not an argument to not

21   post security.  That's an argument to post less security.

22          MR. FREVOLA:  Absolutely, your Honor.

23          THE COURT:  All right.

24          MR. FREVOLA:  The last one I believe is an argument

25   that also goes to the equities.  Again, it sort of resonates in

7aanfrona                           Argument

1  the issue of mitigation.  That is that when the SEA MARCH was

2  nominated by Transfield, which Transfield admits it was

3  nominated, so the vessel was going to present in Australia, a

4  dialogue happened between the parties in terms of where the

5  vessel was going to go, in terms of the where it was going to

6  load, and where it was going to discharge.

7         The two loading parts proposed by Front Carriers were

8  two ports that were inside the charter.  Of the three delivery

9  ports that were offered, one was Dunkirk, which is a named port

10  in the charter; another one was I believe Hollystone, which is

11  a port in Ireland, which again is inside the range of the

12  charter; the last one was in Taranto, Italy, which, your Honor,

13  falls between the heel and the toe of the boot in Italy.

14         But even in that situation, your Honor, in terms of

15  coming up to the Suez Canal and through the Mediterranean

16  Taranto is also on the way to the continent.

17         THE COURT:  OK.

18         MR. FREVOLA:  The whole position here is that we

19  needed to position the vessel on a positioning voyage, and

20  because they breached the contract, we couldn't do that.  The

21  offer here was to go to one of these three ports, and the offer

22  was made and was rejected, so there was a mitigation voyage.

23  Even if you find that there was a port outside the range, it

24  was a mitigating voyage which they could have taken and gotten

25  that benefit in northern Europe if they wanted.

7aanfrona                    Argument

1          Your Honor what happened is that they had a

2    55,000-dollar-a-day charter in the Pacific which they cashed in

3    on.   It is our position that they breached their duty to comply

4    with our charter because they had this 55,000-dollar-a-day

5    charter that they were going to get.

6          since this complaint has been filed, they realize

7    that, hey, the North Atlantic market was even higher.   Let's

8    counterclaim against them and let's make it such that their

9    bringing up security on a claim where they have essentially

10   said the vessel wasn't there, we had to charter in a new

11   vessel, we lost all this money, becomes a defending of a

12   counterclaim for $5 million and a having to post a bunch of

13   money to get our security.

14          That's what the fight has turned into.

15          THE COURT:   OK.   In some ways that is a variation on

16   the first point I guess.

17          MR. FREVOLA:   It is, your Honor.   The reason why I

18   broke them down, your Honor, is because depending on how you

19   look at it, if you look at it as -- there are cases that say

20   that an inquiry into the merits should not be conducted.

21          I think that is true, your Honor, if you are talking

22   about whether or not there is an admiralty claim and whether

23   it's been stated.   There is no doubt this is an admiralty

24   claim.   There is also no doubt that this is a proper

25   counterclaim under E(7) because it is a compulsory counterclaim

7aanfrona                    Argument

1    under 13(a).

2         So on those two grounds, there is no dispute, and we

3    will go on the record and say that.

4         But on the damages issue, there are a number of

5    decisions that talk to this issue, about courts always have the

6    ability to inquire whether the security is too large or whether

7    it should be given at all.

8         On the first two legal points, your Honor, I submit

9    that there is no issue in terms of having to look at the

10   merits.  It is totally a legal issue.  Therefore, you can

11   determine whether or not the claim has a legitimate basis and

12   decide whether or not the countersecurity should be given.

13        On the two factually based ones, your Honor, it goes

14   more towards the issue of quantum and the amount that should be

15   given, either reduced or even none because they mitigated one

16   way versus another and they are not damaged.

17        THE COURT:  I think I get it.  Let me ask you one

18   other question.

19        MR. FREVOLA:  Yes, your Honor.

20        THE COURT:  The attachment order that Judge Karas

21   signed was for I think up to $15 million.

22        MR. FREVOLA:  Yes, your Honor.

23        THE COURT:  What has been attached to date is only

24   three and change, am I right.

25        MR. FREVOLA:  That's correct, your Honor.

7aanfrona                    Argument

1      THE COURT:  OK.  Was there an intervening order by

2  Judge Karas?

3      MR. FREVOLA:  What happened, your Honor, was after we

4  had the motion to vacate that was argued before Judge Karas --

5      THE COURT:  Right.

6      MR. FREVOLA:  -- Judge Karas required us to file an

7  amended verified complaint which essentially stated our claims

8  with more particularity.

9      That's why the document got so thick.  In the first

10  complaint there was still a waiting period to figure out

11  exactly what the charges were going to be on the last voyage

12  and what our damages claim was going to be.

13      It turned out after doing that the damages were

14  slightly higher by about $700,000 and so the amended amount was

15  requested and being added, so it went from like $14.2 million

16  to $15 million even.

17      THE COURT:  You did not attach the majority of --

18      MR. FREVOLA:  Not at all, your Honor.  There is

19  another issue in terms of, if we had not attached as much as

20  they're requesting, there are some courts that say I am only

21  allowing to you attach as much as your opponent got.

22      THE COURT:  There are cases on that?

23      MR. FREVOLA:  There are cases on that as well.

24      THE COURT:  I guess I did have another question, which

25  is arbitration.

7aanfrona                    Argument

1          Is there an arbitration that's going to take place in

2    London or someplace on this?

3          MR. FREVOLA:  By filing the amended verified

4    complaint, your Honor, we have gone on the record by saying

5    essentially we would rather proceed in New York, although we

6    completely acknowledge that if they require arbitration we

7    would have to go there and they do not have to brief that.  If

8    they tell us they want to go to France, we'll go to France.

9          THE COURT:  Maybe I should ask Ms. Peterson, is there

10   an arbitration clause in the agreement?

11         MS. PETERSON:  I believe it provides for arbitration

12   in France.

13         MR. FREVOLA:  In France.

14         THE COURT:  I remember that, which is a nice place to

15   go.  New York is nice, too.

16         It is not a mandatory arbitration clause?  Is this

17   something you have the discretion, the defendants have the

18   discretion here to basically pull the lever and make this an

19   arbitration or not?

20         MS. PETERSON:  No.

21         I assume the parties could agree to go to arbitration

22   in New York.  However, we have not agreed.  So arbitration is

23   to proceed in France as far as I am aware.

24         THE COURT:  OK.  But is there an arbitration taking

25   place in France or scheduled?

7aanfrona                    Argument

1        MR. FREVOLA:  Not yet, your Honor.  Under 9 U.S.C. we

2   are allowed to bring the action in court and then either ask

3   the Court to direct arbitration or essentially waive the

4   arbitration provision.  We've indicated that if it was up to us

5   we would stay in court here, your Honor.

6        But we have also acknowledged the fact that under

7   well-settled principles under Title 9 that if our adversary

8   does not choose to waive the clause then we have to go.

9        THE COURT:  All right.

10       Maybe I don't fully understand that.

11       MS. PETERSON:  This was the subject of our initial

12   motion to vacate, that the arbitration had not been issued, and

13   thus the claim was premature.  If the court wanted to order

14   that arbitration be initiated such that we could get this claim

15   moving in France --

16       THE COURT:  That's something Judge Karas declined to

17   do?  Is that what you are telling me?

18       MS. PETERSON:  I believe he gave you some time to

19   initiate arbitration.

20       MR. FREVOLA:  Or to actually file an amended

21   complaint.

22       MS. PETERSON:  Right.

23       MR. FREVOLA:  Which we did, and we basically went on

24   the record to say, Judge Karas, if it's up to us we're going to

25   forgo a Paris arbitration, which again it is a right you can

7aanfrona                    Argument

1  waive.

2         But at the same time, understanding that if our

3  contractual counterpart demands arbitration, that they were

4  going to make a motion to your Honor to compel arbitration, we

5  don't think we would win.

6         THE COURT:  I get that.

7         I am not saying I would do this, but I just want to

8  make sure I understand:  For the Court to just direct the

9  parties regardless of whether the defendants want to exercise

10 that clause or not, is there any ability?

11        MR. FREVOLA:  I think if neither party decided to

12 enforce the clause, your Honor, I think we would be here.

13        THE COURT:  OK.

14        MR. FREVOLA:  I think they are going to enforce it.

15        MS. PETERSON:  We are going to enforce it.

16        If arbitration is not initiated in a reasonable amount

17 of time, I believe we intend to move for dismissal for want of

18 prosecution.

19        THE COURT:  OK.  None of that eliminates the need to

20 deal with this issue --

21        MS. PETERSON:  That's correct.

22        MR. FREVOLA:  Agreed.

23        THE COURT:  -- which is the security issue.  Whether

24 the arbitration goes forward tomorrow or in six weeks or

25 whether you proceed with the motion to dismiss for failure to

7aanfrona                    Argument

1    prosecute, we still need to resolve this issue.  Probably maybe

2    the last one would alter that, but I think we need to get this

3    issue regardless of whether the arbitration is commenced sooner

4    or later.  OK.

5         Ms. Peterson, I want to give you an opportunity to

6    respond to some of the points that Mr. Frevola made.

7    Obviously, this there seems to be a little bit of daylight

8    between you two as to whether and what extent the Court has

9    discretion under Rule E(7).

10        MS. PETERSON:  The admiralty courts are equitable

11   courts.  The Court, of course, does have discretion.  I think

12   if you look at the most recent cases awarding countersecurity,

13   the court rarely does exercise that discretion.  Rule B

14   provides plaintiffs with an unprecedented remedy in order to

15   obtain security for their claims.

16        Under the Second Circuit's holding in <u>Aquastolle</u>, the

17   court provided that it is improper for courts to engage in a

18   substantive inquiry, into an inquiry into the substantive

19   merits of the underlying claim thereby insulating plaintiffs

20   from having a great deal of scrutiny as to their claims.

21        What Mr. Frevola would like to do is have a greater

22   inquiry into our counterclaims than maybe has even gone into

23   plaintiff's claims.

24        Right now there's three and a half million dollars

25   attached, and the plaintiff continues to serve the garnishee

7aanfrona                    Argument

1   banks every day looking for additional funds up to the $15

2   million.

3           Defendant has alleged a prima facie valid counterclaim

4   and is now seeking the same remedy which plaintiff has already

5   been afforded.

6           THE COURT:  I get that.  I guess the issues are, as an

7   equitable court, I have to look to some extent whether there is

8   a legitimate counterclaim here, right?

9           MS. PETERSON:  Yes.

10          THE COURT:  There is a threshold inquiry that I need

11  to make.

12          MS. PETERSON:  The threshold inquiry, I would direct

13  the court to <u>Tideline</u>, the <u>Tideline</u> case by Chief Judge Wood,

14  in which you would look at the pleading standard when we have

15  pled a valid claim.

16          We should emphasize that French laws do apply.  We

17  have alleged a claim.  We have alleged there's been a breach of

18  contract, causation, and damages.

19          Any defenses as to mitigation, whether we properly

20  mitigated, whether as to if there was proper causation, these

21  are aspects for the French court to look at.  It isn't for this

22  court to look at the defendants to determine that --

23          THE COURT:  I am looking at, this is the <u>Ferruzzi</u> case

24  again, <u>Result Shipping v. Ferruzzi</u>.  This is at page 400, where

25  the Second Circuit is basically saying that the rule is not

7aanfrona                        Argument

1    intended to impose burdensome costs on a plaintiff that might

2    prevent it from bringing suit.

3            So it seems to me what the Second Circuit is telling

4    me is I need to inquire a little bit as to whether the intent

5    of the counterclaim is designed to chill plaintiffs from

6    bringing suit, and doesn't that necessarily require some

7    inquiry into the merits of the case?

8            MS. PETERSON:  Front Carriers is a substantial company

9    who would not have a problem posting that, if that's a problem

10   in terms of equity.  The claim is valid.  We intend to bring it

11   in the underlying arbitration and will do so when the

12   arbitration is initiated.

13           I think there the inquiry ends in determining

14   whether -- it is determining whether that is fair and

15   equitable.  There's been no showing of bad faith, malice, or

16   any other reason why it should be found inequitable.

17           THE COURT:  I get that point.  That's the threshold

18   question.

19           The four points that Mr. Frevola makes, the first is

20   that there's basically a duty to mitigate and that the

21   mitigation that took place here was sufficient to enrich your

22   client beyond the contract, and so there's no loss, no harm, no

23   foul.

24           MS. PETERSON:  I heard his argument, but I agree with

25   your Honor's first understanding of it, in that he says that

7aanfrona                        Argument

1    there was no loss.  But under our interpretation we could have

2    gotten more profit than we initially did.

3              THE COURT:  Let me stop you there.  I'm sorry to

4    interrupt you.

5              By living up to the terms of the contract, if both

6    parties had lived up to the obligations under the contract,

7    your view is that your client would have made more money than

8    it ended up making as it turned out?  Do I have that right?

9              MS. PETERSON:  We would have had made more money

10   because it was a positioning voyage.

11             THE COURT:  I think I understand.

12             MS. PETERSON:  That's the crux of the argument.  It

13   was used as a positioning voyage.  It's commonly done, and it

14   could be expected.  We believe these damages could be

15   reasonably expected by the charterer and therefore that they

16   can be obtained in the arbitration.

17             THE COURT:  Do I have enough in front of me now to

18   make that determination as to whether the fact that this is a

19   positioning voyage substantiates the fact that your damages

20   would be I think in the neighborhood of -- what is it?  $5

21   million --

22             MS. PETERSON:  Yes, your Honor.

23             THE COURT:  -- with interest?

24             MS. PETERSON:  I believe you do.  Again, pointing to

25   the Tideline case, substantial evidence does not have to be

7aanfrona                          Argument

1    shown.  It is a pleading standard.

2         Just as the plaintiff met a pleading standard and they

3    didn't have to submit all of their evidence to support their

4    case, we do not have to submit all the evidence to support our

5    case at this time.

6         THE COURT:  Maybe not at the time that you seek the

7    attachment, but at some point, for them and I guess for you, if

8    there is an attachment, then the other side gets to come to

9    court and say that the attachment is unwarranted or overly

10   large, right?

11        MS. PETERSON:  That is correct.

12        But the standard in Donbu Express, Judge Scheindlin's

13   case, is that the damages have to be -- a reasonable estimate

14   must be used.  In that case, the defendant made a counterclaim

15   and requested security for that counterclaim.

16        The plaintiff submitted an estimate of what the

17   profits would have been.  The defendant submitted an estimate

18   of what the profits would have been, and the Court found that

19   as long as the defendant's estimate is just reasonable, then it

20   goes with the defendant's estimate.  So that case is very on

21   point if your Honor wants to --

22        THE COURT:  How can I determine what's reasonable

23   without having an inquiry as to what the facts are?

24        MS. PETERSON:  We both can submit expert reports.

25   That is definitely within the defendant's rights, to submit

7aanfrona                          Argument

1   that.

2            THE COURT:  Is that what you contemplate the next step

3   is?  Help me out here.  I'm trying to figure out what I should

4   be doing.

5            MS. PETERSON:  If the Court would like us to submit

6   expert reports from both sides, we can do that, just showing

7   that they're reasonable.  I'm just reaffirming that the

8   threshold is very low for putting forth our damages.

9            THE COURT:  I got it.  Threshold aside, you take issue

10  with Mr. Frevola's argument that there was mitigation here

11  sufficient to eliminate any loss under the contract?

