Michael J. Frevola
Lissa D. Schaupp
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR PLAINTIFF
FRONT CARRIERS LTD.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRONT CARRIERS LTD., | 07 Civ. 6333 (RJS) |
| Plaintiff, | **AFFIRMATION OF JON FLAATEN PURSUANT TO 28 U.S.C. § 1746 IN** |
| -against- | **SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S** |
| TRANSFIELD ER CAPE LTD., | **MOTION FOR COUNTER-SECURITY PURSUANT TO** |
| Defendant. | **SUPPLEMENTAL RULE E(7)** |

I, JON FLAATEN, hereby affirm as follows:

1.      I am a Senior Chartering Manager of Golden Ocean Management AS, the commercial manager of Plaintiff Front Carriers Ltd. In my capacity as Senior Chartering Manager, I obtain vessels for use by Front Carriers through time charters, voyage charters and contracts of affreightment.   I am fully familiar with the events related below and I am fully familiar with the statistics and market conditions related below.

2.      I submit this affirmation in support of Front Carriers Ltd.'s opposition to Transfield ER Cape Ltd.'s application for counter-security.



3.      I have been employed in the shipping business for 33 years, and I have been involved in vessel chartering operations for 30 years. From June 1974 to September 1977, I was employed as a Brokering Assistant for RS Platou Shipbrokers, Dry Cargo Department. From September 1977 through December 1977, I was a member of the Chartering Department of Halfdan Ditlev Simonsen (Shipowners), which merged with Seateam in January 1978 at which point I was appointed Assistant Chartering Manager. I was promoted to Chartering Manager of Seateam (Shipowners) in 1990 and remained in that position until June 1991. I then served as Chartering Manager of Teamship (shipowners' pool) in the remainder of 1991 and through 1992. Commencing in 1993 and until September 1997, I was the Chartering Manager of T. Klaveness (Shipowners/pool operators). From September 1997 until December 2004, I was the Chartering Manager of Frontline (Shipowners). In December 2004 there was a de-merger and Frontline created Golden Ocean Group Ltd., of which Front Carriers Ltd is a subsidiary company.

4.      As part of my job as Senior Chartering Manager at Golden Ocean Management AS, Oslo, Norway, it is my responsibility to monitor the dry bulk markets worldwide and to be intimately familiar with the current state of the spot and long term markets. I monitor trends in the dry cargo markets in general, the Capesize and Panamax (vessel sizes) markets in particular.

## THE CONTRACT OF AFFREIGHTMENT

5.      Front Carriers entered into its contract of affreightment with Transfield ER Cape Ltd. ("COA") for the purpose of fulfilling its own lifting requirements under a separate contract of affreightment with a third-party charterer ("Atic"). A true copy of the COA is annexed as Exhibit 1. Front Carriers obtained the Transfield COA on "back to back" terms so that the COA with Transfield fulfilled Front Carriers' obligations to Atic under that separate contract of affreightment. I negotiated the COA with Atic. The contract of affreightment with Messrs

2



Transfield was done by my colleague while I was on summer vacation, but as per my instructions given over the phone. Both contracts have the same terms/conditions with the exception of rates and laytime allowed (laytime differs a half a day between the charters). I have since controlled and monitored the nominations under these two contracts.

6.    The COA's rider has a "Nomination Clause" (Section 10) that contains the following language:  "Around 30 (thirty) days prior the beginning of each quarter of first shipment for one year, [Front Carriers] will do their utmost to give [Transfield] a tentative schedule program." (Section 10, second paragraph).

7.    The COA's Nomination Clause also provides that we (Front Carriers) were to give Transfield not less than 45 days notice of actual intended laydays/cancelling days (the window of availability during which Front Carriers desired a Transfield vessel to arrive at the port designated by Front Carriers): "Not less than 45 (forty-five) days prior beginning of the desired laydays/cancelling dates with 15 days spread, [Front Carriers] will notify [Transfield] of the program i.e. intended loading port and discharging port with combination of loading/discharging ports if any." (Section 10, third paragraph).

8.    The COA's Nomination Clause then required Transfield to respond within ten days with a nominated vessel:  "[Transfield] to nominate within 10 (ten) days a vessel or substitute." (Section 10, fourth paragraph).

## EVENTS SURROUNDING THE DISPUTED FOURTH LIFTING

9.    The first three liftings of the five to be completed under the COA were carried out without incident.

3



10.     During the time period from December 2005 to May 2007, however, the daily hire rates for 170,000 dwt (deadweight ton) Capesize bulk cargo vessels (such as the type to be employed by Front Carriers under the COA) increased drastically. Average rates for a Capesize bulker similar to the types of vessels to be nominated under the COA more than tripled during this period. I have annexed as Exhibit 2 a true copy of an index prepared by the charter broker Simpson Spence and Young, which shows that the calculated index for 170,000 dwt Capesize bulk cargo vessels rose from approximately 6,300 to 20,300 during the recited time period.

11.     On November 22, 2006, I advised Transfield by e-mail that we anticipated the fourth lifting to occur in the window between March 10, 2007 and March 25, 2007 and that lifting would involve a voyage from Dalrymple Bay, Australia to Rotterdam and Antwerp. I annex as Exhibit 3 a true copy of my November 22, 2006 e-mail.

12.     Transfield did not respond to my November 22, 2006 notice.

13.     On January 4, 2007, I advised Transfield by e-mail that our original tentative scheduled loading date in March 2007 was to be postponed until a window of May 10-25, 2007. I annex as Exhibit 4 a true copy of my January 4, 2007 e-mail.

14.     Later that same day, Transfield responded to my revised tentative notice by stating "*REGRET OWNERS CANNOT ACCOMODATE [sic] [Front Carriers'] REQUEST TO POSTPONE SHIPMENT TO MAY.*" A true copy of Transfield's response to my e-mail through broker channels is annexed as Exhibit 5.

15.     The next day, I responded to Transfield's message as follows:

*Please note that there has never been a firm nomination of voyage no:4 under the [COA], only an advice of next lifting. We fully trust that you will honour your obligations once a firm nomination has been given.*

4



I annex as Exhibit 6 a true copy of my January 5, 2007 e-mail.

16.     Transfield rejected our position and advised us that it was nominating a vessel to perform for us in March 2007 (as per the initial tentative schedule). Transfield claimed that the November scheduling advisory that we had provided served as a nomination. I responded that if this truly were the case, Transfield would have had to provide the name of a nominated vessel within 10 days of the date of Front Carriers' November 22, 2006 e-mail which gave the initial tentative notice. Transfield never nominated a vessel in response to the November 22, 2006 notice. I have annexed as Exhibit 7 a true copy of the related e-mail exchange between me and Transfield on January 5, 2007.

17.     When Transfield insisted on presenting its vessel in March 2007, we accepted the vessel (while reserving our rights to claim for damages resulting from the wrongful nomination) in an effort to mitigate our damages by making a profit on a voyage using that vessel. The name of the vessel presented by Transfield for March 2007 was the "C MARCH."

18.     Following these exchanges with Transfield, I went into the market to obtain a cargo for the C MARCH. On January 12, 2007, I e-mailed Transfield for a rate quote for loading at DBCT (Dalrymple Bay Coal Terminal, Australia) or Newcastle (Australia) and discharging at Moneypoint (Ireland), Taranto (Italy), or Dunkirk (France). I have annexed as Exhibit 8 a true copy of my January 12, 2007 e-mail. Of these ports, DBCT, Newcastle and Dunkirk were listed in the COA as loading or discharging ports, respectively. In addition to the named ports, the COA allowed charterers to request alternative ports within an agreed range, and Moneypoint was within that range. The COA also included mechanisms to calculate a rate for Taranto. Over the next four days, I engaged in correspondence with Transfield in which I sought to confirm that Transfield would accept the ports proposed and Transfield objected to our right to nominate the



requested ports. I annex as Exhibits 9 and 10, respectively, true copies of my e-mail of January 15, 2007 and Transfield's response dated January 16, 2007.

19.     On January 17, 2007, I concluded a fixture with charterer Rio Tinto for the voyage charter of the C MARCH. A true copy of that voyage charter is annexed as Exhibit 11.

20.     Despite our agreeing to employ the C MARCH and obtaining a cargo for the C MARCH, Transfield ultimately rejected our multiple attempts to propose European discharge ports and refused to present the C MARCH for loading.

21.     I have been advised by our New York counsel that Transfield has not produced the charter parties for the C MARCH relating to (a) Transfield's chartering the C MARCH "in" from her owner and (b) Transfield's sub-chartering the C MARCH "out" to Swissmarine. I also understand that Transfield has not produced copies of these charter parties to our New York counsel despite a request for these charter parties. In light of Transfield's refusal to accept our proposed voyage to Europe, and in light of Transfield not producing the relevant charter parties, it is quite possible that the C MARCH was chartered to Swissmarine by Transfield before we had finalized our discussions with Transfield as to the relevant discharge and loading ports.

22.     I now will turn to issues related to the charter market. I have read the Attorney Declaration of Nancy R. Petersen dated October 5, 2007. There are several statements in that Declaration which reflect a misunderstanding of certain market conditions at the time in question. I will address these issues in turn below.

6



## THE EXPECTED LENGTH OF THE C MARCH VOYAGE

23.    Ms. Petersen's Declaration states at Paragraph 26 that the voyage of the C MARCH from the East Coast of Australia (Dalrymple Bay) to the Continent should have lasted about 60 days. This estimated length of time is a reasonable estimate.

24.    Ms. Petersen's Declaration then assumes in the last sentence of the same paragraph that the C MARCH would have been available for charter from continental Europe "around May 10, 2007." As May 10 is approximately 60 days after March 10, Ms. Petersen's statement must assume that the C MARCH would have presented on the first day of the loading window of March 10, 2007 through March 25, 2007, loaded immediately, and then sailed for Europe.

25.    The assumption that the C MARCH could have immediately loaded and departed, however, fails to account for a known and continuing condition at Dalrymple Bay.  There was a 25 day loading delay at Dalrymple Bay that was in effect in March 2007.  These loading delays have been standard in Australian ports such as Dalrymple Bay for the last several years, as can be seen by a true copy of the August 31, 2007 Port Congestion Report attached as Exhibit 12.

26.    Therefore, using the March 10-25 loading window at Dalrymple Bay and employing (a) the 60 day voyage estimate and (b) the 25 day loading delay, the discharge window in Europe was June 4-19, 2007 rather than the "around May 10, 2007" estimate claimed by Ms. Petersen's Declaration.

7



**THE CAPESIZE MARKET IN EUROPE**

27.     Ms. Petersen's Declaration states at Paragraph 28 that the C MARCH could have "probably" been chartered for $107,300 per day once it arrived in Europe after it completed its voyage from Australia. This statement does not reflect the 170,000 dwt Capesize market during the time period from June 4 through June 19, 2007.

28.     I annex as Exhibit 13 a true copy of an index reflecting the dry bulk market in Europe during June 2007. On June 19, 2007, the daily charter hire rate for a 3-5 month time charter was $73,961.00. On June 4, 2007, the daily charter hire rate for a 3-5 month time charter was $97,749.50. Taking an average of the figures encompassing this period, the average daily hire rate for a 3-5 month time charter was $82,980.93. This figure is reached by averaging the numbers in column Av 4TC for the time period from June 4 through June 19.

29.     The $107,300 per day rate referred to in Ms. Petersen's Declaration refers to a brief and explosive spike in the European dry bulk market that occurred in mid-May 2007. The brief period of remarkably high daily rates had concluded before the end of May 2007 and rates in June 2007 were more consistent with normal rates. I annex as Exhibit 14 a true copy of an index reflecting the dry bulk market in Europe during May 2007, which shows the spiking of rates in the middle of the month and the subsiding of those rates as the month drew to an end.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 19th day of October, 2007 at Oslo, Norway.

JON FLAATEN

8



**EXHIBIT 1**



ORIGINAL

AMERICANIZED WELSH COAL CHARTER
APPROVED BY
ASSOCIATION OF SHIP BROKERS & AGENTS (U.S.A.), INC.
NEW YORK—1953; AMENDED 1979.

LONDON, 9th August

1     It is this day mutually agreed.    BETWEEN *Messrs. ██████████████ E LTD., of B.V.I.* as transport
2     Owner of the *Vessel to be nominated (See Section 8 "Vessels" of the attached Contract of Affreightment)* Steamship/Motorship
3     of      . built      at      of
4     tons net register, or thereabouts, and about      tons total deadweight inclusive of bunkers, classed
5     m      length overall      beam
6     draft      now
7     and *Messrs.* ██████████████ *O., of Liberia*      Charterer;
8     1.   That the said vessel being tight, staunch and strong, and in every way fitted for the voyage, shall, with all possible dis-
9     patch, sail and proceed to *:*
10    *DALRYMPLE BAY Coal Terminal, or in Charterers' option*
     *HAYPOINT Central Queensland Coal Associate Terminal, or in Charterers' option*
     *ABBOT POINT Coal Terminal, or in Charterers' option*
     *GLADSTONE RG Tanna Facility, or in Charterers' option*
     *GLADSTONE RG Tanna Facility plus DALRYMPLE BAY Coal Terminal, or in Charterers' option*
     *DALRYMPLE BAY Coal Terminal plus GLADSTONE RG Tanna Facility, or in Charterers' option*
     *NEWCASTLE TWCS Kooragang Carrigton, or in Charterers' option*
     *PORT KEMBLA Coal Terminal*
     and there load, always afloat, in the customary manner from the Charterer, in such dock
11    as may be ordered by him, a full and complete cargo of *nominated* coal not exceeding *as per Section 1 "Cargoes" of the attached Contract of Affreightment* tons nor less than
12    tons, quantity at Vessel's option, and not exceeding what she can reasonably stow and carry,
13    over and above her tackle, apparel, provisions and furniture; and being so loaded, shall therewith proceed, with all possible dispatch, to
     *ROTTERDAM Maasvlakte EMO, or in Charterers' option*
     *ROTTERDAM Maasvlakte EMO plus ANTWERP Quay 510 ABT or 750 Delwaide Dock in Charterers' option, or in Charterers' option*
     *ROTTERDAM Maasvlakte EMO plus DUNKIRK EAST Sollac Berth, or in Charterers' option*
     *ROTTERDAM Maasvlakte EMO plus HANSAPORT, or in Charterers' option*
     *DUNKIRK WEST QPO Berth plus DUNKIRK EAST Sollac Berth, or in Charterers' option*
     *One berth GIJON, or in Charterers' option*
     *FOS Sollac Berth, or in Charterers' option*
     *One berth GIJON plus FOS Sollac Berth*
14    or at or near thereunto as she can safely get, and there deliver her cargo alongside any wharf *or alongside the berth as nominated* and/or vessel and/or craft, as ordered,
15    where she can safely deliver, always afloat, on being paid freight at the rate of *as per Section 5 ("Freight Rates") of the attached*
16    *Contract of Affreightment.* U.S. currency per ton of 1,000 kilos on bill of lading quantity. The Owner shall furnish, if
17    required, a statutory declaration by the master and other officers that all cargo received on board has been delivered. The freight
18    is in full of loading, *normal* dumping and trimming *but extra, if any, to be for Owners' account,* and all port charges, pilotages,
     agency fees and consulages on the vessel. All wharfage
19    dues on the cargo to be paid by the Charterer.
20    2.   The FREIGHT is to be paid *in U.S. Dollars by telegraphic transfer to Owners' bank account as per invoice for relevant shipment*
21    3.   Notice of approximate quantity of cargo required and of vessel's expected date of arrival at port of loading to be given to
22    Charterer or his agents at least *15* days in advance *(See also Section 18 "Notices and Loading/Discharging Port Orders" of the attached Contract of Affreightment).*
23    4.   The Cargo to be loaded into vessel *and discharged in 6 (six)*
24    weather working day(s) of 24 consecutive hours, *all purposes, Sundays and Holidays included*
25    (excluding bunkering time, Sundays, custom house, colliery, legal and/or local holidays, and from noon on Saturday or the day
26    previous to any such holiday to 7 a.m. on Monday or the day after such holiday, unless used in which event only time actually
27    used in loading cargo to count) commencing *at sale/first load port 22* hours after vessel tenders and is ready to load, unless sooner
     commenced, in which case only time actually used to count *See also Section 8 "Time for Loading and Discharging"* worked whereupon time

12

28 is to commence and written notice is given of the vessel's being completely discharged of inward cargo and ballast in all her holds
29 and ready to load, such notice to be given *whether in berth or not, whether in port or not, whether in free pratique or not, whether customs cleared or not, any time day or night, Sundays and Holidays included. If upon vessel's arrival at loading port, loading berth is not available, Notice of Readiness will be tendered at the nearest anchorage and time to count as above.* between business hours of 9 a.m. and 5 p.m., or 9 a.m. and 1 p.m. on Saturdays. Any time

30 lost through riots, strikes, lockouts, or any dispute between masters and men, occasioning a stoppage of pitmen, trimmers or other
31 hands connected with the working or delivery of the coal for which the vessel is stemmed, or by reason of accidents to mines or
32 machinery, obstructions, embargo or delay on the railway or in the dock; or by reason of fire, floods, frosts, fogs, storms or any cause
33 whatsoever beyond the control of the Charterer affecting mining, transportation, delivery and/or loading of the coal, not to be com-
34 puted as part of the loading time (unless any cargo be actually loaded during such time). In the event of any stoppage or stoppages
35 arising from any of these causes continuing for the period of six *fifteen* running days from the time of the vessel's being ready to load, this
36 Charter shall become null and void; provided, however, that no cargo shall have been shipped on board the vessel previous to such stop-
37 page or stoppages. In case of partial holiday, or partial stoppage of colliery, collieries or railway from any or either of the aforenamed
38 causes, the lay-days to be extended proportionally to the diminution of output arising from such partial holiday or stoppage. If
39 longer detained, Charterer to pay *as per Section 7 "Demurrage and Despatch" of the attached Contract of Affreightment* U.S.
Currency per running day (or pro rata for part thereof)
40 demurrage. If sooner dispatched, vessel to pay Charterer or his agents *as per Section 7 "Demurrage and Despatch" of the attached
Contract of Affreightment* U.S. Currency per day (or pro rata
41 for part thereof) dispatch money for *lay*                    time saved. No deduction of time shall be allowed for stoppage, unless due
42 notice be given at the time to the master or Owner.

43 5. If any dispute or difference should arise under this Charter, same to be referred to three parties in the City of New York, one
44 to be appointed by each of the parties hereto, the third by the two so chosen, and their decision, or that of any two of them, shall
45 be final and binding, and this agreement may, for enforcing the same, be made a rule of Court. Said three parties to be commercial
46 men. *This Contract will be governed by French Law. The disputes which the present agreement may give rise to, on various points, including its existence, its interpretation, its fulfilment, its cancellation or its validity shall be resolved by way of arbitration by the Chambre Arbitrale Maritime de Paris having its office in Paris, 16 Rue Daunou ~ 75002 Paris, as provided for in its rules.*

47 6. The cargo to be loaded, dumped and trimmed by men appointed by the Charterer *free of risk and expense to the Vessel.* at the
48 tariff rate of the port of vessel's expense.

49 7. The bills of lading shall be prepared in accordance with the dock or railway weight and shall be endorsed by the master,
50 agent or Owner, weight unknown, freight and all conditions as per this Charter, such bills of lading to be signed at the Char-
51 terer's or shipper's office within twenty-four hours after the vessel is loaded. Master shall sign a certificate stating that the
52 weight of the cargo loaded is in accordance with railway weight certificate. Charterer is to hold Owner harmless should any
53 shortage occur.

