Michael J. Frevola
Christopher R. Nolan
Lissa D. Schaupp
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR PLAINTIFF
FRONT CARRIERS LTD.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FRONT CARRIERS LTD.,

                    Plaintiff,

          -against-

TRANSFIELD ER CAPE LTD.,

                    Defendant.

07 Civ. 6333 (RJS)

**MEMORANDUM OF LAW OF FRONT CARRIERS LTD.
IN OPPOSITION TO THE MOTION OF TRANSFIELD ER CAPE LTD.
FOR COUNTER-SECURITY PURSUANT TO SUPPLEMENTAL RULE E(7)(a)**

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ..............................................................................................iii

**PRELIMINARY STATEMENT** ......................................................................................1

**STATEMENT OF FACTS**...............................................................................................2

      **A. The COA** ............................................................................................................2

      **B. The Dispute Arises** ...........................................................................................3

      **C. The Expected Length of the C MARCH Voyage** ...........................................4

      **D. The Capesize Market in Europe** ....................................................................5

**TRANSFIELD'S "ADMISSIONS"**..................................................................................5

      **A. Transfield Admits It Made Close to 600% More Per Day On Its
          Mitigating Charter**...........................................................................................5

      **B. Transfield Admits That It Did Not Give FCL Notice At the Time of
          Contracting That It Would Seek To Recover For Positioning Losses** ..........6

**ARGUMENT**....................................................................................................................6

**I.**     **THE COURT HAS BROAD DISCRETION TO REJECT TRANSFIELD'S
        COUNTER-SECURITY REQUEST UNDER SUPPLEMENTAL
        RULE E(7)** ...........................................................................................................6

**II.**    **COUNTER-SECURITY IS NOT WARRANTED BECAUSE TRANSFIELD
        SUFFERED NO DAMAGE CAUSED BY FCL's ALLEGED BREACH BY
        FIXING A MITIGATING VOYAGE DURING THE SAME TIME PERIOD
        AS THE ALLEGED CANCELLED VOYAGE FOR SEVEN TIMES THE
        DAILY HIRE RATE IT WOULD HAVE RECEIVED**......................................9

III.    TRANSFIELD'S DAMAGES CALCULATIONS BASED ON A
        "POSITIONAL VOYAGE" ARE ENTIRELY SPECULATIVE AND
        SHOULD BE DISREGARDED AS A MATTER OF LAW ................................13

   A. Transfield Has Proffered No Evidence of its Potential Voyage Intention
      at the Time of Entering Into the COA ....................................................13

   B. The Positional Voyage Theory Should be Rejected on Equitable Grounds.......16

IV.    TAKING INTO ACCOUNT THE 91 DAYS THAT THE COA VOYAGE
       WOULD CONSUME, TRANSFIELD'S HIGHER CHARTER RATES IN
       EUROPE WOULD FAIL TO MAKE THE EUROPEAN CHARTER
       MORE LUCRATIVE .............................................................................18

CONCLUSION .................................................................................................21

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aaby v. States Marine Corp.,*
 107 F. Supp. 484 (S.D.N.Y. 1951) ......................................................................10

*Abu-Nassar v. Elders Futures Inc.,*
 No. 88 Civ. 7906, 1991 WL 45062 (S.D.N.Y. March 28, 1991)............................12

*Afram Lines Int'l, Inc. v. M/V CAPETAN YIANNIS,*
 905 F.2d 347 (11th Cir. 1990) ...............................................................................7

*Ainesworth Coal & Iron Co. v. Trafikaktiedolaget Grangesberg Oxelosund,*
 287 F. 291 (4th Cir. 1923) ....................................................................................10

*B.F. McKernin & Co. v. U.S. Lines Inc.,*
 416 F. Supp. 1068 (S.D.N.Y. 1976).......................................................................14

*Bassis v. Universal Line, S.A.,*
 436 F.2d 64 (2d Cir.1970).....................................................................................12

*Daeshin Shipping Co. Ltd. v. Meridian Bulk Carriers, Ltd.,*
 No. 05 Civ. 7173, 2005 WL 2446236 (S.D.N.Y. Oct. 3, 2005), *vacated in part on
 other grounds,* 2006 WL 2987056 (S.D.N.Y. Oct. 18, 2006), *rev'd in part on other
 grounds,* 2006 WL 3462120 (S.D.N.Y. Nov. 20, 2006) ..........................................12

*Dalbeattie S.S. Co. v. Card,*
 59 F. 159 (E.D. S.C. 1893) ....................................................................................10

*Dongbu Express Co., Ltd. v. Navios Corp.,*
 944 F. Supp. 235 (S.D.N.Y. 1996) .......................................................... 7, 10-11, 18

*J.J. Moore & Co. v. Cornwall,*
 144 F. 22 (9th Cir. 1906) .......................................................................................10

*Leblond v. McNear,*
 104 F. 826 (N.D. Cal. 1900) ..................................................................................10

*Marathon Int'l Petrol. Supply Co. v. I.T.I. Shipping, S.A.,*
 766 F. Supp. 130 (S.D.N.Y. 1991) .........................................................................10

*Playboy Enters. v. Public Serv. Comm'n,*
 906 F.2d 25 (1st Cir. 1990)......................................................................................9

*Result Shipping Co. v. Ferruzzi Trading USA Inc.,*
   56 F.3d 394 (2d Cir. 1995)...........................................................................7-8

*Smith v. McGuire,*
   5 Hurl. & N. 544 ........................................................................................10

*Stump v. Gates,*
   211 F.3d 527 (10th Cir. 2000) .......................................................................9

*Texaco Panama, Inc. v. Sun Oil Co. of Pa.,*
   572 F. Supp. 982 (E.D. Pa. 1983) .................................................................10

*The Lake Pachuta,*
   56 F.2d 627 (S.D.N.Y. 1930), *aff'd* 60 F.2d 876 (2d Cir. 1932)...........................16

*Thomas v. Roach,*
   165 F.3d 137 (2d Cir. 1999).............................................................................9