12           MS. PETERSON:  We take issue with that.

13           THE COURT:  Yes.

14           MS. PETERSON:  We say that there was not mitigation,

15  and we set forth a calculation in our motion papers on why we

16  believe we lost profits.

17           THE COURT:  That's based on the positioning, the money

18  you would have made having the boat where you wanted to be

19  after the voyage under the contract?

20           MS. PETERSON:  That's correct.

21           THE COURT:  I should be looking at that to figure out

22  what the loss is?

23           MS. PETERSON:  That's correct.

24           THE COURT:  Let me jump then to Mr. Frevola's third

25  point, which is that the amount should be mitigated because

7aanfrona                        Argument

1    boats in Australia sit around for 25 days, and so your

2    calculation doesn't take that into account and is therefore

3    inflated?

4        MS. PETERSON:  I see that he has mentioned that.  That

5    is a hypothetical as well.  We have made an estimate, and

6    that's his estimate, that there's 25 extra days or that there

7    would be 25 days of delay.

8        However, under our estimation -- I mean that's the

9    best we can estimate at this time.  We don't know if that would

10   have happened.

11       THE COURT:  I have to make a determination as to, A,

12   whether security needs to be posted and, B, what is the proper

13   size of the security.  So again, experts?  We have a hearing?

14   We have witnesses?

15       MS. PETERSON:  What would happen is that he will

16   submit his opposition papers to our motion and we will submit

17   our reply papers.  In those papers both of us will submit our

18   expert reports saying what we believe the reasonable estimate

19   of damages are from qualified individuals and the Court will

20   look at them.  As long as our estimate is reasonable, then I

21   believe the court should uphold our request.

22       THE COURT:  I am going to need to get obviously some

23   evidence or some testimony that would enable me to make the

24   determination as to what is reasonable.  The standard is not

25   beyond a reasonable doubt or probable cause or something like

7aanfrona                          Argument

1    that.   It is reasonable?

2              MS. PETERSON:   Reasonable.

3              THE COURT:   That's good for you.

4              MS. PETERSON:   Yes.

5              THE COURT:   But I still need something.   I still need

6    some evidence on which to make a finding, right?

7              MS. PETERSON:   We've pled it.   There is an attorney

8    declaration.   But if the Court would like more, we are happy to

9    provide it.

10             THE COURT:   It just seems I have two attorneys saying

11   opposite things as to what the damages should be or what

12   security is appropriate.   So when I've got a stalemate based on

13   attorneys, does the inquiry end there and the counterclaimant

14   just wins, or do I need to get more?

15             MS. PETERSON:   We would argue that you do not need to

16   get more and that that is enough.   But to support our claims we

17   can submit this expert report.

18             THE COURT:   All right.   Then I guess the <u>Hadley v.</u>

19   <u>Baxendale</u> point was point number two, which is that the damages

20   asserted are remote and speculative and could not be foreseen

21   at the time that the contract was initiated.

22             Do I have that right, Mr. Frevola?

23             MR. FREVOLA:   Yes, your Honor.

24             MS. PETERSON:   That is a defense that needs to be

25   raised in the underlying action.   First of all, it is under

7aanfrona                      Argument

1    French law, so whether <u>Hadley v. Baxendale</u> applies at all is

2    questionable.

3              So this is a defense that really needs to be addressed

4    by the French attorneys and whether these were foreseeable.  We

5    have alleged that they were foreseeable.  That should satisfy

6    the pleading requirements for the counterclaim.

7              THE COURT:  OK.

8              MR. FREVOLA:  Your Honor, may I answer that one?

9              THE COURT:  Let me just make sure that Ms. Peterson

10   has a chance to respond to each of your points and then I will

11   come back to you, Mr. Frevola.

12             MR. FREVOLA:  Sure.

13             THE COURT:  I guess the fourth point, you were

14   speaking at the same time I was taking notes, and I don't fully

15   comprehend my notes here.

16             Mr. Frevola, what was your fourth point?

17             MR. FREVOLA:  Our fourth point was that we actually

18   offered the very position voyage and they refused.

19             THE COURT:  It was the variation on mitigation.

20             MR. FREVOLA:  Yes, your Honor.

21             THE COURT:  What, if anything, do you say to that,

22   Ms. Peterson, or do you think it's even necessary to respond to

23   this issue?

24             MS. PETERSON:  I don't think it's necessary to respond

25   to.  That mitigation charter was obviously unacceptable.  I can

7aanfrona                    Argument

1   contact my client on why that was unacceptable, but we did in

2   fact mitigate the way we did and still came up with a present

3   profit calculation.

4        THE COURT:  Let me ask you a slightly different

5   question.  You are asking for $5 million and change.

6        MS. PETERSON:  Right.

7        THE COURT:  Plaintiffs have only at this point

8   attached $3 million and change off of a $15 million attachment

9   order.

10        MS. PETERSON:  Yes.

11        THE COURT:  Does that fact that only 20 percent of the

12   attachment order assets have been attached to date mean that I

13   mitigate against the size of the counterclaim attachment or

14   security that you are seeking?

15        MS. PETERSON:  Your Honor, I am unaware of any

16   percentage-based calculations in terms of countersecurity.

17        What I believe plaintiff's counsel was saying to the

18   Court is that there is some case law saying that the

19   countersecurity is limited up to the dollar that plaintiff has

20   attached.  It's not determined to a percentage basis.

21        THE COURT:  So you would be limited to the three and a

22   half and change.

23        MS. PETERSON:  Judge Hellerstein has a case which is

24   slipping my mind right now where it's matched dollar for

25   dollar.  For example, if they attached 10 extra dollars, then

7aanfrona                    Argument

1    they are obligated to give us countersecurity for that 10 extra

2    dollars up to the amount of our countersecurity requested.

3            THE COURT:  OK.  So it would be a wash up to $5

4    million, and then anything after that they get to attach?

5            MS. PETERSON:  That's correct.  I believe that this

6    would accomplish the very purpose of countersecurity, which is

7    to put the parties on equal footing.

8            THE COURT:  That makes sense.

9            I guess we need to brief it.  I'm curious to see

10   whatever attachments or further facts you can give me, but I

11   will leave that up to you as to what is appropriate.

12           Let's talk about a schedule here.  Mr. Frevola, how

13   much time do you think you need?

14           MR. FREVOLA:  Your Honor, Ms. Peterson raises one

15   point which I think is one that needs to be addressed in terms

16   of the timing.  That is that the issue of French law, Rule 44.1

17   allows the Court to take declarations look into textbooks

18   whatever to find out what foreign law is and make a decision on

19   that as a matter of law as opposed to a matter of fact, which

20   again goes away from talking about merits and just talking

21   about issues.

22           In this situation we are expecting to get a

23   declaration from French counsel that talks about how the French

24   version of damages and consequential damages and

25   foreseeability, etc., is consistent with English and U.S. law

7aanfrona                   Argument

1   on this issue.

2           THE COURT:  OK.

3           MR. FREVOLA:  That's probably the most lengthy time

4   issue I'm looking at.

5           Ms. Peterson and I had actually talked about this, and

6   we were going to propose next Friday for us for our opposition

7   papers and the following Friday for them so they can again have

8   some time to get a response.

9           THE COURT:  OK.  That seems reasonable.

10          MS. PETERSON:  We would request a hearing on this

11  issue.

12          THE COURT:  All right.

13          Next Friday for you, Mr. Frevola.  The week after

14  that -- next Friday is the 19th you mean?

15          MS. PETERSON:  Is that the 19th?

16          THE COURT:  You mean the 12th or the 19th?

17          MR. FREVOLA:  The 19th, your Honor.

18          THE COURT:  The 19th of October for you, Mr. Frevola,

19  and the 26th for you Ms. Peterson.  I don't know whether reply

20  or not, or we just go to the hearing.

21          MR. FREVOLA:  Once they're in, your Honor, I think we

22  should probably go to the hearing.

23          MS. PETERSON:  That would be preferable.

24          THE COURT:  I guess I have to read this and figure

25  this all out as well.  Should we set it, then, for the hearing

7aanfrona                    Argument

1   date now, or should I get in touch with the parties after I

2   have seen the submissions?

3           MR. FREVOLA:  I didn't bring my schedule with me.  If

4   we could maybe set that with chambers.

5           MS. PETERSON:  We would prefer that it would be set

6   pretty close --

7           MR. FREVOLA:  I am thinking probably the week after

8   the 26th, that five-day period in that week.  I just don't know

9   actually what I have committed to in the middle of that week.

10  I would like to check it out.

11          THE COURT:  Subject to the Court's availability, as

12  well.

13          MR. FREVOLA:  Absolutely, your Honor.

14          THE COURT:  After I get your submission, I will have a

15  better idea perhaps of what I think this hearing will entail.

16          Any chance of you two getting together and figuring

17  out what is -- reaching some sort of compromise or settling

18  this in advance of the hearing, knowing that hearings take time

19  and cost money and that motions cost money, French counsel

20  costs money?

21          MR. FREVOLA:  I can ask, your Honor.  I think that the

22  nature of the particular dispute here, this one's a tough one.

23  We can ask.

24          THE COURT:  It sounds fascinating.  It sounds

25  interesting.  I am not looking to dodge it.  At every

7aanfrona                    Argument

1    conference I certainly ask the parties to explore whether there

2    is a way to resolve it short of full-blown litigation and short

3    of the expense that accompanies it.

4            That's up to you.  But if you think you might be

5    getting there, let me know sooner rather than later.

6            MR. FREVOLA:  Yes, your Honor.

7            One other thing, your Honor, in terms of going on the

8    record on this, if there is any perception of failure to

9    prosecute, if the Court would like to set an initial conference

10   on this matter --

11           THE COURT:  I will wait for a motion on that.

12           You are not making that motion yet, Ms. Peterson, are

13   you?

14           MS. PETERSON:  Not yet.  It is definitely within our

15   immediate contemplation.

16           MR. FREVOLA:  I just don't understand.  If I

17   understood the basis for failure to prosecute, your Honor, I

18   think if we asked the Court for a Rule 16 conference so that we

19   can start discovery, if they choose to enforce their

20   arbitration clause, and they ask us to go to arbitration, we

21   will commence it.  We'll stipulate to them winning that

22   application before the Court.  But until such time, we are

23   intending to go forward here in New York.  I don't understand

24   the failure to prosecute argument.

25           THE COURT:  Let's pause for a moment.

7aanfrona                    Argument

1           Your intention is to go forward here in New York.  You

2   are the plaintiff.  You filed the complaint.  You are ready to

3   go.

4           MR. FREVOLA:  Yes, your Honor.

5           THE COURT:  No one is moving to dismiss anything.

6   There is a claim under a contract, and there may be

7   counterclaims under a contract, so there's going to be a

8   resolution to this dispute.

9           If it's here, then there's going to be discovery,

10  clearly.

11          If it's going to be arbitrated in Paris or elsewhere

12  in France -- I don't know where in France -- in France, then we

13  are going to stay this matter pending the outcome of the

14  arbitration.  We'll just leave the attachments in place, see

15  how it shakes out there, and enforce whatever comes out there

16  probably.  Right?

17          MR. FREVOLA:  Yes, your Honor.

18          MS. PETERSON:  The problem is the arbitration has not

19  been initiated.  There's no basis at this time to bring this

20  action in New York.  Defendant hasn't consented to that.

21          There is a mandatory arbitration clause.  The fact is

22  that sometimes what happens with these attachments is that the

23  attachment gets taken out, $3 million gets taken, and no

24  arbitration is started for over two years.

25          THE COURT:  If you want to make a motion based on

7aanfrona                    Argument

1  that, that would be one thing.

2          MS. PETERSON:  That's what the motion would be based

3  upon.

4          THE COURT:  I understand Mr. Frevola to be saying

5  something different.

6          MR. FREVOLA:  I am, your Honor.  Judge Karas addressed

7  this.  He said you can either go start the arbitration in Paris

8  or you can file the amended verified complaint that announces

9  your intention to go forward in New York, even though there is

10  an arbitration clause.

11          The remedy afforded the defendant would be to

12  essentially move to stay and have the parties go to

13  arbitration.  I am saying if that motion ever is going to be

14  asked for the Court to have a pretrial conference, we will at

15  that point stipulate to going to Paris without the motion

16  having to be made.

17          THE COURT:  I don't think it needs a motion.  I think

18  it really needs to be a declaration in court or out of court by

19  Ms. Peterson or her clients that they want to compel

20  arbitration in France.

21          MR. FREVOLA:  At that point, your Honor, we are not

22  going to fight it.

23          MS. PETERSON:  OK.

24          MR. FREVOLA:  I don't understand the issue about

25  failure to prosecute or dismissing a case for not prosecuting

7aanfrona                        Argument

1   it.

2         THE COURT:  It seems to me the way out of here, if you

3   don't like being here -- I don't take it personally -- is to

4   compel arbitration under the agreement.  I don't have the

5   agreement in front of me, but I assume that's the way to do it.

6   If that were the case, then it sounds like the plaintiffs

7   wouldn't even be objecting.

8         MR. FREVOLA:  That is exactly right, your Honor.

9         THE COURT:  So if that's where we're going, maybe it

10  makes sense to do that now before everybody briefs -- you still

11  need to brief this, though.

12        MR. FREVOLA:  We still need to brief it.

13        THE COURT:  So let's brief it.  But it would be better

14  to know if I'm handling this only for purposes of

15  prearbitration attachments and security as opposed to discovery

16  and the ultimate resolution of the dispute.

17        MS. PETERSON:  That's what we intend.  We'll submit

18  the declaration.

19        THE COURT:  All right.  Maybe just telling them is

20  enough.  I will leave that to you two.

21        MR. FREVOLA:  Once you say it, we will agree.

22        THE COURT:  We will be back in touch with you with a

23  hearing date.  In the meantime, you all live up to the schedule

24  I just set.

25        MR. FREVOLA:  Thank you, your Honor.

7aanfrona                    Argument

1            THE COURT:  Well argued.  Nice to meet you both.

2            (Adjourned)

**EXHIBIT 3**

1 of 1 DOCUMENT

Copyright © Society of Maritime Arbitrators, Inc.

In the Matter of the Arbitration between CHIA MAY NAVIGATION CORP., as Owner of the M/V CHIA MAY and SEATREK LTD., as Charterer under a New York Produce Exchange Time Charter dated July 14, 1998

No. 3546

July 30, 1999

**PANEL:** Peter W. Hartmann; A. J. Siciliano; Stephen H. Busch, Chair

**COUNSEL:** For Chia May Navigation Corp: HEALY & BAILLIE, LLP by Jack A. Greenbaum, Esq.

For Seatrek Ltd: HAIGHT GARDNER HOLLAND & KNIGHT by James H. Hohenstein, Esq.

**DECISION: FINAL AWARD**

This arbitration was commenced by Chia May Navigation Corp. ("Owner") who seeks to recover $ 63,080.87 in outstanding accounts, including damages, from Seatrek Ltd. ("Charterer") arising out of the premature redelivery of the M/V *CHIA MAY* (or "the vessel").