54 8. The Act of God, the king's enemies, restraints of princes and rulers, and perils of the sea *mutually* excepted. Also fire, barratry of
55 the master and crew, pirates, collisions, strandings and accidents of navigation, or latent defects in or incidents to, hull and/or
56 machinery and/or boilers always excepted, even when occasioned by the negligence, default or error in judgment of the pilot, master,
57 mariners or other persons employed by the shipowner, or for whose acts he is responsible, not resulting, however, in any case from
58 want of due diligence by the Owner of the ship, or by the ship's husband or manager. Charterer not answerable for any negligence,
59 default, or error in judgment of trimmers or stevedores employed in loading or discharging the cargo. The vessel has liberty to call
60 at any ports in any order, to sail without pilots, to tow and assist vessels in distress, and to deviate for the purpose of saving life or
61 property, and to bunker. *It is also mutually agreed that this shipment is subject to all terms and provisions of, and all exemptions from liability in, the Act of Congress of the United States, approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessel's, etc.".*

62 9. The cargo to be discharged by consignee at port of discharge, free of expense and risk to the vessel, *as per above mentioned Clause 4* at the average rate of
63                                 tons per day, weather permitting, Sundays and holidays and after-noon on Saturdays excepted, provided
64 vessel can deliver it at this rate. If longer detained, consignee *Charterers* to pay vessel demurrage at the rate of *as per Section 7 "Demurrage and Despatch" of the attached Contract of Affreightment* U.S. currency
65 per running day (or pro rata for part thereof). If sooner dispatched, vessel to pay Charterer or his agents *as per Section 7 "Demurrage and Despatch" of the attached Contract of Affreightment* U.S cur-
66 rency per day (or pro rata for part thereof) dispatch money for *lay*     time saved. Time at *sole/first discharging port to commence twelve (12)* twenty-four (24)
67 hours, unless sooner commenced in which case *only time actually used to count,* Sundays and holidays *included,* excepted, after
68 vessel is ready to unload and written notice given, *whether in port or not, whether in berth or not, whether in free pratique or not, whether customs cleared or not (See also Section 8 "Time for Loading and Discharging" of the attached Contract of Affreightment)* even if vessel
68 is already on demurrage, and the time allowable for discharging to be calculated on the basis of the bill of lading quantity. In case
69 of strikes, lockouts, civil commotions, or any other causes or accidents beyond the control of the consignee which prevent or delay
70 the discharging, such time is not to count unless the vessel is already on demurrage, *(See also Section 24 of the attached Contract of Affreightment).* Consignee to effect the discharge of the cargo. Vessel to supply at both ends, free of expense to the Charterers, full light for night work on deck and in the holds as requested.

71 10. Notice at port of discharge to be given *any time day or night, Sundays and Holidays included.* In writing to consignee's agent in writing days between the hours of 9 a.m. and
72 5 p.m. and 9 a.m. and noon on Saturdays.

73 11. Shifting time from anchorage place to loading or discharging berth is not to count even if vessel is already on demurrage.
74 12. Opening and closing of hatches at commencement and completion of loading and discharging shall be for Owner's account

75  all time used is not to count.

76  13  Lighterage, if any, at discharge port to be at the risk and expense of consignees and time used to count as laytime.

77  14.  In case of average, the same to be settled according to York/Antwerp Rules 1974 *and as amended 1994, and subsequent*
*amendments thereto.* Should the vessel put into any port or

78  ports leaky or with damage, the captain or Owner shall, without delay, inform the Charterer thereof. Captain to telegraph Charterer

79  in case of putting in any where.

80  15.  Vessel not to tender before 9 a.m. 00.00 hours on *See Section 9 "Nomination Clause" of the attached Contract of*
*Affreightment* and if vessel be not ready at loading port as ordered

81  before 4 p.m. 23.59 hours on _____ , or if any wilful misrepresentation be made respecting the size, position or state of

82  the vessel, Charterer to have the option of cancelling this Charter *Voyage,* such option to be declared on notice of readiness being given.

83  16.  Vessel to be consigned to **Charterers'** _____ agents at port of loading, and to **Charterers'** _____ agents at port

84  of discharge, Owners/Vessel paying customary agency fees.

85  17.  Overtime is to be for account of party ordering same. However, if ordered by port authorities, same is to be for Charterer's

86  account Officers and crew overtime expenses to be for Owner's account.

87  18.  Any Extra insurance on cargo, if any, due incurred owing to vessel's age, flag, classification or ownership shall be for Owner's
account *and may be deducted from the balance freight in the Charterers' option. The Charterers shall furnish original*
*invoice of insurance company supporting such deduction. It is understood that for tonnage upto/including 15 years' old no*
*extra insurance to apply.*

88  19  No cargo is to be loaded in deeptanks or similar places inaccessible to reach by grabs.

89  20.  Any damage by stevedores shall be settled directly between Owner and stevedores *See Section 16 "Repairs of Damage*
*Loading and Discharging" of the attached Contract of Affreightment.*

90  21.  Owner shall, at his risk and expense, comply with all applicable rules, regulations and laws relevant to water and/or air

91  pollution at ports of loading and discharging. In cases where vessel calls at a U.S. port, Owner warrants to have secured and carry

92  on board the vessel a Certificate of Financial Responsibility as required under U.S. law.

93  22.  All bills of lading shall include the following three clauses:

94  NEW JASON CLAUSE: In the event of accident, danger, damage or disaster before or after commencement of the voyage,

95  resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier

96  is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute

97  with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be

98  made or incurred, and shall pay salvage and special charges incurred in respect of the goods.

99  If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if such salving ship or ships belonged

100  to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods, and

101  any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to

102  the carrier before delivery.

103  CLAUSE PARAMOUNT: This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act

104  of the United States, approved April 16th, 1936, which shall be deemed to be incorporated herein, and nothing herein contained

105  shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or

106  liabilities under said Act. If any terms of this bill of lading be repugnant to said Act to any extent, such term shall be void to

107  that extent but no further.

108  NEW BOTH-TO-BLAME COLLISION CLAUSE: If the ship comes into collision with another ship as a result of the

109  negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the

110  navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all

111  loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to,

112  or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the

113  owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim

114  against the carrying ship or carrier.

115  The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other

116  than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

117  23.  PROTECTION & INDEMNITY BUNKERING CLAUSE: The vessel in addition to all other liberties shall have liberty as

118  part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever whether such ports are on or off

119  the direct and/or customary route or routes to the ports of loading or discharge named in this Charter and there take oil bunkers in

120  any quantity in the discretion of Owners even to the full capacity of fuel tanks, deep tanks and any other compartment in which

121  oil can be carried whether such amount is or is not required for the chartered voyage.

122  24.  *See Section 26 "Voywar 1993" Clause of the attached Contract of Affreightment.* C.S.M.K. WAR RISKS CLAUSES 1
& 2: No bills of lading to be signed for any blockaded port and if the port of dis-

123  charge be declared blockaded after bills of lading have been signed or if the port to which the ship has been ordered to discharge

124  either on signing bills of lading or thereafter be one to which the ship is or shall be prohibited from going by the government of

125  the nation under whose flag the ship sails or by any other government, the Owner shall discharge the cargo at any other port directed

126  by this Charter Party or ordered by the Charterers (provided such other port is not a blockaded or prohibited port as above men-

127  tioned) and shall be entitled to freight as if the ship had discharged at the port or ports of discharge to which she was originally

128  ordered.

129  The ship shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppage, destina-

130  tion, delivery, or otherwise howsoever given by the government of the nation under whose flag the vessel sails or any department

131  thereof, or any person acting or purporting to act with the authority of such government or by any department thereof, or by any

132  committee or person having, under the terms of the war risks insurance on the ship, the right to give such orders or directions and

133  if by reason of and in compliance with any such orders or directions anything is done or is not done, the same shall not be deemed

134  a deviation and delivery in accordance with such orders or directions shall be a fulfilment of the contract voyage and the freight

135  shall be payable accordingly.

136  25.  Charterer/Owner shall have the privilege of transferring part or whole of the Charter Party to others, *subject to the other*
*party's approval.* Charterer/Owner guaranteeing to the

137  Owner *Charterer* due fulfillment of this Charter Party.
138      26.  The Charterer's liability shall cease as soon as the cargo is shipped, and the freight, dead freight and demurrage  in  loading
139  (if any) are paid, the Owner having a lien on the cargo for freight, demurrage and average.
140      27.  Penalty for non-performance of this agreement, proved damages, not exceeding the estimated amount of freight.
141      28.  An address commission of *3.75*                percent on the gross amount of freight, dead freight and demurrage is due by  the vessel
142  and Owner to the Charterer on *shipment of cargo, payment of freight.*
143      29.  A commission of *1.25*                percent on the gross amount of freight, dead freight and demurrage is due on payment
144  of freight by the vessel and Owner to *Simpson, Spence and Young, London*

*Additional Clauses here attached 1 - 31 to form part of this Charter Party.*

For and on behalf of
**Transfield ER Cape Limited**

..............................................
**Authorized Signature(s)**

**THE CHARTERERS :**

For and on behalf of

FRONT CARRIERS LTD. OF LIBERIA

This Charter Party is a computer generated copy of the AMERICANIZED WELSH COAL CHARTER form printed by authority of the Association of Ship Brokers & Agents (U.S.A), Inc. (ASBA), using software which is the copyright of Strategic Software Ltd. (SSL). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document, and which is not clearly visible, then the original ASBA approved document shall apply. ASBA and SSL assume no responsibility for any loss or damage caused as a result of discrepancies between the original ASBA approved document and this document.



**CONTRACT OF AFFREIGHTMENT**

**DATED LONDON, 9TH AUGUST, 2005**

**BETWEEN**

**MESSRS. TRAN~~~~ ER CAPE LTD., OF B.V.I.**

**AS OWNERS**

**AND**

**MESSRS. FRONT CARRIERS LTD., OF LIBERIA**

**AS CHARTERERS**

It has been this day mutually agreed the following :

**Section 1 : Duration of the Contract :**

The duration of this Contract will be for a period of two (2) firm years starting November, 2005.