*Titan Navigation, Inc. v. Timsco, Inc.,*
   808 F.2d 400 (5th Cir. 1987) .......................................................................7-8

*Trademark Research Corp. v. Maxwell Online, Inc.,*
   995 F.2d 326 (2d Cir. 1993)..........................................................................14

*Ullises Shipping Corp. v. Fal Shipping Co. Ltd.,*
   415 F. Supp. 2d 318 (S.D.N.Y. 2006).............................................................12

*U.S. Maritime Services, Inc. v. Trade Ventures, Inc., No. CIV. A. 98-0499,*
   1998 WL 388669 (E.D. La. July 8, 1998) .......................................................15

*Washington-Southern Navigation Co. v. Baltimore & Philadelphia Steamboat Co.,*
   263 U.S. 629 (1924)........................................................................................8

*Weeks Marine, Inc. v. John P. Picone, Inc.,*
   No. 97 Civ. 9560, 1998 WL 717615 (S.D.N.Y. Oct. 14, 1998) ...........................10

*World Reach Shipping v. Indus. Carriers Inc.,*
   No. 06 Civ. 3756, 2006 WL 3316828 (S.D.N.Y. Nov. 9, 2006) ...........................12

## STATE CASES

*Charles E. McCloud, Inc. v. R.B. Hamilton Moving & Storage,*
      89 A.D.2d 863, 453 N.Y.S.2d 251 (1st Dep't 1982)........................................................ 13-14

## OTHER AUTHORITIES

*Hadley v. Baxendale,* 9 Exch. 341, 156 Eng. Rep. 145 (1854)......................................................13

*In re Chia May Navigation Corp. and Seatrek Ltd.,*
      SMA No. 3546 (July 30, 1999)...............................................................................10

*In re Norelf Ltd. and Georgia Gulf Corp.,*
      SMA No. 2778 (July 18, 1991)...............................................................................11

*In re Precious Capitals Ltd. and Transworld Cargo Carriers S.A.,*
      SMA No. 3811 (Nov. 3, 2003) ...............................................................................11

*In re Seamblem Marine Ltd. and Jahre Ship Serv. A/S,*
      SMA No. 3053 (March 7, 1994)..............................................................................13

*Star S.S. Soc'y v. Beorgradska Plovidba* [1988] 2 Lloyds' Rep. 583, 587-88 ...............................10

## MISCELLANEOUS

Fed. R. Civ. P. 44.1 .........................................................................................................................12

James W. Moore et al., *Moore's Federal Practice* (2d ed. 1996)) ............................................7, 18

Restatement (Second) of Contracts (1981) ....................................................................................14

3 Dan B. Dobbs, *Law of Remedies* (1992)....................................................................................14

Supp. Adm. R. E(7)....................................................................................................................... 6-7

**PRELIMINARY STATEMENT**

Defendant Transfield's application for an order directing plaintiff Front Carriers Ltd. ("FCL") to post counter-security on Transfield's counter-claim is extraordinary. Transfield seeks security for a counter-claim when it suffered no damages. Transfield *admits* both in its counter-claim and its counter-security application two facts which collectively support a finding, as a matter of law, that Transfield's mitigation charter of the M.V. C MARCH (after FCL's alleged breach) garnered revenues far exceeding those it would have earned under its contract of affreightment ("COA") with FCL:

1. The extrapolated COA equivalent daily rate of $8,000 daily for 60 days (the agreed length of the fourth voyage under the COA), equals a total revenue of $480,000.

2. The mitigating charter of the C MARCH to non-party Swissmarine was at a rate of $55,000 daily for 5-7 months. The $55,000 daily rate, calculated at the length of the fourth COA voyage with FCL (60 days), equals a total revenue of $3,300,000.

Transfield's revenues during the minimum charter period were therefore seven times the amount it would have made under the COA with FCL for the fourth shipment. Far from suffering any damage, Transfield benefited handsomely from the alleged breach due to the remarkable rise in the dry bulk cargo vessel market.[1] Because Transfield suffered no damage, the Court should exercise its broad discretion and deny Transfield's counter-security request.

Should the Court not end the counter-security inquiry here and consider Transfield's argument, that it was damaged not because it made less on the substitute charter, but rather that it could have made even more at a later date, this argument must fail as a matter of law under

---

[1]    Indeed, FCL's claims against Transfield allege that Transfield intentionally sabotaged FCL's efforts to employ Transfield vessels for the last two voyages contemplated by the Parties' COA in order to cash-in on this market. *See* Attorney Declaration of Nancy R. Peterson dated Oct. 5, 2007 ("Peterson Decl."), Ex. 1 (FCL Am. V. Compl.), ¶ 25.

traditional doctrines of forseeability associated with consequential damages claims. The $5+ million claimed hinges on profits predicated on a "positioning voyage," of which Transfield gave FCL no notice. Indeed, Transfield has introduced no proof of its purported positioning intention at the time the COA was entered in August 2005 or that it conveyed that intention to FCL at the time of contracting. Transfield's failure to address these issues at the time of contracting makes its damages claim both entirely unforeseeable and speculative. Well-settled precedent makes clear that such claims are not entitled to counter-security.

Moreover, Transfield's positioning voyage argument is equitably deficient because Transfield failed to accept the mitigating voyage offered by FCL which would have put the C MARCH in the exact positioning voyage circumstances that Transfield claims it desired.

Transfield's damages claim suffers one last critical defect: once Transfield's obligations under the COA and the realities of the Australian port congestion are taken into account, Transfield simply would not have earned as much after being repositioned to the European market as it is on the Swissmarine charter. Transfield's reliance on the wrong market period data led to an exaggerated claim which cannot be supported factually or legally.

In all, Transfield's counter-security request is not well-founded and the Court should exercise its discretion and deny it *in toto*.