**BACKGROUND**

Under a New York Produce Exchange Charter party dated July 14, 1998, Owner chartered the *CHIA MAY* to Charterer for a period of ". . . *minimum 3 months, maximum 5 months timecharter* . . ." n1 The vessel was delivered on July 23, 1998 at 0200 hours in accordance with the charter terms and commenced a voyage from Australia to Straumsvik, Iceland under Clause 4 provided, *inter alia*, for a charter hire rate of $ 6,750 per day, and for the vessel to be redelivered ". . . *on dropping last outbound sea pilot at a safe port Charterer's option SKAW-Casablanca including Med. but excluding Black Sea, Muscat-Japan including Maylasia/Taiwan/PRC/Indonesia and Phillippines, Montreal-Buenos Aires range including Caribs unless otherwise mutually agreed . . .*"

n1 Preamble to Charter Party.

Pursuant to the terms of the charter, the earliest permissible redelivery date would have been on October 23, three months after delivery. However, in a fax to Owner on September 9, Charterer advised that its planned employment after Straumsvik had failed and that it intended to redeliver the vessel on dropping the Straumsvik sea pilot outbound. Charterer acknowledged this premature redelivery was not permitted by the charter terms, and offered to compensate Owner at $ 1,000 per day up until 0200 hours October 23. Alternatively, it invited Owner to mitigate its damages based on the minimum period of three months and submit its claim. Owner rejected the monetary offer. At 1300 hours on September 23 Charterer redelivered the vessel off Straumsvik, and does not dispute that Owner is entitled to damages.

To mitigate its damages, Owner fixed the vessel to Chilsan Merchant Marine Co., Ltd. ("Chilsan") for a time-chartered trip to the Far East with delivery passing Skaw, at a rate of $ 5,575 per day. The Chilsan delivery took place at 0001 hours on September 27. Because the Seatrek charter included the option of redelivery passing Skaw, Owner maintains that the damage calculation is straightforward, amounting to full hire until 0001 hours September 27, plus the difference between the two hire rates for the period between delivery under the Chilsan charter and 0200 hours October 23. Owner has incorporated this calculation into its final hire statement dated October 26, 1998. n2

n2 Owner's Exhibit 9.

Page 2

Copyright © Society of Maritime Arbitrators, Inc.

Owner seeks an award of $ 63,080.87 plus interest, plus its costs and attorney's fees in the amount of $ 10,156.01, and an assessment of the arbitrators' fees against Charterer. Charterer contends Owner is entitled to no more than $ 31,473.62, which represents the unpaid and undisputed balance in the final hire account.

The panel was formed pursuant to the terms of Rider Clause 81 (Arbitration), which also provides that the Society of Maritime Arbitrators, Inc. ("SMA") rules were to apply. The dispute was submitted to the arbitrators entirely on documents.

### DISCUSSION and DECISION

The only major issue in this arbitration centers upon whether Owner's fixture to Chilsan was in proper mitigation of its damages, or, as Charterer argues, conferred an ultimate benefit on Owner to the immediate detriment of Charterer. n3 Charterer contends that Owner took a short charter at a low rate in order to position the vessel in the Far East charter market, which was considerably higher than the Atlantic market at that time. Charterer argues that under these circumstances it would be inappropriate to view the Chilsan charter in isolation. Rather, the correct measure of damages should take into consideration the total net hire earned under the Seatrek, Chilsan and post-Chilsan charters over the five months Seatrek could have controlled the vessel. n4 The panel found this argument seriously flawed, because calculations of this nature generally consider only the minimum charter period, and, moreover, in this case Charterer specifically acknowledged Owner's entitlement to damages only up to the minimum three-month period of the charter. n5

n3 The panel takes note of Charterer's citation of The *GRIFONE*, S.M.A. 1319 (1979). There, the arbitrators found the owner's mitigation efforts unreasonable when its tanker, which had been carrying clean petroleum products, was extensively cleaned and fixed with grain from South America to the Mediterranean. It was shown that this decision was influenced more because the owners had made arrangements for shipyard repairs in Italy than by pure market conditions. The facts in that case are distinguishable from these, however, and we find it has no application here.

n4 Charterer requested production of the charter following the Chilsan charter in order to accurately quantify its damage calculation under this theory, however, the panel declined to order such production.

n5 Owner's Exhibit 3.

Charterer submitted considerable historical evidence to support its argument that the short-term market for similar vessels with delivery in Europe ranged between $ 6,250 and $ 7,650 per day. However, it is to be noted that the fixtures reported at these rates were for periods of between three and six months, or for prompt vessels at other delivery points. Owner argues that it was only obligated to mitigate its damages from the time of the breach until the earliest permissible redelivery date, and that the market for such short periods at the time was in line with the rate at which it fixed the vessel to Chilsan. Owner also notes that approximately one-half of its total claim is undisputed by Charterer.

Both parties made reference to the same passage from Wilford, Coghlin and Healy, Time Charters, 4<th> Ed. 1995. At page 277, the authors state the principle governing damages in cases of wrongful redelivery is based upon the ". . . *difference between the original charter rate and the prevailing market rate for equivalent business at the time of the breach* . . ." We find the term "equivalent business" does not mean, as Charterer argues, that Owner had to commit its vessel for a three to five month period, i.e., the term of the Seatrek charter, but only for its remaining minimum period, i.e., about one month. Accordingly, we find Owner's approach to damages for premature redelivery is correct. In addition, the panel finds no reason to criticize Owner's actions following the breach, or its fixture to Chilsan. An owner always strives to make the best of existing market conditions, and provided it acts reasonably is not required in circumstances such as these to put the best interests of the breaching party above its own. Moreover, Charterer knowingly committed the breach that gave rise to this dispute, and apparently chose not to pursue other short-term business for the same rate considerations that it now criticizes Owner. n6

n6 Owner passed along a short-term time charter inquiry on September 10 in an effort to assist Charterer. According to Owner, the indicated rate for about 15-20 days employment was $ 5,000 per day.

In addition to the issue of damages, the parties had minor disputes involving a small discrepancy between the amounts of hire payments made and received, and the responsibility for various expenses at Straumvik. The difference in the hire payment account is $ 263.15, which Owner alleges represents bank charges for Charterer's account. Owner produced no evidence to support this, however. Charterer produced documents showing it instructed its bank to transfer

Copyright © Society of Maritime Arbitrators, Inc.

the full amounts due. On the basis of the evidence presented, we conclude this difference is for Owner's account. The $ 697.00 in expenses at Straumvik claimed by Charterer is comprised of one-half the cost of an off-hire survey; the cost of filing a sea protest; and the purchase of several nautical charts. Owner disputes the off-hire survey element because the vessel was improperly redelivered, and the balance of the account because it is in Icelandic. The Charter Party clearly provides that the cost of both on and off-hire surveys is to be equally shared, and the panel finds the remainder of the account is reasonable. This account is therefore for Owner's account.

The panel notes that in calculating its damages Owner has failed to allow for commissions that it would have had to pay. Apart from this, and the omission of the two items above, we find the statement of account as rendered by Owner in its Exhibit 9 to be correct. We have adjusted Owner's claim in accordance with our findings above and award Owner the sum of $ 58,770.67, plus interest at the rate of 7.75% calculated from October 23, 1998 to the date of this Award. The SMA Rules permit the award of costs and reasonable attorney's fees. We find Owner's claim for these costs to be fair and reasonable, and award them as stated. The arbitrators' fees are assessed entirely against Charterer, and the manner in which they are to be settled is set forth in Appendix A, attached.

### AWARD

Charterer is directed to pay $ 78,920.71 to Owner forthwith. We calculate this amount as follows:

| | |
|---|---|
| Final Accounting, including Damages | $ 58,770.67 |
| Interest at 7.75% per annum from 10/23/98 to 7/30/99 | 3,494.03 |
| Costs and Attorney's Fees | 10,156.01 |
| Arbitrators' fees | 6,500.00 |
| Total payable to Owner | $ 78,920.71 |

Interest at the rate of 8% per annum is to continue on the principal sum of $ 58,770.67 from the date of this Award until paid or reduced to judgment, whichever occurs first.

Pursuant to Clause 81 and Title 9 U.S.C., § 1 *et seq.*, this Award may be reduced to judgment in any court of competent jurisdiction.

New York, NY

**EXHIBIT 4**

***583** Star Steamship Society v. Beogradska Plovidba., (The 'Junior K')

Queen's Bench Division (Commercial Court)

QBD (Comm Ct)
Feb. 25, 1988

Before Mr. Justice Steyn

Charter-party (Voyage) - Negotiation - Stipulation in telex that fixture subject to details - Meaning - Whether binding charter-party concluded - Whether application to set aside writ should be granted.

The defendants wished to charter the plaintiffs' vessel *Junior K* and negotiations for the chartering of the vessel took place on Oct. 1, 1985 and were conducted through intermediaries.
On Oct. 4 there were various telex messages and telephonic discussions between the brokers who acted on behalf of the parties. The last exchange was a telex from the plaintiffs' brokers timed at 19 27 hours which stated inter alia: 'Confirm telcons here recap fixture sub details', and then set out the terms agreed ending with the words 'sub dets Gencon CP'.
It was common ground that there was no telephone conversation between the parties after the despatch and receipt of the 'recap' telex, and that if a contract was concluded it was concluded by the despatch and receipt of the 'recap' telex.
On Oct. 5 the defendants indicated that they did not want to proceed with the negotiations. The plaintiffs regarded this as a repudiation of the concluded contract and on Oct. 7 they accepted the alleged repudiation and claimed damages.
On Aug. 18, 1986 the plaintiffs obtained leave to issue and serve proceedings against the defendants out of the jurisdiction. The defendants applied to set aside that order and service pursuant to it.
The principal issue was whether a binding contract had been concluded.
Held, by Q.B. (Com. Ct.) (STEYN, J), that
(1) the Gencon form was a detailed and well-known standard form; by the expression 'subject to details of the Gencon charterparty' the owners made clear that they did not wish to commit themselves contractually until negotiations had taken place about the details of the charter-party in that the Gencon form contained within it alternative provisions which required a positive selection of the desired alternative; no discussion had taken place about these options and against this background it was clear that the words conveyed that the fixture was conditional upon agreement being reached on the details of the Gencon form; there was no binding contract (*see* p. 586, cols. 1 and 2);
(2) the plaintiffs' submission that as the vessel sailed immediately after the telex had been sent, they had acted on the basis that there was an agreement would be rejected; on the evidence there was nothing to indicate and it had not been suggested that the defendants were aware that the vessel would sail; the plaintiffs took the risk of giving instructions for the vessel to sail (*see* p. 586, col. 2);
(3) the expression 'subject to details' enabled owners and charterers to know where they were in negotiations and to regulate their business accordingly; it was a device which tended to avoid disputes and the assumption of those in the shipping trade that it was effective to make clear that there was no binding agreement at that stage ought to be respected; there was no binding contract (*see* p. 588, col. 2);
(4) the telex stated that there would be no contract until the details had been agreed; it contained a clear stipulation that no binding agreement was concluded and it was essential for the doctrine of estoppel to apply that there must have been some representation; the words 'subject to details' negatived and made it impossible to find any representation which could assist the plaintiffs and the order and service pursuant to it would be set aside (*see* p. 589, col. 2).

The following cases were referred to in the judgment:
Atlantic v. Steelmete 565 F 2d 848 (2d Circuit 1977);
Great Circle v. Matheson (the Cluden), 681 F 2d 121 (2d Circuit 1982);
Interfoto Picture Library Ltd. v. Stiletto Visual Programmes, Ltd., (C.A) [1988] 1 All E.R. 348;
Interocean v. National Shipping 523 F 2d 527 (2d Circuit 1975);
Nissos Samos, the [1985] 1 Lloyd's Rep. 378;
Pollux v. Dreyfus, 455 F Supp. 211 (S.D.N.Y. 1978);
Solholt, the [1981] 2 Lloyd's Rep. 574.

This was an application by the defendants Beogradska Plovidba that the order granting the plaintiffs, Star Steamship Society, leave to issue and serve proceedings against the defendants out of the jurisdiction be set aside on the ground that there was no concluded contract between the parties.

Mr. Stuart Isaacs (instructed by Messrs. William A. Crump) for the plaintiffs; Mr. Alistair Schaff (instructed by Messrs. Ingledew Botterell Roche & Pybus of Newcastle) for the defendants.
The further facts are stated in the judgment of Mr. Justice Steyn.
Judgment was delivered in open Court.

## JUDGMENT

Mr. Justice STEYN:
In the context of an issue between the parties as to whether a binding charter-party was concluded, this case raises directly the question of the meaning and effect of a stipulation in telex exchanges that there is a fixture 'subject to details'. Since the decision in this case may affect the way in which negotiations for the chartering of vessels is conducted, I give this judgment in open Court.
The background to the dispute can be sketched relatively briefly. The plaintiffs in this case are the Star Steamship Society, a Lebanese concern which was the owner of the vessel *Junior K*. The defendants are Beogradska Plovidba, a Yugoslav corporation, and they were the proposed charterers. In the usual way negotiations took place through intermediaries. On the plaintiffs' side they were represented by their managers and London chartering brokers. The defendants were represented by Rotterdam brokers. The negotiations for the chartering of the vessel by the plaintiffs to the defendants commenced on Oct. 1, 1985. The critical events took place on Oct. 4. On that date there were various telex exchanges, and telephonic discussions, between the brokers who acted on behalf of the parties. The last exchange is a telex from the plaintiffs' brokers to the defendants' brokers which was timed at 19 27 hours on Oct. 4. This telex is of considerable importance. It was in the usual brokers' shorthand to the following effect:
Junior K
Confirm telcons here recap fixture *sub details*
Vessel as described before as per our earlier recap (tc) 2 Oct acct Beogradska Plovidba Beograd
Min 6000 tons chopt up to full cargo of vessels capacity agprods stowed 55 cuft pmt
Laycan Spot/7 Oct (vsl could eta Mersin tomo pm)
1 sb Mersin aaaa/1 sb Bombay aaaa
650 tons per wwd shexeiu free in
Disch cop free out
Dem USD 2000 per hdwts loadport
Frt USD 180,000 lsum fio basis 6000 tons of cargo. Any additional cargo loaded to be settled at the rate of USD 25 pmt fio.
90 pct freight within 3 banking days of issuing and releasing bsl balance after right and *585* true delivery latest within 7 days completion discharge.
Freight deemed earned on shipment discountless ship and or cargo lost or not lost
Taxes/dues and or fees on freight and vessel owners account
Taxes/dues and or fees on cargo including primage if any max 5 pct charterers account
For primage/freight tax calculations, authorities to be shown lumpsum freight as USD 120,000
Any overage premia chts account bs/l dated 30 Sept will be issued and delivered chasbe
3.75 pct
*SUB DETS GENCON CP*
It is common ground that there were no telephone conversations between the parties on Oct. 4 after the despatch and receipt of the 'recap' telex. It is common ground that if a contract was concluded, it was concluded by the despatch and receipt of the 'recap' telex. Turning back to the chronology, what happened was that on Oct. 5 the defendants indicated that they did not want to proceed with the negotiations. That was viewed as a repudiation of a concluded contract by the plaintiffs. On Oct. 7 they accepted that alleged repudiation, subject to their claim for damages. On Aug. 18, 1986 leave was granted to the plaintiffs to issue and serve proceedings against the defendants out of the jurisdiction. The defendants now apply to set aside that order and service pursuant to it.
A number of issues arise in this matter but I propose to address myself to one principal issue and that is whether a study of the contemporaneous documents reveals that a binding contract was concluded. At the outset, however, it must be emphasized that all that the plaintiffs need to show is a good arguable case. In other words, they need merely show that they have a realistic prospect of success. If one deals with a case of an oral agreement, that is almost invariably a matter to be tried and not to be decided on affidavits. Usually, if the contract put forward is alleged to have been concluded partly orally and partly in writing, it is again a matter that must go to trial. Here it is the plaintiffs' case that a contract partly in writing and partly oral was concluded on Oct. 4. The solution of saying 'Leave it to the trial Judge' is, in my judgment, nevertheless inappropriate here and I should explain in a little detail why I say that. It is common ground that no contract was made before the despatch and receipt of the critical telex which I quoted. If there was a contract, that is the communication which clinched the contract. No telephone conversation took place after the despatch of the 'recap' telex on Oct. 4. The telex either served to conclude the contract or it failed to do so. The critical issue is therefore what is the meaning to be given to the opening words of the telex, 'RECAP FIXTURE SUB DETAILS' and the concluding words 'SUB DETS GENCON CP'? Those expressions mean 'subject to the details of the Gencon charterparty'. It is common ground that the meaning to be given to those words was not discussed in oral exchanges. And, not surprisingly, neither party has asserted that those words have any special or technical meaning

deriving from custom or trade usage in the strict sense. Subject to one qualification, there is also no real dispute about the facts in this case. If the stipulation that the fixture was 'subject to details Gencon charterparty' clearly shows that the parties did not intend to be bound immediately, it follows that the plaintiffs have no good arguable case on the merits. The plaintiffs submit that the point is arguable; the defendants contend that the meaning of the expression is clear beyond any doubt.