**Section 2 – Quantity / Cargo Sizes :**

Quantity :

~~~~~~~~~~~~~~~~~~~~two (~~~~~~~~~~~~~~~C.O.A.) plus one (1) optional cargo in Charterers option. Cargoes to be shipped fairly evenly spread as much as Charterers can.

Charterers to declare the optional cargo latest by close of business Oslo 31st December, 2005.

Cargo Sizes :

Each cargo to be 150,000 metric tons 10 percent more or less in Owners' option of Harmless Coal in Bulk. One up to several grades in Charterers' option to be loaded within vessel's natural segregations.

Cargoes to be loaded always in accordance with I.M.O. recommendations.

Present Intended Scheduling :

First cargo is intended December, 2005 without guarantee.

- 1 -

## "TRANSFIELD TONNAGE TO BE NOMINATED"

## CONTRACT OF AFFREIGHTMENT DATED 9$^{TH}$ AUGUST, 2005.



### Section 3 – Loading Ports :

One (1) named berth. one (1) or two (2) ports :

| | |
|---|---|
| DALRYMPLE BAY Coal Terminal. | or in Charterers' option |
| HAYPOINT Central Queensland Coal Associate Terminal. | or in Charterers' option |
| ABBOT POINT Coal Terminal. | or in Charterers' option |
| GLADSTONE RG Tanna Facility. | or in Charterers' option |
| GLADSTONE RG Tanna Facility plus DALRYMPLE BAY Coal Terminal. | or in Charterers' option |
| DALRYMPLE BAY Coal Terminal plus GLADSTONE RG Tanna Facility. | or in Charterers' option |
| NEWCASTLE TWCS Koorogang Carrigton. | or in Charterers' option |

PORT KEMBLA Coal Terminal.

Owners option via Cape of Good Hope or Suez Canal.

Should the nominated berths become unsafe for whatever reason beyond the control of Owners. then Charterers and Owners to mutually agree on other loading port or other way of solving the problem and ensuring vessel(s) will be loaded at safe ports/places for ships of this size. It is understood and agreed that neither party is to take any undue advantage from such an arrangement and Owners confirm that they will co-operate as much as possible in order to ensure a smooth solution to any possible problem.

### SECTION 4 : DISCHARGING PORTS :

One (1) named berth. one (1) or two (2) ports :

| | |
|---|---|
| ROTTERDAM Maasvlakte EMO. | or in Charterers' option |
| ROTTERDAM Maasvlakte EMO plus ANTWERP QUAY 510 ABT or 750 Delwaide Dock in Charterers' option, | or in Charterers' option |
| ROTTERDAM Maasvlakte EMO plus DUNKIRK EAST Sollac Berth (*). | or in Charterers' option |
| ROTTERDAM Maasvlakte EMO plus HANSAPORT, | or in Charterers' option |



**"TRANSFIELD TONNAGE TO BE NOMINATED"**

**CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.**

DUNKIRK WEST QPO Berth plus DUNKIRK EAST
Sollac Berth (*).                                          or in Charterers' option

GIJON.                                                    or in Charterers' option

FOS Sollac Berth.                                         or in Charterers' option

GIJON plus FOS Sollac Berth.

(*) DUNKIRK EAST as discharging port to be limited to maximum one (1) cargo.

Should the nominated berths become unsafe for whatever reason beyond the control of Owners, then Charterers and Owners to mutually agree on other discharging port or other way of solving the problem and ensuring vessel(s) will be discharged at safe ports/places for ships of this size. It is understood and agreed that neither party is to take any undue advantage from such an arrangement and Owners confirm that they will co-operate as much as possible in order to ensure a smooth solution to any possible problem.

Owners know the restrictions in the above named ports and will nominate vessels of suitable size and draft assuming that conditions at the port and loading installations will not negatively alter during the Contract period.

Should Charterers request an alternative discharging port, Owners then agree to give FIOST rate on same equivalent timecharter (to be substantiated on open book basis) based on Passero-Hamburg Range including United Kingdom, Spain and Eire. Such calculation to include bunker price differentials for bunker replenishment at ports other than Rotterdam.

Excluded ports :

A)   The vessel shall not be ordered to nor bound to enter any port where fever or epidemics are prevalent or to which the Master, Officers and Crew by law are not permitted to follow the vessel.

     If for any of the above reasons the vessel is unable to enter the loading port, the voyage in question shall be considered cancelled.

B)   Should a quarantine be declared affecting the port of discharge prior the vessel's entering, the Charterers shall request the Owners to order the vessel to another port, where she can safely discharge, such orders to be given 48 hours after the Master or the Owners have given notices to the Charterers of the quarantine at the port of discharge.

     If the Charterers fail to arrange a substitute port or to give orders within 48 hours as stated above, the detention, if any, to be for their account.

C)   If the vessel has already entered the loading or discharging port, detention by quarantine against the performing vessel for reasons related only to said vessel shall not count as time used.

- 3 -

## "TRANSFIELD TONNAGE TO BE NOMINATED"

## CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.

Unless the vessel is already on demurrage, half the time lost in loading or discharging by reason of epidemics ashore shall count as time used in loading or discharging as the case may be. The Charterers, however, shall not be responsible for damages caused by the fact that the Owners cannot deliver their vessel within laydays for a following voyage.

## SECTION 5 : FREIGHT RATES / FREIGHT PAYMENT :

All rates in U.S. Dollars, per metric ton F.I.O.S.T. :

| DALRYMPLE BAY loading : | | |
|---|---|---|
| Rotterdam (basic rate) | | U.S.$ 13.00 |
| Rotterdam plus Antwerp | | U.S.$ 13.80 |
| Rotterdam plus Dunkirk East | (+ 1.95) | U.S.$ 14.95 |
| Rotterdam plus Hansaport (*) | (+ 1.50) | U.S.$ 14.50 |
| Dunkirk West plus East | (+ 1.50) | U.S.$ 14.50 |
| Gijon | (- 0.50) | U.S.$ 12.50 |
| Fos | (0.00) | U.S.$ 13.00 |
| Gijon plus Fos | (+ 2.30) | U.S.$ 15.30 |
| | | |
| GLADSTONE loading : | | (- 0.40) |
| Rotterdam | | U.S.$ 12.60 |
| Rotterdam plus Antwerp | | U.S.$ 13.40 |
| Rotterdam plus Dunkirk East | | U.S.$ 14.55 |
| Rotterdam plus Hansaport (*) | | U.S.$ 14.10 |
| Dunkirk West plus East | | U.S.$ 14.10 |
| Gijon | | U.S.$ 12.10 |
| Fos | | U.S.$ 12.60 |
| Gijon plus Fos | | U.S.$ 14.90 |
| | | |
| HAYPOINT loading : | | (0.00) |
| Rotterdam | | U.S.$ 13.00 |
| Rotterdam plus Antwerp | | U.S.$ 13.80 |
| Rotterdam plus Dunkirk East | | U.S.$ 14.95 |
| Rotterdam plus Hansaport (*) | | U.S.$ 14.50 |
| Dunkirk West plus East | | U.S.$ 14.50 |
| Gijon | | U.S.$ 12.50 |
| Fos | | U.S.$ 13.00 |
| Gijon plus Fos | | U.S.$ 15.30 |

## "TRANSFIELD TONNAGE TO BE NOMINATED"

## CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.

| ABBOT POINT loading : | (0.00) |
|---|---|
| Rotterdam | U.S.$ 13.00 |
| Rotterdam plus Antwerp | U.S.$ 13.80 |
| Rotterdam plus Dunkirk East | U.S.$ 14.95 |
| Rotterdam plus Hansaport (*) | U.S.$ 14.50 |
| Dunkirk West plus East | U.S.$ 14.50 |
| Gijon | U.S.$ 12.50 |
| Fos | U.S.$ 13.00 |
| Gijon plus Fos | U.S.$ 15.30 |
| **NEWCASTLE loading :** | **(+ 2.75)** |
| Rotterdam | U.S.$ 15.75 |
| Rotterdam plus Antwerp | U.S.$ 16.55 |
| Rotterdam plus Dunkirk East | U.S.$ 17.70 |
| Rotterdam plus Hansaport (*) | U.S.$ 17.25 |
| Dunkirk West plus East | U.S.$ 17.25 |
| Gijon | U.S.$ 15.25 |
| Fos | U.S.$ 15.75 |
| Gijon plus Fos | U.S.$ 18.05 |
| **PORT KEMBLA loading :** | **(+ 2.50)** |
| Rotterdam | U.S.$ 15.50 |
| Rotterdam plus Antwerp | U.S.$ 16.30 |
| Rotterdam plus Dunkirk East | U.S.$ 17.45 |
| Rotterdam plus Hansaport (*) | U.S.$ 17.00 |
| Dunkirk West plus East | U.S.$ 17.00 |
| Gijon | U.S.$ 15.00 |
| Fos | U.S.$ 15.50 |
| Gijon plus Fos | U.S.$ 17.80 |
| **GLADSTONE plus DALRYMPLE BAY loading :** | **(+ 1.00)** |
| Rotterdam | U.S.$ 14.00 |
| Rotterdam plus Antwerp | U.S.$ 14.80 |
| Rotterdam plus Dunkirk East | U.S.$ 15.95 |
| Rotterdam plus Hansaport (*) | U.S.$ 15.50 |
| Dunkirk West plus East | U.S.$ 15.50 |
| Gijon | U.S.$ 13.50 |
| Fos | U.S.$ 14.00 |
| Gijon plus Fos | U.S.$ 16.30 |

## "TRANSFIELD TONNAGE TO BE NOMINATED"

## CONTRACT OF AFFREIGHTMENT DATED 9$^{TH}$ AUGUST, 2005.

| DALRYMPLE BAY plus GLADSTONE loading : | (+ 0.35) |
|---|---|
| Rotterdam | U.S.$ 13.35 |
| Rotterdam plus Antwerp | U.S.$ 14.15 |
| Rotterdam plus Dunkirk East | U.S.$ 15.30 |
| Rotterdam plus Hansaport (*) | U.S.$ 14.85 |
| Dunkirk West plus East | U.S.$ 14.85 |
| Gijon | U.S.$ 12.85 |
| Fos | U.S.$ 13.35 |
| Gijon plus Fos | U.S.$ 15.65 |

(*) At Hansaport quay weight and tonnage dues to be for Charterers' account.

Freight Payment :

Ninety (90) percent of freight to be paid within five (5) banking days from Bill of Lading date.

Balance together with demurrage/despatch, if any, to be paid within fifteen (15) days after documents received and calculations of laytime agreed by both parties.

Freight to be deemed earned as cargo loaded on board, discountless and non-returnable, vessel and/or cargo lost or not lost.

Freight to be paid on Bill of Lading weight.

No in lieu of weighing.

Freight to be paid to Owners' bank account as per invoice for relevant shipment.

## SECTION 6 : BUNKER CLAUSE :

No Bunker Adjustment freight.

## SECTION 7 : DEMURRAGE AND DESPATCH :

Demurrage shall be paid by Charterers in U.S. Dollars as stated hereunder, per day/pro-rata for all time used in excess if laytime allowed :

U.S.$ 20,000

Despatch to be at half demurrage rate on laytime saved per day or pro-rata both ends.



**"TRANSFIELD TONNAGE TO BE NOMINATED"**

**CONTRACT OF AFFREIGHTMENT DATED 9<sup>TH</sup> AUGUST, 2005.**

## SECTION 8 : TIME FOR LOADING AND DISCHARGING :

Cargo to be loaded and discharged in 6 (six) weather working days of 24 consecutive hours, Sundays and Holidays included, all purposes.

Turn Time :

12 (twelve) hours turn time unless sooner commenced when actual time used to count both ends.

In case of two loading ports and/or two discharging ports used, no turn time to apply at second loading port and/or discharging port.

Delays in loading for draft checks ordered by Master shall not count as laytime used.

Ballasting or deballasting not to count as laytime unless not interfering with loading/discharging operations.

Shifting time from anchorage to loading berth not to count as laytime.

Time at loading and discharging ports to be as follows :

a)    If the discharging berth is available on vessel's arrival at or off the discharging port, notice of readiness can only be tendered after vessel's arrival at the discharging berth.

b)    If the discharging berth is not available on vessel's arrival at or off the discharging port or so near thereunto as she may be permitted to approach, the vessel shall be entitled to give notice of readiness on arrival there, unless vessel already on demurrage, with the effect that laytime counts as if she was in all respects ready to discharge provided that the Master warrants that she is in fact ready in all respects.

c)    If after berthing the vessel is found not to be ready in all respects to discharge the actual time from the discovery thereof until she is in fact ready to discharge shall not count as laytime used.

d)    At loading and discharging, any time lost because of the vessel having to wait for the first suitable tide to reach and enter the port and nominated berth not to count as laytime or time on demurrage.

Shifting time between anchorage/waiting place to loading/discharging berth not to count as laytime nor as time on demurrage. Only time actually used between the second waiting place (anchorage or berth) and the loading/discharging berths shall count as laytime or as time on demurrage.

Navigation risks always to be for Owners' account. At loading and discharging ports, any time lost at anchorage due to bad weather, delay or pilots, tugs or any reason connected with vessel's navigation before arrival at Charterers' berth shall not count as laytime.

- 7 -

"TRANSFIELD TONNAGE TO BE NOMINATED"

CONTRACT OF AFFREIGHTMENT DATED 9<sup>TH</sup> AUGUST, 2005.

Bunkering if delaying loading and/or discharging operations not to count as laytime, even if vessel is already on demurrage.

e)   At load port minor stoppage (i.e. stoppage of more or less ten (10) minutes) due to mechanical or electrical breakdowns to count as laytime.

In case of breakdown of crane(s) at discharging port, laytime shall count pro-rata of cranes used but deduction of time will not exceed 8 hours per call.

Any warping alongside the berth at loading and discharging shall be for Owners' account and time so used shall not interrupt laytime.

f)   Owners guarantee that distance from waterline to top of hatch-coaming will not exceed 13.70 metres at any time throughout discharge operations at DUNKIRK. If the distance is over, time lost for deballasting not to count.

All expenses, if any, resulting from vessel's non-compliance with above specification to be for Owners' account.

Owners have to comply with Charles de Gaulle break waters regulations which are available at the port authorities of Dunkirk.

g)   Time lost due to "black tides" at Dunkirk to count as laytime used. Shifting cost between Dunkirk West and Dunkirk East to be for Owner's account but shifting time to count as laytime.

Shifting at Dunkirk East to be for Charterers' account and time to count as laytime.

h)   At loading and discharging ports, time lost for draft checks ordered by Master not to count as laytime or time on demurrage. Final and intermediate draft survey(s) always to be part of laytime.

i)   In case of storm blowing more than 80 km/h, discharging operations to be stopped and such time lost not to count as laytime.

## SECTION 9 : PERFORMING VESSEL :

All vessels nominated by Owners for use under this Contract shall be vessels owned/managed/chartered or controlled by Owners and will comply in all respects with the requirements of the Charter Party.

Vessels shall be :

maximum 15 years old, but Owners to have on a case by case basis the option, subject to Charterers' prior approval which not to be unreasonably withheld, to nominate vessels upto 20 years of age. Extra insurance to be for Owners' account.

- 8 -

**"TRANSFIELD TONNAGE TO BE NOMINATED"**

**CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.**

- Selftrimming geared or gearless single deck bulk carriers / OBO's with holds suitable for normal grab discharge, classed Highest Lloyds 100A1 or equivalent. ISM in order.

- No vessel shall have corrugations in holds, which are arranged horizontally.

## SECTION 10 : NOMINATION CLAUSE :

Nomination of the performing vessel to remain subject to stem/Shippers/Receivers/Charterers approval and receipt and approval of all filled out questionnaire including Arcelor Questionnaire certificates and/or P. and I. wording, to be lifted two (2) working days after proper nominations.

Around 30 (thirty) days prior the beginning of each quarter of first shipment for one year, Charterers will do their utmost to give Owners a tentative schedule program.

Not less than 45 (forty five) days prior beginning of the desired laydays/cancelling dates with 15 days spread, the Charterers will notify the Owners of the program i.e. intended loading port and discharging port with combination of loading/discharging ports if any.

Owners to nominate within 10 (ten) days a vessel or substitute.

On receipt of such nomination, Charterers shall confirm same with stem number within 2 (two) working days.

Owners have the option to provide a substitute vessel upto 15 (fifteen) days prior beginning of laydays and then will nominate performing vessel advising best E.T.A. load port / estimated intake and also will advise vessel's itinerary via Cape or Suez. Owners will also advise approximate E.T.A. at discharging port.

Charterers will confirm the nomination of the performing vessel within 2 (two) working days after receipt of nomination which not to be unreasonably withheld.

When nominating performing vessel, Owners to provide following information :

    Name :
    Built :
    Flag :
    Class :
    Type :
    DWT :
    TPC / TPI :
    LOA :
    Beam :
    GRT :
    NRT :
    Capacity :
    Holds :
    Hatchsizes :

- 9 -



"TRANSFIELD TONNAGE TO BE NOMINATED"

## CONTRACT OF AFFREIGHTMENT DATED 9$^{TH}$ AUGUST, 2005.

Name of Owners :

P. and I. Club :
Confirmation that the vessel has full coverage for intended trade date of entering such membership and until when premiums are paid.

- Vessel to be suitable in construction and cleared for the carriage of coal in bulk and suitable for grab discharge.

- No cargo to be loaded in places inaccessible to grabs, no cargo to be loaded in wing tanks/deeptanks/bunker tanks or water tanks. Any extra expenses caused by Owners not complying with above will be for Owners' account and additional time consumed will be added to loading or discharging allowed laytime as the case may be.

- Vessel is fully ITF or equivalent bona fide acceptable to ITF, classed Lloyds 100 A1 or equivalent as recognised by Charterers' Underwriters.

- Owners guarantee they/their tonnage are not subject to any boycott at any time during the performance of the voyage.

- Vessel to be fully insured for hull and machinery against total loss.

- Owners guarantee that vessel is suitable for the trade and port(s)/berth(s) in all respects and Owners confirm that they are conversant with the trade.

- Owners guarantee that the vessel is in full conformity with latest up to date Australian regulations/rules.

- Neither Owners/Timecharter Owners/vessel's management or the vessel is/are barred by a United Nations embargo.

- Neither Owners/Timecharter Owners/vessel's management or the vessel have relationship with any kind of Yugoslavian interest.

- Owners class always to be member of I.A.C.S.

- P. and I. Wording :
"Owners warrant that the vessel is fully insured with a P. and I. Club including cargo liabilities. Owners' P. and I. Club who is a member of the International Group of P. and I. Clubs and will remain so for the currency of the Charter Party."

- When nominating Owners shall provide a copy of the relevant document of compliance (D.O.C.) and Safety Management Certificate (S.M.C.) to the Charterers.

- 10 -



## "TRANSFIELD TONNAGE TO BE NOMINATED"

## CONTRACT OF AFFREIGHTMENT DATED 9<sup>TH</sup> AUGUST, 2005.

### SECTION 11 :

a)  Owners shall during the terms of this agreement provide sufficient tonnage to perform all the voyages under this agreement. With respect to this obligation, Owners shall not be able to claim force majeure if and as far as the prevention of the performance of this obligation is – wholly or partially – due to risks resulting from Owners' other fleet commitments. Owners shall therefore, if such prevention occurs, be held fully responsible for the performance of this obligation.

b)  Without prejudice to the provision of the other paragraphs of this section, the party concerned shall be excused from the performance of this agreement or an obligation thereof for the duration and in proportion to the extent that such party if prevented by reason of force majeure.

Such force majeure shall be deemed to exist if the performance of this agreement or an obligation thereof will be partially or wholly prevented as a result of any circumstances that could not be foreseen by the party concerned and has occurred beyond his will or control and that at the same time is not due to negligence of that party itself or of persons or due to defects of objects, which that party used of the fulfilment of this agreement.

c)  A case of force majeure with regard to a voyage in which case the provisions of the attached Charter Party are applicable does only apply to the voyage concerned and does not affect the obligations of the Owners under this agreement, unless fulfilment of these obligations would become impossible for them as a result of such cases.

d)  If one of the following circumstances occurs. Charterers shall be excused from their obligations under this agreement for the duration and in proportion to the extent of such circumstances :

-   a supplier of the coal cannot as result of a cause beyond his will or control produce and/or deliver the coal. Charterers will however do their utmost to nominate another port of loading :
-   stoppages or breakdowns off, or damages to, or destruction of installations and/or machinery and/or plant of Charterers.

e)  If a case of force majeure or circumstances mentioned in paragraph d) of this section occurs. the party concerned shall give written notice thereof to the other party as soon as possible.

f)  Voyages not performed by Owners by reason of force majeure and/or circumstances mentioned in paragraph d) of this section shall be deducted from the annual voyage.

g)  If, as a result of force majeure or circumstances mentioned in paragraph d) of this section. during a period of twelve months or longer, no voyages have been performed under this agreement, each party has the right to cancel the agreement by written notice to be given by means of a registered letter.

h)  In cases mentioned in paragraph b), d), f) and g) of this section, all claims for damages and for costs from one party to the other will be excluded.

- 11 -

**"TRANSFIELD TONNAGE TO BE NOMINATED"**

**CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.**

### SECTION 12 :

In the event that U.S.A., Great Britain, France, Russia, Japan, China, the Netherlands, Germany, Australia become involved in major war directly between one with another and same affects seriously the shipments under this transport agreement, both Owners and Charterers have to meet in order to mutually decide about the further execution of this agreement.

### SECTION 13 :

Arbitration Clause :

This Contract will be governed by French Law.

The disputes which the present agreement may give rise to, on various points, including its existence, its interpretation, its fulfilment, its cancellation or its validity shall be resolved by way of arbitration by the Chambre Arbitrale Maritime de Paris, having its office in Paris, 16 Rue Dounou – 75002, as provided for in its rules.

General Average :

General Average shall be adjusted, stated and settled in London, according to the York Antwerp Rules 1974, as amended 1994.

### SECTION 14 :

This agreement, as well as the attached Charterers "Amwelsh" Charter Party, shall be governed by French Law.

### SECTION 15 :

At port of loading/discharge, the Master shall apply to and employ Agents nominated by Charterers, Owners paying customary fees.

### SECTION 16 : REPAIRS OF DAMAGE AT LOADING AND DISCHARGING :

Vessel's tank tops and shaft tunnel (if any), ladders and all other fixtures and equipment within the holds are to be customarily protected to prevent damage by grabs and bulldozer, otherwise Owners to be responsible for any consequences.

Charterers shall be free of any liability and not responsible for any damages to the vessel unless such damage is caused by any negligence, default or error of judgement of the stevedores in loading and/or discharging the vessel. In case of damage to vessel during loading and/or discharging, notice must be presented in writing by the Master before the vessel departs or as soon as practicable from loading and/or discharging berth, failing which Charterers are not responsible.

- 12 -