## STATEMENT OF FACTS

### A.    The COA

FCL entered into a five voyage contract of affreightment with Transfield (the "COA") for the purpose of fulfilling its own lifting requirements under a separate contract of affreightment with a third-party charterer. Affirmation of Jon Flaaten dated Oct. 19, 2007 ("Flaaten Aff."), ¶ 5. Although early liftings under the COA were carried out without incident, the daily hire rates for

170,000 dwt (deadweight ton) Capesize bulk cargo vessels (such as the type to be employed by FCL under the COA) increased drastically during the charter period. *Id.* ¶¶ 9-10. Average rates for a Capesize bulker similar to the types of vessels to be nominated under the COA more than tripled during this period. *Id.* ¶ 10 & Ex. 2.

**B.    The Dispute Arises**

A dispute arose between the parties as to the fourth lifting under the COA, with Transfield insisting on presenting its vessel in March 2007. *See id.* ¶¶ 11-17. FCL accepted the vessel, reserving its right to claim for wrongful nomination, in an effort to mitigate its damages by making a profit on a voyage using that vessel. *Id.* ¶ 17. The name of the vessel presented by Transfield for March 2007 was the "C MARCH." *Id.*

After Transfield insisted on presenting the C MARCH, FCL entered the market and obtained a cargo for the C MARCH. *Id.* ¶ 18. On January 12, 2007, FCL e-mailed Transfield for a rate quote for loading at Dalrymple Bay or Newcastle, Australia and discharging at Moneypoint, (Ireland), Taranto (Italy), or Dunkirk (France). *Id.* & Ex. 8. The loading ports and Dunkirk were specifically listed in the COA as contemplated ports. *Id.* ¶ 18. The COA further allowed charterers to request alternative ports within an agreed range; Moneypoint was within that range. *Id.* The COA also included mechanisms to calculate a rate for Taranto. *Id.* FCL spent several days attempting to confirm that Transfield would accept the ports proposed, in response to which Transfield steadfastly objected to FCL's right to nominate the requested ports. *Id.* ¶ 18 & Exs. 9-10.

On January 17, 2007, FCL concluded a fixture with charterer Rio Tinto for the voyage charter of the C MARCH. *Id.* ¶ 19 & Ex. 11. Despite FCL's agreeing to employ the C MARCH and obtaining a cargo for the C MARCH, Transfield rejected FCL's multiple attempts to propose

3

European discharge ports and refused to present the C MARCH for loading.  *Id.* ¶ 20.  One possible reason for Transfield's rejection of FCL's ports was because Transfield chartered the C MARCH to Swissmarine before FCL had concluded its discussions with Transfield as to the relevant discharge and loading ports.  *See id.* ¶ 21.  While this issue could be resolved if Transfield had filed the Swissmarine charter party (or fixture recap) with its counter-claim – a counter-claim it had contemplated for over two months prior to filing – or had produced a copy of these documents at FCL's attorney's request, Transfield has not introduced the Swissmarine charter.  Affidavit of Michael J. Frevola dated Oct. 19, 2007 ("Frevola Aff."), ¶ 9.

## C.    The Expected Length of the C MARCH Voyage

Transfield and FCL agree that the voyage of the C MARCH from the East Coast of Australia (Dalrymple Bay) to continental Europe should have lasted about 60 days.  Flaaten Aff., ¶ 23.  Transfield then assumes – solely through the vehicle of an attorney declaration – that the C MARCH would have been available for charter from continental Europe "around May 10, 2007."  *Id.* ¶ 24.  This assumption only could be plausible mathematically if the C MARCH could have loaded immediately on March 10 and then sailed for Europe.  *Id.*

Transfield's assumption that the C MARCH could have immediately loaded and departed, however, fails to account for a known and continuing condition at Dalrymple Bay.  *Id.* ¶ 25 & Ex. 12.  There was a 25-day loading delay at Dalrymple Bay that was in effect in March 2007.  *Id.*  These loading delays have been standard in Australian ports such as Dalrymple Bay for the last several years, as reference to numerous industry sources reveal.  *Id.*  Indeed, the delays were recently reported in Lloyds List, perhaps the largest periodical in the maritime industry.  Frevola Aff., ¶ 3 & Ex. 1.  Transfield also fails to account for the six days of free laytime agreed by the parties under the COA.  *Id.*, Ex. 1 (COA), Rider Clause 8.

4

Using the agreed March 10-25 loading window at Dalrymple Bay as a benchmark, and then applying the agreed 60-day voyage estimate and the well-documented 25-day loading delay, the discharge window in Europe was June 4-19, 2007 rather than the "around May 10, 2007" estimate claimed by Transfield. Flaaten Aff., ¶ 26.

### D.    The Capesize Market In Europe

Transfield's attorney's declaration also claims that the C MARCH could have "probably" been chartered for $107,300 per day once it arrived in Europe after it completed its voyage from Australia. *Id.* ¶ 27. This statement does not reflect the 170,000 dwt Capesize market during the time period from June 4 through June 19, 2007. *Id.*

On June 19, 2007, the daily charter hire rate for a 3-5 month time charter was $73,961.00. *Id.* ¶ 28 & Ex. 13. On June 4, 2007, the daily charter hire rate for a 3-5 month time charter was $97,749.50. *Id.* Taking an average of the figures encompassing this period, the average daily hire rate for a 3-5 month time charter was $82,980.93. *Id.*

In contrast, the $107,300 per day rate referred to in Ms. Peterson's Declaration concerns a short and explosive spike in the European dry bulk market that occurred in mid-May 2007. *Id.* ¶ 29 & Ex. 14. The brief period of remarkably high daily rates had concluded before the end of May 2007 and rates in June 2007 were more consistent with normal rates. *Id.*

### <u>TRANSFIELD'S "ADMISSIONS"</u>

### A.    Transfield Admits It Made Close to 600% More Per Day On Its Mitigating Charter

Transfield candidly admits that it made $55,000 per day on the substitute Swissmarine charter of the C MARCH where it only would have made an $8,000 per day equivalent on the C MARCH under the COA. *See* Peterson Decl., ¶¶ 24-26. Thus, Transfield admits that its

counter-claim seeks to recover an additional windfall, rather than to recover for damages resulting from lesser earnings made during the COA's charter period as a result of FCL's breach.