The meaning of the relevant expression must, of course, be ascertained against the contextual scene. The plaintiffs submit, and I accept, that the 'recap' telex of Oct. 4, 1985 contains all the essential terms of charter-party. The plaintiffs further point out that, 'subject to the details of Gencon charterparty', no matter had been specifically raised in the negotiations which remained unresolved. That is also correct. On the other hand, it remains to be considered what was meant by the words 'subject to details of Gencon charterparty'.

The correct approach to that question is to ask how a reasonable man, versed in the chartering business, would have construed those words. There are judicial expressions of opinion on the point. But one is dealing with the meaning of words which have no technical or special meaning, and I propose to examine the question first without the aid of authority. The starting point seems to me to be the proposition that if there has been a complete and unqualified acceptance of an offer, prima facie a contract comes into existence even if the parties intend to reduce the agreement to writing. On the other hand, in negotiations parties are free to stipulate that no binding contract shall come into existence, despite agreement on all essentials, until agreement is reached on yet unmentioned and unconsidered detailed provisions. and the law should respect such a stipulation in commercial negotiations. That seems to me to be exactly what happened in this *586 case. The Gencon charter-party is, of course, a detailed and well-known standard form. It is plain that the parties had in mind a contract on the Gencon form but that they had not yet considered the details of it. By the expression, 'Subject to details of the Gencon charterparty' the owners made clear that they did not wish to commit themselves contractually until negotiations had taken place about the details of the charter-party. Such discussions might have covered a number of clauses. It does not follow that the owners were willing to accept all the detailed provisions of the standard form document. After all, it is a common occurrence for some of the detailed provisions of the Gencon form to be amended during the process of negotiation. In any event, the Gencon standard form contains within it alternative provisions which require a positive selection of the desired alternative. I will give only one illustration.Box 16 of the first page of the Gencon standard form deals with laytime. It directs one to cl. 6 and cl. 6 contains various options available to the parties.

6 Laytime.

*(a) Separate laytime for loading and discharging
The cargo shall be loaded within the number of running hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time actually used shall count. The cargo shall be discharged within the number of running hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time actually used shall count.

*(b) Total laytime for loading and discharging
The cargo shall be loaded and discharged within the number of total running hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time actually used shall count.

(c) Commencement of laytime (loading and discharging)
Laytime for loading and discharging shall commence at 1 p.m. if notice of readiness is given before noon, and at 6 a.m. next working day if notice given during office hours after noon. Notice at loading port to be given to the Shippers in Box 17. Time actually used before commencement of laytime shall count. Time lost in waiting for berth to count as loading or discharging time, as the case may be.

* indicate (a) or (b) as agreed, in Box 16.

No discussion whatever had taken place about these options. The plaintiffs say that no delays would have taken place in the loading port in Turkey. Factually, that may or may not be correct, but no port is immune from delays and I am satisfied that an agreement on laytime, although not essential, is a most desirable provision and one which in practice is almost invariably insisted on. Against this background it seems to me clear that the stipulation 'Subject to details of the Gencon charterparty' conveys that the fixture is conditional upon agreement being reached on the details of the Gencon form, which had not yet been discussed. In other words, it was stipulated that there was to be no contract until agreement had been reached on the details of the Gencon charter-party.

What I have described as the stipulation in this particular case is, of course, one that can be displaced in certain circumstances. It can be displaced by a subsequent waiver of the stipulation. It can be displaced by actual agreement on the details. It can also be displaced by an execution of a formal contract. It is common ground, however, that none of those events occurred in this case. Prima facie, therefore, there was no binding contract.

The plaintiffs submitted that there is one issue of fact which might affect this matter. The plaintiffs point to the time of the telex which I have mentioned before and they stress the reference in the telex to 'Laycan spot/7 October (vessel could ETA Mersin tomorrow pm)'. They then say that the vessel sailed after the critical telex was sent. In other words, the argument is that the plaintiffs acted on the basis that there was an agreement. This is a factor that I have carefully considered, but it seems to me that when one looks at the telex the very words 'vessel could ETA Mersin tomorrow pm' is not supportive of the plaintiffs' case. If a binding contract was to have been concluded by the despatch of the 'recap' telex, one would have expected a straightforward ETA. On the evidence before me there is nothing whatsoever to indicate, and it has not been suggested, that the defendants were aware that the vessel would sail. In any event, it seems to me that what happened here is simply that the plaintiffs were confident that the deal, which had not yet been concluded, would not fall through. In other words, they took the risk of giving instructions for the vessel to sail. In all the circumstances, the resolution of this issue of fact is not one which could lead to a different conclusion.

**\*587** The meaning of the words 'subject to details' have also been discussed in a number of decisions. The first case to which I refer is <u>The Solholt, [1981] 2 Lloyd's Rep. 574</u>. In that case Mr. Justice Staughton made the following observation (at p. 576, col. 2):

. . . Also on July 27 further employment for the vessel was arranged. She is described as having on that day been 'fixed subject to details'. That means that the main terms were agreed, but until the subsidiary terms and the details had also been agreed no contract existed.

It is right to add that his observation did not form part of the ratio decidendi of the case. Then there is another decision which is also of relevance. It is <u>The Nissos Samos, [1985] 1 Lloyd's Rep. 378</u>. In that case Mr. Justice Leggatt referred to the expression 'subject to details'. He said (at p. 385, col. 2):

'Subject details' is a well-known expression in broking practice which is intended to entitle either party to resile from the contract if in good faith either party is not satisfied with any of the details as discussed between them.

I will return to the meaning of that passage in due course, but I only add at this stage that Mr. Justice Leggatt's observation was also not part of the ratio decidendi of the case. These dicta do, however, reinforce my view as to the meaning of the relevant stipulation.

The plaintiffs rely on the way in which the matter has been approached in the United States, and I have been referred to four decisions of United States Courts and provided with transcripts of those decisions. These decisions are Interocean v. National Shipping 523 F 2d 527 (2d Circuit 1975); Atlantic v. Steelmete 565 F 2d 848 (2d Circuit 1977); Pollux v. Dreyfus 455 F. Supp. 211 (S.D.NY 1978) ; and Great Circle v. Matheson 681 F 2d 121 (2d Circuit 1982). It was suggested that in the light of the decisions 'the English approach' might be reconsidered.

It seems to me that it is only necessary to refer to the last case, Great Circle v. Matheson, which is commonly referred to as The Cluden. That is so because it is the last of the four decisions, and it is noteworthy that it is a decision of the United States Court of Appeals 2nd Circuit. What happened in that particular case is that there was an action by charterers against owners for wrongful withdrawal from an alleged charter-party contract. The negotiations had taken place in the context of a New York Produce Exchange form charter. The owners said that no final contract had been concluded and that they were entitled to withdraw from the negotiations. That plea was unsuccessful. There had been agreement on all essential matters. Thereafter the owners had sent a 'recap' telex to the charterers containing certain detailed provisions. The charterers suggested certain amendments. The owners telexed back their reactions and required an immediate response; they did not receive one and they withdrew. What is important is that the owner's 'recap' telex had been 'subject to details'. That was then the way in which the matter came before the United States Court. Various issues arose. In the first place, the owners argued that the distinction between main terms and details is wrong in law. That was rejected by the United States Court and the United States Court observed as follows (at p. 125 in the second column):

The details are not meaningful to the trade in the same way that the main terms of the fixture are, inasmuch as the fixture affects the trade directly and determines whether it will be a successful piece of business. Where no amendment of details is agreed upon, however, the terms of the printed form govern.'

There was also an argument that the clause 'subject to details' was a condition *subsequent*, that is, a condition the occurrence of which brought a concluded contract to an end.

It is clear that the issues were not placed before the United States Court in the way in which they arose in the present case, and the United States Court did not consider some of the matters discussed in this judgment. But there are a few comments that I would make about The Cluden. The suggestion which is made in The Cluden that details are unimportant and that one can simply go back to the printed form does not always work. That is classically illustrated by the present case, where one cannot solve the problem by simply going back to the printed form because the printed form contains alternatives. Moreover there is apparently no unanimity in the United States about this particular matter, and I draw attention to a report of a United States arbitration award which has been placed before me. It is arbitration award No. 1924 of the Society of Maritime Arbitrators of New York. In that particular case the tribunal, in accordance with the latitude allowed to United States arbitrators, declined to follow The Cluden and said:

With all due respect to these rulings, I must uphold the basic understanding throughout the worldwide shipping markets that until all**\*588** terms have been agreed no fixture has been concluded.

But the assertion in The Cluden that the details may not be important is also refuted in a dissenting opinion in an earlier United States arbitration award (Award No. 1715 (1982)), which is quoted in an interesting article by Dr. Charles Debattista, 'Charterparty Fixtures 'Subject details' - Further Reflections', [1985] L.M.C.L.Q. 241 at p. 251. The extract reads as follows:

The need to agree on details and terms is as paramount as the need to agree on the freight rate. Indeed, until an owner is fully aware of all the possible financial consequences that may arise from the commitment to the charterparty details, he is not in a position to determine the anticipated results of the voyage; consequently he is unable to decide if the financial returns make that particular cargo desirable. It makes no commercial sense for either party to a negotiation to be obliged to accept all the terms submitted by the other one, if thereby financial risk may be involved. But I return to The Cluden to point out that the United States Court referred to the English perception in the following terms (at p. 126 in the second column):

Finally Matheson argues that owing to its London situs its understanding of the terminology in use in the industry was different than that found by the trial court. Any lingering concern that the London-based owner of The Cluden might honestly have understood the phrase used to have a different meaning is dispelled by a leading treatise in this field published in London: J. Bes, Chartering and Shipping Terms (9th ed., 1975). This context - considered a prominent international reference work on the shipping industry and one which has been translated into seven languages - reinforces the international scope of the industry's customs and usages. It discusses the function of the chartering

brokers in much the same way as that found by the trial court, and defines a 'fixing letter' (a condensed fixture) as a summary of the principal conditions of a charterparty. Under a listing of standard charterparties, it refers to the 'time charterparty approved by the New York Produce Exchange. Hence, it may be surmised that the customs of the worldwide business were the same in London as in New York.

With the greatest deference, it does seem a little strange for a Court to base its decision as to what a 'recap' telex 'subject to details' means on a general dictionary definition of what such a document is.

To the extent the United States Court considered that the view which it upheld was consistent with the international perception of the meaning of 'subject to details', it seems to me that the material before me convincingly demonstrates that that is not so. I refer to a bulletin by the Federation of National Associations of Shipbrokers and Agents, commonly called FONASBA, which in the relevant part reads as follows:

As we are all aware, several court decisions in the United States have recently determined that a fixture has resulted when the main terms have been agreed, despite the fact that it was still 'subject to details'. The US court's view is not shared by the rest of the shipping world and is being severely criticised by the entire market, including US shipowners, charterers and shipbrokers alike.

The bulletin then continues to give practical advice but I need not cite that.

Looking at the matter in the round, it does not seem to me that the suggested reappraisal of the English approach in the light of the United States decisions has any realistic prospect before an English Court. This Court has, of course, the greatest respect for the decisions of the United States Courts. Our Courts frequently gain assistance from United States decisions, notably in the field of international trade. On this occasion, I must say, that it is my clear impression that it is the United States Courts rather than the English Courts which are out of step with the way in which the shipping trade works. And, I would respectfully suggest, that it is in the interests of the chartering business that the Courts should recognise the efficacy of the maritime variant of the well-known 'subject to contract'. The expression 'subject to details' enables owners and charterers to know where they are in negotiations and to regulate their business accordingly. It is a device which tends to avoid disputes and the assumption of those in the shipping trade that it is effective to make clear that there is no binding agreement at that stage ought to be respected.

My conclusion is, therefore, that no contract was concluded in this case. That does not, however, conclude the matter. Mr. Isaacs, in a helpful speech, had one further argument. He submitted as follows: if, contrary to the plaintiffs' submissions, the arrangements relied upon only amounted to an agreement to agree, then **\*589** in so far as such a contract is not acknowledged by English law to be capable of being sued on, it is submitted that the defendants were precluded from withdrawing from the negotiations except in good faith. He relied on to the observation of Mr. Justice Leggatt in The Nissos Samos, which I have already quoted. For convenience, I set it out again:

'Subject details' is a well-known expression in broking practice which is intended to entitle either party to resile from the contract if in good faith either party is not satisfied with any of the details as discussed between them.

At first glance this observation might seem reminiscent of the civilian doctrine of culpa in contrahendo. The meaning of that doctrine in civilian systems is carefully reviewed on a comparative basis in an article by Kessler and Fine in the Harvard Law Review, vol. 77. at p. 401. The authors point out that the very thesis of that doctrine is that damages should be recoverable against the party whose blameworthy conduct during negotiations for a contract brought about its invalidity or prevented its perfection. English law approaches such problems in a different and more pragmatic fashion. It tries to solve the problems not under an all-embracing principle of culpa in contrahendo but it solves it by implied terms, the doctrine estoppel and in various other ways. This is not to say that there is not a capacity for further growth of English law in this area. This is illustrated by the recent decision in Interfoto Picture Library Ltd. v. Stiletto Visual Programmes Ltd., [1988] 1 All E.R. 348, and I refer in particular to the judgment of Lord Justice Bingham and his reliance on considerations of fair dealing in relation to an issue of contract formation. However, I am quite confident that Mr. Justice Leggatt was not intending in the relevant passage to state any new principle of law. Reading his judgment in context it seems to me clear that in the relevant passage Mr. Justice Leggatt, in so far as he refers to the qualification of good faith, is simply recording and stating a broking view as to the matter and not the strict legal position. The doctrine of culpa in contrahendo does not form part of our law. So that particular way of approaching the matter would not be open to the plaintiffs in this case. But, of course, Mr. Isaacs says that he can raise the issue on a perfectly orthodox basis, namely, that there is an estoppel. Here there is a possible doctrinal difficulty, in the sense that what the plaintiffs are really trying do is to use the alleged estopping event as a sword rather than a shield. I prefer to express no opinion on that particular point. But I am firmly of the opinion that there is an insuperable difficulty to the application of estoppel in this case. That difficulty arises from the very fact that the telex sets out there will be no contract until the details are agreed. In other words, it contains a perfectly clear stipulation that no binding agreement is concluded. It is of the very essence of an estoppel that there must be some representation. The words 'subject to details', as I have interpreted them, negatives and makes it impossible to find any representation which can assist the plaintiffs.