### "TRANSFIELD TONNAGE TO BE NOMINATED"

### CONTRACT OF AFFREIGHTMENT DATED 9$^{TH}$ AUGUST, 2005.

With a view to establishing damage, if any, solely attributed to the operations of loading and/or discharging (fair wear and tear excepted. Charterers' agents are to be notified by the Master or vessel's agents immediately after occurrence time permitting or as soon as practicable and such damage is to be agreed by surveyor appointed by each party. If surveyor not available damage report to be drawn up by the Master and signed by stevedores or Charterers' agents. Said repairs to be carried out at Owners' convenience. Prior to repairs Owners will inform Charterers as to the place and time of repairs and estimated cost.

Any time reasonably required to complete loading and/or discharging damage repairs set out in the surveyor's statement and for which the stevedores are liable shall count as laytime but only if the vessel is delayed after her normal sailing time.

Owners agree to and do hereby hold harmless Charterers for all damages to wharves and installations and loading and/or discharging and other equipment caused by the vessel.

### SECTION 17 : GRAB DISCHARGE :

Owners warrant that the vessel is in every way suitable to enable the entire cargo to be discharged by grabs. Should Owners be in breach of this warranty and should cargo be loaded and trimmed in deep tanks, tween-decks or bunker spaces or in any area not readily accessible to grabs (hereinafter referred to as "inaccessible areas"), any and all extra expenses and any loss of time in such loading and trimming and any and all extra expenses over and above the cost of normal grab discharge and any and all time lost by reason of loading into and discharging from such inaccessible areas shall be for Owners' account.

Charterers' representatives and Master to issue a joint statement at discharge port stating :

a)      tonnage, if any, actually discharged from inaccessible areas,
b)      any and all time lost by reason of discharge from inaccessible areas.

### SECTION 18 : NOTICES AND LOADING / DISCHARGING PORT ORDERS :

Owners to give to :

-       Charterers

-       Messrs. ATIC Services Paris c/o L.S.S. (e-mail : chartering@lsscape.com, or fax no. 33 1 43623489).

-       ATIC Services Asia/Pacific
        Suite 1003, Level 10
        St. Martins Tower
        31 Market Street
        Sydney NSW 2000
        Australia
        Telephone : (61) 2 92690020 / Fax : (61) 2 92618241

- 13 -

"TRANSFIELD TONNAGE TO BE NOMINATED"

CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.

- and to Charterers' agents at loading port

notice on fixing, then 15 (fifteen), 7 (seven) and 2 (two) days notice of vessel's expected readiness to load and approximate quantity vessel will lift.

If Owners do not give notice as per Charter Party, they are to be held responsible for all consequences.

Notices at discharging port to be given to :

- Agents nominated by Charterers

- Charterers

- Messrs. ATIC Services Paris c/o L.S.S.

Notice Clause for Discharging Port :

On departure from loading port, Master to advise Charterers and agents at discharging port stating :

- Communication datas of the vessel (e-mail/Satcom/etc .....)
- Date of sailing
- Tonnage loaded
- E.T.A.
- Expected fore and aft draft on arrival

The Master is to send to Charterers and their agents his position and E.T.A. once a week (every Monday), and also 15 days/10 days E.T.A. at discharging port.

Seven (7) days before E.T.A., Master to ask confirmation of discharging port. When the discharging port is definitely assigned, Master to send 5 days and 3 days notice followed by 48/24 hours E.T.A. notice to Charterers and agents.

If Owners/Master do not give notices as per Charter Party, they are to be held responsible for all the consequences unless due circumstances beyond Master's/Owners' control.

Failure by Charterers to give timely orders for the first and/or subsequent discharging port(s) does not remove their right to give such orders. Furthermore, Charterers have the right to change discharging port(s) already given and/or to order vessel to interrupt her voyage and anchor at a safe place en route, pending further instructions. In such case, Charterers shall reimburse Owners for extra provided deviation expenses/costs.

SECTION 19 : ISM CLAUSE :

Non-compliance with the requirements of the ISM Code shall be deemed a breach of the Charter Party. The requirements of the International Safety Management (ISM) Code are hereby incorporated into the terms of this Charter Party.

- 14 -

"TRANSFIELD TONNAGE TO BE NOMINATED"

## CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.

Owners warrant that as from the 1st July 1998 a Safety Management System in accordance with the ISM Code is fully implemented.  Owners further warrant that they have a valid Document of Compliance (DOC) and that the vessel has valid Safety Management Certificate (SMC).

Upon request the Owners or the Master of the vessel shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

If the vessel is found not to be in compliance with the ISM Code and/or the competent official body or authority having jurisdiction prevents the vessel from conducting cargo operations, and forces the vessel to leave port without loading or unloading cargo, the Owners to take immediate steps in order to rectify such situation.

Failing which the Owners shall indemnify the Charterers for all damages arising from the breach including, but not limited to additional costs of replacement freight, sales contact penalties, and storage charges assessed as a result of delays caused.

In the event of any delay to the vessel caused by non-compliance with the requirements of the ISM Code, laytime or time on demurrage shall not count.

## SECTION 20 : GEAR AND LIGHT :

Whenever required, vessel shall supply, free of expense to Charterers, gear, runners, ropes and slings as on board.  Whenever required, vessel shall also supply free use of light as on board, which shall always be sufficient to carry out night work.

## SECTION 21 : GEAR CERTIFICATE :

Deleted.

## SECTION 22 : POLLUTION CLAUSE :

Owners shall at their risk and expense comply with all applicable rules, regulations and laws relevant to water and/or air pollution at ports of loading and discharging.

This Contract has been entered into as of 9th August, 2005, and any regulations and restrictions concerning pollution that will subsequently become applicable at loading and at discharging ports agreed under this Contract, should they adversely affect the performance of the Contract, will be the subject of a meeting between Owners and Charterers in order to find a mutually acceptable solution.

- 15 -

**"TRANSFIELD TONNAGE TO BE NOMINATED"**

**CONTRACT OF AFFREIGHTMENT DATED 9$^{TH}$ AUGUST, 2005.**

### SECTION 23 : FORCE MAJEURE :

Time lost by reason of cases of Force Majeure. war. insurrection. civil commotion. political disturbances. riots. strikes or lockouts. floods. landslides. frost. stoppages on railway. whether partial or total. or river. canal. quay. wharf. jetty. rope or cable way. at loading or discharging plants and equipment. lack of trucks. stoppage of miners or workmen or other hands connected with the mining or handling of the cargo (for which the stem has been granted). breakdown of machinery at the mines. whether partial or general. or by reason of any causes of whatsoever kind or nature beyond he control of the Charterers or their Agents, supplying, loading. discharging or conveying the cargo from the mines to the vessel. shall not be computed in the loading or discharging time.  If a case such as above should last longer than 72 hours, clause "GENCON General Strike Clause" to come into force.

This Clause only reflects cases of Force Majeure and is not applicable for cases of minor technical breakdowns. for instance electrical power failure, stoppages on belts. crane breakdowns, etc....

### SECTION 24 : AMENDED GENCON STRIKE CLAUSE :

Neither the Charterers nor the Owners shall be responsible for the consequences of any strikes or lock-outs preventing or delaying the fulfilment of any obligation under this Contract.

If there is a strike or lock-out affecting the loading of the cargo, or any part of it, when the vessel is ready to proceed from her last port or at any time during the voyage to the port or ports of loading or after her arrival there. the Master or the Owners may ask Charterers to declare that they agree to reckon the laydays as if there were no strike or lock-out.   Unless the Charterers have given such declaration in writing (by telegram, if necessary) within 24 hours, the Owners shall have the option of cancelling this contract.

If part cargo has already been loaded, the Owners must proceed with same (freight payable on loaded quantity only) having liberty to complete with other cargo on the way for their own account.  Such cargo to be properly separated from Charterers' cargo at Owners' risk and expense.

If there is a strike or lock-out affecting the discharge of the cargo on or after vessel's arrival at or off the port of discharge and same has not been settled within 48 hours, the Receivers shall have the option of keeping vessel waiting until such strike or lock-out is at an end against paying half demurrage after expiration of the time provided for discharging. or of ordering the vessel to a port where she can safely discharge without risk of being detained by strike or lock-out. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the strike or lock-out affecting the discharge.

On delivery of the cargo at such port. all conditions of this Charter Party and of the Bill(s) of Lading shall apply and the vessel shall receive the same freight as if she had discharged at the original port of destination. except that if the distance of the substituted port exceeds 100 nautical miles. the freight on the cargo delivered at the substituted port to be increased in proportion.

- 16 -

"TRANSFIELD TONNAGE TO BE NOMINATED"

CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.

### SECTION 25 : NEGLIGENCE CLAUSE :

The act of God, perils of the sea, fire, barratry of the Master and/or crew, enemies, pirates and thieves, arrest and restraints of princes, rulers and people, collisions, stranding and other accidents of navigation excepted, even when occasioned by negligence, default or error of judgement of the pilot, Master, mariners or other servants of the Ship-Owners.

Vessel is not responsible for losses through explosion, bursting of boilers, breakage of shafts or any latent defect of machinery or hull not resulting from want of due diligence by the Owners of the vessel or any of them, or by the ship's husband or manager.

### SECTION 26 : VOYWAR 1993 :

1)    For the purpose of this Clause the words :

  a)    "Owners" shall include the Shipowners, bareboat Charterers, Disponent Owners, Managers or other operators who are charged with the management of the Vessel, and the Master; and

  b)    "War Risks" shall include any war (whether actual or threatened) act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades, (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

2)    If at any time before the vessel commences loading, it appears that in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose or is likely to expose the vessel, her cargo, crew or other persons on board the vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage or may refuse to perform such part of it as may expose, or may be likely to expose, the vessel, her cargo, crew or other persons on board the vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports and at the port or ports nominated by the Charterers, the vessel, her cargo, crew, or other persons onboard the vessel may be exposed or may be likely to be exposed, to War Risks; the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

**"TRANSFIELD TONNAGE TO BE NOMINATED"**

**CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.**

3) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage or on any part thereof, or to proceed through any canal or waterway or to proceed to or remain at any port or place whatsoever where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the vessel, her cargo (or any part thereof), crew or other persons on board the vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

4) If at any stage of the voyage after the loading of the cargo commences, it appears that in the reasonable judgement of the Master and/or the Owners, the vessel, her cargo, crew or other persons on board the vessel may be or are likely to be exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled if the total extra distance exceeds 100 miles to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

5) The vessel shall have liberty :

   a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any way whatsoever, which are given by the Government of the Nation under whose flag the vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions:

   b) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risk insurance:

   c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community the effective orders of any other Supernational body which has the right to issue and give the same and with national laws aimed at enforcing the same to which the Owners are subject and to obey the orders and directions of those who are charged with their enforcement:

- 18 -



**"TRANSFIELD TONNAGE TO BE NOMINATED"**

**CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.**

  d)  to discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier;

  e)  to call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions;

  f)  where cargo has not been loaded or has been discharged by the Owners under any provisions of this clause to load other cargo for the Owners own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards in a contrary direction to the ordinary or customary route.

  6)  If in compliance with any of the provisions of sub clauses 2) to 5) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage.

## SECTION 27 : CANCELLING CLAUSE :

The Charterers shall have the option of cancelling the voyage in question if the vessel be not ready to load on or before twelve midnight (24.00 hours) on the cancelling dates.

If it appears that the vessel will be delayed beyond the cancelling date, the Owners shall, as soon as they are in a position to state with reasonable certainty the day on which the vessel should be ready, give notice thereof to the Charterers entitling them either to exercise their option of cancelling the Charter Party within three working days of the receipt by Charterers of such notice, or either not to do so, the fifth (5th) day after the readiness date stated in the Owners' notice being regarded as the new cancelling date.

If the vessel will be further delayed (Owners repeating same regarding notices towards Charterers); and if Charterers are unable to further extend the new cancelling date giving notice hereof to Owners within two working days of receipt of such notice, Owners will endeavour to substitute the nominated vessel by an earlier vessel within five days after receipt of Charterers' reply, otherwise Charterers will have the option to cancel the voyage in question or not to do so, the fifth day after the readiness date stated in the Owners' notice being regarded as the new cancelling date.

The Charterers shall in any event declare whether they exercise any option of cancelling not later than the time of the vessel's readiness to load.

## SECTION 28 : RESPONSIBILITIES AND IMMUNITIES :

  A)  The Hague Rules contained in the International Convention for the Unification of Certain Rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment, shall apply to this Contract and to any Bill of Lading issued hereunder.

- 19 -

## "TRANSFIELD TONNAGE TO BE NOMINATED"

## CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.



When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactment are compulsorily applicable, the terms of the said convention shall apply.

B) In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd, 1968 – The Hague Visby Rules – apply compulsorily, the provisions of the respective legislation shall apply.

C) The Owners shall in no case be responsible for loss of or damage to cargo howsoever arising prior to loading into and after discharging from the vessel or while the goods are in the charge of another Owner nor in respect of deck cargo and live animals. This sub-clause shall not detract from the Owners' obligations under Clause 4 of Orevoy Charter Party.

D) Save to the extent otherwise in this Charter Party expressly provided, neither party shall be responsible for any loss or damage or delay or failure in performance hereunder resulting from Act of God, war, civil commotion, quarantine, strike, lockouts, arrest or restraint of princes, rulers and peoples or any other event whatsoever which cannot be avoided or guarded against.

### SECTION 29 :

Deleted.

### SECTION 30 :

Each voyage will be governed by the conditions of the attached Charterers' "Amwelsh" Charter Party.

### SECTION 31 :

Owners/Vessels to comply fully with latest up to date Dalrymple Bay Coal Terminal / Australian Regulations.

Charterers' Questionnaire to be incorporated in Contract of Affreightment / Charter Party.

OWNERS :                                          CHARTERERS :

For and on behalf of
Transfield ER Cape Limited

...................................................
Authorised Signature(s)

- 20 -

"TRANSFIELD TONNAGE TO BE NOMINATED"

CONTRACT OF AFFREIGHTMENT DATED 9<sup>TH</sup> AUGUST, 2005.

### CHARTERERS' QUESTIONNAIRE

When nominating Owners to advise :

Vessel's description :
Name                        :
Flag                        :
Built                       :
Where                       :
Type                        :
Gear                        :
Tons Deadweight             :
Draft                       :
LOA                         :
Beam                        :
Holds / Hatches             :
Type of Hatchcovers         :
GT                          :
NT                          :
Call Sign                   :
Satcom / Telex              :
TPI / TPC                   :
P. and I. Club              :
Classification Society      :
Vessel is fully ITF approved :
Distance from waterline to top
        of hatchcoaming      :    if required by Charterers not to exceed .. feet both ends
Hold cubic breakdown         :    1
                                  2
                                  3
                                  4
                                  5
                                  6
                                  7
                                  8
                                  9
                                  Total

All space is guaranteed suitable for grab discharge and available in unobstructed clear main holds only.

Owners' Name                 :

Speed                        :    Vessel to perform ballast and laden voyages at full speed

- 21 -

## "TRANSFIELD TONNAGE TO BE NOMINATED"

## CONTRACT OF AFFREIGHTMENT DATED 9TH AUGUST, 2005.

| | | |
|---|---|---|
| P. and I. Club | : | Name |
| | | Owners guarantee that vessel's P. and I. Club is a member of the International Group of P. and I. Clubs and will remain so throughout the duration of the Charter Party. |
| | | Confirmation that the vessel has full coverage for intended trade at date of entering such membership and until when premiums are paid. |
| Classification | : | Owners guarantee that vessel classification society is a member of the International Association of Classification Societies and will remain so throughout the duration of this Charter Party. |

| | | | |
|---|---|---|---|
| Hull and Machinery Insured with | | : | |
| Insured Value | | : | |
| Last Drydock | Where | : | |
| | When | : | |
| Last Special Survey | Where | : | |
| | When | : | |
| Casualty and Pollution History | | : | Collision, grounding, pollution (oil-bunker spills and others), fire, cargo damage etc ...... over last 2 years). |
| Last Port State Control Inspection | | : | |
| | Where | : | |
| | When | : | |
| | Problem | : | |
| | Vessel passed without recommendation or detention : | | |

ISM : Document of Compliance (D.O.C.) and Safety Management Certificate (S.M.C.) to be faxed on to the Charterers.

Current Ownership :
How long vessel has been in current Ownership :

Last Charter Party date with ATIC :

Has vessel been in lay up (when/where/period) :

Warranties :
Owners warrant that vessel not be sold for scrap after this voyage :
Owners warrant that officers and crew are fluent in English :

- 22 -

"TRANSFIELD TONNAGE TO BE NOMINATED"

CONTRACT OF AFFREIGHTMENT DATED 9$^{TH}$ AUGUST, 2005.

Last four cargoes and Charterers :
Last vessel dry bulk cargo :
The certificates of P. and I. / Hull and Machinery / Class / ISM to be faxed on  nominating final performing vessel.

Performing vessel to be subject to Shipper(s)/Receivers/Charterers and Head-Charterers' approval one (1) working day after Owners' nomination provided all documents/certificates/required information are in Charterers' hands.

(For DUNKIRK only)
Owners when nominating the performing vessel will provide following details for Charterers' approval :

A)     Ship's name (including former name(s), if any).
B)     Ship's type.
C)     Summer deadweight.
D)     Flag.
E)     Extreme breadth i.e. the maximum breadth to the outside of the ship's structure and in paddle
         ship include the paddle boxes.
         Figure must show two figures after the comma.
F)     Extreme length with two figures after the comma.
G)     Draft.
H)     The following radio must be lower than 10 :
                          Summer Dwat
         -------------------------------------------------------
                Total power of the engine (BHP)
I)      Revolution on full-ahead manoeuvring speed and full astern manoeuvring speed must be the
         same.
J)      The bridge wings must extend up to the maximum breadth of the ship at the midship section.


                          * * * * *

**EXHIBIT 2**

### SSY Pacific Capesize Index

| Trade | Cargo/Ship Size | Weight | 20/08/2007 $/t | 28/08/2007 $/t |
|---|---|---|---|---|
| RIZHAO/ROTTERDAM | 150,000/10% | 10.0% | 32.60 | 33.45 |
| DAMPIER/QINGDAO | 150,000/10% | 10.0% | 23.00 | 23.30 |
| SALDAHNA BAY/QINGDAO | 150,000/10% | 10.0% | 42.60 | 43.15 |
| RICHARDS BAY/KWANGYANG | 130/150,000/10% | 10.0% | 36.45 | 36.90 |
| CAPE LAMBERT/ROTTERDAM | 160,000/10% | 10.0% | 31.60 | 32.40 |
| NSW 15.2M/JAPAN | 130,000/10% | 10.0% | 30.95 | 31.40 |
| QUEENSLAND/ROTTERDAM | 150,000/10% | 10.0% | 42.15 | 43.20 |
| NSW 15.2M/SOUTH KOREA | 130,000/10% | 10.0% | 33.40 | 33.85 |
| T/C TRIP FAR EAST/CONT | 172,000 DWT | 10.0% | 14.49 | 15.02 |
| T/C TRANSPACIFIC ROUND | 172,000 DWT | 10.0% | 18.38 | 18.73 |
| | | 100.0% | | |
| **CALCULATED INDEX** | | | **19,261** | **19,646** |
| Change on Previous Week | | | +574 | +385 |
| Change on Four Weeks Ago | | | +2,641 | +1,953 |
| Change on Previous Year | | | +8,401 | +9,060 |
| Change on Two Years Ago | | | +13,471 | +12,645 |



SSY Pacific Capesize Index

The fifth consecutive weekly rise for the Pacific Index puts it at a three-month high. At $85,000/day, backhaul time charter earnings for 172k dwt vessels are level with their record high. However, transpacific round voyage earnings of $106,000/day are almost $8,000 short of their all-time peak.

For more information contact David Beard/Peter Norfolk
The Pacific Index started at 4,114 points on 6 January 1997.

**EXHIBIT 3**

**Jon Flaaten**

| | |
|---|---|
| **From:** | Jon Flaaten |
| **Sent:** | 22. november 2006 13:29 |
| **To:** | 'Brian Taylor' |
| **Cc:** | V-OPER |
| **Subject:** | GOLDEN OCEAN / TRANSFIELD TBN  COA 09.08.2005 4th lifting DBCT/RDAM+ANTW |