**B.    Transfield Admits That It Did Not Give FCL Notice At the Time of Contracting That It Would Seek To Recover For Positioning Losses**

Transfield's attorney's declaration also tacitly concedes that Transfield did not convey to FCL at the time of the parties' contracting that Transfield intended to use COA voyages as "positioning" voyages.    Rather, according to Transfield's own submission, "*[Transfield] considered* these voyages as positioning voyages" and "the voyages [under the COA] *represented to [Transfield]* positioning voyages." Peterson Decl., ¶¶ 23, 34 (emphasis added). There is no showing whatsoever that Transfield placed FCL on notice at the time of contracting, in a market that was significantly depressed compared to Transfield's counter-claim in this proceeding, and that Transfield later would seek to hold FCL liable for approximately over $100,000 per day for a several month charter period.

## ARGUMENT

### POINT I

### THE COURT HAS BROAD DISCRETION TO REJECT TRANSFIELD'S COUNTER-SECURITY REQUEST UNDER SUPPLEMENTAL RULE E(7)

Transfield's memorandum of law contends that it is entitled both substantively and equitably to counter-security under Rule E(7)(a) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule E(7)") because: (a) its counter-claim arose from the same transaction and occurrence that is the subject of FCL's affirmative claim and (b) FCL has obtained security against Transfield. (Moving Mem. at 5-6). Counsel for Transfield went so far as to claim that the imposition of counter-security is *automatic* under Rule E(7). *See* Frevola Aff., Ex. 2 (Hearing Transcript, October 10, 2007 pre-

6

motion conference) ("Hrg. Tr."), at 2:20-22.  Transfield errs in both respects.  It is well-settled that the Court has broad discretion both in determining whether to order counter-security and also in the amount to be posted.  Here, Transfield is not entitled to counter-security because it has not incurred any damages.

> Rule E(7)(a) provides in relevant part:

> When a person who has given security for damages in the original action asserts a counterclaim that arises from the same transaction or occurrence that is the subject of the original action, a plaintiff for whose benefit the security has been given must give security for damages demanded in the counterclaim unless the court for cause shown, directs otherwise.

Fed. R. Civ. P. Supp. R. E(7)(a).

While this rule's initial language makes it appear that the posting of counter-security is mandatory whenever its conditions are satisfied, "the final clause of the quoted language makes clear that the trial court possesses broad discretion in deciding whether to order counter-security under such conditions." *Result Shipping Co. v. Ferruzzi Trading USA Inc.*, 56 F.3d 394, 399 (2d Cir. 1995) (citing *Afram Lines Int'l, Inc. v. M/V CAPETAN YIANNIS*, 905 F.2d 347, 349 (11th Cir. 1990); *Titan Navigation, Inc. v. Timsco, Inc.*, 808 F.2d 400, 403 (5th Cir. 1987); 7A James W. Moore et al., *Moore's Federal Practice* ¶ E.15, at E-756 (2d ed. 1995)).

Indeed, a case Transfield heavily relied on at the pre-motion conference before the Court (Hrg. Tr. 24:12-21), *Dongbu Express Co., Ltd. v. Navios Corp.*, 944 F. Supp. 235 (S.D.N.Y. 1996), supports FCL's position.  In *Dongbu Express*, even though the defendant had satisfied Rule E(7)'s technical requirements, Judge Scheindlin recognized that "the trial court possesses broad discretion in deciding whether to order counter-security." *Id.* at 239 (citing cases).  In exercising this discretion, Judge Scheindlin noted two countervailing principles would guide her analysis:

The Second Circuit has held that the following countervailing principles should guide the court in exercising its discretion: (1) "[placing] the parties on an equality as regards security," *Titan Navigation, Inc. v. Timsco, Inc.*, 808 F.2d 400, 403 (5th Cir. 1987) (quoting *Washington-Southern Navigation Co. v. Baltimore & Philadelphia Steamboat Co.*, 263 U.S. 629, 638-39 . . . (1924)); and (2) avoiding the imposition of burdensome costs on a plaintiff that might prevent it from bringing suit. *Result Shipping v. Ferruzzi Trading*, 56 F.3d 394, 399 (2d Cir. 1995).

*Id.* Here, although FCL certainly would find the imposition of over $5 million in counter-security costs burdensome, the key inquiry concerns the first element of the inquiry employed by Judge Scheindlin. The circumstances of both parties are not equal. FCL has submitted detailed documentary proof of millions of dollars actually paid to FCL to cover for voyages that Transfield contractually obligated itself to perform.

Transfield, on the other hand, has failed to sufficiently support its counter-claim in the following respects:

- Its counter-claim failed to attach any documents, let alone the charter for the mitigating voyage;

- The declaration in support of its memorandum of law was executed by counsel, not Transfield, meaning the Court and FCL are relegated to relying on facts and market data proffered to counsel without the imposition of penalty or perjury;

- There is no declaration from a broker or market expert assessing the rates at the time of the alleged breach; and

- No expert on French law was initially provided to assess issues under the law agreed upon in the COA, though Transfield belatedly agreed to provide expert reports in its reply. (Hrg. Tr. at 21:16-18; 25:5-8).[2]

---

[2]    Moreover, under well-settled procedure, Transfield should not be allowed to buttress its application through submissions accompanying its reply papers, but rather only rebut arguments made by FCL. *See, e.g., Thomas v.*

8

Simply put, FCL and Transfield are not on equal footing with respect to both the factual and legal bases for their respective claims, even applying the "reasonable estimate" of damages standard espoused by Transfield's counsel. (Hrg. Tr. at 24:12-15). FCL has sustained tangible out of pocket losses; Transfield in contrast has claimed that it should have profited even more than it did. As a result, the parties should not be deemed to be on equal grounds with respect to the entitlement of security. Accordingly, this Court should exercise its discretion and deny Transfield's counter-security request for the reasons stated more fully below.