I conclude, therefore, that the plaintiffs have no realistic prospects of success. The application must succeed, and the order previously granted and service pursuant thereto must be set aside.

(c) Lloyds of London Press Limited

[1988] 2 Lloyd's Rep. 583

END OF DOCUMENT

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 5**

1 of 2 DOCUMENTS

Copyright © Society of Maritime Arbitrators, Inc.

In the Matter of the Arbitration between PRECIOUS CAPITALS LTD., as Owners of the THARINEE NAREE and TRANSWORLD CARGO CARRIERS S.A., as Charterers, Pursuant to a Charter Party dated May 15, 2000

No. 3811

November 3, 2003

**PANEL:** Manfred W. Arnold; Jack Berg; James J. Warfield, Chairman

**COUNSEL:** Haight Gardner Holland & Knight
Attorneys for Owner
James H. Hohenstein, Esq.

Cardillo & Corbett
Attorneys for Charterer
Tulio R. Prieto, Esq.

**DECISION: FINAL AWARD**

## BACKGROUND

On May 15, 2000, Precious Capitals Ltd. (hereinafter "Owners" or "Precious") entered into a time charter (NYPE form) with Transworld Cargo Carriers S.A. (hereinafter "Charterers" or "Transworld"). The fixture was for a voyage from Osaka (Japan) via safe ports for redelivery in the Tampa/Trinidad range. The intended cargo was steel products.

On May 21, 2000, Charterers advised Owners that their cargo interests had canceled their steel shipment. On May 25, Charterers advised Owners that they would not be accepting delivery of the vessel and that Owners should mitigate their damages.

## CLAIMS

Owners' claim is for damages of $ 200,816.33 plus interest, the costs of this arbitration as well as their attorneys' fees and disbursements. Owners claim $ 134,818.33 as direct damages, representing their losses, which is the difference between the anticipated time charter hire and the amounts earned in mitigation. Owners also claim $ 66,000 as potential freight losses due to Charterers' failure to redeliver the vessel in the U.S. Gulf (at Brownsville, Texas), where she could have found onward employment without the need of extensive ballasting.

Charterers reject Owners' claim, arguing that Owners should not have sustained any loses if they had properly mitigated. In turn, Charterers claim for the cost of this arbitration and attorneys' fees.

## DISCUSSION AND DECISION

The basic facts in this matter of the parties entering into this charter party and Charterers' failure to perform are not in dispute. The disagreement between the parties is based on two elements: i.e., Owners' mitigation efforts and the "loss" incurred as well as Owners' entitlement to claim for the "opportunity lost" as a result of the alleged failure to re-deliver the vessel in the U.S. Gulf.

Before addressing the quantum of Owners' claim, it would be appropriate to address the conceptual aspect of this arbitration.

Owners have argued that since Charterers had given voyage orders, they should be bound by them, and that all the damages should be based upon the specifics of that voyage with respect to duration and redelivery. The panel does not

Page 2

Copyright © Society of Maritime Arbitrators, Inc.

accept this interpretation and instead finds The Aragon n1 and The Rijn n2 to be on point and most persuasive. Specifically, the Hon. Lord Michael Mustill n3 stated (at page 271):

> *The question is simply this, would the charterers have been entitled to change their minds, when the sub-charter fell through, and say that after all they did not want the ship to carry a cargo of grain to Japan? From a commercial point of view, there is no problem with an affirmative answer to this question. Indeed, any other answer would make little sense. **Why should not the charterers have been entitled to change their minds and order the ship to carry grain to Singapore, or coal to Japan, or nothing at all to any port within the range? What commercial reason could there be to hold that the charterers were permanently locked into an obligation to ship grain to Japan, merely because this was what they had said they were going to do;** and to go on to say that they would have been compelled to keep the ship idle at Galveston, for no matter how long, until they could find a cargo of grain (and nothing else) to be carried to Japan (and nowhere else).*

> ***Nor do I find the owners' argument compelling in point of law.*** *There can certainly be no doubt on the findings in the award, that the charterers evinced successively an intention to ship cargo, to ship grain cargo and to ship it from Galveston. The owners equally evinced a willingness to carry cargo from this port, and did their best to do so, within the capabilities of their ship. Perhaps - and I say only "perhaps" - if the present case had been concerned with a voyage charter, it might have been possible to hold, on the basis of the difficult cases relating to the "election" of a loading port or cargo, that the charterers, having once committed themselves to a particular charter within the permitted range of voyages, could not thereafter choose another. **In my view, however, this notion has no application to a time charter, where the ship is at the free disposition of the charterer for any service, so long as he does not exceed the stipulated limits of cargo and of port:** see per Mr. Justice Donaldson in Segovia Compania Naviera S.A. of Panama v. R. Pagnan & F.Lli. of Padova (The Aragon), [1975] 1 Lloyd's Rep. 628. Nor can I see any signs of a variation, in the strict contractual sense. For this, one would need to find an unequivocal offer to restrict the choice of return voyages to the carriage of grain from Galveston to Japan, coupled with an unequivocal agreement by the owners that this, and no other, would be a permissible employment. The conduct of the parties was certainly consistent with an intention to engage the ship on this employment; but I can see nothing in the award to show that they intended to bind themselves to such an employment.* (Emphasis supplied)

n1 [1975] 1 LLR 628.

n2 [1981] 2 LLR 267.

n3 Then Justice Mustill of the Commercial Court Queen's Bench Division.

For the determination of damages, the parameters which exist and cannot be changed are the minimum charter period, the charter rate and an account of the delivery and redelivery ranges. There is no question that the innocent party is entitled to be put in the same financial position it would have been but for the breach, however, it is not entitled to anything more. Also, the breaching party, despite its acts, is entitled to all rights and limitations as provided for in the governing contract. Furthermore, it is the Charterers' burden to establish the inappropriateness of the mitigation effort.

Under these parameters, the panel finds that the period of employment for which Transworld is liable is the minimum period of this charter, i.e., 50 days without guarantee. Applying the customary trade practice of 5% more or less, we determine the minimum period to be 47.5 days.

We have closely reviewed Owners' mitigation efforts. We agree with Charterers that the results produced by the Owners are not consistent with the prevailing market conditions. Evidence produced by Owners' own witnesses indicates that the market was at or close to the level of this fixture and, therefore, Precious should have been able to achieve a higher level of mitigation than recorded. Employing the vessel under Owners' existing contract of affreightments at rates which do not reflect the prevailing market level, does not, in the panel's opinion, meet the test of mitigation. It

Page 3

Copyright © Society of Maritime Arbitrators, Inc.

would appear that Owners' decisions to employ the vessel in the controlled market was a decision made for reasons of their own and not necessarily in an attempt to maximize the mitigation efforts. Evaluating the evidence regarding market rates during the period at issue, the panel concludes that $ 6,300 per day represents the market rate to be applied. Adjusting the market and charter rates by the applicable commissions, we arrive at a differential of $ 1,185 per day.

Having concluded that Charterers did not have an obligation to redeliver the vessel at Brownsville and are entitled to invoke the minimum charter duration for the purpose of the damage calculations, it follows that Charterers cannot be held responsible for the positioning damages as claimed. The panel agrees with Transworld that Owners' positioning claim is highly speculative and not within the parameters of predictability, as it is dependent upon a series of intervening events, which may or may not occur.

We calculate Owners' damages as follows: 47.5 days at $ 1,185 per day, for $ 56,287.50.

## INTEREST

The panel awards interest at the rate of 5.9% p.a. from July 14, 2000 to the date of this award.

## COSTS AND EXPENSES

The panel majority, Mr. Arnold dissenting, n4 directs that each side bears its own legal fees and expenses.

n4 The fact that Owners did not prevail with their total claim but only succeeded with approximately 28%, should not determine whether or not they are entitled to an allowance towards their legal fees. There was an admitted breach, which forced Owners to proceed with the arbitration; this action would not have been necessary had Charterers performed as they had agreed to do.

The arbitrators' fees, set forth in Appendix A, are a joint and several obligation of both parties and payable in accordance with instructions contained in the appendix.

## AWARD

Charterers are directed to pay Owners the sum of $ 67,269.42, which we arrived at as follows:

| | | |
|---|---|---|
| . Cancellation damages | | $ 56,287.50 |
| . Interest thereon | | 10,981.92 |
| | DUE OWNERS | $ 67,269.42 |

If payment of this amount has not been made within 30 days from the date of this award, interest at the rate of 4% p.a. will resume and continue to accrue on the principal amount until the award is paid in full or has been reduced to judgment, whichever first occurs.

Pursuant to the Arbitration Clause, this award may be reduced to judgment in any court of competent jurisdiction.

New York, New York

**EXHIBIT 6**

1 of 1 DOCUMENT

Copyright © Society of Maritime Arbitrators, Inc.

In the Matter of the Arbitration between NORELF LTD., as Disponent Owners of the
KURT ILLIES and GEORGIA GULF CORPORATION, as Charterers

No. 2778

July 18, 1991

**PANEL:** Thomas J. Bradshaw; Lloyd C. Nelson; Manfred W. Arnold

**COUNSEL:** Healy & Baillie
for and on behalf of Norelf Ltd.
by Glen T. Oxton, Esq., of Counsel

Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito
for and on behalf of Georgia Gulf Corporation
by Vincent J. Barra, Esq., of Counsel

**DECISION:** Decision and Award

On July 10, 1989, Norelf Ltd. (hereinafter "Norelf" or "Owners") entered into a charter party (ASBATANKVOY form) with Georgia Gulf Corporation (hereinafter "Georgia Gulf" or "Charterers") for the carriage of 5,000 metric tons of vinyl chloride monomer (VCM) from the U.S. Gulf to Santos, Brazil for the account of Brasivil Resinas Vinilicas S.A. (hereinafter "Brasivil"). The laydays were July 12 - 18, 1989.

The KURT ILLIES had been carrying an inbound cargo for discharge (Tanks #2 port and starboard) at Good Hope and the balance of her tanks (#1 and #3 port and starboard) at Houston. While the vessel was discharging her inbound parcels, Owners arranged for the preparation and inspection of tanks in order to be able to present a loadready vessel upon arrival at Baton Rouge.

The vessel arrived at Baton Rouge on the morning of July 18th and was ready for presentation n1 later that day, but after the cancelling hour of 16.00 hours. Whereas Owners were of the opinion that the tanks were suitable and ready to receive the VCM cargo, Charterers' inspector rejected the tanks, requiring additional cleaning. Cleaning efforts and inspections/rejections continued. On July 24, 1989 at 15.00 hours, Charterers cancelled the contract citing the vessel's non-readiness to load within a reasonable period of time and the frustration of the sales contract between Georgia Gulf and their Brazilian buyers. Owners rejected the cancellation notice as untimely, advising Charterers that vessel's tanks would be loadready and ready for their inspection and acceptance later on that day. At 19.00 hours on July 24th, Owners' surveyor reported that all tanks were clean and ready to receive the VCM and Owners then tendered the vessel's Notice of Readiness.

n1 Special Clause 01

After Charterers' cancellation, Owners chartered the vessel for substitute employment in mitigation and positioning for her next scheduled voyage.

Owners' claim in this arbitration is for $ 434,759.14, representing a) damage caused by the wrongful cancellation in the amount of $ 273,024.89 and b) losses of $ 161,734.25 resulting from the unreasonable tank cleaning requirements of Charterers. Owners are also seeking an award of interest, costs and fees of the arbitration and attorneys' fees.

Charterers reject Owners' claims in their entirety and in turn assert a claim for $ 400,000 lost profit on their cancelled sale to Brasivil; Georgia Gulf also seeks an award of interest, costs and reasonable attorneys' fees.

The contract clauses which, in the panel's opinion, bear upon this dispute are reflected in Appendix A.

Copyright © Society of Maritime Arbitrators, Inc.

After careful review and consideration of all arguments and evidence, the panel has concluded that Charterers failed to cancel the charter party in a timely fashion and are thus liable for such damages as may be proven by Owners.

Under Clause 5 of Part II, Charterers had the option of cancelling the charter by giving notice of such cancellation within 24 hours from the agreed cancelling date. Because of their Brazilian customers' desperate need of the VCM cargo and the unavailability of a suitable substitute vessels, Charterers "decided to continue cooperating with the Owners in an effort to save the venture for all concerned and not exercise their right to cancel". n2 Charterers also point out that they never had to cancel a vessel because of an owner's failure to properly clean the vessel, and it was never their intention to cancel the KURT ILLIES. When Brasivil cancelled their purchase contract with Georgia Gulf, Charterers in turn cancelled the charter party.

      n2 Charterers' Memorandum at p. 5

The option to cancel once the stated cancellation time provided for in the charter party n3 has passed, can only be invoked when the actual or predictable period of delay is such that it would frustrate the very purpose for which the parties had entered into the charter agreement. We have before us a situation wherein the vessel could not achieve the state of cleanliness required by Charterers' surveyor until at least July 24, 1990. Regrettably, this delay, short as it was, caused Brasivil to cancel its purchase contract with Georgia Pacific. We are of the opinion that the delay did not frustrate the charter party.

      n3 Clause 5, Part II

Charterers did not exercise their right of cancellation on July 19, 1990, in the desperate hope that they could satisfy Brasivil's letter of credit requirements to have the cargo loaded on board the KURT ILLIES on or before July 25, 1990, an extended date from the original sale undertaking of having cargo on board the vessel on or before July 18, 1990. Unfortunately, upon being requested by Georgia Pacific to extend the shipping date to August 5, 1990, Brasivil cancelled their purchase and offered to postpone delivery of this VCM parcel until October 1990, but with a renegotiation of the price. Whether or not the VCM could have been loaded by July 25, 1990 is a moot question, for Charterers wrongfully cancelled on July 24, 1990 at 15.00 hours.

The panel can appreciate the dilemma that Owners faced when on the one hand they were assured by their surveyors of the suitability of the tanks to load VCM and on the other hand being faced with continuous rejections by Charterers' surveyor. Owners have argued that Charterers' surveyor's requirements were so unreasonable that they brought into question his professional competence and, therefore, his finding should be disregarded. Cleanliness of tanks to receive VCM is a matter of judgment and it is not uncommon for surveyors to differ on this issue. Nevertheless, Owners, in any event, agreed in Clause 18 to clean to Charterers' surveyor's satisfaction. In our opinion, we do not find that Charterers' surveyor imposed on the vessel requirements for cleanliness that were so completely beyond reasonable expectations that his competence should be questioned. Required cleaning in this case was a matter of time and expense, and not impossibility. It was not in Charterers' best interest to frustrate their sale and it cannot be said that the cost and the period required for cleaning in this case was so extensive that Owners should be held in breach of their charter party representation that they could load this VCM parcel.

In view of these findings, the panel rejects Charterers' claim of $ 400,000, representing the loss of profit from the VCM sale.