```
GOLDEN OCEAN / TRANSFIELD TBN COA 09.08.2005 4th lifting
---------------------------------------------------
```

We are pleased to nominate Laycan 10-25/03 DBCT/RDAM+ANTW which please confirm by
return.


Best regards

1

**EXHIBIT 4**

**Jon Flaaten**

| | |
|---|---|
| **From:** | Jon Flaaten |
| **Sent:** | 4. januar 2007 12:13 |
| **To:** | 'Brian Taylor' |
| **Cc:** | V-OPER |
| **Subject:** | COA Transfield TBN / Front Carriers dated 09.08.2005 |

COA Transfield tbn / Front Carriers dated 09.08.2005
------------------------------------------------------

Under above CoA next voyage initially indicated to be 10-25 March 2007 is now
postponed with new intended laycan of 10/25 May 2007 DBCT/RDAM+Antwerp

Please confirm safe receipt of this message

Best regards

1

**EXHIBIT 5**

## Jon Flaaten

| | |
|---|---|
| **From:** | Brian Taylor [postfix@ssy.co.uk] |
| **Sent:** | 4. januar 2007 17:49 |
| **To:** | Jon Flaaten |
| **Subject:** | FRONT/TRANSFIELD COA |

BWT42704692

FROM: SIMPSON, SPENCE & YOUNG LTD
DATE: 04/01/2007
TIME: 16:49:16

JON/BRIAN

THANKS YOURS EARLIER TRANSFIELD COMMENT AS FOLLOWS.

Subject: Re: FRONT CARRIERS CAPE COA/TSI

RE CHTRS EMAIL BELOW. REGRET OWNERS CANNOT ACCOMODATE CHTRS REQUEST TO POSTPONE
SHIPMENT TO MAY

REGARDS

BWT42693205

FROM: SIMPSON, SPENCE & YOUNG LTD
DATE: 04/01/2007
TIME: 12:51:59

FRANCIS-NEWMAN/BRIAN

FOLLOWING FROM FRONT CARRIERS.

PLEASE CONFIRM YOUR ACCEPTANCE TO THIS CHANGE.

Subject: COA Transfield TBN / Front Carriers dated 09.08.2005
Date: Thu, 4 Jan 2007 12:12:47 +0100

COA Transfield tbn / Front Carriers dated 09.08.2005
-----------------------------------------------------

Under above CoA next voyage initially indicated to be 10-25 March 2007 is now
postponed with new intended laycan of 10/25 May 2007 DBCT/RDAM+Antwerp

Please confirm safe receipt of this message

Best regards

.
REGARDS    - BRIAN TAYLOR
DIRECT PH.  020 7977 7424
FAX         020 7488 2833

1

**EXHIBIT 6**

**Jon Flaaten**

| | |
|---|---|
| **From:** | Jon Flaaten |
| **Sent:** | 5. januar 2007 09:35 |
| **To:** | 'Brian Taylor' |
| **Cc:** | V-OPER; Herman Billung; Anders Zorn Singapore; 'marius@rostock.no' |
| **Subject:** | RE: FRONT/TRANSFIELD COA |

For Messrs Transfield:

Please note that there has never been a firm nomination of voyage no:4 under the CoA
of 09.08.05, only an advice of next lifting.
We fully trust that you will honour your obligations once a firm nomination has been
given

Please confirm that the below message is just a mistake on your behalf

Regards
Jon Flaaten


-----Original Message-----
From: Brian Taylor [mailto:postfix@ssy.co.uk]
Sent: 4. januar 2007 17:49
To: Jon Flaaten
Subject: FRONT/TRANSFIELD COA


BWT42704692

FROM: SIMPSON, SPENCE & YOUNG LTD
DATE: 04/01/2007
TIME: 16:49:16


JON/BRIAN


THANKS YOURS EARLIER TRANSFIELD COMMENT AS FOLLOWS.


Subject: Re: FRONT CARRIERS CAPE COA/TSI

RE CHTRS EMAIL BELOW. REGRET OWNERS CANNOT ACCOMODATE CHTRS REQUEST TO
POSTPONE SHIPMENT TO MAY

REGARDS




BWT42693205

FROM: SIMPSON, SPENCE & YOUNG LTD
DATE: 04/01/2007
TIME: 12:51:59


FRANCIS-NEWMAN/BRIAN


FOLLOWING FROM FRONT CARRIERS.

PLEASE CONFIRM YOUR ACCEPTANCE TO THIS CHANGE.

1

Subject: COA Transfield TBN / Front Carriers dated 09.08.2005
Date: Thu, 4 Jan 2007 12:12:47 +0100


COA Transfield tbn / Front Carriers dated 09.08.2005
----------------------------------------------------

Under above CoA next voyage initially indicated to be 10-25 March 2007
is now postponed with new intended laycan of 10/25 May 2007
DBCT/RDAM+Antwerp

Please confirm safe receipt of this message

Best regards

.
REGARDS    - BRIAN TAYLOR
DIRECT PH.  020 7977 7424
FAX         020 7488 2833
I-MAIL      POSTFIX@SSY.CO.UK


.

2

**EXHIBIT 7**

**Jon Flaaten**

| | |
|---|---|
| **From:** | Jon Flaaten |
| **Sent:** | 5. januar 2007 16:47 |
| **To:** | 'Brian Taylor' |
| **Cc:** | 'marius@rostock.no'; V-OPER; Herman Billung |
| **Subject:** | RE: FRONTLINE/TSI CAPE COA |

Ref owners below message

If Owners then read the section 10 Nomination clause as they now want to : they should have nominated the below vessel within 10 days of such nomination.

The clause says that "Around 30 days prior the beginning of each quarter charterers will do their utmost to give Owners a tentative schedule program"
Which then was done end November 2006.

Not less than 45 days prior beginning of the desired laydays/cancelling dates with 15 days spread, the Charterers will notify the Owners of the program etc.

We have still not reached the 45 days notice prior to even the first intended laycan of 10/25 March 2007 ( that would put us on the 23rd or the 24th of January and we are still reading the 5th of Jan 2007 on the calendar this end )

If Owners insist on their line of thinking we will need a proper and full nomination of a vessel as per cp with the questionnaire fully filled in and all certificates attached.
We also see that they have nominated a final performing vessel ( no sub ).

We also reserve all our rights under our CoA and will hold Owners fully responsible for any and all costs/losses incurred.

Regards
Jon Flaaten


-----Original Message-----
From: Brian Taylor [mailto:postfix@ssy.co.uk]
Sent: 5. januar 2007 13:40
To: postfix@ssy.co.uk
Subject: Re: FRONTLINE/TSI CAPE COA


BWT42743119

FROM: SIMPSON, SPENCE & YOUNG LTD
DATE: 05/01/2007
TIME: 12:40:22


JON/BRIAN

FURTHER EXCHANGES PLEASE SEE FURTHER COMMENT FROM TRANSFIELD.

HERE THE WORDING OF YOUR MESSAGE TO WHICH THEY REFER.
Q

Subject: GOLDEN OCEAN / TRANSFIELD TBN  COA 09.08.2005 4th lifting
DBCT/RDAM+ANTW
Date: Wed, 22 Nov 2006 13:28:56 +0100


GOLDEN OCEAN / TRANSFIELD TBN COA 09.08.2005 4th lifting
-------------------------------------------------

We are pleased to nominate Laycan 10-25/03 DBCT/RDAM+ANTW which please

1

confirm by return.


Best regards
.

UNQ


Subject: Re: FRONTLINE/TSI CAPE COA

ate: Fri, 5 Jan 2007 19:30:17 +0800

TER CApe dis-agree with Charterers allegations and their last message
is
not a mistake.
Charterers allegation that there has never been a firm nomination of
voyage
no4 is not correct.
Please note Charterers in their email dated Nov22 2006 nominated
Laycan
10-25/03 DBCT/RDAM+ANTW.
TER CAPE are committed to honour their obligations and upon received
Charterers nomination TER CAPE made the necessary scheduling and have
vessel earmarked for the 10-25/03
nomination.

TER CAPE hereby nominate performing vessel:

- lifting no4
- laycan 10-25/03 DBCT/RDAM+ANTW
- performing vessel
  MV C. MARCH
  korea flag/built 1995
  151,053mt dwt on 17.419m ssw
  167,883 grain cubic
  9h9h
  loa/beam 273m/43m
  all details about

  cargo intake about 140,000mt.

  certificates as attached

Regards

(See attached file: 5688913.tif)




BWT42731497

FROM: SIMPSON, SPENCE & YOUNG LTD
DATE: 05/01/2007
TIME: 09:41:48


NEWMAN-FRANCIS/BRIAN


RE: FRONT/TRANSFIELD COA

FOLLOWING RESPONSE FROM FRONT LINE. PLEASE RECONSIDER YOUR SITUATION
AND ADVISE.


Q
Please note that there has never been a firm nomination of voyage no:4

2

under the CoA of 09.08.05, only an advice of next lifting.
We fully trust that you will honour your obligations once a firm
nomination has been given

Please confirm that the below message is just a mistake on your behalf

Regards
Jon Flaaten
UNQ

-
BWT42704692

FROM: SIMPSON, SPENCE & YOUNG LTD
DATE: 04/01/2007
TIME: 16:49:16


JON/BRIAN


THANKS YOURS EARLIER TRANSFIELD COMMENT AS FOLLOWS.


Subject: Re: FRONT CARRIERS CAPE COA/TSI

RE CHTRS EMAIL BELOW. REGRET OWNERS CANNOT ACCOMODATE CHTRS REQUEST TO
POSTPONE SHIPMENT TO MAY

REGARDS




BWT42693205

FROM: SIMPSON, SPENCE & YOUNG LTD
DATE: 04/01/2007
TIME: 12:51:59


FRANCIS-NEWMAN/BRIAN


FOLLOWING FROM FRONT CARRIERS.

PLEASE CONFIRM YOUR ACCEPTANCE TO THIS CHANGE.


Subject: COA Transfield TBN / Front Carriers dated 09.08.2005
Date: Thu, 4 Jan 2007 12:12:47 +0100



COA Transfield tbn / Front Carriers dated 09.08.2005
----------------------------------------------------
Under above CoA next voyage initially indicated to be 10-25 March 2007
is now postponed with new intended laycan of 10/25 May 2007
DBCT/RDAM+Antwerp

Please confirm safe receipt of this message

Best regards

.
REGARDS   - BRIAN TAYLOR
DIRECT PH.  020 7977 7424
FAX        020 7488 2833

3

**EXHIBIT 8**

43044355.tlx

From: "Jon Flaaten" <jon.flaaten@goldenocean.no>
To: "Brian Taylor" <postfix@ssy.co.uk>
Subject: FW: re CMarch / Transfield voy 4 under CoA 09.08.05
Date: Fri, 12 Jan 2007 12:46:35 +0100

Please change to Dunkirk East only

As Dunkirk West+East is covered

---

From: Jon Flaaten
Sent: 12. januar 2007 12:43
To: 'Brian Taylor'; 'marius@rostock.no'
Cc: V-OPER
Subject: re CMarch / Transfield voy 4 under CoA 09.08.05


re CMarch / Transfield voy 4 under CoA 09.08.05


Need Owners rates for following:


DBCT or Newcastle loading

To Moneypoint or Taranto or Dunkirk EAST


Means 6 calculations which please make earliest possible

Note we sent the draft/pier at Taranto which means less cargo ex DBCT

Need also confirmation if via Suez or GH.



Please forward calcs with base calc DBCT/Rotterdam for comparison
reasons.


Again :

Please advise full itinerary of the C.March


Regards

Jon Flaaten

**EXHIBIT 9**

44464702.tlx
FRONT CARRIERS / TRANSFIELD TBN COA 09.08.2005 4th lifting

"Charterers acknowledge receipt of owners' message sent through brokers yesterday.

The above communication leaves charterers rather perplexed. Owners appear to be requiring strict compliance from charterers with respect to time limits, while owners are not so obliged.

If the November 22nd communication from charterers is deemed a nomination pursuant to Section 10 (which is disputed), owners should have nominated a vessel within 10 days. They failed to do so. Thus if time limits are at issue, owners are in breach, not charterers.

Insofar as the nomination of the C. MARCH is concerned, the relevant communication was sent to charterers on January 5th, a Friday. The vessel was accepted on January 8th (a Monday) well within the two working day deadline (assuming it applies in this case). Thus owners certainly have no complaint in this regard.

While owners and charterers agree that there is a firm confirmation of the March 10-25 laycan with the nominated C. MARCH as performer, the remaining difference of opinion between the parties relates to the load port. Owners' attempt to restrict the load port to DBCT is obviously flawed.

Again, if the November 22nd communication from charterers is a formal nomination pursuant to Section 10 paragraph 3, it is expressly stated in this provision that the reference to the vessel's programme is:

"i.e. intended loading port and discharging port with combination of loading/discharging ports if any."

In view of this language it is absolutely clear that charterers are not bound by their initial reference to DBCT. Another matter is the fact that any other interpretation of this provision would be ridiculous from a commercial perspective.

As a final point, we should mention that Newcastle is one of the listed optional ports in Section 3 and is specifically catered for on Section 5 with respect to applicable freight rates.

In view of the above circumstances, charterers will require owners to confirm whether they now are in a position to perform the contemplated voyage with loading at Newcastle. If not, charterers will be forced to mitigate and the consequences for owners will far exceed any differential between the charter rate and any alternative employment owners may have in mind.

44464702.tlx

Given the above circumstances. charterers require owners' response
within 12:00 noon London time tomorrow Friday February 16th."

Yours faithfully,

Jon Flaaten

**EXHIBIT 10**

44511548.tlx

BWT44511548

FROM: SIMPSON, SPENCE & YOUNG LTD
DATE: 16/02/2007
TIME: 12:35:26


JON/BRIAN



FRONT CARRIERS/TRANSFIELD TBN COA. 09.08.2005 4TH LIFTING


Owners thank charterers for their message late yesterday evening.


Owners note that chrs acknowledge that the parties have agreed on the
vessel, and indeed that chrs had accepted on 8th January the
nomination
made by owners on 5th January, namely of the C MARCH, with estimated
laycan
of 10/25 March, for a DBCT/RTDM+ANTW voyage.


 In the circumstances, there is objectively no difference of
understanding
about the agreed load port.  Chrs nominated DBCT/RTDM+ANTW, owners
accepted
that nominated voyage, and chrs thereafter confirmed this nomination.


Chrs' reliance on the wording of Section 10, para 3, does not appear
to
assist them for the purposes of modifying the load port.  This states:
"the
charterers will notify the Owners of the programme - i.e.  intended
loading
port and discharging port with combination of loading / discharging
ports
if any".


This provides chrs with the possibility, at the time of nomination, to
nominate a "combination of loading/discharging ports".  Chrs simply
nominated "DBCT/RTDM+ANTW" as their combination of load and discharge
ports.  Owners accepted this, when they nominated the C MARCH.  Chrs
now
acknowledge that this nomination was accepted and confirmed by them.


The above clause does not objectively entitle chrs, after the
nomination
process, to make further modifications to the intended load  port.


Furthermore, Chrs have sought various variations not only to the load
port,
but also to discharge ports, even laycan and type of cargo.  To date,
in
the light of charterers' messages, including the most recent one, it
remains unclear what voyage chrs actually either intend to or can
perform.

Page 1

44511548.tlx

Chrs have not responded in this respect to the various points raised in
owners' most recent message dated 15th February. The only point which is
apparent from chrs' message is that they may no longer intend to load at
DBCT, but may only want to load at Newcastle. This is not what the parties
had agreed.


Unless Owners receive clear confirmation within the deadline set out in
Owners' message of 15th February that the DBCT/RTDM+ANTW voyage is to be
performed by chrs as per the agreed nomination of C MARCH with 10/25 March
laycan at DBCT, Owners will have to consider that chrs do not intend to
perform this voyage;  in such circumstances, owners will have to seek
alternative employment for their vessel, in order to try to minimise their
losses.  Meantime, Owners reserve their right to claim Charterers for any
and all damages/losses arising.



Regards
.

# EXHIBIT 11

CODE NAME:  VOY June 2006


STANDARD FORM

VOYAGE CHARTER PARTY


BETWEEN


RIO TINTO SHIPPING PTY LIMITED
A.C.N. 007 261 430


AND


GOLDEN OCEAN GROUP LIMITED


DATED:  17TH JANUARY, 2007

NO:  GOL 1347

# CONTENTS

| CLAUSE | PAGE |
|---|---|
| CONTENTS | 2 |
| 1. | DEFINITIONS | 1 |
| 2. | BASIC OBLIGATIONS | 2 |
| 3. | CARGO - SHIPMENT, SIZES AND OPTIONS | 2 |
| 4. | VESSEL'S DESCRIPTION | 2 |
| 5. | OWNER'S/MASTER'S OBLIGATIONS | 4 |
| 6. | ISM CLAUSE | 4 |
| 7. | I.T.F. CLAUSE | 5 |
| 8. | LOADING PORT | 5 |
| 9. | VOYAGES | 5 |
| 10. | DISCHARGING PORT(S) | 5 |
| 11. | LAYDAY AND CANCELLING DATE | 6 |
| 12. | RELETTING, SUBLETTING, SUBCONTRACTING AND ASSIGNING | 6 |
| 13. | NOTICES BY MASTER | 6 |
| 14. | LOADING AND DISCHARGING RATES | 7 |
| 15. | PRESENTATION OF NOTICE OF READINESS | 8 |
| 16. | COUNTING OF LAYTIME | 8 |
| 17. | FORCE MAJEURE EXCEPTIONS | 10 |
| 18. | DEMURRAGE/DESPATCH | 10 |
| 19. | COVERING AND UNCOVERING OF HATCHES | 11 |
| 20. | OVERTIME | 11 |
| 22. | STEVEDORE DAMAGE | 11 |

22. LIGHTERAGE AND LIGHTENING ...................................................................11

23. PORT CHARGES, DUES AND TAXES..............................................................12

24. AGENCY AND DISBURSEMENTS ...................................................................12

25. BILLS OF LADING............................................................................................12

26. RATE OF FREIGHT AND DISCHARGE.............................................................13

27. PAYMENT OF FREIGHT...................................................................................13

28. DEADFREIGHT.................................................................................................14

29. ADDRESS COMMISSION..................................................................................14

30. WAR RISKS ......................................................................................................14

31. EXTRA WAR RISK INSURANCE/WAR BONUS ...............................................14

32. EXTRA INSURANCE..........................................................................................14

33. SECRECY ..........................................................................................................15

34. UNFORESEEN CIRCUMSTANCES ....................................................................15

35. ARBITRATION ...................................................................................................15

36. PROPER LAW ....................................................................................................15

37. OIL POLLUTION ................................................................................................16

38. LIEN ..................................................................................................................16

39. DRUG AND ALCOHOL CLAUSE .......................................................................16

40. GENERAL AVERAGE AND THE NEW JASON CLAUSE....................................16

41. BOTH TO BLAME COLLISION CLAUSE ...........................................................17

42. ICE CLAUSE......................................................................................................17

43. ISPS CLAUSE....................................................................................................18

44. DEVIATION AND LIBERTIES ............................................................................19

**45.    COMMUNICATIONS** ..................................................................................**19**

**46.    AMENDMENTS** ........................................................................................**20**

**47.    INCORPORATED DOCUMENTATION** .................................................**20**

THIS VOYAGE CHARTER PARTY (hereinafter called 'Contract' ) is entered into on the 17th January, 2007

BETWEEN

RIO TINTO SHIPPING PTY LIMITED (A.C.N. 007 261 430) (hereinafter called 'Charterer') of Level 35, 55 Collins Street, Melbourne, Victoria 3000, Australia

AND

GOLDEN OCEAN GROUP LIMITED, Hamilton, Bermuda, as Disponent Owners (hereinafter called 'Owner')

of the  "C.MARCH" or similar sub.     hereinafter called the 'vessel'.

WHEREBY IT IS MUTUALLY AGREED AS FOLLOWS:

## 1. DEFINITIONS

In this Contract, unless a contrary intention appears:

A. 'Bill of Lading' means the Charterer's Standard Form Bill of Lading in Appendix No.1.

B. 'Contract' means this Voyage Charter Party.

C. 'Discharging Port(s)' means any of the ports listed in Clause 10 and includes, unless the context expresses a contrary intention, any berth to which the vessel is ordered at such port.

D. 'Dollars', '$' and 'cents' refer to the lawful currency of the United States of America.

E. 'ETA' means estimated time of arrival.

F. FIOST means Free In and Out  Spout Trimmed

G. 'ITF' means the organisation presently styled the International Transport Federation or any successor organisation.

H. 'Layby Berth' means the facility adjacent to Charterer's/Shipper's East Intercourse Island berth at Dampier into which, on completion of draft survey, a vessel can be moved always afloat.

I. 'Laydays' and 'Laycan' means the period from the opening loading date to the cancelling or last agreed loading, date.

J. 'MOLOO' means more or less in owner's option.

K. 'NOR' means Notice of Readiness.

L. 'MTDW' means total deadweight metric tons (Summer load line).

M. 'Overtime' means time spent over and above standard and or agreed hours of work.

N. ' Port(s) of Loading' means any port(s) referred to in Clause 8 at which a vessel loads hereunder.

O. 'RightShip' means RightShip Pty Limited, a company engaged by the Charterer to screen, inspect, survey and/or vet, assess and approve, as a ship acceptable for the carriage on the nominated cargo(s).

P. 'Vessel(s)' means a vessel or vessels nominated by the Owner

Q.  'Voyage(s)' means the carriage of the cargo in the Vessel from the Port(s) of Loading to the Discharging Port(s).