## POINT II

### COUNTER-SECURITY IS NOT WARRANTED BECAUSE TRANSFIELD SUFFERED NO DAMAGE CAUSED BY FCL's ALLEGED BREACH BY FIXING A MITIGATING VOYAGE DURING THE SAME TIME PERIOD AS THE ALLEGED CANCELLED VOYAGE FOR SEVEN TIMES THE DAILY HIRE RATE IT WOULD HAVE RECEIVED

Assuming *arguendo* that FCL did breach its obligations under the COA with respect to the fourth voyage, and accepting Transfield's allegations concerning its mitigating charter to Swissmarine as true, Transfield experienced a windfall, not a loss. Although Transfield creatively argues that it would have profited *even more* had FCL performed, Transfield's argument is not the proper measure of damages under the laws of the United States and France.

A century ago, the Ninth Circuit stated the well-settled principle that breach of charter damages focus on the difference between the charter's hire rate and *the amount actually earned during the period required for performance*:

---

*Roach*, 165 F.3d 137, 146 (2d Cir. 1999) (refusing to consider appellant's argument because it was "raised for the first time in his reply brief.") (citations omitted). Should Transfield attempt to buttress its application with affirmative proof submitted with its reply papers (such as actual support for its damages claim or evidence of its purported right to claim under French law), that submission either should be stricken or FCL should be entitled to a sur-reply. *See, e.g.*, *Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000); *Playboy Enters. v. Public Serv. Comm'n*, 906 F.2d 25, 41 (1st Cir. 1990).

> The measure of [the shipowner's] damages is the net amount that would have been earned by the vessel under the charter sued on, less the net amount earned, or which might with reasonable diligence have been earned, by the vessel during the time required for the performance of the voyage named in the charter party.

*J.J. Moore & Co. v. Cornwall*, 144 F. 22, 32 (9th Cir. 1906) (citing *Leblond v. McNear*, 104 F. 826 (N.D. Cal. 1900), *aff'd*, 123 F. 384 (9th Cir. 1903); *Smith v. McGuire*, 5 Hurl. & N. 544; *Dalbeattie S.S. Co. v. Card*, 59 F. 159 (E.D.S.C. 1893)); *see also Ainesworth Coal & Iron Co. v. Trafikaktiedolaget Grangesberg Oxelosund*, 287 F. 291, 296 (4th Cir. 1923); *accord Aaby v. States Marine Corp.*, 107 F. Supp. 484, 486 (S.D.N.Y. 1951).

Judge Scheindlin similarly recognized in *Dongbu Express* that comparing the terms of a prematurely-terminated subcharter with market rate quotes was the proper consideration when calculating purported damages – *so long as the time period was the same*. Judge Scheindlin held that "Dongbu has a duty to mitigate its damages, and its claim must be offset by the savings it could have obtained by chartering another vessel *for the term of the subcharter*." *Dongbu Express*, 944 F. Supp. at 238 (emphasis added).

Maritime arbitration panels consistently have used the length of the breached charter as the period against which to compare the owner's claimed damages and to assess the owner's mitigation efforts. For example, in *In re Chia May Navigation Corp. and Seatrek Ltd.*, SMA No. 3546 (July 30, 1999)[3] (Frevola Aff., Ex. 3), the panel ruled against the charterer who argued that the charter rate for the five months it could have controlled the vessel was proper, instead of the

---

[3]    Society of Maritime Arbitrators (i.e., SMA) awards have been widely recognized by courts sitting in admiralty in both the United States and England as support for key maritime principles and concepts. *See, e.g., Weeks Marine, Inc. v. John P. Picone, Inc.*, No. 97 Civ. 9560 (SAS), 1998 WL 717615, at *8 (S.D.N.Y. Oct. 14, 1998); *Marathon Int'l Petrol. Supply Co. v. I.T.I. Shipping, S.A.*, 766 F. Supp. 130, 137 (S.D.N.Y. 1991); *Texaco Panama, Inc. v. Sun Oil Co. of Pa.*, 572 F. Supp. 982, 983 (E.D. Pa. 1983); *Star S.S. Soc'y v. Beorgradska Plovidba* [1988] 2 Lloyds' Rep. 583, 587-88 (Frevola Aff., Ex. 4). One reason for this is because virtually all charter parties have arbitration clauses and, hence, there is a paucity of judicial precedent on the interpretation of these maritime contracts.

minimum three-month period of the charter.[4]  The panel stated that the charterer's argument was "seriously flawed because calculations of this nature generally consider only the minimum charter period, and, moreover, in this case Charterer specifically acknowledged Owner's entitlement to damages only up to the minimum three-month period of the charter."  Other SMA decisions have similarly recognized the importance of comparing charter rates only during the applicable mitigation time period.  *See In re Precious Capitals Ltd. and Transworld Cargo Carriers S.A.*, SMA No. 3811 (Nov. 3, 2003) (analyzing the owner's mitigating efforts when the charterer cancelled a steel shipment by "[e]valuating the evidence regarding market rates *during the period at issue.*") (emphasis added); *In re Norelf Ltd. and Georgia Gulf Corp.*, SMA No. 2778 (July 18, 1991) (noting the mitigating voyage was during the "same time frame" as the cancelled voyage for charter hire comparisons) (Frevola Aff. Exs. 5 & 6, respectively).

Here, it is accepted by both parties that the COA daily hire rate was $8,000 and the fourth voyage under the COA would have been 60 days.  Transfield's mitigating-voyage daily hire rate during those 60 days (and beyond) was $55,000.  The mitigating revenues therefore exceeded the contract revenues it would have earned by a substantial margin.[5]  No counter-security is justified because no damages were suffered by Transfield.

Though Transfield focuses on its theory of seeking a positional voyage when rebutting FCL's argument that it suffered no damage (Hrg. Tr. 25:9-23), this is not consistent with maritime mitigation principles as articulated above.  Since *Dongbu Express*, courts have

---

[4]  Charterer sought the longer time period because the charter rate was higher over the five-month period than the minimum three-month period.