With respect to Owners' damages, the panel has concluded that Owners and the vessel should be in the same physical and financial position as if the vessel had carried the VCM parcel to Santos.

The panel is satisfied that the mitigation efforts by Owners following the cancellation of the Georgia Pacific contract were both reasonable and appropriate. Owners proceeded to seek a voyage which would position the vessel into a position for her subsequent employment for loading at Rio Grande (Brazil). On August 3, 1989, Owners concluded a fixture with Fronape for the carriage of LPG from Puerto La Cruz (Venezuela) to Sao Luis and Fortaleza (Brazil), for which the vessel earned $ 166,804 in gross freight.

Under the cancelled voyage, Owners would have been paid $ 341,250 in freight less 2% commission (or $ 6,825) for a net freight of $ 334,425. Applying the expense of the port disbursements at Baton Rouge ($ 27,758.66) and the estimate disbursements for Santos ($ 8,520), the freight would have been reduced to $ 298,146.34.

Copyright © Society of Maritime Arbitrators, Inc.

Having decided that the standards applied by the surveyor were not unreasonable, it then has to follow that Owners, in order to earn the freight, would have had to incur the tank cleaning costs ($ 52,238) and the nitrogen service ($ 3,500). The Baton Rouge port disbursements as stated above already include the additional dockage charges incurred through the cleaning delay.

The net revenue under the cancelled charter would, therefore, have been $ 242,408.34.

In the mitigation voyage, which covered approximately the same time frame as the cancelled voyage, the vessel earned a gross freight of $ 166,804, which was reduced by the 2% commission ($ 3,336.08) to $ 163,467.92. Owners incurred port expenses at Puerto La Cruz ($ 12,078.46), Sao Luis ($ 5,828.12) and Fortaleza ($ 8,406.94), which reduced the freight revenue to $ 137,154.40.

Since the mitigation voyage and the cancelled voyage were on basically identical tracts, the panel has not taken the vessel's bunker consumption into consideration when determining the respective voyage results.

Owners' freight loss amounts to $ 105,253.94 (the difference of what the vessel would have earned; i.e., $ 242,408.34; less what she earned in mitigation; i.e., $ 137,154.40).

At the time the vessel completed her cargo operation in Fortaleza on August 16, 1989, she was still 5.12 days north of Santos (where she would have been if Charterers had not breached the charter). Therefore, Owners are entitled to compensation of 5.12 days measured by the daily value of the vessel ($ 15,000 per day at the demurrage rate), or $ 76,800.

The panel determines that Owners' damages are $ 105,253.94 in lost freight plus $ 76,800 for the steaming delay, for a total award in Owners' favor of $ 182,053.94. The panel also awards interest at the rate of 9.81% per annum from August 16, 1989 to the date of this award.

With regard to Owners' claim for legal fees and expenses, the panel awards to Owners an allowance of $ 21,000 against attorneys' fees and arbitration expenses incurred in this proceeding. If indeed Charterers had cancelled the vessel in a timely fashion, as required by the terms of the charter party, no arbitration would have occurred.

The cost of the hearing transcripts are to be shared equally by the parties. The arbitrators' fees, as set forth in Appendix B, are a joint and several obligation of the parties and are to be paid in accordance with the instructions contained in the appendix.

THE AWARD:

Charterers are directed to pay to Owners the amount of $ 237,353.95, which we arrived at as follows:

| | | |
|---|---|---|
| 1. | Freight loss | $ 105,253.94 |
| 2. | 5.12 days steaming time delay | 76,800.00 |
| 3. | Interest on Items 1 and 2 | 34,300.01 |
| 4. | Allowance towards Owners' legal fees and expenses | 21,000.00 |
| | | $ 237,353.95 |

If payment of the award has not been made within 30 days from the date of this award, interest at the rate of 8.5% per annum shall resume on the principal amount of $ 182,053.94 and run from the date of this award until payment in full has been received or the award has been reduced to judgment, whichever first occurs.

The arbitration clause provides that this award may be made a rule of the court.

New York, New York

**ATTACHMENT-1:** APPENDIX A

In the panel's opinion, the following clauses bear upon this dispute:

PART I

B. Laydays:

Commencing July 12, 1989

Copyright © Society of Maritime Arbitrators, Inc.

Cancelling July 18, 1989

K.  Place of General Average and arbitration proceedings to be New York, U.S. law.

PART II

5.  LAYDAYS.  Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction.  Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation with twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

6.  NOTICE OF READINESS.  Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs.  However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

18.  CLEANING.  The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of Charterer's Inspector.  The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

(01) PRESENTATION

Vessel to present with tanks open under breathable air ready for visual tank inspection.  Upon Charterers passing vessel's tanks, lines, compressors, and pumps, vessel to purge with nitrogen down to a maximum 0.1 pct volume in the vapor phase.  Purging and cleaning to be for Owner's account.  Owner to pay max USD 5,000.00 for nitrogen, any additional costs for nitrogen in excess of USD 5,000.00 to be for Charterer's account.

(02) Upon completion loading in the U.S. GULF vessel to proceed directly to Brazil with utmost dispatch to deliver Charterer's cargo.

**EXHIBIT 7**

2 of 3 DOCUMENTS

Copyright © Society of Maritime Arbitrators, Inc.

In the Matter of the Consolidated Arbitrations - between - SEAEMBLEM MARINE LTD, Owner of the M/T BONI - and - JAHRE SHIP SERVICES A/S, Charterer under a Charter Party dated December 13, 1988, - and between - AROCHEM INTERNATIONAL INC., Sub-Charterer under a Sub-Charter Party dated December 13, 1988.

No. 3053

March 7, 1994

**PANEL:** R. Glenn Bauer, Esq.; Mr. Jack Berg; Larry Mahoney, Esq., Chairman

**COUNSEL:** Freehill, Hogan & Mahar
Attorneys for Seaemblem Marine Ltd.

Peter D. Clark, Eugene J. O'Connor, Jr., Michael Fernandez

Of counsel

Hill, Rivkins, Loesberg, O'Brien, Mulroy & Hayden

Attorneys for Arochem International, Inc.

Alan S. Loesberg, Patrick V. Martin, Timothy D. Ford, John F. Ryan

Of counsel

Cichanowicz, Callan & Keane

Attorneys for Jahre Ship Services, A/S

James M. Textor

Of counsel

**DECISION:** FINAL AWARD

This is a consolidated arbitration of claims arising out of two back-to-back charter parties, bills of lading issued pursuant to the charter parties which were signed by the Master, and a Submission Agreement signed by the parties. The first charter party is dated December 13, 1988 at Stamford, Connecticut between Seaemblem Marine Ltd. (hereafter "Seaemblem"), as owner of the M/T BONI, and Jahre Ship Services A/S (hereafter "Jahre"), as charterer, on an AS-BATANKVOY form of tanker voyage charter party. The second is a charter party of the same vessel, on the same form, having the same date, but dated at Houston, Texas, between Jahre, as chartered owner, and Arochem International Inc. (hereafter "Arochem"). The bills of lading are dated December 16, 1988 and December 21, 1988. The Submission Agreement is dated November 15, 1990.

Arochem is claiming damages exceeding $ 9,000,000.00 from both Seaemblem and Jahre arising out of a fire which commenced in the engine room of the M/T BONI on December 26, 1988 while on a voyage from Port Kerteh, Malaysia, and Blang Lanclang, Indonesia enroute to the Caribbean Sea via the Cape of Good Hope. The fire resulted in a termination of the voyage upon the vessel's being towed back to Singapore.

Seaemblem has made a claim against Jahre for unpaid freight and detention. Its claims exceed $ 2,800,000.00. Jahre claims indemnity from Seaemblem or Arochem if it should be held liable to either of the other two parties.

STATEMENT

Copyright © Society of Maritime Arbitrators, Inc.

In accordance with the governing charter parties, on December 16, 1988, the vessel loaded a partial cargo of Tapis crude oil at Port Keteh, Malaysia. On December 21, 1988, an additional cargo of Arun crude was loaded at Blang Lanclang, Indonesia. Bills of lading for these cargoes were issued by Seaemblem. The bills of lading were in the form prescribed by the charter party and were signed by the Master. Neither Arochem nor Jahre are named in the bills of lading. They effectively incorporate all the terms and conditions of the charter parties. In accordance with the instructions given by Jahre, the M/T BONI departed from Blang Lanclang on December 23, 1988.

The M/T BONI was a VLCC built in 1974 in Italy of 254,681 tons deadweight capacity. She was 1,144.67 feet long with a beam of 169.97 feet. She was classed with ABS. Seaemblem purchased her in July 1987.

The engine room was aft beneath the superstructure. At the time of her construction, the Fiat 10-cylinder main engine and the engine room surrounding it were the largest in the world. There were five levels below the main deck in the engine room. On the lowest level there were two Fiat diesel generators at the forward end. The next level above that contained a turbo generator, and two levels further up, there was a fourth generator known as the Daihatsu generator which had been installed by Seaemblem in late 1987 and served as the principal generator for ship operations

Just prior to the fire, the Daihatsu generator failed because of water in the diesel oil. As a result the port Fiat generator had to be started as an emergency replacement. The starboard Fiat generator could not be used because it was partially dismantled.

At approximately 2000 hours on December 26, 1988, a fire was detected in the engine room on or near the port Fiat generator. According to the crew member witnesses, efforts to fight the fire were hampered by dense smoke, and the crew was forced to abandon the engine room. The ship's $CO_2$ system was then actuated, but only a portion of the available $CO_2$ was discharged into the engine room.

It appeared to the crew on deck that the heat in the engine room had subsided, but there was a resurgence of the fire at about 0400 on the morning of December 27, 1988. Approximately three hours later the Master gave the order to abandon ship, and the crew was taken aboard another vessel. The fire was extinguished by the salvors, and the BONI and her cargo were towed to Singapore by a number of salvage vessels, following the signing of Lloyd's Salvage Agreements. On January 18, 1989, the BONI reached Singapore where the cargo was found to be undamaged. However, the vessel itself was severely damaged and could not proceed on the voyage.

After general average guarantees had been executed and security provided, the cargo was delivered to Arochem at Singapore. The Tapis portion of the cargo was sold by Arochem and discharged to the vessel MANHATTAN PRINCE, designated by the purchaser, Phibro, on February 18, 1989. The Arun cargo was delivered to the CENTURY DAWN and transshipped to Arochem's facility in Puerto Rico.

The claims of the salvors were arbitrated in London in accordance with the Salvage Agreements. After an arbitration and appeal, the cargo interests were charged with salvage expenses in the amount of $ 2,648,224.20 which was paid by Arochem's underwriters, in accordance with the salvage awards.

Since both charters contained the same New York arbitration clauses, Seaemblem, Jahre and Arochem agreed that all disputes among the parties be consolidated, and submitted to the same Panel.

On February 14, 1992, a Petition of Involuntary Bankruptcy was filed against Arochem in the United States Bankruptcy Court in Bridgeport, Connecticut. As a result, all proceedings against Arochem were automatically stayed. Thereafter, the parties submitted to the Bankruptcy Court a stipulation that the stay be modified to permit the Panel to decide all issues in the consolidated arbitration, and to render final awards concerning these issues. The stipulation was so ordered by the bankruptcy judge on June 10, 1993.

THE CLAIMS

Arochem, as sub-charterer, and cargo owner, has alleged that it has sustained damages because of the unseaworthiness of the BONI, and has asserted its claims against Jahre, as disponent owner under the charter, and against Seaemblem, the owner and operator of the vessel. These damage claims, which will be considered in detail in this award, include cargo's salvage expenses, the cost of obtaining the testimony of the vessel's Third Engineer, direct losses sustained as a result of the delay in the arrival of the cargo at its destination, and the legal cost and expenses relating to this arbitration. These claims are asserted by Arochem in the total amount of $ 9,124,567.00.

Copyright © Society of Maritime Arbitrators, Inc.

Seaemblem, as owner of the BONI has asserted a claim against Jahre as charterer for detention in the amount of $ 48,858.00, and for freight in the net amount of $ 2,810,231.00. These claims rely upon the provisions in the head charter between Seaemblem and Jahre, which subsequently chartered the vessel to Arochem, the cargo owner.

Jahre, the intermediate charterer, takes the position that it is entitled to indemnity from Arochem or Seaemblem, for any damages imposed upon it. Jahre further asks that any award in favor of either Seaemblem or Arochem be made payable directly by the real party in interest, and not by Jahre in first instance.

LIABILITY

The principal question to be decided by the Panel is whether Seaemblem, as owner and operator of the BONI, and Jahre, as disponent owner, are responsible for the consequences of the fire aboard the vessel.

Both charter parties incorporated by reference the U.S. Carriage of Goods by Sea Act (COGSA, 46 U.S.Code §§ 1300-15) and the U.S. Limitation of Liability Act, which includes the Fire Statute (46 U.S.Code §§ 181-88).

Arochem, as cargo owner, argues in substance that the ship was poorly maintained and that the crew was inadequately trained, particularly with respect to firefighting procedures. Arochem further contends that the multiple defects were obvious and long standing and that the shipowner's representatives on a managerial level either knew or should have known that the BONI was unseaworthy.

Although Arochem evidently concedes that it bears the burden of proof under the Fire Statute and COGSA, the cargo owner asserts that it has proven the fire to be the result of "design or neglect" and "actual fault or privity" of the carriers. Arochem takes the position that Jahre, as charterer, must rely upon the fire provisions in COGSA, 46 U.S.Code § 1304(2)(b), as only the shipowner is entitled to the protection of the Fire Statute, 46 U.S.Code § 182.

The defense of the shipowner, Seaemblem, is premised upon the contention that Arochem has failed to carry cargo's burden of proof under the Fire Statute or COGSA. According to Seaemblem, the cargo owner must prove that the ship was unseaworthy at the start of the voyage, that the unseaworthiness caused the fire or prevented it from being extinguished and that the unseaworthiness was caused by the actual fault and privity of the shipowner.

Relating these principles to the facts of this case, Seaemblem argues that neither the fault of the crew nor the latent defects of the vessel are chargeable to the shipowner, which used due diligence to make the BONI seaworthy.

In fact, however, neither COGSA nor the Fire Statute require proof of unseaworthiness at the commencement of the voyage. What must be proven is that the fire was "caused by" the "design or neglect" of the owner (under the Fire Statute) or the "fault or privity" of the carrier (under COGSA). These two expressions have been held to have the same meaning.

Jahre does not address the issue of liability under the Fire Statute, or COGSA. As disponent owner and intermediate charterer, Jahre insists that it had no knowledge of the condition of the ship or the circumstances surrounding the fire.

In support of their respective positions, the parties presented numerous witnesses, including members of the crew, and an imposing array of experts who testified over the course of 25 hearings. Arochem contends that its evidence has established the existence of numerous defective conditions aboard the vessel, and that these defects caused the fire and prevented effective efforts to extinguish it. Based upon eyewitness testimony and the opinions of its experts, Arochem attributes the start of the fire to an oil leak in a flange of a fuel line leading to the port Fiat generator in the lowest level of the engine room. According to this hypothesis, the oil sprayed upon the hot surface of an exhaust pipe and manifold. Arochem's experts and witnesses testified that the protective sheathing, designed to cover the exhaust pipe and manifold, was missing. They attributed the leaky flange to a misalignment of the fuel oil pipes.