R.  'WMT' means wet metric ton.

S.  'Overage' means a vessel, which by reason of its age and/or class, attracts any additional insurance premiums.

T.  Clause Headings in this Contract are inserted for the parties' convenience only and shall be disregarded for the purposes of interpretation.

## 2.  BASIC OBLIGATIONS

Owner to nominate and provide a vessel, which shall be RightShip approved, loaded with cargo provided by the Charterer under the direction and responsibility of the vessel's Master, and Owner shall carry and deliver the cargo as set out in this Contract.

## 3.  CARGO - SHIPMENT, SIZES AND OPTIONS



A.  The vessel shall load a cargo of coal in bulk, including but not limited to, lump and/or fines iron ore at Charterer's option, but excluding DRI/P, this quantity within the range at Owner's options of minimum   135,000 WMT, maximum 165,000 WMT if loading Dalrymple Bay or minimum 126,000 WMT, maximum 154,000 WMT if loading Newcastle NSW.

Cargo shall be loaded, transported and discharged in accordance with IMO recommendations

B.  The shipment will be deemed to be a full and complete cargo, even if the vessel is not loaded down to her marks by reason of draft restrictions at Loading or Discharging Port(s).

## 4.  VESSEL'S DESCRIPTION

A.  Owner undertakes that the vessel shall at all times be acceptable to Charterer.

The Vessel shall be suitable at all times for the loading, carriage and discharge of the cargoes nominated under this contract.

Charterer and/or Receiver shall have the right at any time on reasonable notice to inspect or survey the vessel or substitute vessel with the Master or his nominee for the purpose of ascertaining whether the vessel meets the requirements set out in Clause 4B and is being maintained and operated in accordance with the terms and conditions of this contract.

B.  Owner shall provide a seaworthy and cargo-worthy vessel for the voyage, which:

(a)  is maximum 15 years of age,  non overage, single deck, self trimming, gearless bulk carrier or ore carrier, which has been approved by RightShip, with engine/accommodation aft, each without longitudinal centre line bulkheads; be tight, staunch and strong and in every way fitted for the nominated voyage, and classed 100A1 at Lloyds or equivalent; and

(b)   shall be acceptable to the relevant authorities and conform with all laws, regulations and requirements in force at or applicable to Loading and Discharging Ports, and be maintained to standards of accommodation, equipment, fixtures & fittings acceptable to the Charterer, and

(c)   shall be of such size, draft, airdraft and other dimensions as to permit the vessel to safely enter, berth, lay alongside, load and discharge and depart always safely afloat from Loading and Discharging Port(s); and

(d)   shall have holds strengthened and classed for carriage of coal in bulk; and

(e)   shall be capable of loading cargo in all holds as required by Charterer and be cargo-worthy in every respect ; and

(f)   shall be suitable for grab discharge with no fittings protruding from internal hold surfaces; and

(g)   shall have all cargo holds, compartments, open and closed trunk-ways, where applicable, free of flammable and toxic gasses on presentation of the vessel at the Loading Port and Discharge Port(s); and

(h)   subject to paragraph 4B(g), if the vessel's slop tanks contain any slops, shall be warranted by the Owner at its expense, to have been made safe with inert gas before commencing operations to load and discharge the vessel.

C.   Owner warrants that:

   (a)   if by reason of vessel's construction cost of discharge exceeds the customary normal cost, the extra costs are to be for Owner's account and any additional time used in discharging shall be added to laytime; and

   (b)   Owners' warrant that the vessel is entered with a Protection & Indemnity Club for full P&I coverage and that vessel's hull and machinery is fully insured and shall remain so for the duration of this Contract.

D.   Should the vessel after arrival at a Loading Port or Discharging Port(s) be found to be in breach of sub-clause 4B, then notwithstanding any right(s) of the Charterer elsewhere contained in this Contract, the Charterer may at its option and without prejudice to Owners obligations under this Contract:

   (a)   at the Loading Port, treat the vessel's nomination as cancelled and the voyage unperformed, or;

   (b)   treat the voyage as suspended until Owner rectifies the vessel's default of sub-clause 4B .

Any NOR previously accepted shall be deemed to be invalid and all time counting to be for Owner's account. Owner shall keep Charterer fully indemnified against any consequences of the vessel's failure to comply with the warranties of Clause 4, including any delays, and, where applicable, Charterer's costs to provide a suitable replacement vessel to meet its shipping requirements.

E.   In the event of the Owner providing an overage and/or a vessel not classed as required in subclause 4B(a) the Charterer may at its sole discretion accept in writing such nomination, which acceptance shall in no way relieve the Owner of all its other obligations under this Contract, particularly subclauses 4A, 4B and Clause 32 with which the Owner shall comply.

F.    Following is a description of the vessel:

If "C.MARCH" is nominated as the performing vessel, her description is as follows:
Korea flag/built 1995
151,053 mt dwt on 17,419 m ssw
167, 883 grain cubic
9 holds/9 hatches
LOA/Beam: 273m/43 m
All details "about"

Cargo intake basis DBCT about 140,000 mt


## 5.   OWNER'S/MASTER'S OBLIGATIONS

Owner undertakes that Owner and/or Master:

A.    shall at all times be solely responsible to establish the applicable vessel size, draft
and air-draft requirements for Loading and Discharging Ports and to ensure that the
vessel is loaded so as to comply at all times with such requirements; and

B.    should Owner or the Master cause or permit the vessel to be loaded with a quantity
of cargo such that on arrival the vessel has at any Discharging Port, a draft in excess
of the permissible entry draft at that port, Charterer or consignee(s) or their agent(s)
shall have the right to require the vessel to proceed to that port, or to any other port
or place as they may require, for the purpose of lightening and/or complete or partial
discharge.  The costs of any lightening and any other additional costs incurred and
time lost by reason of the necessity to lighten and/or divert the vessel as aforesaid as
a consequence of the above shall be for Owner's account.

C.    further, Owner shall indemnify Charterer and/or consignee(s) against any loss or
damage resulting from such diversion or delay including but not limited to the costs
of on-carriage of the cargo to the nominated port, stockpiling charges, deterioration
to the cargo (including any loss of market).

D.    shall by no later than  fourteen *[14]* days before the opening date of the Laycan
period, nominate a Vessel to perform the Voyage. Failure to do so by the date
specified in this clause will give the Charterer the right to cancel the Voyage on
notice to the Owner, fix a vessel against the Owner and to claim as damages from the
Owner any increased cost differential incurred by the Charterer as a result.


## 6.   ISM CLAUSE

From the date of coming into force of the International Safety Management (ISM) Code in
relation to the Vessel and thereafter during the currency of this Contract, the Owners shall
procure that both the Vessel and 'the Company' (as defined by the ISM Code) shall comply
with the requirements of the ISM Code.  Upon request, the Owners shall provide a copy of
the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC)
to the Charterers.

Except as otherwise provided in this Contract, loss, damage, expense or delay caused by failure on the part of the Owners or 'the Company' to comply with the ISM Code shall be for the Owner's account.

## 7.  I.T.F. CLAUSE

Owner shall provide evidence to Charterer that vessels, excluding those manned by Master and crew of the same nationality as the flag state of the vessel's registration, shall comply with all the requirements of the International Transport Federation ('I.T.F.') or any successor organisation at the Loading and Discharging Port(s) from time to time applicable.

If the vessel does not possess a current I.T.F. certificate or equivalent acceptable to the I.T.F. or if the vessel certificate lapses at any time during the currency of a voyage under this Contract, Charterer may terminate the voyage.

Further, Owner shall keep Charterer fully indemnified against any consequences (including any delay as well as Charterer's costs to provide a suitable replacement vessel to meet its scheduling requirements) occasioned by such lapse of the vessel's I.T.F certification and/or failure to comply with any rules, by-laws or regulations as aforesaid.

## 8.  PORT OF LOADING

The vessel shall proceed with all reasonable despatch to Newcastle, NSW, or Dalrymple Bay, as ordered by Charterer, and there load a full and complete cargo pursuant to the provisions of sub-clause 5A.

All costs of shifting directly between berths, if ordered by Charterer, shall be for Charterer's account and shifting time shall count as laytime.

## 9.  VOYAGES

Upon completion of loading and final draft survey and if tide and weather permit the vessel shall proceed at the nominated speed, via the direct and/or customary route to the nominated Discharging Port(s).

Routing via Suez or CGH in Charterers' option (Charterers to pay any rate differential), but subject to head Owners' approval.

## 10.  DISCHARGING PORT (S)

A.    The vessel shall discharge always afloat at Rotterdam.
B.    Charterers shall have the option to change the Discharging Port against paying freight which gives the Owner an equivalent time charter return to the base freight rate originally agreed.

## 11. LAYDAY AND CANCELLING DATE

Charterer is not bound to commence loading the vessel and, unless otherwise agreed, laytime at the Port of Loading shall not count before 10th March, 2007.    Should the vessel not be presented ready to load on or before 25th March, 2007    Charterer has the right, without any penalty attaching, to cancel the voyage.

## 12. RELETTING, SUBLETTING, SUBCONTRACTING AND ASSIGNING

Charterer may relet or, sublet the vessel and/or assign or subcontract any of its rights, duties or obligations but shall remain at all times fully responsible for all or any part thereof.

## 13. NOTICES BY MASTER

A.  Port of Loading

The Master of a vessel proceeding to Port of Loading shall advise Rio Tinto Shipping (e-mail: operations@riotinto.com), the Port Authority and agent, in accordance with the voyage instructions, as follows:

(a)    ten (10) days prior to vessel's arrival:

    (i)    giving ETA;

    (ii)    quantity of cargo to be loaded on deepest departure draft; and

    (iii)    distance between keel and hatch coaming;

(b)    seven (7) days prior to vessel's ETA:

    (i)    revised ETA;

    (ii)    advise hatch loading order and quantities of cargo by holds; and

    (iii)    advise expected fore and aft drafts on arrival.

(c)    seventy two (72) hours prior to vessel's ETA confirming or revise information in (b) above.

(d)    forty eight (48) hours; revised ETA

(e)    twenty four (24) hours; revised ETA.

B.  Discharging Port(s)

The Master of each vessel to advise Rio Tinto Shipping (e-mail: operations@riotinto.com Port Authority, consignee and agent (as advised by Charterer in voyage instructions) as follows:

(a)    on departure Port of Loading: ETA Discharging Port and estimated arrival draft;

(b)     ten (10) days prior arrival: ETA and expected arrival drafts;

(c)     seventy two (72), forty eight (48) and twenty four (24) hours prior arrival: ETA.

C.    In addition to the foregoing advice 'only' to RIO TINTO SHIPPING, each day noon position report giving the following information:

-    position
-    general average speed
-    ETA at discharge port
-    distance to discharge port.

D.    Charterer may by radioed notice to Master, which notice is deemed to be notice to the Owner for the purposes of this Clause, advise of any change in the order of the Discharging Port(s) provided that such notice is given:

(a)     at least five (5) days prior to vessel's ETA at first Discharging Port; or

(b)     within twenty four (24) hours of receipt of Master's advice pursuant to paragraph 11C and that either

(c)     the vessel as loaded will be able to enter such port; or

(d)     if such alteration necessitates lightening and/or the use of lighterage at Discharging Port, the provisions of Clause 21 shall apply.

## 14. LOADING AND DISCHARGING RATES

A.    The cargo shall be loaded, spout trimmed and discharged free of expense to Owner, while under Owner's/Master's direction and supervision which includes, but is not limited to loading and discharging speeds, which at all times remain the sole responsibility of the Owner and Master.

B.    Subject to the provision of this Contract the Owner and Master shall be responsible for:-

(a)     the declaration of cargo quantity to be loaded within the range specified

(b)     nominating the hatch loading sequence with quantities in each hold; and

(c)     the calculation and determination of each vessel's drafts at Port of Loading and Discharging Port(s) but always subject to any limitations and restrictions at those ports; and

(d)     maintaining a seaworthy trim and condition of each vessel at all times.

C.  (a)    Cargo shall be loaded at an average rate of 50,000 WMT at Dalrymple Bay or 40,000 WMT at Newcastle NSW per weather working day of twenty four [24] consecutive hours or pro rata for part thereof, Saturdays, Sundays and Holidays included, irrespective of size of cargo.

(b)    Cargo shall be discharged at an average rate of 25,000 WMT per weather working day of twenty four [24] consecutive hours or pro rata for part thereof,

Saturdays, Sundays and Holidays included, irrespective of size of cargo, for Rotterdam discharge.

(c)   The above loading and discharging terms have been calculated on the basis of all the vessel's hatches being available for loading and discharging when and as required by Charterer.



D.   Owner shall provide and maintain in good working order vessel's lights for loading and discharging.

## 15. PRESENTATION OF NOTICE OF READINESS

At Port of Loading or Discharging Port(s)

NOR for loading and discharging is to be tendered any time day or night Saturdays, Sundays or holidays included, by the Master or the vessel's agent, to and be accepted, by the shipper or consignee or their nominated agent after the vessel is anchored as directed by port authorities and provided the vessel is in all respects ready to load or discharge, as the case may be.

NOR may be tendered whether the vessel is in berth or not, whether in free pratique or not, whether in customs clearance or not, but in case the vessel is an ore/oil or ore/bulk/oil carrier the Master must possess a valid gas free certificate (as Owner provides for in paragraph 4B(g)) and present same as required by the Port/Harbour Authority or berth operator.

In the event that free pratique and /or customs clearance is not granted, or the vessel is not ready in all respects to load or discharge the previously tendered NOR shall be deemed null and void and a new NOR shall be tendered when the vessel has complied with the aforementioned conditions.

If Master or vessel's agent fails to tender NOR by the cancelling date pursuant to Clause 11, Charterer may at its option and without prejudice to Owner's obligations under this Contract, treat the vessel's nomination as cancelled and the voyage unperformed.

## 16. COUNTING OF LAYTIME

The measure of Laytime shall be a weather working day of twenty four [24] consecutive hours or pro rata for part thereof, Saturdays, Sundays and Holidays included/excluded as the case may be.



A.   At Loading Port

(a)   Laytime shall commence running twelve (12) hours after a valid NOR has been accepted in accordance with Clause 15, or when loading commences whichever occurs first.

(b)   Time used for draft checks during the course of loading shall not count as laytime whether the vessel is already on demurrage or not.

(c)   Laytime shall cease on completion of loading.

B.  At Discharging Ports

    (a)  Laytime shall commence running twelve (12) hours after valid NOR has been accepted in accordance with Clause 15, or when discharging commences whichever occurs first.

    (b)  Time used for draft checks during the course of discharge shall not count as laytime whether the vessel is already on demurrage or not.

    (c)  Laytime shall cease on completion of discharge, but any extra time used solely for Charterer's draft survey shall count as laytime.

C.  At Port of Loading and Discharging Port(s)

    (a)  Time used in the first shift of the vessel from any waiting place to the berth shall not count as laytime whether the vessel is already on demurrage or not. Cost of the first shift shall be for Owner's account.

    (b)  Time used in shifting directly between berths at Charterer's request shall count as laytime and all costs thereof shall be for Charterer's account.

    (c)  If the Charterer orders the vessel to discharge at two ports, time shall not count from the time of completion of discharge at the first port until arrival of the vessel at the second port, whether in berth or not, or when discharge resumes, whichever occurs first. Shifting time from waiting place to berth in the second port is not to count at as laytime.

    (d)  If either the Master or the Port Authority shall for any reason whatsoever order the vessel out of a berth, time shall not count from the cessation of loading or discharging, whichever is applicable, until the vessel is again in the berth ready to resume loading or discharging, whether the vessel is on demurrage or not.

D.  Any time lost during loading or discharging due to the vessel's inability to load or discharge at the rates set out in sub-clause 14C or due to any other defect and/or default in the vessel, deficiency and/or default of vessel's personnel, including inability of the vessel to ballast or deballast at a rate commensurate with the respective loading or discharging rate, then such time lost shall not count as laytime. Any time lost by the vessel in obtaining gas free clearance, either directly or consequentially, shall be for Owner's account, whether the vessel is already on demurrage or not.

E.  Laytime shall not be reversible.

F.  Laytime permitted at Port of Loading and Discharging Port(s), shall be calculated on the Bill of Lading quantity.

## 17. FORCE MAJEURE EXCEPTIONS

A.    Charterer shall be under no liability to Owner for any delay or failure in the performance of any of its obligations under this Contract nor shall laytime count, nor shall any other time thereby lost count against Charterer whether the vessel is already on demurrage or otherwise, if such delay or failure is due to or results directly or indirectly from war, or the anticipated imminence thereof, between any nations; restraint of rulers, governments or peoples; legislation, decrees, orders, regulations or the like by government of the country of shipment or discharge or any port or waterway where the vessel may from time to time be, or of the vessel's flag; inability to obtain export or import licenses; blockade, sanctions, civil commotion, political disturbances, revolution, revolt or riot, strikes, boycott, lock-outs, industrial disturbances or any effects whatsoever thereof; combinations of seamen or workmen; blockages or obstructions in the loading or discharging port(s), the navigation channels or approaches;    accidents or stoppages, mechanical or electrical breakdowns, whether total or partial, at mines, ports, railways, roadways, waterways, ropeways or other means of transport; epidemics, quarantine, acts of God, inclement weather (including but not limited to drought, frosts, tropical revolving storms, high winds, floods, snow, storms, heavy rain, tempests or washaways); congestion at the Port of Loading or Discharging Port(s) resulting from any of the above causes; or any other event or occurrence of any nature or of any kind whatsoever beyond the reasonable control of Charterer, including any delay or failure resulting directly or indirectly from the consequences of such event or events after they have ceased to operate.