[5]  Interestingly, Transfield provides no information of 60-day charter hire rates for March 2007, although it was able to find market data for 90-150 day charter hire rates commencing in May 2007.  *See* Peterson Decl., Ex. 2, Counterclaim ¶ 6(g) (citing M.V. SIDRIS GS); *see also* Peterson Decl., ¶ 27 (same).  This Court should draw the reasonable inference that the market rate for a 60-day time charter must have greatly exceeded the $8,000 daily hire rate under the COA and perhaps the $55,000 amount obtained under the mitigating voyage.

carefully considered whether there is any support (or a "reasonable estimate" as Plaintiff claims, Hrg. Tr. at 24) for the damages alleged when a challenge is made to the amount sought. *See World Reach Shipping v. Indus. Carriers Inc.*, No. 06 Civ. 3756 (NRB), 2006 WL 3316828, at *3-4 (S.D.N.Y. Nov. 9, 2006) (analyzing amended damages claim and, in the context of a reduction argument, noting that the amended complaint "adequately justifies the increased damages claims"); *Ullises Shipping Corp. v. Fal Shipping Co. Ltd.*, 415 F. Supp. 2d 318, 324-25, 328-29 (S.D.N.Y. 2006) (recognizing the right to reduce security and analyzing validity of the plaintiff's damages calculations contained in a declaration); *Daeshin Shipping Co. Ltd. v. Meridian Bulk Carriers, Ltd.*, No. 05 Civ. 7173 (NRB), 2005 WL 2446236, at *1-2 (S.D.N.Y. Oct. 3, 2005) (analyzing "evidence in the record" to determine "the prevailing market charter rate during the period in question" to conclude the amount of funds the plaintiff could legally attach), *vacated in part on other grounds*, 2006 WL 2987056 (S.D.N.Y. Oct. 18, 2006), *rev'd in part on other grounds*, 2006 WL 3462120 (S.D.N.Y. Nov. 20, 2006). Transfield's purported damages should be scrutinized in the same fashion and counter-security denied as Transfield benefited from the alleged breach of the COA.

Finally, the Court would reach the same result under French law.[6]  Plaintiff's expert, Mr. Gilles Gautier, confirms that because Transfield "actually made a better profit" because of the alleged breach, a counter-claim would not be accepted under French law. Affirmation of Gilles Gautier dated Nov. 17, 2007 ("Gautier Aff."), ¶¶ 26-28.

---

[6]    Under Federal Rules of Civil Procedure 44.1, the determination of foreign law is a question of law for the Court. *See Bassis v. Universal Line, S.A.*, 436 F.2d 64, 68 (2d Cir. 1970); *Abu-Nassar v. Elders Futures Inc.*, No. 88 Civ. 7906 (PKL), 1991 WL 45062, at *19 (S.D.N.Y. Mar. 28, 1991).

## POINT III

## TRANSFIELD'S DAMAGES CALCULATIONS BASED ON A "POSITIONAL VOYAGE" ARE ENTIRELY SPECULATIVE AND SHOULD BE DISREGARDED AS A MATTER OF LAW

**A.**  **Transfield Has Proffered No Evidence of its Positional Voyage Intention at the Time of Entering Into the COA**

In an effort to collect more of a windfall than it already has from the Swissmarine mitigating voyage, Transfield concocted the concept of lost profits stemming from a positional voyage that would have occurred if FCL purportedly had not breached the COA. Of course, this positional voyage did not occur because Transfield chose to charter the C MARCH for $55,000 a day for 5-7 months, months longer than the fourth COA voyage would have been. Nonetheless, Transfield's counter-security application contends that Defendant's daily hire rate could have been almost double that amount after the fourth COA voyage based on its unsupported comparison of one vessel's rate, the SIDRIS GS. *See* Peterson Decl., ¶¶ 26-30.

This entire line of inquiry not only is irrelevant because it considers matters after FCL's obligation for the fourth COA voyage ceased, but also it may be dismissed as a matter of law because Transfield's claim of lost profits was not reasonably foreseeable and contemplated by the parties at the time the COA was fixed in August 2005.

Under generally accepted damages principles, the measure of damages for breach of a COA is governed by the law of damages for breach of contract. 2 Thomas J. Schoenbaum, *Admiralty & Maritime Law* §§ 11-17 (1994). The general rule for an award of damages in a breach of contract action is to assess damages resulting from the breach that could have reasonably been contemplated by the parties at the time the contract was executed. *See In re Seaemblem Marine Ltd. and Jahre Ship Serv. A/S*, SMA No. 3053 (March 7, 1994) (Frevola Aff. Ex. 7) (citing *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng. Rep. 145 (1854)); *see also Charles E.*

13

*McCloud, Inc. v. R.B. Hamilton Moving & Storage*, 89 A.D.2d 863, 864-65, 453 N.Y.S.2d 251, 253 (1st Dep't 1982); Restatement (Second) of Contracts § 351 (1981).

*Hadley* established a framework for disallowing damages where under the circumstances, the kind of damage involved was not foreseeable. *See* 3 Dan B. Dobbs, *Law of Remedies* § 12.(1), at 7 (1992) (noting that damages not within the party's contemplation are not recoverable, even when they are clearly proven). Thus, only damages which are foreseeable and within the contemplation of the parties at the time the contract is made are recoverable. *See, e.g.*, *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 332 (2d Cir. 1993); *B.F. McKernin & Co. v. U.S. Lines Inc.*, 416 F. Supp. 1068, 1072 (S.D.N.Y. 1976).

In this case, Transfield presented no evidence that FCL was aware of its intention to treat COA voyages as "positional voyages." Instead, Transfield relies on the *ipse dixit* of its counsel, who uses the terms "considered" and "represented" to describe Transfield's purported intent under the COA with respect to positional voyages. *See* Peterson Decl., ¶¶ 23, 34. This falls far short of the reasonable estimate of damages standard Transfield conceded was proper for a counter-security inquiry.