Arochem's witnesses also asserted that the seriousness of the fire was aggravated by oil leaking from the service tank for the Daihatsu generator located at the highest level above the Fiat generator, as the result of multiple defects in design or construction of the tank. According to the experts who testified on Arochem's behalf, missing or improper safeguards permitted the contents of the tank to overflow into the engine room, adding fuel to the fire and contributing to its resurgence. The improper safeguards included a drain valve that was not self closing, and an inadequate splash pan.

The defects which allegedly prevented effective firefighting included the absence of certain fire extinguishers, in particular, a large foam extinguisher required to be in the engine room, failure of the emergency generator, defective

Copyright © Society of Maritime Arbitrators, Inc.

closure vents and skylights, and most significantly, the failure of the CO[2] system. This malfunction was attributed to a broken actuator handle, and to the absence of an indicator to show whether certain valves were open or closed.

Arochem, through its expert witnesses, asserted that these conditions must necessarily have existed for a long period, and would have been apparent to the owners' superintendent during the course of any inspection.

The memoranda submitted by Seaemblem take the position that the fire was not caused by a defect in the ship's equipment, but resulted from crew negligence, particularly that of Third Engineer, Constantine Peppas. Specifically, Seaemblem's witnesses asserted that Peppas violated proper procedure by leaving the area after starting the Fiat generator, where the fire originated. The shipowner's experts agreed that oil spraying from the fuel line caused the fire, but testified that the casualty would not have occurred if Peppas had continued to attend to the generator until it warmed up. According to Seaemblem's rationale, if Peppas had properly remained at his post for 10 to 15 minutes, he would have observed the oil leak and corrected it.

Seaemblem argued further that the oil leak resulted from the working loose of the bolts at the flange, in combination with gasket failure, and that these conditions could not have been detected by visual inspection. With respect to the cargo owner's allegation that a contributing cause of the fire was oil striking an uninsulated section of the exhaust manifold, the shipowner's witnesses denied that any insulation was missing, and further testified that the equipment required no sheathing.

With respect to the partial failure in the CO[2] system, Seaemblem admits that three banks of CO[2] bottles, a total of 87 bottles, failed to discharge, and that this malfunction prevented the injection into the engine room of a volume of CO[2] sufficient to extinguish the fire. However, the owner of the BONI argues that any defects in the closed CO[2] system were latent, and could not be detected by a diligent inspection.

In response to Arochem's claim that the BONI's crew was inadequately trained in firefighting procedures, Seaemblem introduced testimony that most of the officers had attended firefighting courses in maritime schools, and that the engineers were required to attend seminars and interviews regarding shipboard safety. According to the shipowner's witnesses, video cassettes and manuals dealing with firefighting were available aboard the vessel, and fire drills were held regularly.

DISCUSSION

Both Arochem and Seaemblem have submitted extensive briefs in support of their legal positions concerning the responsibility for the fire. Although their factual contentions are sharply disputed, the parties are in general agreement concerning the principal issue to be decided by this Panel. As has been stated in substance by both Seaemblem and Arochem, the cargo owner must meet the burden of proof that the fire was caused by the "actual fault or privity" or "design or neglect" of the owner or carrier. This can be accomplished by proof of a defective condition which caused the fire, and/or prevented it from being extinguished, and that the defect was due to the fault of the managing officers or agents of the shipowner.

We find that Arochem has successfully met this burden of proof. The record of this arbitration contains ample evidence that the BONI was poorly maintained, and began her final voyage in an unseaworthy condition which was known, or should have been known, to Seaemblem's managing agents. We find further that several of the defects that rendered the vessel unseaworthy either caused the fire, increased its intensity, or prevented effective efforts to extinguish it. We reject Seaemblem's contention that the fire was caused, or allowed to spread solely by Third Engineer Peppas' negligence, for which the shipowner is not liable, in accordance with the Fire Statute. Even if we were to accept the contention that Peppas was at fault, it is undisputed that an oil leak took place. It is speculative to assert that Peppas would have prevented the fire if he had not left the area of the generator. Furthermore, his actions cast strong doubt upon his competence and training.

The experts who testified for Seaemblem and Arochem expressed the same opinion that the fire was caused by oil leaking from a flange joint, as a result of a deteriorated gasket. However, their opinions differ sharply regarding the cause of the gasket's failure. The shipowner's expert witnesses attributed the problem to the opening of the flange joint, after the nuts holding it were loosened by vibration.

Arochem's experts testified that the failure of the gasket and the subsequent oil leak were caused by improper welding at the joint, resulting in the misalignment of the piping. These witnesses emphasized that this condition was apparent and obvious to owners' superintendent when he was on board, as was the absence of sheathing on the exhaust mani-

Copyright © Society of Maritime Arbitrators, Inc.

fold. Moreover, there was testimony that a rag was seen wrapped around the joint which indicated a long standing condition.

According to Seaemblem's expert witnesses, the loosening of the nuts, which they blame for the leak, would not have been noticeable during an inspection. The shipowner denied that the sheathing on the manifold was missing, and alleged that the sheathing itself ignited after it was saturated by oil.

We believe that Arochem's explanation of the fire's origin is more consistent with the physical evidence noted after the casualty. Seaemblem's contention that the fire resistant sheathing itself became ignited is not plausible, and we accept the testimony that some of the exhaust piping to the manifold was not covered by sheathing when it was sprayed by oil from the leaky joint. This condition would certainly be noticeable, as was the condition of the flange joint, as described by the Arochem's experts. We find this explanation more reasonable than the opinion of the shipowner's expert that the leak resulted from vibration that loosened the nuts at the joint.

Even if the precise cause of the oil leak and the visibility of the defect can be debated, no ambiguity exists concerning the progress of the fire and efforts to extinguish it. The Panel finds that there were numerous unseaworthy conditions that increased the intensity of the fire and seriously impeded the crew's efforts to extinguish the blaze. We also conclude that these defects should have been detected by any diligent inspection prior to the voyage.

We accept the testimony of Arochem's witnesses that the BONI was not equipped with proper firefighting equipment, as required by SOLAS. Specifically, we find that a large portable fire extinguisher, called a fire engine, was located outside instead of inside the engine room and that in any event it had been empty before the fire. There was disputed testimony concerning the availability of the portable extinguishers. We accept Arochem's contention that adequate required firefighting equipment was unavailable.

We also find that firefighting efforts were impeded by the inoperable condition of the emergency generator, the fire pump, the engine room skylights and the stack vents. These vents and skylights could not be closed because of missing or defective closing devices. The Panel further accepts the testimony of Arochem's witnesses that the fire was fueled and intensified by diesel oil leaking from an inadequately constructed service tank installed by Seaemblem at a high level in the engine room.

In addition to the conditions described above, Arochem introduced persuasive evidence that the crew's failure to extinguish the fire and to prevent its resurgence resulted at least in part from a defective condition in the $CO_2$ system. Seaemblem conceded that a minimum of 303 bottles of $CO_2$ had to be discharged into the engine room to put out the fire, and that only 216 bottles did in fact discharge. It was not disputed that the failure of 87 $CO_2$ bottles prevented the complete extinguishment of the fire and permitted its subsequent resurgence. If the $CO_2$ system had functioned properly, it is entirely possible that the fire could have been contained and the damage minimized.

Although agreeing that the system failed to discharge an adequate volume of $CO_2$ into the engine room, the parties are in dispute concerning the cause of the malfunction. The experts who examined the equipment on Arochem's behalf have cited a broken actuator handle as a reason that a bank of 87 $CO_2$ bottles failed to discharge. According to this explanation, $CO_2$ escaped through the hole left by the broken handle, thus reducing pressure and preventing discharge of the 87 cylinders.

Another defect in the $CO_2$ system described by Arochem's witnesses was the absence of a nameplate or indicator to show whether the valves were in an opened or closed position. According to the record, some of the handles were found to be in the wrong position after the fire, indicating that $CO_2$ had been discharged by error into spaces other than the engine room where it was needed. Much of this was into the emergency generator room which had the effect of delaying any attempt to start the emergency generator. Arochem attributed this misdirection error to the absence of the nameplate to indicate whether the valves were opened or closed. Arochem asserts that the defects in the $CO_2$ system should have been detected by a diligent inspection and that they were violations of SOLAS.

While admitting that the system had failed, Seaemblem attributed the failure to latent defects not discoverable by a diligent inspection. The shipowner sharply disputes Arochem's allegations concerning the cause of the $CO_2$ malfunction, but does not offer an explanation why an inadequate quantity of $CO_2$ reached the engine room. With respect to prior diligent inspections, Seaemblem refers only to an ABS survey before the voyage.

Arochem further contends that the BONI was rendered unseaworthy by the total incompetence of the crew and the shipowner's failure to provide proper training and instruction in firefighting techniques. Seaemblem contradicts these

Copyright © Society of Maritime Arbitrators, Inc.

allegations by reference to firefighting courses attended by the officers, lectures and seminars provided by the shipowner and weekly fire drills held aboard the vessel.

After reviewing the evidence and the legal arguments admitted by the parties, the Panel concludes that the unseaworthiness of the BONI caused the fire and prevented its containment. We find that the shipowner Seaemblem is responsible for this unseaworthiness and is liable for the provable damages that presented.

We hold that Arochem has sustained its burden of proof under the Fire Statute as well as under COGSA. The defective conditions described by the witnesses were of such a nature that the shipowner either knew or should have known of their existence after pre-voyage inspections. Specifically, the knowledge of George Archontakis, the owner's Marine Superintendent, was imputable to the shipowner. There is ample evidence in the record that Mr. Archontakis inspected the vessel and was familiar with the maintenance of her equipment. We reject Seaemblem's defense that prior inspections by ABS or other classification societies demonstrated that Seaemblem had used diligence, as that duty is non-delegable. Therefore, we find the fire was caused by the "design or neglect" of the shipowner. We further conclude that Seaeblem failed to exercise due diligence to make the vessel seaworthy.

Although the issue is academic in view of our findings set forth above, we believe that the incompetency of the crew was a contributing factor. The inadequacy of the firefighting equipment and the malfunction of the $CO_2$ system would have impeded the efforts of a thoroughly trained crew, but the crew of the BONI was clearly incapable of dealing with the crisis. There was testimony that the officers and crew received training in firefighting procedures, but none of this training was evident in the way in which the fire was fought in its initial stages and its subsequent spread. Furthermore, the inadequacies already discussed in the vessel's equipment speak loudly of incompetent crew maintenance.

Finally, we find that Jahre, as intermediate charterer, is not liable under the terms of the fire provisions in COGSA. Although we agree that Jahre is not entitled to the protection of the Fire Statute, there is nothing in the record to establish privity and knowledge, or lack of due diligence on the part of Jahre. Seaemblem is liable directly to Arochem under the bills of lading and the Submission Agreement.

DETENTION AND FREIGHT CLAIMS

A separate but related issue submitted to the Panel in this consolidated arbitration is Seaemblem's claim for detention and freight. In the first instance, this claim by the shipowner was brought against Jahre pursuant to a charter between these parties. Jahre denied that the shipowner was entitled to detention or freight, but instituted an indemnity claim against Arochem, and tendered to Arochem the defense of Seaemblem's claim.

Seaemblem based its detention claim upon the charterer's alleged failure to issue prompt sailing orders at Blang Lanclang, Indonesia, where the BONI completed loading on December 21, 1988. According to Seaemblem, the vessel's departure was delayed for 2 days, 5 hours and 18 minutes, resulting in a detention loss of $ 48,858.33. This computation was based upon the charter party demurrage rate of $ 22,000.00 per day.

Seaemblem's claim for adjusted freight in the amount of $ 2,810,231.30 is based upon a contention that the shipowner was prevented from delivering the cargo to destination by the charterer's demand of delivery at Singapore, the port of refuge. While agreeing that freight is not earned unless the cargo is carried to its destination, Seaemblem contends that it was prevented from transshipping the cargo and earning adjusted freight, because the cargo owner directed that the discharge take place at Singapore.

According to Seaemblem's computations, transshipment of the cargo at Singapore reduced the voyage operating expenses by $ 339,768.74. The freight claim gave the charterers credit for these saved expenses which were deducted from the lump sum charter freight of $ 3,150,000.00, leaving a net freight claim of $ 2,810,231.36.

Both Jahre and Arochem oppose Seaemblem's freight claim and rely primarily on the contention that the BONI was unseaworthy at the inception of the voyage, and that Seaemblem was entitled to freight only if it delivered the cargo at destination. The charterers pointed out that Singapore, where the cargo was discharged, is in the vicinity of the loading ports, and that only minimal service, if any, was rendered by the shipowner. Therefore, according to this argument, any freight award based upon quantum meruit could only be in a de minimis amount.

Arochem makes the additional argument that Seaemblem cannot rely on "General Average" Clause 146 in the charter party because of the shipowner's failure to demonstrate seaworthiness at the beginning of the voyage. Clause 146, entitled "General Average", permits the charterer to demand release of its cargo at a port of refuge in exchange for a nonseparation of interest agreement. It obviously contemplates a future resumption of service by the vessel. Further-

Copyright © Society of Maritime Arbitrators, Inc.

more, according to Arochem, the charterers did not depend upon Clause 146 in demanding delivery at Singapore, but upon charter party Clause 104.

In reply, Seaemblem contends that Arochem could not validly demand delivery of its cargo at Singapore under Clause 104, which gave the charterers the right to take delivery without producing the original bill of lading. Seaemblem further asserts that Clause 146, although entitled "General Average", does not require the shipowner to prove that it exercised due diligence to make the vessel seaworthy at the onset of the voyage. It is Seaemblem's position that Clause 146 benefits the charterers because the clause allows the charterers to demand delivery of the cargo for their own commercial reasons when a General Average act has occurred, but that the shipowner does not thereby lose his right to adjusted freight even without proof of due diligence.

The Panel holds that Seaemblem is not entitled to detention or freight under the circumstances of this casualty.

With respect to detention we find nothing in the voyage charter party to support the shipowner's claim. Detention damages are recoverable only if the delay in question caused the shipowner a loss. There is no evidence that Seaemblem suffered any damage due to the alleged delay, particularly in view of the vessel's subsequent return to the vicinity of the loading ports. In the absence of proof of damage, we reject Seaemblem's computation of loss based upon the demurrage rate in the charter party.

We deny Seaemblem's claim that it is entitled to adjusted freight, even though the charterers took delivery of the cargo in Singapore in vicinity of the loading ports. The rule of law asserted by the charterers is simple and unequivocal, i.e., freight is payable upon the delivery of cargo at the port of destination. This obligation on the part of the shipowner is clearly stated in Clause 2 of the charter parties.

There is no question that, as a general rule, the cargo must be carried to its destination before freight is earned, unless the parties have agreed otherwise. Seaemblem does not dispute this statement of the law, but argues that it was deprived of its right to transship the cargo to its destination by the charterer's decision to take delivery at Singapore.

We reject this assertion. The charter parties gave the charterers the right to require the delivery of the cargo at a port of refuge, as provided in Clause 146. We do not find that the charterer's rights under this clause were affected by Arochem's reference to Clause 104 in demanding delivery at Singapore without production of the bills of lading. The Panel also disagrees with Seaemblem's position that lack of diligence on the part of shipowner was irrelevant to its right to freight. In this regard, we find the authorities cited by the charterers to be persuasive, particularly a holding that the owner of an unseaworthy ship forfeited its right to freight, even where the charter party provided that freight is earned upon loading; and was non-returnable, "vessel lost or not lost".