B.    In the event of an occurrence of Force Majeure under sub-clause 15A, affecting or likely to affect the performance of any of Charterer's obligations herein, Charterer shall give prompt notice thereof to Owner and shall, if required, and upon reasonable notice, give to Owner in writing particulars of the relevant event, together with such supporting evidence as is reasonably available.

C.    In the event of an occurrence of Force Majeure as aforesaid affecting the performance of any of Charterer's obligations herein, Charterer shall take reasonable steps to minimise any delay or effect of Force Majeure and make good and resume with the least possible delay compliance with any obligation affected.    Charterer, whilst having contractual commitments to other owners and operators of other vessels in the Loading Port may be directed by the Port Authority to allocate berths and cargo at that port, and accordingly, Charterer shall not be bound to give to Owner any precedence over any other vessel.

## 18. DEMURRAGE/DESPATCH

At Loading and Discharging Port(s)

A.    Charterer shall pay to Owner demurrage at the rate of $ 25,000 per day of twenty four [24] consecutive hours and pro rata for part thereof for all time used in excess of laytime allowed.

B.    Owner shall pay to Charterer despatch money at the rate of $ 12,500 per day of twenty four [24] consecutive hours and pro rata for part thereof for all laytime saved.

C.  Demurrage and/or Despatch, if any, shall be settled within 14 days of completion of discharge.

## 19. COVERING AND UNCOVERING OF HATCHES

A.  All time and expenditure relating to the covering and uncovering of hatches shall be for Owner's account.

B.  The Master shall cover the hatch(es) of each hold as soon as loading into that hold has finished.

C.  If weather is inclement or wet the Master shall have all hatches closed when loading or discharging has finished for the day.

D.  During rain and/or snow and/or high wind the Master shall cover up all hatches into or from which loading or discharging is not in progress.

## 20. OVERTIME

Overtime expenses are to be paid by the party ordering same, except for overtime expenses for the vessel's officers and crew, which shall be borne by Owner. Should overtime work be ordered by Port Authorities or outside bodies, extra expenses shall be shared equally between Charterer and Owner.

## 22. STEVEDORE DAMAGE

Stevedores, although appointed by Charterer, shipper or receiver(s) or their agents, shall be under the direction and control of the Master. Charterer, shipper or receiver(s) shall not be responsible for the act and default of the stevedores at Loading and Discharging Ports.

All claims for damage allegedly caused by stevedores shall be settled directly between Owner and stevedores at the Loading and/or Discharging Port.

Neither the Charterer nor stevedores shall be responsible for fair wear and tear commensurate with the nature of the trade.

Owner or Master shall give written notice to stevedores of damage claimed not later than twentyfour [24] hours after occurrence.

## 22. LIGHTERAGE AND LIGHTENING

Charterer has the option of discharging into lighters and/or otherwise lightening the vessel if it so requires; the time and expenses thereof shall subject to Clause 5, be for Charterer's account and time so used to count as laytime.

Otherwise all other terms, conditions and exceptions of this Contract shall apply to lighterage and lightening.

## 23. PORT CHARGES, DUES AND TAXES

Any taxes (including any goods and services taxes, or freight tax), dues, port charges or other charges levied against the vessel and/or freight payments or added to any fees, levies or charges levied against the vessel shall be for Owner's account.

Any taxes, dues or other charges levied against the cargo shall be for the Charterer's account.

## 24. AGENCY AND DISBURSEMENTS

At load/discharge ports, the vessel(s) shall be consigned to agents nominated by the Charterer.

Agency fees as customary shall be for Owners' account. Owners undertake to provide the nominated agents with funds sufficient to cover vessel(s) disbursements prior to arrival at the respective ports and acknowledge that pursuant to Charterers' worldwide agency arrangements, Charterers' may receive appointment fees from the nominated agents, which shall be for Charterers' benefit.

## 25. BILLS OF LADING

All Bills of Lading issued in respect of the shipment of cargo under this Contract shall be in the Standard "CONGENBILL" bill of lading form, Edition 1994 and any subsequent modification thereof. On completion of loading:

A. the Master or Owner's agent shall sign and issue on demand Bill(s) of Lading as presented, in strict conformity with Mate's Receipts by Charterer or Shipper without prejudice to this Contract;

B. the Master shall ensure that (i) Mate's Receipts and ii) Bill(s) of Lading signed and issued by the Master or Owner's agent accurately describe the cargo's apparent order and condition. The Owner shall indemnify the Charterer against all consequences or liabilities which may arise as a result of the Mate's Receipts or Bill(s) of Lading inaccurately describing the cargo' apparent order and condition;

C. except where the Charterer is the Shipper of the cargo shipped under this Contract, the Shipper will not be regarded as the Charterer's agent in presenting the Mate's receipt and or Bill(s) of Lading for signature by the Master or Owner's agents;

D. all Bills of Lading issued under this Charter Party are to incorporate the Australian Carriage of Goods by Sea Act 1991 incorporating the Hague-Visby Rules as amended.

## 26. RATE OF FREIGHT AND DISCHARGE

A.   The rate of freight shall be paid as follows:

(a)   US$ 27.50   per WMT FIOST basis  loading at Dalrymple Bay.

(b)   US$ 30.50   per WMT FIOST basis loading at Newcastle, NSW.

B: Full freight to be deemed earned on completion of loading whether or not the vessel and/or cargo is subsequently lost, and shall be paid on the loaded weight as determined by a joint draft survey made by the Master of the vessel and Charterer's nominated surveyor, which quantity will be incorporated in the Bill(s) of Lading. The cost of Charterer's nominated surveyor is to be for Charterer's account.

## 27. PAYMENT OF FREIGHT

A.   Freight shall be remitted telegraphically by Charterer through its bank to Owner's nominated bank account, ninety percent [90%] for value within five [5] banking days after signing Bill(s) of Lading, but in any case before breaking bulk, on Bill(s) of Lading quantity, non-returnable, ship and/or cargo lost or not lost. Freight shall be deemed paid when Charterer gives to its bank written instructions to make the appropriate remittance and Owner acknowledges any delay in transfer of freight that may thereafter occur, to be outside Charterer's control. The balance of freight together with settlement of despatch and/or demurrage if applicable shall be paid within 30 days of completion of discharge.

B.   Owner's nominated bank account is as follows:

Bank: Skandinaviska Enskilda Banken AB (publ), Oslo Branch
Address: Filipstad Brygge 1,Oslo  Telephone: +47 22 82 70 00
US Dollar acct: 97500442321
IBAN: NO1297500442321
SWIFT : ESSENOKX

in favour of: Golden Ocean Group Limited

C.   Charterer's nominated bank account is as follows:

Bank of America NT and SA
1850 Gateway Boulevard
Concord
San Francisco CA 94520
USA

Swift ID   BOFAUS6S
ABA No. 121000358
Account Name:    Rio Tinto Shipping Pty Limited
A/C No.  62906-28313

## 28. DEADFREIGHT

Under no circumstances shall deadfreight be payable in respect of any voyage performed under this Contract provided Charterer makes available cargo as confirmed under Clause 3.

## 29. ADDRESS COMMISSION

An address commission of one and one quarter per cent (1.25%) shall be payable to Charterers and a brokerage of one and one quarter (1.25%) shall be payable to FEARNLEYS A/S, Oslo on all freight, deadfreight and demurrage.

## 30. WAR RISKS

A.   No Bill(s) of Lading to be signed for any blockaded port and if the Discharging Port(s) be declared blockaded after Bill(s) of Lading have been signed, or if the port(s) to which the ship has been ordered to discharge either on signing Bill(s) of Lading or thereafter be one to which the ship is or shall be prohibited from going by the government of the nation under whose flag the ship sails or by any other Government. Owner shall discharge the cargo at any other port covered by this Contract as ordered by Charterer (provided that such other port is not blockaded or prohibited port as above mentioned) and shall be entitled to freight as if the ship had discharged at the Discharging Port(s) to which she was originally ordered.

B.   The vessel shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or otherwise howsoever given by the government of the nation under whose flag the vessel sails or any department thereof, or any person acting or purporting to act with the authority of such government or any department thereof, or by any committee or person having, under the terms of the War Risks Insurance on the ship, the right to give such orders or directions and if by reason of and in compliance with any such orders or directions anything is done or not done, the same shall not be deemed a deviation, and delivery in accordance with such orders or directions shall be a fulfilment of the contract voyage and the freight shall be payable accordingly.

## 31. EXTRA WAR RISK INSURANCE/WAR BONUS

Charterer shall pay for the additional cost, if any, of any War Risks Insurance premiums on the vessel and for her crew over the rates in effect on the date of this Contract which are necessitated by the trade in which the vessel is employed under this Contract. All War Risk Bonuses paid by Owner to members of the crew, in accordance with the provisions of Owner's Maritime Board agreements, and/or similar agreements in excess of those in effect on the date of this Contract as to the trade in which the vessel is employed under this Contract shall to the extent of the excess (if any) of the rates from time to time prevailing in such trade over those in effect on the date of the commencement of the voyage, be for Charterer's account.

## 32. EXTRA INSURANCE

Subject to Clause 4E any extra cost of insurance payable on cargo due to vessel's age and/or class not being one of the ages or classes included in the Classification Clause

which at the particular time is adopted by the Cargo Underwriters and/or route and/or flag and/or ownership, shall be for Owner's account.

## 33. SECRECY

It is hereby agreed that the terms of this Contract are confidential and that neither party shall disclose any of the terms to any third party unless such disclosure shall be required by law or to give commercial effect to this Contract.

## 34. UNFORESEEN CIRCUMSTANCES

Both Owner and Charterer realise that circumstances may arise which could not have been foreseen at the time this Contract was executed and each agree to use their best efforts to solve any such problems in a spirit of mutual understanding and cooperation.

## 35. ARBITRATION

A.    Any dispute arising out of or in relation to this Contract shall be referred to arbitration in London. A single arbitrator to be appointed by agreement between the parties shall settle the dispute; or, in the event one party fails, in response to the other's notice of appointment, to appoint an arbitrator of its choice; the arbitrator so appointed shall be the sole arbiter of the dispute. If the parties cannot agree upon the appointment of the single arbitrator within fourteen [14] days after service by either of a notice to arbitrate, the dispute shall be settled by two arbitrators, each party appointing one arbitrator and in the event of the arbitrators disagreeing on any matter they shall appoint a third arbitrator.

The arbitrators appointed shall be senior commercial or legal men engaged in the shipping industry. The President for the time being of the London Maritime Arbitrators Association shall upon request of either party appoint an umpire.

B.    The arbitrator(s) shall have an absolute discretion in relation to the apportionment of the costs and expenses of the arbitration between the parties.

C.    The award of the arbitrator, arbitrators shall be a condition precedent to the reference of any dispute to a Court.

D.    The arbitration shall be conducted in London in accordance with the provisions of the LMAA's Rules and shall be commenced within 1 year of the dispute arising or lapse.

## 36. PROPER LAW

This Contract shall in all respects be governed by and construed in accordance with Australian law/ English law and each party expressly submits to the jurisdiction of the Australian Courts / English Courts.

## 37. OIL POLLUTION

Owner agrees to indemnify Charterer, its servants, its agent or any other party against any liability which may be imposed upon them or which they may incur under any statute regulation (or requirement or directive made thereunder) of any nation, state or international organisation regarding liability for pollution of navigable waters by oil by reason of any contravention of such statute, regulation (requirement or directive made thereunder) as aforesaid by the vessel, the Master or by any servant or agent of Owner, provided that such contravention shall not have been caused by the party seeking to be indemnified under this Contact and provided further that the facts and matters giving rise to the contravention do not constitute a defence under Article 3 Section 2 of the International Convention on Civil Liability for Oil Pollution Damage 1969. Owner warrants that the ship is adequately insured at all times for any liabilities arising out of any contravention as aforesaid.

## 38. LIEN

If the vessel is under charter to the Owner then the Owner shall defend, indemnify and hold the Charterer herein harmless from any lien on cargo exercised by the actual/head Owner of the vessel arising from the failure of Owner to discharge its obligations to the vessel's actual Owner under charter. All liability of Charterer shall cease upon completion of loading.

## 39. DRUG AND ALCOHOL CLAUSE

Owner/Disponent Owner undertakes to Charterer that it has guidelines on drug and alcohol abuse applicable to each vessel with the objective that no seafarer will navigate a ship or operate its on-board equipment while impaired by drugs or alcohol and that no seafarer will have the use or possession of or the opportunity to sell or distribute or transport illicit or non-prescribed drugs aboard the vessel. Further, the Charterer expects that the Owner/Disponent Owner exercise due diligence throughout the period of the charterparty to ensure that such guidelines are complied with.

## 40. GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules, 1994, as amended, but where the adjustment is made in accordance with the law and practice of the United States of America, the following Clause shall apply:

### NEW JASON CLAUSE

'In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agent(s) may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.'

Charterer shall ensure that the Bills of Lading issued under this Contract shall contain or by general reference be deemed to incorporate the abovementioned 'General Average and New Jason Clause'.

## 41. BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Contract falls to be determined in accordance with the laws of the United States of America, the following Clause shall apply:-

### BOTH TO BLAME COLLISION CLAUSE

'If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the vessel, the owner(s) of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owner(s) in so far as such loss or liability represents loss of, or damage to, any claim whatsoever of the owners of the said goods, paid or payable by the other non-carrying ship or her owner(s) to the owner(s) of the said goods and set off, recouped or recovered by the other or non-carrying ship or her owner(s) as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the owner(s), operator(s) or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.'

Charterer shall ensure that the Bill(s) of Lading issued under this Contract shall contain or by general reference be deemed to incorporate the abovementioned 'Both to Blame Collision Clause'.

## 42. ICE CLAUSE

A.   Should ice prevent the vessel(s) from reaching Discharging Port(s), Charterer shall have the option of keeping the vessel waiting until the re-opening of navigation on paying demurrage for time thereby lost, or of ordering the vessel to a safe and immediately accessible port (within the range as stated in Clause 24) where it can safely discharge without risk of detention by ice.  Such orders are to be given within forty eight (48) hours after Master or Owner has given notice to Charterer and consignee(s) of the impossibility of reaching the Discharging Port.

B.   If, during discharging the Master, for fear of the vessel being frozen in, deems it advisable to leave, he has the liberty to do so with whatever quantity of cargo he has on board.   Owner shall forthwith give notice to Charterer of the situation. Within forty eight (48) hours after receipt of such notice Charterer shall give notice to Owner in reply nominating an alternate discharge port conforming to the same conditions in sub-clause 40A.

C.   On delivery of the cargo at the alternative discharge port, all conditions of the Contract shall apply and Owner shall receive the same freight as if the vessel had discharged at the original Discharging Port, except that if the distance of the alternative discharge port from the Discharging Port exceeds one hundred (100) nautical miles, Charterer shall pay Owner any extra expenses incurred by Owner due to such alteration of destination.

## 43.  ISPS CLAUSE

    a) In this clause:

        (i)   'CSO' means Company Security Officer;

        (ii)  'ISPS Code' means the International Ship and Port Facility Security (ISPS) Code (as amended from time to time) and the relevant amendments to Chapter XI of the International Convention for the Safety of Life at Sea 1974;

        (iii) SSO' means Ship Security Officer;

        (iv) all words and expressions that are defined in the ISPS Code have the same meanings in this clause, in particular 'the Company', 'Company Security Officer', 'Interim International Ship Security Certificate', 'International Ship Security Certificate', 'Ship Security Officer' and 'Ship Security Plan'.

    b) From the date of coming into force of the ISPS Code in relation to the Vessel and thereafter during the currency of this Contract, Owner shall ensure that both the Vessel and the Company comply at all times with the requirements in the ISPS Code relating to the Vessel and the Company.  Owner shall provide to Charterer:

        (i)     a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) for the Vessel; and

        (ii)    the full style contact details of the CSO.

    c) Except as otherwise provided in this Contract, Owner shall be liable for any loss, damage, expense or delay, which arises from any failure at any time of the Company or the Vessel to comply with the requirements in the ISPS Code (or the taking of any action to meet such requirements) or breach by Owner of any of its obligations in this clause.

    d) Charterer shall provide the CSO and either the SSO or the Master with Charterer's full style contact details and any other information Owner requires to comply with the ISPS Code.  Any delay caused by Charterer's failure to provide information required under this paragraph (d) shall count as Laytime and Charterer must reimburse Owner for any additional costs incurred by Owner, which result directly from Charterer's failure to provide such information.

    e) The Master shall be entitled to tender NOR even if the Vessel is not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code provided that the SSO and the Master believe (having made all reasonable enquiries) that clearance will be granted swiftly in accordance with normal practice and procedure at the port. However, the NOR shall be invalidated if any delay in clearance of the Vessel

arises from any failure at any time of the Company or the Vessel to comply with the requirements in the ISPS Code (or the taking of any action to meet such requirements) or breach by Owner of any of its obligations in this clause.