The *Precious Capitals* panel rejected a similar argument where the owner claimed it could have collected additional hire if the vessel was positioned properly as it would have been if the time charter was not breached by the charterer. SMA No. 3811 (2003). After finding that the charterer was entitled to apply the minimum charter duration for damages calculation, it refused to acknowledge subsequent positioning damages claims. "The panel agrees with . . . [the charterer] that the Owners' positioning claim is highly speculative and not within the parameters of predictability, as it is dependent upon a series of intervening events, which may or may not occur." *Id*. There, as here, no evidence was proffered to support positional voyage claims.

14

Similarly, in *U.S. Maritime Services, Inc. v. Trade Ventures, Inc.*, No. CIV. A. 98-0499, 1998 WL 388669 (E.D. La. July 8, 1998), the defendants counter-claimed for damages arising out of an alleged lost charter party. *Id.* at *2. In denying the defendants' motion for counter-security, the court ruled that the counter-claim was too speculative and insufficiently supported to justify an order directing the posting of counter-security:

> the defendants' claim for the alleged lost charter is too speculative to sustain an order for countersecurity. *Unlike plaintiff's claim which is based on past events reasonably able to be ascertained and quantified, defendants' losses due to a 'road not taken' cannot be so readily ascertained and quantified. The Baldwin affidavit [submitted by defendants] is insufficient by itself to determine what the defendants estimated actual loss is after expenses and other items are deducted, even assuming the voyage would have occurred but for the plaintiff's alleged broken agreement.*

*Id.* (emphasis added).

Transfield has offered even less substance than the defendant in *U.S. Maritime Services*. Transfield summarily contends that it has claims for over $5 million predicated on a positioning voyage, but it does not produce any contracts, any witness statements, or any other proof that FCL was aware of its intentions. As the decisions cited above make clear, general claims or unsupported allegations are not given a presumption of validity that a well-supported and documented claim is to receive.

Moreover, like the plaintiff in *U.S. Maritime Services*, FCL's affirmative claim is based on costs associated with a mitigating voyage it was forced to undertake for a specified period of time. Thus, FCL's claim is based on events that already have occurred and consideration already rendered. In contrast, just like the defendant's claim in *U.S. Maritime Services*, Transfield seeks security for claims looking beyond the fourth COA voyage on the speculation of a positioning voyage that did not occur. This is not valid. Transfield made the decision to seek a longer-term mitigating charter and reap the rewards of that significantly-higher charter rate. Having done so,

it cannot have its cake and eat it too by seeking speculative charter rates for a positional voyage that did not occur.

The Court should also note that it would reach the same result concerning Transfield's positional voyage profits claims under French law. *See* Gautier Aff., ¶¶ 18-28. Indeed, under the French Civil Code:

> The debtor is liable only for damages *which have been foreseen in the contract or which could have been foreseen at the time the contract was concluded* ...

*Id.* ¶ 18 (emphasis added).

Thus, French law is on all fours with commonly accepted foreseeability principals, and excludes as remote and speculative consequential damages not contemplated by the parties at the time the contract was executed.

**B.    The Positional Voyage Theory Should be Rejected on Equitable Grounds**

Even if the Court were to accept Transfield's positional voyage theory for the purposes of this motion, Transfield still should not be entitled to counter-security on equitable grounds. Judge Hazel recognized nearly 80 years ago that "courts of admiralty act as courts of equity and according to what is just and right." *The Lake Pachuta*, 56 F.2d 627, 629 (S.D.N.Y. 1930), *aff'd* 60 F.2d 876 (2d Cir. 1932). Here, Transfield claims the fourth voyage under the COA was a "positioning voyage [from Australia to continental Europe], which would enable Transfield thereafter to charter the vessels on the more lucrative North Atlantic market." Peterson Decl., ¶¶ 23, 26. But if this were true, Transfield could easily have accepted the mitigating voyage FCL offered which would have positioned the C MARCH in continental Europe after the fourth COA voyage. It did not. Why? It was more profitable to disregard FLC and the COA and fix its own voyage at a substantially higher charter rate.

Jon Flaaten, a senior chartering manager of FCL's commercial manager, confirms in detail the circumstances surrounding the mitigating voyage offered by FCL. After Transfield insisted on presenting the C MARCH in March 2007, FCL entered the market and obtained a cargo for the vessel. The discharging ports contemplated by FCL were all within the continental Europe area Transfield purportedly desired to be (Moneypoint, Ireland, Taranto, Italy, or Dunkirk, France). Having already agreed to a cargo, FCL spent several days attempting to confirm that Transfield would accept the ports proposed, in response to which Transfield steadfastly objected to FCL's right to nominate the requested ports. Flaaten Aff., ¶¶ 18-20.

FCL eventually concluded a fixture with charterer Rio Tinto and the cargo was discharged at the continental European port of Dunkirk, thus the mitigating voyage offered by FCL was not hypothetical. Transfield chose not to accept that voyage. Rather, it made a 600% profit during the same time period for the C MARCH by chartering it to Swissmarine. While Transfield no doubt made a shrewd business decision in ignoring FCL's mitigating voyage, it cannot then turn around and assert a positional voyage theory to seek even higher profits under the guise of a counter-claim based on a fortuitous change in the market. FCL offered a positional voyage and Transfield rejected it for the only possible reason: more money.[7]

Under the circumstances, it is not "just and right" for Transfield to obtain counter-security on the basis of a hypothetical positional voyage when they rejected a reasonable mitigating positional voyage offered by FCL. The Court should exercise its broad discretion and reject Transfield's request on equitable grounds.

---

[7]  FCL's mitigating voyage is not addressed in Transfield's counter-claim, attorney declaration or memorandum of law. At the pre-motion conference, counsel for Transfield merely stated, "[t]he mitigation charter was obviously unacceptable" without providing any further explanation. (Hrg. Tr. 28:17-25).