The charterers of the BONI have a much stronger defense to Seaemblem's claim for freight as the charter parties do not contain a "vessel lost or not lost" provision.

It is true that Clause 146 allows recovery of a net freight if the charterer exercises its option to take delivery of the cargo at a port of refuge. But this same clause allows charterer's transshipment expenses to be included in general average, which means owners would ultimately pay a portion of them. Even if Clause 146 were construed to allow recovery to the shipowner of a net freight, the charterers would be permitted to add that net freight to their damages in view of our finding of liability against the shipowner.

Moreover, it would be inequitable to award freight to the shipowner under the circumstances of this case where the unseaworthiness of the vessel resulted in the return to the loading port. We hold that Seaemblem's lack of due diligence resulted in its failure to perform its obligations under the charter party, and that the shipowner is not entitled to freight under the provisions of the freight clause and general maritime law.

DAMAGES

Arochem seeks recovery for losses allegedly sustained because of the fire aboard the BONI. The claims against Seaemblem and Jahre are summarized as follows:

| | |
|---|---|
| Salvage expenses | $ 2,648,243.90 |
| Expenses of Peppas' deposition | $ 15,298.65 |
| Translation of Audiotape re Peppas' deposition | $ 8,625.00 |

Copyright © Society of Maritime Arbitrators, Inc.

| | |
|---|---|
| Hedging and Yield Losses | $ 5,861,825.00 |
| Costs and legal fees | $ 600,000.00 |
| Total | $ 9,133,192.55 |

We will discuss these claims in the same order as enumerated above.

SALVAGE EXPENSES

Arochem has included in its statement of damages a claim for payments made by the cargo interests as a result of salvage proceedings in London. The claims of three salvage vessels were submitted to an arbitrator whose award was subsequently appealed. According to exhibits produced by Arochem, the ultimate award after appeal resulted in a total payment by the cargo interests in the amount of $ 2,648,224.20.

Of this total, cargo's share of the basic award to salvors was $ 2,196,961.50. In addition Arochem demands reimbursement for the costs and expenses it incurred as a result of the salvage proceedings, amounting to $ 451,262.70. These charges include contribution to salvors' attorneys' fees of $ 246,820.22, cargo counsel fees in the salvage proceedings in the amount of $ 172,117.90, and salvage arbitrators fees and expenses of $ 32,324.58.

In summary, Arochem seeks damages for the amounts paid by the cargo interests in the London salvage proceedings, as follows:

| | |
|---|---|
| Basic salvage awards | $ 2,196,961.50 |
| Salvors' attorneys' fees | $ 246,820.22 |
| Cargo attorneys' fees | $ 172,117.90 |
| Arbitrators' fees & expenses | $ 32,324.58 |
| | $ 2,648,224.20 |

Seaemblem does not question Arochem's claim for cargo's portion of the salvage awards, in the amount of $ 2,196,961.50. However, the shipowner does oppose the claim for reimbursement for the cargo interests' share of salvage costs and fees, in the net amount of $ 451,262.70. This opposition is based on Seaemblem's contention that the salvage arbitration decisions did not provide for the payment of legal fees incurred during the salvage proceedings. We find Seaemblem's position without merit. We find that this claim of Arochem is recoverable in full.

EXPENSES OF PEPPAS' DEPOSITION

Arochem includes in its statement of damages the costs it incurred in obtaining the testimony of Third Engineer Constantine Peppas in New Orleans. Arochem argues that these expenses would not have been necessary if Seaemblem had produced Peppas in Australia, as it had agreed to do. Although Third Engineer Peppas was the officer on watch at the commencement of the fire, and perhaps the primary witness in this case, he was not produced in the Australian depositions.

The shipowner denies responsibility for Peppas' failure to testify in Australia and alleges that Peppas refused to appear for his deposition unless he was paid $ 100,000.00 by Seaemblem.

Much of Peppas' testimony was not creditable, and the circumstances of his dealings with the shipowner in Australia are in dispute. However, it is apparent to the Panel that Thenemaris' representatives in Adelaide were remiss in failing to produce Peppas for his deposition as they were obliged to do. The expense of taking Peppas' testimony in New Orleans was a direct result, and we find that Arochem is entitled to reimbursement.

However, we do not find the translation fee of $ 8,625.00 paid by Arochem to Captain Coutsodontis was an expense necessarily incurred as a result of Seaemblem's failure to produce Peppas in Australia. We find that Seaemblem fulfilled its obligation regarding the tape introduced during testimony of Mr. Ionnis Vekris by providing Arochem with a certified translation, for which Seaemblem paid $ 2,000.00. Therefore, we deny this portion of Arochem's claim. We award Arochem the legal fees and other expenses incurred in New Orleans in the amount of $ 15,298.65.

Copyright © Society of Maritime Arbitrators, Inc.

## THE ARUN EQUITY (HEDGE) AND YIELD LOSSES

Arochem contends it suffered crude oil equity and yield losses because of the BONI fire of $ 5,861,025. Broken down into its two components, Arochem's hedge claim is for $ 2,315,418.21 and is based upon a comparison of the hedge positions it placed based upon a date the BONI should have arrived at Arochem's refinery and the actual date the Arun crude arrived on the transshipping vessel. The Arun yield loss amounts to $ 3,552,657, and is measured by a comparison of the projected yield Arochem would have obtained from the Tapis and Arun crudes against the actual yield of the replacement Algerian condensate cargoes.

With respect to the hedge claim, Arochem submits the Tapis crude case and hedge positions were liquidated in January 1989, when the Tapis was sold at Singapore after the BONI casualty. This is said to have resulted in a net gain of $ 7,050, which Arochem has credited to the claim. The Arun hedge loss is premised on the fact that Arochem was required to extend its hedging program beyond the contemplated period because of the BONI problem and the delayed arrival of the transshipping vessel. Arochem contends the expected February 1st, BONI arrival date at Arochem's Puerto Rico refinery, coupled with the normal refinery run of 20-40 days, would have allowed it to market its products in the March/April period. Arochem asserts this was the basis of its hedge position. Instead, the delay in receiving the Arun and the need to extend its hedge position resulted in the equity loss complained of. Arochem contends this was not offset by liquidating the physical side of the transaction.

Seaemblem and Jahre contend the hedge claim is not properly supported, but in any event submit the hedging program was not conducted in accordance with industry standards. More specifically, they argue there was an unexplained gap between the cargo purchase date and the short hedge position taken about 15 days later which is contrary to the no risk hedging concept Arochem stated it was committed to. Also, it is argued that Arochem failed to present proper supporting documentation of its trading on the New York Mercantile Exchange against its position of wet physical barrels. Seaemblem and Jahre submit that the predicate for Arochem's alleged equity and yield losses rests heavily on the credibility of Arochem's documentation and the truthfulness of its executives and trading personnel. It is argued Arochem was engaged in an illegal scheme to cover up speculative trading losses long before the BONI event and that pending civil and criminal litigations graphically reveal the carefully designed pattern of deception intended to defraud a number of international banks out of some $ 200 million. Therefore, Seaemblem and Jahre maintain Arochem's witnesses should not be believed.

Arochem's Arun yield loss is predicated on the position that the Algerian condensate, which Arochem purchased as a replacement for the Arun and Tapis crudes carried on the BONI, is an inferior feedstock. Arochem argues that its Puerto Rico refinery is designed to primarily produce naphtha, jet fuel and residual fuel, mostly from gas condensate and lighter crude oils. Therefore, Arochem contends the nature of the feedstock is of utmost importance to its operation.

The primary difference in the value of feedstocks is in the amount of BTX naphtha that is produced, and in this respect Arochem argues that Tapis and Arun crudes produce the more valuable BTX naphtha -- Algerian condensate is said to produce a less valuable paraffinic naphtha. The difference in valuation of the three feedstocks is a principal point of difference between the parties. Arochem contends its yield calculations are correct.

Seaemblem and Jahre contend they had no knowledge of Arochem's crude blending program, or that Arochem's Puerto Rico facility is more of a petrochemical type of operation than the typical refinery, producing high N + A elements. They also argue Algerian condensate is not inferior to other feedstocks because the lower N + A components are reflected in the pricing formula. Furthermore, Seaemblem and Jahre content Arochem's own documents show that the Algerian crude was blended with other N + A material, producing a naphtha with sufficient N + A so that it could be handled by the refinery's gasoline producing units.

We now address Arochem's claim. The general rule for an award of damages in a breach of contract action is to assess against the party in breach all damages resulting from the breach which could have reasonably been contemplated by the parties at the time the contract was executed. Hadley v. Baxendale, 9 Exch. 341, 156 Eng. Rep. 145 (1854). Damages should return the innocent party to the position it would have occupied had the contract not been breached, subject to the foreseeability standard referred to above.

Seaemblem and Jahre argue that Arochem's equity and yield loss claims are "special damages", consequential in nature and not reasonably foreseeable. They further argue they were unaware of Arochem's refinery's operations or its hedging practice and that at no time did Arochem ever inform them of refinery yield data, hedging practices or the lift-

Copyright © Society of Maritime Arbitrators, Inc.

ing of the Algerian condensate replacement cargoes. Therefore, Seaemblem and Jahre maintain the equity and yield claims should be denied.

There is no basic disagreement between counsel on their understanding of the legal implications of general damages v. special damages and the applicability of the Hadley v. Baxendale rule. However, there is a decided disagreement as to whether hedging losses fall within the gambit of "special damages" and, if not, whether Arochem's hedging practice as presented here was, in fact, hedging as it is generally recognized and understood in the trade. Counsel also differ in their legal analyses of the Arun yield loss, its nature, and the computation of its monetary consequences. While the two categories of damages are contained under the same heading, they are quite different and we shall treat them separately.

It is generally recognized that the hedging of petroleum products and other commodities is a desirable and essential method of minimizing price fluctuations and exposure to loss. All of the experts before this panel testified on this point and there was no disagreement. Indeed, one may logically conclude that it is foolhardy and speculative not to do so. Seaemblem and Jahre knew Arochem operated a refinery in Puerto Rico and that it was also a sometime trader in the spot markets. Jahre's principal business is in the tanker lighterage trade and as such has close contact with a variety of petroleum operating companies. Seaemblem operates tankers and is presumed to have some understanding of the basic elements of the petroleum trade. After all, the very political and economic pressures impacting oil prices also affect tanker rates. We accept in this day and age that most companies are aware of the need and advantage of hedging products to assure price stability and a low risk profile.

Arochem's chief executive testified in this proceeding and described his company's hedging policy as follows:

Well, what we try to do -- we enter into a balancing, if you will, what -there is -- at that point in time and what we were trying to do for every barrel physically we bought of either Tapis or Arun, we would sell an equal number of barrels of West Texas Intermediate.

The principal question we must now address is whether the transactions which form the basis of Arochem's equity loss claim are hedging losses on the BONI transaction or speculative position taking. Jahre's expert witness explained hedging in its simplest form:

A hedge is placed by either going long or short on the American Mercantile at a fixed month or fixed commodity at a fixed price by either buying in or selling out a relevant number of contracts relating to your open position in the wet oil, therefore, performing the hedge. If you are long, for example, a cargo of 250,000 barrels of gasoline, then you go short, a relevant number of wet contracts per thousand barrel contracts on the New York Mercantile on the month you anticipated that cargo be delivered or the month you take position so you lock in your prices.

We have carefully reviewed the alleged hedging transactions and conclude they are not in accord with Arochem's own stated procedure, nor are they placed in accordance with accepted industry standards. Hedges are never an absolute protection against the risks of market fluctuations, but if placed properly, and in a manner similar to the procedure which Arochem's witness described, they offer a large measure of price protection. They were not so placed here.

Arochem submitted voluminous documentation and broker's records in support of its equity claim but those records never completely isolated the BONI transactions, nor did they offer a satisfactory explanation for the timing of the alleged hedge transactions.

In view of the above, we deny Arochem's equity loss claim.

We will now address Arochem's Arun yield loss and accept as a premise Arochem's portrayal of Seaemblem and Jahre as sophisticated business operators who must be held to a knowledge of the ordinary business practices of the industry in which they operate. Assuming for the time that Arochem's yield calculations are correct, although serious questions have been raised on this score, the more pertinent issue is whether two knowledgeable carriers should be presumed to understand the inner workings of a refinery and the special requirements and limitations of its machinery and equipment.

The parties stipulated that Arochem never disclosed to Seaemblem or Jahre the crude oil yield analysis for Tapis or Arun crudes, or that the refinery was more akin to a petrochemical plant than to a typical refinery producing gasoline. For Arochem to prevail on its yield claim, the type of loss must have been reasonably foreseeable at the time of contracting. We have great difficulty with the proposition that an ocean carrier should be sufficiently expert and able to

Copyright © Society of Maritime Arbitrators, Inc.

understand refinery operations, which would include some knowledge of the most efficient and desirable feedstock charges.

The yield loss being claimed here is of major proportion in every sense of the word and is predicated on a sophisticated understanding of refinery operations and the advantages and disadvantages of utilizing various types of crudes. We do not believe a carrier would recognize that a delayed arrival at the discharge port because of a casualty would result in a multi-million dollar damage claim because the substituted crude could not produce the special end result elements.

We have also reviewed in some detail the refinery Report of Operations for the relevant period and note with some interest that they reflect an on-going maintenance and repair schedule which may or may not otherwise be relevant to the issue before us but for the more basic foreseeability question.

In conclusion, we find that Arochem's yield loss is not recoverable because, unlike the alleged hedge loss, it falls into the category of special damages.

COSTS AND LEGAL FEES

Finally, Arochem asks the Panel to award costs and attorneys' fees in the estimated amount of $ 600,000.00

Clauses 23 and 24 of the charter parties clearly give the Panel the authority to award costs, including a reasonable allowance for attorneys' fees.

We award Arochem an allowance of $ 125,000.00 toward the costs and legal fees of this arbitration. Other than this allowance, the parties are to bear their own costs and counsel fees, and share the expense of the hearing transcript.

SUMMARY

The claims of Seaemblem for detention and freight are denied.

The claims of Arochem for Equity and Yield losses on the Arun crude are denied.

All claims against Jahre are denied.

The remaining claims of Arochem against Seaemblem are awarded in the following amounts:

| | |
|---|---|
| Salvage Expenses | $ 2,648,243.90 |
| Interest at 7.5% p.a.<br>on Salvage Expenses from<br>4/24/90 to date of the Award | $ 768,896.81 |
| Expenses of Peppas' Deposition | $ 15,298.65 |
| Costs and Attorneys' Fees | $ 125,000.00 |
| Total | $ 3,557,439.36 |

If payment is made within 30 (thirty) days of this Award, no further interest shall be awarded. If payment is not made within 30 (thirty) days, however, interest shall resume on the sum of $ 2,788,542.55 at the rate of 6% per annum from the date of the Award until it is paid or reduced to judgment.

The arbitrators' fees are set forth in Appendix A attached hereto. The said fees are assessed jointly and severally against all three parties in this arbitration. Each party is to pay one-third of the said fees initially, but shall remain jointly and severally liable until they are paid. In default of any party paying its one-third share, the other parties paying the fees shall be entitled to reimbursement from the delinquent party.

This Award may be confirmed and made a judgment of the U.S. District Court for the Southern District of New York in accordance with the Title 9, U.S. Code Sec. 1, et seq.

New York, N.Y.

March 7, 1994