f) Notwithstanding sub-clause (e), any time lost as a result of security measures imposed by a port facility or relevant authority under the ISPS Code shall not count as Laytime or time on demurrage (unless such lost time was directly caused by Charterer's failure to comply with its obligations in the ISPS Code or this clause), whether the Vessel is on demurrage or not.

g) Notwithstanding anything else contained in this Contract:

Owner and Charterer shall share in equal proportions any additional costs or expenses arising out of, or related to, security regulations or measures required by the port facility or relevant authority under the ISPS Code including security guards, launch services, tug escorts, port security fees or taxes and inspections (provided that if any such additional costs arise solely from either party's failure to comply with the requirements of the ISPS Code or this clause, then that party will be solely responsible for such costs);

Owner shall be responsible for the cost and expense of all measures required by Owner or the Company to comply with the Ship Security Plan.

h) If either party makes any payment, which is for the other party's account according to this clause, the other party shall indemnify the paying party.

## 44.  DEVIATION AND LIBERTIES

The vessel shall have liberty to sail with or without pilots, except where compulsory pilotage is required, to tow or to be towed to deviate from the voyage for the purpose of saving human life, to communicate with a vessel in distress in case lives may be in danger or to avoid danger to the ship or cargo, but for no other purpose whatsoever.

## 45.  COMMUNICATIONS

It is mutually agreed that the English language will be used in notices, letters, telexes and all other means of communication between parties.  In this Contract:

A.   Charterer's address for purpose of service is:
     Rio Tinto Shipping Pty Limited
     Level 35
     55 Collins Street
     Melbourne   Victoria 3000
     Australia
     Facsimile:  +61 3 9283-3316
     Telephone:  +61 3 9283-3311
     operations@riotinto.com

B.     Owner's address for purpose of service is:

Golden Ocean Management AS
P.O.Box 2005 Vika
NO-0125 Oslo, Norway
( visiting address : Bryggegata 3 )

Phone : +47 2201 7340 +47 2201 7349
(direct to Operation Manager Tord Brath)
Mobile: +47 9758 4001 ( Tord Brath )
Fax   : +47 2201 7359

Email : operation@goldenocean.no

Unless otherwise provided, notices hereunder may be given by either party by facsimile, telex, cable or airmail and shall be deemed to have been given at the time they would in normal circumstances be received by the other party.

## 46. AMENDMENTS

Amendments, if any, to the Contract shall be in the form of a properly numbered and executed addendum to the Contract, unless otherwise agreed in writing, telex or facsimile by Charterer.

## 47. INCORPORATED DOCUMENTATION

Any document, letter, fax and/or e-mail created under and with reference to this Contract, is incorporated into and forms part of this Contract, including but not limited to the following:-

a)  Standard Form (Congen) Bill of Lading.
b)  Fixture Note(s)

In case of any conflict between the provisions of any of these documents, letters, faxes and or e-mails and the provisions of this Contract, the provision of this Contract will prevail.

IN WITNESS WHEREOF the parties hereto have signed this Contract as at the date hereinabove mentioned by their respective duly authorised officers or representatives.

CHARTERER:                              OWNER:
RIO TINTO SHIPPING PTY LIMITED          GOLDEN OCEAN GROUP LIMITED


..................................................          ..................................................

**>>< Fearnleys A/S**

## ADDENDUM NO 1.

*Ou*

### TO

### M/V "CMARCH"

### CHARTER PARTY DATED 17TH JANUARY, 2007

It is this day mutually agreed between:

RIO TINTO SHIPPING PTY LIMITED, as Charterer, and GOLDEN OCEAN GROUP LIMITED, as Owner,

That:

The voyage to be performed under this Charter Party shall be converted from a coal cargo, and consist of:

- Minimum 144,000 WMT, maximum 176,000 WMT, exact quantity
  in Owner's option, of lump and/or fines iron ore in bulk,
  excluding DRI/P
- Loading port: Dampier
- Discharging port: Rotterdam
- Laydays/cancelling: 15/25th April, 2007
- Loading/discharging terms: 7 total days Shinc
                             12 hours turntime at loading
                              4 hours turntime at discharging

- Freight rate: USD 21.50 per WMT FIOST

- Routing of laden voyage to be via Suez Canal or Cape of Good Hope,
  in Owners' option.

All other terms and conditions of the Charter Party dated 17th January, 2007 to remain in force.

Oslo, 8th March, 2007

**Owners:**                                          **Charterers:**

**EXHIBIT 12**



## *Monson Agencies Port Congestion Reports*

To access the reports please click on the require report below.

### Total Vessel Congestion
This report details the total number of vessels currently at anchorage or in berth in all Australian **BULK** ports.
It is broken up by vessel size.

### Coal Vessel Congestion Report
This report details the total number of vessels currently at anchorage or in berth in all Australian **COAL** ports.
It is broken up by vessel size.

### Iron Ore Vessel Congestion Report
This report details the total number of vessels currently at anchorage or in berth in all Australian **IRON ORE** ports.
It is broken up by vessel size.

### Wheat Vessel Congestion Report
This report details the total number of vessels currently at anchorage or in berth in all Australian **WHEAT** ports.
It is broken up by vessel size.

### Alumina Vessel Congestion Report
This report details the total number of vessels currently at anchorage or in berth in all Australian **ALUMINA** ports.
It is broken up by vessel size.

**New!**  **Vessel Delays at Coal Ports**
**This new report show the average vessel delay at anchorage prior to loading at all Australian Coal Ports**

**New!**  **Total Vessel Delays at Iron Ore Ports**
**This new report show the average vessel delay at anchorage prior to loading at all Australian Iron Ore Ports**

## *Monson Agencies Port Congestion Graphs*

### Total Vessel Congestion Bar Graph
To view the Bar Graph, click on the Red Tab below titled "Bar Graph"

| Commodity | Coal |
|-----------|------|

| Day Delay | Port Name | | | | | |
|-----------|-----------|----------|---------------|-----------|-----------|-----------|
| Date | Abbot Point | Brisbane | Dalrymple Bay | Gladstone | Hay Point | Newcastle |
| 7/2/2004 | 0 | 2 | 5 | 8 | 4 | 5 |
| 7/9/2004 | 4 | | 5 | 3 | 1 | 3 |
| 7/16/2004 | 0 | | 5 | 7 | 4 | 4 |
| 7/23/2004 | | 0 | 7 | 8 | 4 | 2 |
| 7/30/2004 | 4 | | 8 | 8 | 5 | 4 |
| 8/6/2004 | 2 | | 8 | 8 | 5 | 7 |
| 8/13/2004 | 0 | | 8 | 8 | 5 | 3 |
| 8/20/2004 | 0 | 0 | 10 | 3 | 9 | 8 |
| 8/27/2004 | 2 | | 10 | 3 | 9 | 8 |
| 9/3/2004 | 9 | | 10 | 3 | 9 | 3 |
| 9/10/2004 | 3 | 0 | 12 | 4 | 9 | 4 |
| 9/17/2004 | 3 | | 16 | 4 | 9 | 4 |
| 9/24/2004 | | 0 | 17 | 4 | 11 | 4 |
| 10/1/2004 | 0 | 0 | 17 | 4 | 11 | 10 |
| 10/8/2004 | | | 17 | 4 | 11 | 7 |
| 10/15/2004 | 0 | | 10 | 8 | 8 | 7 |
| 10/22/2004 | 0 | | 10 | 8 | 9 | 5 |
| 10/29/2004 | 2 | | 10 | 9 | 6 | 5 |
| 11/5/2004 | 0 | | 10 | 5 | 4 | 1 |
| 11/12/2004 | 0 | 0 | 10 | 5 | 6 | 4 |
| 11/19/2004 | | 0 | 5 | 6 | 8 | 6 |
| 11/26/2004 | 0 | 0 | 10 | 6 | 8 | 6 |
| 12/3/2004 | 0 | | 10 | 6 | 5 | 5 |
| 12/10/2004 | 0 | | 10 | 6 | 5 | 6 |
| 12/17/2004 | | | 10 | 6 | 4 | 6 |
| 12/24/2004 | | | 10 | 9 | 0 | 8 |
| 12/31/2004 | 6 | | 10 | 10 | 1 | 10 |
| 1/7/2005 | | | 13 | 10 | 2 | 11 |
| 1/14/2005 | 5 | | 13 | 9 | 8 | 8 |
| 1/21/2005 | 3 | 0 | 13 | 3 | 6 | 8 |
| 1/28/2005 | 2 | | 20 | 3 | 6 | 8 |
| 2/4/2005 | 0 | 0 | 23 | 4 | 1 | 5 |
| 2/11/2005 | | 0 | 23 | 2 | 2 | 6 |
| 2/18/2005 | 0 | | 24 | 7 | 3 | 6 |
| 2/25/2005 | 0 | 0 | 24 | 5 | 8 | 10 |
| 3/4/2005 | 0 | | 24 | 5 | 8 | 10 |
| 3/11/2005 | 0 | | 24 | 5 | 6 | 10 |
| 3/18/2005 | | | 25 | 7 | 4 | 8 |
| 3/28/2005 | 1 | | 25 | 6 | 5 | 7 |
| 4/1/2005 | 0 | | 25 | 4 | 8 | 7 |
| 4/8/2005 | | 2 | 25 | 4 | 10 | 8 |
| 4/15/2005 | 1 | 0 | 25 | 2 | 14 | 8 |
| 4/22/2005 | 1 | 1 | 25 | 0 | 14 | 8 |
| 4/29/2005 | | 0 | 22 | 7 | 16 | 3 |
| 5/6/2005 | 0 | | 22 | 4 | 12 | 1 |
| 5/13/2005 | | 0 | 18 | 4 | 10 | 2 |
| 5/20/2005 | 1 | | 15 | 5 | 4 | 4 |
| 5/27/2005 | 0 | | 15 | 6 | 6 | 2 |
| 6/3/2005 | 0 | | 15 | 7 | 2 | 2 |
| 6/10/2005 | 0 | | 15 | 8 | 6 | 4 |
| 6/17/2005 | 0 | 2 | 15 | 8 | 4 | 5 |

| Date | | | | | | |
|---|---|---|---|---|---|---|
| 6/24/2005 | | 2 | 15 | 8 | 4 | 10 |
| 7/1/2005 | 1 | | 15 | 6 | 2 | 11 |
| 7/8/2005 | | | 10 | 8 | 4 | 10 |
| 7/15/2005 | | 0 | 7 | 8 | 0 | 11 |
| 7/22/2005 | | 0 | 10 | 4 | 5 | 11 |
| 7/29/2005 | 2 | | 10 | 3 | 0 | 6 |
| 8/5/2005 | 1 | 0 | 10 | 5 | 0 | 4 |
| 8/12/2005 | 0 | 0 | 7 | 2 | 1 | 3 |
| 8/19/2005 | 2 | | 8 | 0 | 4 | 5 |
| 8/26/2005 | 0 | 0 | 8 | 4 | 4 | 7 |
| 9/2/2005 | | | 8 | 5 | 4 | 7 |
| 9/9/2005 | 2 | | 8 | 5 | 0 | 5 |
| 9/16/2005 | 0 | 0 | 8 | 2 | 3 | 5 |
| 9/23/2005 | 1 | | 8 | 3 | 3 | 6 |
| 9/30/2005 | 0 | | 10 | 0 | 3 | 12 |
| 10/7/2005 | | | 6 | 3 | 4 | 12 |
| 10/14/2005 | 4 | 0 | 7 | 7 | 3 | 10 |
| 10/21/2005 | | 0 | 7 | 2 | 4 | 7 |
| 10/28/2005 | 0 | | 10 | 3 | 4 | 5 |
| 11/4/2005 | 0 | 0 | 10 | 5 | 4 | 0 |
| 11/11/2005 | 1 | 0 | 10 | 2 | 4 | 3 |
| 11/18/2005 | | | 7 | 2 | 2 | 7 |
| 11/25/2005 | 0 | 0 | 5 | 5 | 0 | 8 |
| 12/2/2005 | 0 | | 7 | 9 | 3 | 10 |
| 12/9/2005 | 1 | | 6 | 10 | 3 | 8 |
| 12/16/2005 | 0 | | 6 | 7 | 2 | 6 |
| 12/23/2005 | | 5 | 6 | 8 | 2 | 8 |
| 12/30/2005 | 2 | | 7 | 7 | 7 | 8 |
| 1/6/2006 | 2 | | 7 | 7 | 7 | 11 |
| 1/13/2006 | 1 | | 7 | 7 | 7 | 10 |
| 1/20/2006 | | | 8 | 7 | 7 | 7 |
| 1/27/2006 | 3 | | 3 | 10 | 9 | 7 |
| 2/3/2006 | 1 | 0 | 3 | 10 | 9 | 7 |
| 2/10/2006 | 2 | 0 | 7 | 7 | 8 | 10 |
| 2/17/2006 | | | 5 | 18 | 5 | 8 |
| 2/24/2006 | 6 | | 5 | 18 | 3 | 10 |
| 3/3/2006 | | | 6 | 14 | 4 | 6 |
| 3/10/2006 | | | 6 | 14 | 4 | 5 |
| 3/17/2006 | 1 | | 7 | 14 | 4 | 5 |
| 3/24/2006 | | | 10 | 14 | 10 | 7 |
| 4/3/2006 | | | 6 | 15 | 6 | 10 |
| 4/7/2006 | | | 4 | 15 | 10 | 10 |
| 4/12/2006 | | 0 | 4 | 15 | 7 | 8 |
| 4/21/2006 | 3 | | 5 | 15 | 2 | 5 |
| 4/28/2006 | 3 | | | 9 | 7 | 4 |
| 5/5/2006 | 2 | 0 | 6 | 11 | 4 | 4 |
| 5/12/2006 | | | 10 | 11 | 6 | 2 |
| 5/19/2006 | 0 | | 10 | 11 | 6 | 2 |
| 5/26/2006 | 0 | | 12 | 11 | 3 | 3 |
| 6/2/2006 | | 0 | 12 | 14 | 0 | 2 |
| 6/9/2006 | | | 10 | 15 | 3 | 5 |
| 6/16/2006 | 3 | 0 | 10 | 15 | 6 | 8 |
| 6/23/2006 | 1 | 1 | 10 | 15 | 4 | 8 |
| 6/30/2006 | | | 10 | 13 | 4 | 8 |
| 7/7/2006 | | 0 | 10 | 17 | 1 | 10 |
| 7/14/2006 | 0 | | 10 | 17 | 4 | 7 |

| Date | | | | | | |
|---|---|---|---|---|---|---|
| 7/21/2006 | 3 | | 3 | 17 | 2 | 6 |
| 7/28/2006 | | 0 | 3 | 13 | 8 | 8 |
| 8/4/2006 | 1 | | 8 | 13 | 4 | 6 |
| 8/11/2006 | 0 | 1 | 14 | 14 | 7 | 5 |
| 8/18/2006 | | 1 | 11 | 10 | 3 | 5 |
| 8/25/2006 | 2 | | 10 | 6 | 3 | 7 |
| 9/1/2006 | 0 | 0 | 10 | 6 | 3 | 9 |
| 9/8/2006 | | | 10 | 6 | 3 | 11 |
| 9/15/2006 | | | 10 | 8 | 4 | 11 |
| 9/22/2006 | 0 | | 7 | 7 | 3 | 14 |
| 9/29/2006 | | | 7 | 5 | 2 | 14 |
| 10/6/2006 | 0 | 0 | 7 | 5 | 2 | 14 |
| 10/13/2006 | 6 | | 7 | 7 | 6 | 14 |
| 10/20/2006 | 4 | | 5 | 5 | 78 | 13 |
| 10/27/2006 | | | 7 | 5 | 8 | 13 |
| 11/3/2006 | 0 | | 9 | 6 | 4 | 12 |
| 11/10/2006 | | | 13 | 0 | 4 | 14 |
| 11/17/2006 | | | 10 | 6 | 5 | 17 |
| 11/24/2006 | 0 | | 10 | 6 | 1 | 18 |
| 12/1/2006 | 8 | | 13 | 7 | 2 | 18 |
| 12/8/2006 | | | 11 | 6 | 2 | 18 |
| 12/14/2006 | 4 | | 11 | 6 | 0 | 18 |
| 12/22/2006 | 1 | 0 | 11 | 7 | 3 | 19 |
| 12/29/2006 | 5 | 3 | 11 | 10 | 5 | 19 |
| 1/5/2007 | 10 | | 11 | 10 | 9 | 20 |
| 1/12/2007 | 10 | 0 | 11 | 10 | 8 | 20 |
| 1/19/2007 | 7 | | 11 | 13 | 8 | 20 |
| 1/25/2007 | 7 | 0 | 12 | 13 | 9 | 20 |
| 2/2/2007 | 7 | | 14 | 19 | 12 | 20 |
| 2/9/2007 | 3 | | 17 | 19 | 14 | 22 |
| 2/16/2007 | 8 | | 18 | 19 | 14 | 24 |
| 2/23/2007 | 6 | 0 | 18 | 19 | 18 | 24 |
| 3/2/2007 | 9 | 0 | 24 | 19 | 21 | 25 |
| 3/9/2007 | 10 | | 25 | 19 | 21 | 25 |
| 3/16/2007 | 10 | | 25 | 16 | 21 | 25 |
| 3/23/2007 | 11 | | 26 | 20 | 26 | 26 |
| 3/30/2007 | 13 | 0 | 26 | 14 | 26 | 26 |
| 4/5/2007 | 17 | 0 | 26 | 17 | 17 | 26 |
| 4/13/2007 | 17 | | 27 | 16 | 17 | 26 |
| 4/20/2007 | 12 | | 29 | 16 | 15 | 26 |
| 4/27/2007 | 8 | | 30 | 20 | 12 | 26 |
| 5/4/2007 | 0 | | 30 | 15 | 11 | 26 |
| 5/11/2007 | | | 30 | 17 | 12 | 26 |
| 5/18/2007 | 2 | | 30 | 13 | 11 | 26 |
| 5/25/2007 | | | 30 | 13 | 11 | 24 |
| 6/1/2007 | 1 | 0 | 30 | 15 | 11 | 27 |
| 6/8/2007 | 2 | 0 | 34 | 15 | 11 | 23 |
| 6/15/2007 | 3 | | 33 | 15 | 11 | 30 |
| 6/22/2007 | 6 | 0 | 35 | 16 | 11 | 27 |
| 6/29/2007 | 12 | 0 | 35 | 18 | 10 | 27 |
| 7/6/2007 | 12 | 0 | 37 | 20 | 10 | 30 |
| 7/13/2007 | 20 | | 40 | 20 | 14 | 27 |
| 7/20/2007 | | | 40 | 20 | 15 | 27 |
| 7/27/2007 | 8 | 0 | 35 | 20 | 15 | 29 |
| 8/3/2007 | 8 | | 40 | 15 | 14 | 25 |
| 8/10/2007 | 20 | 0 | 35 | 15 | 12 | 23 |

| 8/17/2007 | 19 | 0 | 36 | 15 | 12 | 21 |
| 8/24/2007 | 15 |   | 36 | 15 | 12 | 20 |
| 8/31/2007 | 7  | 0 | 30 | 15 | 12 | 20 |

**EXHIBIT 13**

## The Baltic Handysize Indices

| Date | HS1 | HS2 | HS3 | HS4 | HS5 | HS6 | 6TC HSI |
|------|-----|-----|-----|-----|-----|-----|---------|
| 6/1/2007 | 22421 | 23107 | 39100 | 39285 | 27436 | 26186 | 28894.625 |
| 6/4/2007 | 22350 | 23043 | 38783 | 38730 | 27614 | 26207 | 28818.5 |
| 6/5/2007 | 22264 | 22936 | 38517 | 38280 | 27807 | 26264 | 28767.375 |
| 6/6/2007 | 22279 | 22936 | 38183 | 37985 | 27843 | 26411 | 28736.375 |
| 6/7/2007 | 22207 | 22850 | 37961 | 37790 | 27829 | 26414 | 28661.75 |
| 6/8/2007 | 22093 | 22729 | 37544 | 37535 | 27700 | 26314 | 28491.125 |
| 6/11/2007 | 21971 | 22571 | 37211 | 37393 | 27560 | 26290 | 28355.75 |
| 6/12/2007 | 21814 | 22414 | 37061 | 37263 | 27529 | 26264 | 28267.25 |
| 6/13/2007 | 21879 | 22343 | 36883 | 37070 | 27443 | 26246 | 28194.125 |
| 6/14/2007 | 21750 | 22229 | 36511 | 36825 | 27407 | 26139 | 28050.875 |
| 6/15/2007 | 21607 | 22164 | 36306 | 36560 | 27336 | 25993 | 27911.875 |
| 6/18/2007 | 21543 | 22079 | 36167 | 36415 | 27221 | 25821 | 27786 |
| 6/19/2007 | 21486 | 21971 | 35956 | 36120 | 27086 | 25700 | 27638.125 |
| 6/20/2007 | 21443 | 21907 | 35767 | 35980 | 27000 | 25639 | 27546.875 |
| 6/21/2007 | 21371 | 21886 | 35694 | 35960 | 27007 | 25664 | 27531.625 |
| 6/22/2007 | 21357 | 21871 | 35683 | 35915 | 27064 | 25681 | 27539.5 |
| 6/25/2007 | 21393 | 21900 | 35689 | 35805 | 27179 | 25736 | 27577.125 |
| 6/26/2007 | 21443 | 22014 | 36006 | 35965 | 27364 | 25864 | 27735.5 |
| 6/27/2007 | 21936 | 22657 | 36311 | 36090 | 27407 | 25936 | 27960 |
| 6/28/2007 | 22300 | 23079 | 36589 | 36260 | 27557 | 26100 | 28192.75 |
| 6/29/2007 | 22589 | 23311 | 36906 | 36453 | 27781 | 26473 | 28470.875 |
| | | | | | | | |
| Monthly | 21880.7619 | 22476.0476 | 36896.5714 | 36937.0952 | 27436.6667 | 26063.9048 | 28148.9524 |

## The Baltic Cape size Indices

| Date | C4 | C7 | C8_03 | C9_03 | C10_03 | C11_03 | Av 4TC |
|------|-----|-----|--------|--------|--------|--------|--------|
| 6/1/2007 | 25.527 | 28.591 | 101795 | 124208 | 90817 | 71542 | 97090.50 |
| 6/4/2007 | 25.764 | 28.668 | 102023 | 125225 | 91625 | 72125 | 97749.50 |
| 6/5/2007 | 25.764 | 28.436 | 100873 | 123821 | 91496 | 71633 | 96955.75 |
| 6/6/2007 | 25.132 | 27.995 | 98341 | 119455 | 88682 | 69545 | 94005.75 |
| 6/7/2007 | 23.955 | 26.95 | 95386 | 113208 | 83892 | 65021 | 89376.75 |
| 6/8/2007 | 23.573 | 26.418 | 93091 | 110042 | 77375 | 62292 | 85700.00 |
| 6/11/2007 | 23.232 | 26.045 | 91682 | 107958 | 76408 | 61383 | 84357.75 |
| 6/12/2007 | 22.273 | 25.023 | 86318 | 102708 | 73258 | 59100 | 80346.00 |
| 6/13/2007 | 21.92 | 24.382 | 83182 | 98542 | 65917 | 55771 | 75853.00 |
| 6/14/2007 | 21 | 23.682 | 80341 | 96167 | 61958 | 53271 | 72934.25 |
| 6/15/2007 | 20.409 | 23.495 | 79227 | 95667 | 61075 | 52313 | 72070.50 |
| 6/18/2007 | 20.255 | 23.523 | 79773 | 96104 | 61438 | 52529 | 72461.00 |
| 6/19/2007 | 20.359 | 23.805 | 81077 | 97708 | 63563 | 53496 | 73961.00 |
| 6/20/2007 | 20.841 | 24.577 | 85977 | 101208 | 67083 | 55408 | 77419.00 |
| 6/21/2007 | 22.5 | 26.173 | 94045 | 109708 | 75708 | 59067 | 84632.00 |
| 6/22/2007 | 24.523 | 27.455 | 100273 | 118917 | 86167 | 65083 | 92610.00 |
| 6/25/2007 | 26.105 | 27.877 | 101955 | 121167 | 89917 | 67875 | 95228.50 |
| 6/26/2007 | 26.409 | 28.195 | 103841 | 122292 | 91125 | 68525 | 96445.75 |
| 6/27/2007 | 26.432 | 29.095 | 108182 | 125833 | 92333 | 69004 | 98838.00 |
| 6/28/2007 | 26.495 | 29.364 | 109545 | 128367 | 93625 | 69567 | 100276.00 |
| 6/29/2007 | 26.473 | 29.45 | 109909 | 129208 | 94079 | 69654 | 100712.50 |
| | | | | | | | |
| last 7 days | 25.5624 | 28.2299 | | | | | |
| Monthly | 23.7591 | 26.6285 | 94611.2381 | 112738.7143 | 79882.9048 | 63057.3333 | 87572.5476 |

**EXHIBIT 14**

## The Baltic Handysize Indices

| Date | HS1 | HS2 | HS3 | HS4 | HS5 | HS6 | 6TC HSI |
|------|-----|-----|-----|-----|-----|-----|---------|
| 5/1/2007 | 24408 | 25208 | 42143 | 41344 | 25710 | 24560 | 29205.375 |
| 5/2/2007 | 24414 | 25179 | 42417 | 41490 | 25864 | 24643 | 29314.25 |
| 5/3/2007 | 24457 | 25186 | 42750 | 42055 | 26225 | 24908 | 29589.25 |
| 5/4/2007 | 24607 | 25343 | 43250 | 42450 | 26388 | 25008 | 29805.25 |
| 5/8/2007 | 24779 | 25514 | 43706 | 42925 | 26871 | 25493 | 30206.5 |
| 5/9/2007 | 24893 | 25679 | 44122 | 43210 | 27129 | 25807 | 30472 |
| 5/10/2007 | 24986 | 25779 | 44506 | 43530 | 27504 | 26111 | 30753.875 |
| 5/11/2007 | 25071 | 25843 | 44817 | 43910 | 27614 | 26164 | 30899.625 |
| 5/14/2007 | 25107 | 25850 | 45050 | 44260 | 27964 | 26536 | 31158.375 |
| 5/15/2007 | 24964 | 25664 | 45328 | 44590 | 28064 | 26682 | 31254.75 |
| 5/16/2007 | 24864 | 25593 | 45572 | 44790 | 28136 | 26800 | 31336.375 |
| 5/17/2007 | 24767 | 25558 | 45583 | 44779 | 28175 | 26861 | 31344.875 |
| 5/18/2007 | 24664 | 25393 | 45650 | 45005 | 28092 | 26692 | 31285 |
| 5/21/2007 | 24543 | 25271 | 45489 | 44985 | 28014 | 26607 | 31191.25 |
| 5/22/2007 | 24307 | 25043 | 45278 | 44810 | 28018 | 26564 | 31075.25 |
| 5/23/2007 | 24071 | 24829 | 44822 | 44170 | 27968 | 26475 | 30847.25 |
| 5/24/2007 | 23721 | 24607 | 43894 | 43595 | 27879 | 26336 | 30530.875 |
| 5/25/2007 | 23450 | 24336 | 42667 | 42530 | 27679 | 26207 | 30094.375 |
| 5/29/2007 | 23243 | 24036 | 41367 | 41530 | 27500 | 26039 | 29656.75 |
| 5/30/2007 | 23000 | 23729 | 40317 | 40505 | 27386 | 26079 | 29310.125 |
| 5/31/2007 | 22557 | 23286 | 39578 | 39860 | 27400 | 26242 | 29070.625 |
| **Monthly** | **24327.2857** | **25091.7143** | **43728.8571** | **43158.2381** | **27408.5714** | **26038.7619** | **30400.0952** |

## The Baltic Cape size Indices

| Date | C4 | C7 | C8_03 | C9_03 | C10_03 | C11_03 | Av 4TC |
|------|-----|-----|-------|-------|--------|--------|--------|
| 5/1/2007 | 31.069 | 30.5 | 111313 | 128625 | 104156 | 81406 | 106375.00 |
| 5/2/2007 | 31.177 | 30.468 | 110455 | 128504 | 104021 | 81288 | 106067.00 |
| 5/3/2007 | 31.068 | 30.305 | 109318 | 128358 | 103479 | 81025 | 105545.00 |
| 5/4/2007 | 31.164 | 30.4 | 109677 | 129025 | 104358 | 82350 | 106352.50 |
| 5/8/2007 | 31.414 | 30.595 | 110836 | 131288 | 105792 | 83354 | 107817.50 |
| 5/9/2007 | 31.736 | 30.718 | 111450 | 132375 | 107617 | 84171 | 108903.25 |
| 5/10/2007 | 32 | 31 | 114164 | 138500 | 109417 | 86313 | 112098.50 |
| 5/11/2007 | 32.332 | 31.273 | 115591 | 141667 | 111417 | 87896 | 114142.75 |
| 5/14/2007 | 32.514 | 31.4 | 115773 | 142417 | 111708 | 88250 | 114537.00 |
| 5/15/2007 | 32.541 | 31.473 | 115773 | 143000 | 109808 | 88300 | 114220.25 |
| 5/16/2007 | 32.182 | 31.468 | 114773 | 143063 | 106792 | 86925 | 112888.25 |
| 5/17/2007 | 31.461 | 31.278 | 114222 | 142750 | 105450 | 85350 | 111943.00 |
| 5/18/2007 | 31.241 | 31.114 | 112955 | 142167 | 104292 | 84000 | 110853.50 |
| 5/21/2007 | 30.814 | 31.182 | 112318 | 141375 | 103500 | 83479 | 110168.00 |
| 5/22/2007 | 30.318 | 30.905 | 110227 | 140900 | 102233 | 82267 | 108906.75 |
| 5/23/2007 | 29.709 | 30.668 | 109000 | 140021 | 101342 | 81208 | 107892.75 |
| 5/24/2007 | 29.035 | 30.14 | 106900 | 137050 | 98200 | 79025 | 105293.75 |
| 5/25/2007 | 28.468 | 29.705 | 105341 | 134375 | 97167 | 77767 | 103662.50 |
| 5/29/2007 | 27.523 | 29.423 | 103573 | 130463 | 96392 | 76154 | 101645.50 |
| 5/30/2007 | 26 | 28.773 | 101227 | 125396 | 93083 | 72925 | 98157.75 |
| 5/31/2007 | 25.6 | 28.541 | 101091 | 123521 | 90775 | 71729 | 96779.00 |
| | | | | | | | |
| last 7 days | 28.0933 | 29.7364 | | | | | |
| **Monthly** | **30.4460** | **30.5395** | **110284.6190** | **135468.5714** | **103380.9048** | **82151.5238** | **107821.4048** |