## POINT IV

### TAKING INTO ACCOUNT THE TIME THE COA VOYAGE WOULD CONSUME, THE HIGHER CHARTER RATES IN EUROPE WOULD FAIL TO MAKE THE EUROPEAN CHARTER MORE LUCRATIVE

If this Court, in its discretion, proceeds to analyze whether a counter-security award might be appropriate, the grossly exaggerated nature of Transfield's claims becomes apparent. Judge Scheindlin recognized in *Dongbu Express* that "[b]ecause pre-judgment attachments are usually based upon reasonable estimates and not precise facts, parties often attach amounts which are later deemed excessive in light of changes in circumstance. . . . As a result, a reduction in security is 'freely granted upon a showing that the [attachment] is excessive.'" 944 F. Supp. at 237 (quoting 7A James W. Moore et al., *Moore's Federal Practice*, ¶ E14 (2d ed. 1996)). Even viewing Transfield's claims in a light most favorable to Transfield, it appears that Transfield would not have earned more money on a subsequent European charter after repositioning. This is because Transfield's damages estimates focus on incorrect market data and fail to account for the congestion in Australia.

Mr. Flaaten's Affirmation carefully details Transfield's damages misstatements which focus on two key mistakes: (1) Transfield's disregard of a known and established port congestion to claim that the C MARCH would have been available in Europe "around May 10, 2007," while in reality the C MARCH could not have reached Europe – at the earliest – until early-to-mid-June,[8] and (2) with that delay, Transfield would not have obtained a daily hire rate of $107,300 as the market between June 4 and June 19, 2007 experienced a substantial correction from the unique hire-rate spike in mid-May 2007. Flaaten Aff., ¶¶ 23-29.

---

[8] These loading delays were widely reported in Lloyds List, the largest periodical in the maritime industry. Frevola Aff., ¶ 3 & Ex. A.

Employing this information, the following conclusions can be drawn:

(1)    Under Transfield's own position, the C MARCH contractually had to present at Dalrymple Bay, Australia not earlier than March 10, Flaaten Aff., Ex. 7, p. 2 (Transfield's statement of laycan availability as of March 10-25);

(2)    The loading delays in Australia on March 9, both in Dalrymple Bay and in Newcastle, stood at 25 days, *see id.*, Ex. 12;

(3)    The COA gave FCL laytime of 6 days to load and discharge its cargo free of demurrage charges, *see id.*, Ex. 1 (COA), Rider Clause 8;

(4)    As agreed by the parties, the voyage from Australia to continental Europe would take 60 days.

Taking these facts and employing the time periods suggested by Transfield,[9] the data shows that *Transfield actually made more money on the Swissmarine charter* than it would have made on a European charter following the fourth COA voyage.

Under the undisputable facts set forth above, the C MARCH would not have been free to undertake another charter until all of the foregoing events had come to pass, or until 91 days from March 10 (that is Sunday, June 10). On June 11 (no rates are given for Sundays), the European market for daily rates on Capesize vessels was $84,357.75.

Transfield uses the figure of 210 days to compare the Swissmarine charter to the "lost" European charter. Using that 210 period (although footnote 9 addresses the likely defects with using the larger period), the Swissmarine charter will earn:

210 days x $55,000/day = **$11,655,000.00**

---

[9]    The authorities cited by FCL in this memorandum uniformly hold that *minimum* periods, not maximum periods, should be employed when calculating damages for a breached charter. In other words, the 210 day period used by Transfield (as opposed to the lesser 150 day period) probably overstates Transfield's right to damages as a matter of law. Even using the 210 day period, as shown above, the higher daily charter rates in Europe fail to catch up to the Swissmarine charter.

Turning to the COA voyage and the follow on European charter, the following figures for the first 91 days need to be considered:

| | | |
|---|---|---|
| 60 days at COA net earnings (admitted by Transfield) = | | $480,000.00 |
| 25 days delay x COA demurrage rate $20,000/day (Rider Clause 7) = | | $500,000.00 |
| 6 days laytime for loading (free)[10] | = | $            0 |
| 91 days | = | $980,000.00 |

After these 91 days were consumed by the COA voyage, Transfield then would be free to charter the C MARCH on the European market for the balance of the 210 day period (which balance is 119 days). Assuming that Transfield immediately chartered the C MARCH in the same port as the C MARCH discharged (in other words, the vessel did not have to waste any time sailing in ballast to another port to commence the next charter), the C MARCH then would earn the following amount over the remaining 119 days of the 210 day period:

119 days x $84,357.75/day (daily rate on June 11)   =       $10,038,572.25

Adding this figure to the amount earned on the first 91 days consumed by the COA voyage, Transfield would have earned $10,038,572.25 + $980,000.00 = **$11,018,572.25.**

Stated another way, taking into account the impositions of the COA and the realities of loading delays, Transfield would have made $600,000 *less* if it had carried out the C MARCH "positioning voyage" and then chartered the C MARCH on the European market.

Transfield's claim for a lost "repositioning voyage" only result in a favorable balance to Transfield if Transfield's obligations under the COA and the Australian port congestion are

---

[10]    The COA provides 6 (weather) working days of laytime, indicating free time to be used by the vessel before demurrage charges apply. *See* COA, Rider Clause 8. As the (weather) qualification indicates, this period of laytime can be extended where the loading or discharge is halted by adverse weather. For the purpose of this calculation, Transfield is given the benefit of the assumption that no bad weather would have extended the free laytime past 6 days.

ignored. These facts, however inconvenient to Transfield, are incontrovertible and are proper to consider in assessing the propriety of Transfield's counter-security application.

## CONCLUSION

For the foregoing reasons, Front Carriers respectfully requests this Court deny Transfield's motion for counter-security in its entirety.

Dated: New York, New York
      October 19, 2007

HOLLAND & KNIGHT LLP

By: _____
    Michael J. Frevola
    Christopher R. Nolan
    Lissa Schaupp
    195 Broadway
    New York, NY 10007-3189
    Tel:   (212) 513-3200
    Fax:   (212) 385-9010

    *Attorneys for Plaintiff*
    *Front Carriers Ltd.*

# 4864206_v1

21