UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
FRONT CARRIERS LTD.                                :

                 Plaintiff,        :        07 Civ. 6333 (KMK)

   - against -                                        :
                                     ECF CASE
TRANSFIELD ER CAPE LTD.,                       :

                Defendant.        :
--------------------------------------------------------------X

## DECLARATION OF STEVE TSE IN SUPPORT OF
## TRANSFIELD ER CAPE LTD'S MOTION FOR COUNTERSECURITY

       Steve Tse declares under penalty of perjury of the laws of the United States of America as follows:

       1.      I am the Senior Manager of the Defendant herein, Transfield ER Cape Ltd.

       2.      I submit this Declaration in support of Transfield's Motion for Countersecurity and based on facts and information known to me personally, as well as documents and information available to me, all of which I believe to be true and accurate.

       3.      I refer to my August 24, 2007 Declaration submitted in this case and, by way of background, wish to incorporate the facts of that Declaration herein.

       4.      The Contract of Affreightment between Transfield and Front Carriers Ltd. ("FCL") provided for the carriage of multiple cargoes of coal from various optional ports in Australia to various optional ports in Western Europe.

       5.      I note that all of the relevant information relating to the COA dispute between Transfield and FCL was provided to our attorneys, including our New York attorneys, Lennon, Murphy & Lennon at the time that FCL commenced this action and began attaching millions of dollars belonging to Transfield as a way of obtaining security for its claims.

6.      I note also that all relevant details and information regarding Transfield's counterclaim was provided to our French lawyer, Mr. Olivier Purcell as the counterclaim was to be pursued in French arbitration proceedings in accordance with the provisions of the COA.

7.      Despite originally alleging in its Verified Complaint that it would commence arbitration in France in accordance with the COA, I understand from our French counsel that FCL has only commenced the arbitration proceeding this week, more than 3 months after filing the case in this Court and commencing to attach Transfield's property.

8.      Nonetheless, when Transfield decided to pursue countersecurity for its counterclaim, our French lawyer, Mr. Purcell, in coordination with Lennon, Murphy & Lennon, LLC prepared the necessary allegations based on the facts, documents and information provided by us with regard to the damages suffered by Transfield due to FCL's breach of the COA.

9.      I understand from reviewing the Declaration of Jon Flaaten at paragraph 29 that he has criticized Transfield and its New York counsel for allegedly "not producing the relevant charter parties" for the vessel M/V C MARCH in relation to this dispute and in particular relation to Transfield's counterclaim.  I was first requested to provide copies of the C. MARCH charter parties by our New York lawyer, Mr. Lennon, on Thursday, October 18, 2007 after the close of business in Hong Kong where Transfield maintains its offices.  I understand that FCL's papers in opposition to Transfield's Motion for Countersecurity were due on Friday, October 19, 2007.

10.     As I explained to Mr. Lennon late on October 18, 2007, our office was closed the following day for a holiday and I had no means of sending copies of the C. MARCH charters to Mr. Lennon in time for him to provide them to FCL's counsel by Friday, October 19, 2007.

11.     In any case, and notwithstanding the fact that FCL could have asked for copies of the charters prior to the day before its opposition papers were due, I attach copies of the charters

to this Declaration as Exhibits "1" and "2." Mr. Flaaten's speculation at paragraph 21 of his Declaration that "it is quite possible that the C MARCH was chartered to Swissmarine by Transfield *before* we had finalized our discussions with Transfield" is entirely mistaken because on February 20, 2007 Transfield received a message via brokers in which FCL ended negotiations with Transfield concerning the 4th voyage under the COA with a threat of claim in arbitration. *See Exhibit "3" annexed hereto.* As can be seen from the Swissmarine charter, the C MARCH was not fixed to Swissmarine until February 26, 2007, six days after Transfield received FCL's message. *Compare Exhibits "2" and "3."*

12.    In relation to the calculation of Transfield's loss of profit counterclaim against FCL, Mr. Flaaten of FCL in his Declaration at paragraphs 23 through 26 criticizes Transfield for allegedly failing to account for a 25-day delay that he claims was in existence at Dalrymple Bay. Mr. Flaaten submits as Exhibit "12" to his Declaration an August 31, 2007 "Port Congestion Report" that he clams shows there was at least a 25 day loading delay at the time the C. MARCH would have loaded cargo for FCL under the COA but for FCL's breach. However, Mr. Flaaten mistakenly claims that Report, Exhibit "12" proves there was a 25 day delay at Dalrymple Bay. To the contrary, properly read the report merely shows the number of *vessels* that were in Dalrymple Bay on the dates detailed in the report, and not the number of days any given vessel would be delayed in loading. Thus, Mr. Flaaten has offered no competent proof to contradict Transfield's reasonable calculation of its damages due to FCL's breach of the COA.

13.    I also question Mr. Flaaten's reliance on Exhibits "13" and "14" of his Declaration in his attempt to refute Transfield's claim that it would have been able to charter the C. MARCH for $107,300 per day in the open market in May 2007. As Mr. Flaaten's own Exhibits show, in mid-May 2007, that is to say the period during which Transfield contends the

C. MARCH would have come out of service to FCL and been available to charter on the open

market, the rate of $107,300 would very likely have been earned by Transfield for a 3-5 month

charter of the C. MARCH. I refer to Mr. Flaaten's Declaration, Exhibit 14 which entirely

supports and is consistent with Transfield's calculation of its claim in this regard.

14.    As is set forth in Transfield's counterclaim at paragraphs 6(f-h), Transfield's

claim has been reasonably calculated as follows:

> e.    If M.V. "C MARCH" had performed the 4th shipment at the COA rate,
> the total revenue for this voyage would have been US$8,000 x 60 days = US$480,000 for
> 60 days on a gross basis.
> f.    After the performed 4th voyage, the vessel would have been available
> for charter from continental Europe around May 10, 2007.
> g.    At that time, the M.V. "SIDRIS GS" chartered in the market at
> US$120,000 per day for 3-5 months. The M.V. "C MARCH" would probably have been
> chartered at about US$12,700 less than the "SIDRIS GS," or at about US$107,300 per
> day for about 150 days, which would have generated total revenue to Defendant of
> US$107,300 x 150 days = US$16,095,000 on gross basis.
> h.    Had Plaintiff not breached the COA, Defendant would have realized
> gross revenue during the 210 day period of US$16,575,000 (US$480,000 +
> US$16,095,000).
> i.    The loss suffered by Defendant as a result of Plaintiff's breach of the
> COA by failing to perform the March 2007 lifting for the "C MARCH" was thus, on the
> basis of the figures above, US$4,920,000 for 210 days when compared with the revenue
> obtained from the Swissmarine fixture referenced in paragraph 6(c) of this Counterclaim.

15.    Mr. Flaaten and FCL take issue with Transfield's use of the word "probably" in

paragraph 6(g) of the Counterclaim. Given that the claim is for loss of profits on Transfield's

missed opportunity due to FCL's breach of the COA, I do not understand the criticism since the

damages are calculated on the basis of a hypothetical charter party and in any case, whether

Transfield used the word "probably" or "likely" or "definitely" would not change the analysis.

The point is that even on FCL's proof as submitted in Mr. Flaaten's Declaration Exhibits 13 and

14, Transfield has reasonably calculated its loss of profits due to FCL's breach of the COA as its

calculations were based on well-known market conditions for the relevant time periods involved.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on October 26, 2007

STEVE TSE

## AFFIRMATION OF SERVICE

I hereby certify that on October 26, 2007, a copy of the foregoing Declaration of Steve Tse was filed electronically and served by FedEx, return receipt mail and/or facsimile on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's CM/ECF system.

By: _____
Patrick F. Lennon

# EXHIBIT "1" TO
# TSE DECLARATION

**FIRST ORIGINAL**

# Time Charter
## GOVERNMENT FORM
*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946



1 **This Charter Party**, made and concluded in ....., *the.. 20th*..... ..........day of .. *July, 2006* ~~19~~
2 Between ..... *Messrs. CHANG MYUNG SHIPPING CO., LTD. Seoul, Korea*....
3 Owners of the good ..... ~~Steamship~~/Motorship .... *C.MARCH – see clause 64 for description* .of. ...
4 of ................................ tons gross register, and ................ tons net register, having engines of ............................................indicated horse-power
5 and with hull, machinery and equipment in a thoroughly efficient state, and classed .........................................................
6 at ........................................of about ..................................................cubic-feet-bale-capacity, and about ................................tons of 2240 lbs.
7 deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,
8 allowing a minimum of fifty tons) on a draft of ................feet ............inches on ............Summer freeboard, inclusive of permanent bunkers,
9 which are of the capacity of about ...........................................tons of fuel, and capable of steaming, fully laden, under good weather
10 conditions about ...................knots on a consumption of about ...................tons of best Welsh coal - best grade fuel oil - best grade Diesel oil,
11 now *trading*. ...... ... .... ............. ... .... .... ... ... .. ... ... .. .. .. ..
12 ...... ......... ....... and *Messrs. TRANSFIELD ER CAPE LTD.* Charterers of the City of *BVI*..
13 **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14 time charter period about *18/20 months (about means 15 days more or less Charterers' option)*
15 *World wide trading via safe port(s)/safe berth(s)/safe anchorage(s) always afloat always within Institute Warranty Limits with lawful and harmless iron ore and coal in bulk always excluding DRI/DRIP/HBI/Sponge iron – cargo to be always loaded, transported and discharged in accordance with IMO recommendations.. within below mentioned trading limits*

16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17 the fulfilment of this Charter Party. *Acceptance of delivery of the vessel shall not constitute a waiver of Owners' obligations under this charter-party.*

18 Vessel to be placed at the disposal of the Charterers, at *on dropping last outward sea pilot one safe port*
19 *SINGAPORE/S.JAPAN range including Malaysia/Indonesia/Thailand/Philippine/Taiwan/People's Republic of China/South Korea or Owners' option Skaw/Passero range including United Kingdom/Eire or Owners' option upon passing Skaw or upon passing Passero or Owners' opiton passing Muscat Outbound port in Owners' option, any time day/night, Sundays/ holidays included . - see clause No. 30.*

20 in such dock or at such wharf or place (where she may safely lie, always afloat, at all time of tide, except as otherwise provided in clause No.6), as
21 the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No.5. Vessel on her delivery to be
22 ready to receive cargo with clean swept holds and tight, staunch, strong and in every way fitted for the service *and shall remain so for the currency of this time-charter*, having water ballast, winches and
23 donkey-boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same
24 time (and with full complement of officers, seamen, engineers and firemen *according to regulations* for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25 dise, including petroleum or its products, in proper containers, excluding *see clause 34* ... ..... .. .....
26 (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,
27 all necessary fittings and other requirements to be far for account of Charterers), in such lawful trades, between safe port and/or ports *safe berth(s), safe anchorage(s) – see clause 37* to British North
28 America, and/or United States of America, and/or West-Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or
29 Mexico, and/or South America- ...... .. .............. ....... .... .. .... .... .... ... .. ..... .... ......... .. ... ... .and/or Europe
30 and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between
31 October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when-out-of-season, White-Sea,-Black-Sea and the Baltic.
32 . .. .. . ........... .. ... .... ... .. ... ... .. ... ... ... ... .. ... .. ... ..... ... ..... ......... ...... ..
33 ...... ........ .... ...... .... .. ... .... ... ... ... ... .. ... .. ... ... ... .. ... ... .. .... ... ...
34 ...... .... ... ......... ..... ... .. ....... ... .. ... .... .. ... .. .... ... ..... ... ... .. ...... ....
35 as the Charterers or their Agents shall direct, on the following conditions:
36 1. That the Owners shall provide and pay for all provisions, wages *including overtime except as provided in clauses 23 and 23 A, immigration* and consular shipping and discharging fees of the Crew; *and gangway watchmen (except compulsory) ;* shall pay for the
37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler *fresh* water *and lubricating oil* and maintain her class and keep
38 the vessel in a thoroughly efficient state in hull, machinery and equipment *with inspection certificates necessary to comply with Safety and Health regulations and with current requirements at all ports of call* for and during the service
39 2. That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port charges,

compulsory and Skaw, Bosporous, Dardanelles — Magelan Strait, Massena Strait Pilotage, Agencies, Commissions,

40  Consular Charges (except those pertaining to the Crew or flag of the vessel), and all other usual expenses except those before stated, but when the vessel puts into

41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners Fumigations ordered because of

42  illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43  charter to be for Charterers account ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period~~

44  ~~of six months or more~~ *Owners to provide and keep on board valid deratization certificate throughout the time-charter period.*

45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but

46  Owners to allow them the use of any dunnage and shifting boards already aboard vessel Charterers to have the privilege of using shifting boards

47  for dunnage, they making good any damage thereto.

48  3. ~~That the Charterers, at the port of delivery, and the Owners, at the port of re delivery, shall take over and pay for all fuel remaining on~~

49  ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~ . . . . . . . : ~~tons and not more than~~

50  . . . ~~tons and to be re delivered with not less than~~ . . ~~tons and not more than~~ . . . . . ~~tons.~~

51  4 That Charterers shall pay for the use and hire of the said Vessel at the rate of (See standard Time Charter clause 2). —

52  . . . . . . . . . ~~United States Currency per ton on vessels total deadweight carrying capacity, including bunkers and~~

53  ~~stores, on~~ . . . . . . . ~~summer freeboard, per Calendar Month,~~ commencing on and from the *time of the* day of her delivery, as aforesaid, and at

54  and after the same rate for any part of a *day* month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55  wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot one safe port SKAW-PASSERO range*

56  *including UNITED KINGDOM/EIRE, or upon passing Skaw or upon passing Passero or Charterers' option passing Muscat Outbound port in Charterers' option, any time day/night Sundays/ holidays included, or on dropping last outward sea pilot one safe port SINGAPORE/SOUTH JAPAN range including Malaysia/Indonesia/Thailand/Philippines/Taiwan/People's Republic of China/South Korea, port in Charterers' option, any time day/night, Sundays and holidays included* . . unless otherwise mutually agreed ~~Charterers are to give Owners not less than ... days~~

57  ~~notice of vessels expected date of re delivery, and probable port.~~ *See clause 31.*

58  5 Payment of said hire to be made ~~in New York~~ ~~in cash in United States Currency,~~ ~~semi-monthly~~ *every fifteen (15) days* in advance, and for the last *fifteen (15) days* ~~half month~~ or

59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~

63  ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

64  ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65  Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subjec*

66  to 2-1/2% commission and such advances shall be deducted from the hire The Charterers, however, shall in no way be responsible for the application

67  of such advances.

68  6 That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place *or such safe open roadstead anchorage, however, if such anchorage place is not customary for same size of vessel, Owners' prior consent to be necessary, which shall not be unreasonably withheld* that Charterers or their Agents may

69  direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for similar size vessels to safely~~

70  ~~lie ground.~~

71  7 That the whole reach of the Vessel's Hold, ~~Decks,~~ and usual places of loading (not more than she can reasonably stow and carry), also

72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73  tackle, apparel, furniture, provision, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~

74  ~~paying Owners~~ . . . . . . . ~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

75  ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~

76  8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew an

77  boats The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78  agency; and Charterers are to load, stow, ~~and trim~~ *and discharge* the cargo at their expense under the supervision *and responsibility* of the Captain – *in respect of safety and seaworthiness of the vessel,* who is to sign Bills of Lading for

79  cargo as presented, in conformity with Mate's or ~~Tally Clerk's receipts~~ *without prejudice to this C/P.*

80  9 That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82  10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83  with the utmost despatch  He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84  rate of *U.S. $10.00* $1.00 per day ~~Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to~~

85  ~~victual Tally~~ ~~Clerks, Stevadore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling.~~ *See Clause 74.*

86  11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88  terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the

89  sumption of fuel.

90  12. That the Captain shall use diligence ~~in caring for~~ *the care, custody and* the ventilation of the cargo

91  ~~13. That the Charterers shall have the option of continuing this charter for a further period of~~

92

93  ~~on giving written notice thereof to the Owners or their Agents . . . . days previous to the expiration of the first-named term, or any declared option~~

94  14. That if required by Charterers, time not to commence before ....... *0001* hours 1st September, *2006*................and should

v              e              s                    s              c              l

95  not have given written notice of readiness on or before .......... *2359* hours *31st December, 2006 - local time* ..  ~~but not later than 4 p.m~~ Charterers or

96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.    *See clause 30*

97  15. That in the event of the loss of time from deficiency *and/or default of crew or Officers and/or deficiency* of men or

stores, fire, breakdown or damages to hull, machinery or equipment,

98  grounding, detention by average accidents *or all pollution only due to ship's fault* to ship or cargo, drydocking for the purpose of

examination or painting bottom, or by any other cause *not excepted in this charter-party.*

99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost, and if upon the voyage the speed be reduced by

100  defect in or breakdown of any part of her hull, machinery or equipment, the time, so lost, and the cost of any extra fuel consumed in consequence

101  thereof, and all extra expenses shall be deducted from the hire.

102  16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104  Rivers, Machinery, Boilers ~~and Steam~~ navigation, and errors of Navigation throughout this Charter Party, always mutually excepted

105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106  purpose of saving life and property

107  17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London*

~~New York~~, *according to the London arbitration rules and laws*,

108  one to be appointed by each of the parties hereto, and the third by the two so chosen; their *the* decision *being* or that of any two of them, shall be

final, and for

109  the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial *shipping* men *and*

*LMMA members.    This charter-party shall be governed by and construed in accordance with English law.*

110  18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-

111  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112  Deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents,

which

113  might have priority over the title and interest of the owners in the vessel

114  19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

115  Crew's proportion. General Average shall be adjusted, stated and settled *in London, English law to apply,* according to ~~Rules 1 to 15,~~

~~inclusive, 17 to 22, inclusive, and Rule P of~~

116  York-Antwerp Rules *1994 and any subsequent amendments.* ~~1924, at such port or place in the United States as may be selected by the~~

~~carrier, and as to matters not provided for by these~~

117  ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~

118  ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~

119  ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~

120  ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~

121  ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~

122  ~~required, be made by the goods, shippers, consignees or owners of the goods to carrier before delivery. Such deposit shall, at the option of the~~

123  ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~

124  ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~

125  ~~United States money.~~

126  ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~

127  ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~

128  ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifice~~

129  ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~

130  ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~

131  ~~ships belonged to strangers.~~ *(New Jason clause as attached) – Hire not to contribute to General Average.*

132  Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder

133  20. *Bunkers* ~~Fuel~~ used by the vessel while off hire *to be for Owners' account* ~~also for cooking, condensing water, or for grates and~~

~~stoves to be agreed to as to quantity; and the~~

134  ~~cost of replacing same, to be allowed by Owners~~

135  21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~

136  ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~

137  ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

138  *See clause 46.* . . . .  . . . . . .   . . .  . . . . . . .   . . . . .  . . . . .      . . . . .   . . . .     . . .      . . .     .

139  . .  . . .   . . . . . . . . . . . . .  . . . . .   . .  . . . . . . .    . . . . . . .   . .  . . . .    . . . . .  .  .   . . . . .   . . . . .

140  22. ~~Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also~~

141  ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~

142  ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for~~

143  ~~night work, and vessel give use of electric light when so fixed, but any additional lights over those on board to be at Charterers' expense. The~~

144  ~~Charterers to have the use of any gear on board the vessel.~~

145  23. Vessel to work night and day, if required by Charterers, *see also clause 23 A.* ~~and all winches to be at Charterers' disposal during~~

~~loading and discharging;~~

146  ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen~~

147  ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of~~

148 ~~port, or labor unions, prevent crew from driving winches, there Winchmen is to be paid by Charterers; or the event of a disabled winch or winches, or~~

149 ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~

150 ~~thereby.~~

151 24 ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~

152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~

153 ~~etc." In respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~

154 ~~of which are to be included in all bills of lading issued hereunder.~~

155 **U.S.A. Clause Paramount *as attached*.**

156 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~

157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~

158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~

159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

160 **Both-to-Blame Collision Clause *as attached*.**

161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~

162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~

163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~

164 ~~or liability represents less of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~

165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~

166 ~~owners as part of their claim against the carrying ship or carrier.~~

167 25. The vessel shall not be required to *force ice nor follow ice-breakers nor to* enter any ice-bound port, or any port where

lights or light-ships have been or are about to be with-

168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the

169 port or to get out after having completed loading or discharging

170 26 Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the

171 navigation of the vessel, *acts of pilots and tugboats except strike and/or boycott not directed against Owners*, insurance,

crew, and all other matters, same as when trading for their own account.

172 27 A commission of  *0.625* 2-1/2 per cent is payable by the Vessel and Owners to *Jangsoo Shipping Co., Ltd., Seoul and 0.625 per cent to Simpson, Spence & Young Ltd*

173 .................................................................................................

174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175 28 An address commission of *3.75* per cent payable to … *Charterers* … on the hire earned and paid under this Charter

*Clauses no. 29 to 90 and Standard Time-Charter clauses as attached are to form part of this charter-party.*

**Charterers:**

For and on behalf of
**Transfield HR Cape Limited**



........................................
*Authorized Signature(s)*

**Owners:**

J.G. KIM
Director of
Business Department

FOR AND ON BEHALF OF
CHANG MYUNG SHIPPING CO., LTD.



## 29. I.T.F. and ISM

The Owners of the vessel guarantee that vessel is certified with ITF or Bona Fide Trade Union agreement and the minimum terms and conditions of employment of the crew of the vessel are now or will be prior to presentation of the vessel for delivery and will remain for the period of this Charter Party covered by an I.T.F. Agreement or a Bona Fide Trade Union Agreement acceptable to I.T.F.

In the event that the vessel is delayed by reason of boycotts, strikes, labour stoppages or other actions by the ITF against the vessel due to employment conditions, time so lost shall be considered as off–hire, and prover. costs directly resulting therefrom are to remain for Owners' account.

During the currency of this Charter Party, the Owners shall procure that both the vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code.  Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC), Safety Management Certificate (SMC) and vetting questionnaire with Shippers' forms to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the BIMCO ISM Code shall be for the Owners' account.

## 30. Notices of Delivery

Owners to narrow with 15 days spread when Owners give approximate 30 days delivery notice with intended delivery port, thereafter Owners to give 10/5/3/1 day(s) notices of definite delivery to Charterers.

## 31. Notices of Redelivery

Charterers to give Owners 30/20/15/10 day(s) notice of approximate redelivery and 7/5/3/2/1 day(s) of definite redelivery notices.

## 32. Charterers' Inspection

Charterers to have the option of holding an inspection of the vessel before delivery, at any time, without interfering with the progress of the vessel's construction, at their risk and expenses, Charterers to have the option of holding an inspection of the vessel, at any time between delivery and redelivery, at their risk and expenses.  In all cases, Charterers shall tender at least three (3) days advance notice.

In all cases, Owners and Master to give every facility and assistance to carry out this Inspection.

## 33. Grain Loading

Non applicable.

## 34. Loading Condition

Owners warrant the vessel can load a full cargo of following cargoes in bulk to full deadweight capacity, all





holds, safety of vessel permitting.

Harmless coal, iron ore, iron ore pellets, iron ore concentrates, iron ore lumps, iron ore fines to be allowed. DRI/DRIP/HBI always to be excluded.

The vessel is self trimming bulk-carrier. Owners represent that the whole space of the vessel's holds and hatches is free from obstructions, available for cargo.

## 35.    Agents

Charterers undertake to keep Owners informed during the period of this Charter as regards the itinerary of vessel and the names of their Agents at ports of call.  Owners to appoint Owners' Agents to attend all Owners' matters.  In case Owners unable to arrange same, Charterers to agree to have their Agents to attend such matters with Owners setting with Agents according to Agents' usual husbanding tariff or rate mutually agreed beforehand.

## 36.    Sea Water In Double-Bottom

Owners to permit sea water to be placed in any double- bottom tanks except Fuel Oil, Diesel Oil and fresh water tanks in order to press tanks up to full capacity to give maximum stability.

## 37.    Trading Limits

Vessel to be employed always afloat in world-wide trading, always via safe port(s), safe berth(s), or safe anchorage(s), always within Institute Warranty Limits, always excluding war, warlike areas as declared by Owners' Underwriters and/or countries excluded by authorities of the vessel's flag.

Trading to be always via ice free ports and vessel not to follow ice breakers nor to force ice.  Master to have absolute discretion to refuse to proceed if and when he considers same to be dangerous.

Notwithstanding the above, no trading to/from following countries : Cuba, Former Yugoslavia (but Koper and Bakar to be allowed), Lebanon, Syria, Iran, Iraq, North Korea, any Pacific ports where US & Canadian APHIS Asian Gypsy Moth policy applied, Somalia, Ethiopia, Nicaragua, Sudan, Yemen, Algeria, El Salvador, Honduras, Liberia, Zaire, Vietnam, Kampuchea, Angola, Orinoco River, Amazon River to be excluded. No direct trading between Taiwan and People's Republic of China.

Should the present political situation change whereby the vessel is in danger of being blacklisted by a major nations or international organization, then the Owners have right to request Charterers that Israel should agah be included in the vessel's trade exclusions.

## 38.    Certificates

Owners guarantee vessel holding valid Certificate of Financial Responsibility/International Tonnage Certificate during the entire Charter-Party period.

-2-



Owners warrant vessel is in all respects eligible for trading to the ports, places or countries specified in Charter-party and that at all necessary times the vessel and/or Owners shall have valid certificates, records or other documents required for such trade.

All documents/certificates to be valid/kept on board by Owners including compliance with ISM regulations carrying an accredited SMC/DOC Certificate issued by international recognized Classification Society. See also BIMCO ISPS clause as attached.

## 39.   Suez Canal Tonnage Certificate

Charterers have right to sail vessel via Suez. Vessel to provide a valid Suez canal tonnage measurement certificate.  All other necessary documents, if requires to be valid at any time.

## 40.   Calling at U.S. Ports/Australian

It is understood that the vessel has full bunkering privileges with maximum quantity of 92% tank capacity at U.S. ports.

The vessel to have USCG Certificate of financial Responsibility as necessary to comply with the Oil Pollution Act 1990 obligations or any subsequent amendments.

Owners guarantee that the vessel is suitable to trade Australian/USA ports in every respects.

## 41.   War Risk Insurance

Any additional war risk insurance premium over and above Owners' basic/normal war risk insurance premium for vessel and crew, if any, resulting from Charterers' trading of the vessel to be for the Charterers' account War bonus to crew if required to meet Charterers' trade also to be for Charterers' account.  The vessel shall not be required to proceed to a war risk area unless insurance is available on payment of an additional premium and unless permitted by country of vessels registry.  The Conwartime 1993, as attached, to be considered as part of this Time Charter Party.

## 42.   Bills of Lading

If required by the Charterers, Master to authorize their agents or nominees to sign Bills of Lading on his behalf, as presented, but Charterers agree to remain responsible for any consequences should these not conform the Mate's receipts and Tally Clerk's records irregularities of Bill(s) of Lading signed by Charterers or their Agents. All Bills of Lading issued are to be claused so as to incorporate all terms and conditions of this Charter Party.

All Bills of Lading shall be without prejudice to this Charter and Charterers shall indemnity Owners from all consequences arising from Charterers and/or their agents signing Bills of Lading not in conformity with the remarks in Mate's receipts, also against all consequences or liabilities which may arise from any inconsistency between this Charter and any Bill of Lading signed by Charterers or their agents under this Charter.



- 3 -

## 43.    Cargo Holds Cleaning

Vessel's holds on delivery, in Charterers' option on arrival at first load port to be clean/swept/washed down by fresh water and dried and in every respect fit and ready to receive Charterers' intended cargo, being free of rust scale and previous cargo residues to the satisfaction of Charterers' Surveyors, should vessel not to be ready or approved by relevant Surveyors as being fit and suitably clean for Charterers' intended cargo, the vessel to be off-hire from time of rejection until the vessel is fully accepted/reinspection being passed and any additional cleaning expenses directly incurred because of rejection and/or whilst vessel off-hire to be for Owners' account.

## 44.    Arrest

Should the vessel be arrested during the currency of this Charter Party at the suit of any party having or purporting to have a claim against or any interest in the vessel, hire under this Charter Party shall not be payable in respect of any period during which the vessel is not fully at Charterers' disposal, and any consequential expenses whatsoever shall be for Owners' account, unless such arrest is due to action against Charterers or sub-Charterers or their Agents or the contractors or the cargo Shippers or Consignees.

## 45.    Deleted.

## 46.    Drydocking

Owner's privilege to dry dock and/or repair the vessel in any time during the currency of this Charter for any purposes, giving Charterers 90 days notice together with estimated period required. In case of unforeseen emergencies occurring , no such notice need to be given to Charterers, but if required by Charterers Owners to provide Charterers promptly with all required documentary evidence pertaining to the emergency occurrence, including but not limited to classification society or their Agent's report, certificates, repair yard documentation and/or invoice.

Vessel to be placed off-hire for the time the vessel puts back to a port or departs from or interrupts the voyage or is withdrawn from the service of Charterers for dry docking, repairs or other Owners' purposes, until the vessel is again in the same position or at any point equivalent thereto. Charterers option to add the off-hire period into this charter.

Charterers will endeavour to trade the vessel back to China for dry-docking after receiving Owners prior notice of advance dry-docking intention. ~~Charterers option to add this off-hire period into this charter.~~

## 47.    Cargo Claims

Cargo claims shall be settled in accordance with the Inter Club New York Produce Exchange Agreement of September 1996 and any subsequent amendments.

Owners are to confirm to Charterers the name of P & I Club into which the vessel is entered and shall remain throughout the whole period of the charter, unless/until notice is given if there is a change.   Upon Charterers request, confirmation of entry to be faxed by P & I Club to Charterers directly, provided the Club agrees to do



-4-

so. Otherwise Owners shall provide a copy of general confirmation of entry issued by the Club.

### 48. Delivery

Owners to deliver vessel to Transfield immediately upon redelivery from present Charterers without any intermediate voyage.

### 49. BIMCO Stevedore Damage Clause for Time Chartering

Any damage caused by stevedores during the currency of this Charter Party shall be reported by the Master to the Charterers or their agents, in writing, within 24 hours of the occurrence or as soon as possible thereafter but latest when the damage could have been discovered by the exercise of due diligence. The Master shall use his best efforts to obtain written acknowledgement by responsible parties causing damage unless damage should have been made good in the meantime.

Stevedore damage affecting seaworthiness or the proper working of the Vessel and/or her equipment, shall be repaired without delay to the Vessel after each occurrence in the Charterers' time and shall be paid for by the Charterers. Other repairs shall be done at the same time, but if this is not possible, same shall be repaired whilst Vessel is in drydock in the Owners' time, provided this does not interfere with the Owners' repair work, or by Vessel's crew at the Owners¡" convenience. All costs of such repairs shall be for the Charterers¡" account. Any time spent over Owners work for repairing stevedore damage shall be for the Charterers account.

The Charterers shall pay for stevedore damage whether or not payment has been made by stevedores to the Charterers.

### 50. Insurance for Hull and Machinery

Owners warrant that the vessel is covered by a reputable First Class insurance for Hull and Machinery and shall remain fully insured throughout the terms of the Charter. ~~Hull and Machinery value.~~

Hull and Machinery value : USD 60.0 Million.

As long as the vessel is on hire to Charterers, Charterers to have the benefit of any return insurance premium receivable by Owners from their Underwriters (as and when received from Underwriters) after expiry of the relevant Policy Year by reason of the vessel being in port for extended period qualifying for such returns.

### 51. P & I Club

Charterers to have the benefit of Owners' P & I Club cover so far as Club rules permit.

### 52.

Charterers shall be free from responsibility in respect of any loss damage, liability or expenses by Oil P



and/or other pollution unless otherwise it's cause by Charterers.

## 53.  BIMCO Oil Pollution Charter Party Clause (Non Tankers)

Financial responsibility in respect of pollution (all ships other than self propelled tank vessels and non self propelled tank vessels carrying more than 2,000 tons of persistent oil in bulk as cargo)

(1) Owners warrant that throughout the currency of this charter they will provide the vessel with the following certificates:

Certificates issued pursuant to Section 1016 (a) of the Oil Pollution Act 1990, and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended, in accordance with Part 138 of Coast Guard Regulations 33 CFR, from (indicate the earliest date upon which the owners may be required to deliver the vessel into the charter), so long as these can be obtained by the owners from or by (identify the applicable scheme or schemes).

(2) Notwithstanding anything whether printed or typed herein to the contrary,

(a) save as required for compliance with paragraph (1) hereof, owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this charter.

(b) Charterers shall indemnify owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(c) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any bill of lading issued pursuant to this charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(3) Charterers warrant that the terms of this clause will be incorporated effectively into any bill of lading issued pursuant to this charter.

## 54.  Redelivery Conditions

Vessel is to be redelivered with all cargo holds clean–swept and washed–down.  Charterers to have the option of redelivering the vessel with uncleaned holds, against paying lumpsum USD 5,500.– in lieu of hold cleaning.

BIMCO Cleaning of Cargo Compartments Clause



Upon completion of discharge of each cargo, the crew shall render customary assistance in cleaning all cargo compartments in preparation for the next cargo, if required by the Charterers and if not prevented by any regulations or agreement whatsoever. Such cleaning work shall be performed while the Vessel is en route to next loading port, provided that this can be safely done and that the duration of voyage is sufficient. The Charterers shall pay to the Owners ( USD 500 per each cleaned hold) each time such cleaning is performed. The Owners will endeavor to effect such cleaning as best possible, but without any guarantee that the cargo holds will be sufficiently cleaned and accepted on arrival at the loading port and the Owners shall not be responsible for any consequences arising from the fact that the crew has been employed in cleaning

55.  Deleted

56.  Time Zone

For the purpose of computing hire payments, G.M.T. to apply on delivery and redelivery.
However, actual time of delivery and redelivery as per local time.

57.  Clause Paramount and Others

Clause Paramount, New Both-to-Blame Collision, New Jason Clause, Conwartime 1993, Bimco ISPS Clause, as attached hereto, are to be considered part of this Time Charter Party and same are to be incorporated in the Bills of lading issued hereunder.

58  Metric Tons

Wherever tons are referred to in this Charter Party, same are understood to be metric tons unless otherwise stated.

59.  Deviation

Vessel has the liberty to deviate for the purpose of saving life and/or property and to tow and assist vessel(s) in distress.  Such operations not to be deemed a deviation under this Charter Party, but all salvage attribution thus payable to the vessel to be equally divided with Charterers, after proper deduction of expenses, if any, including Captain's and Crew's shares incurred in this respect.

Should the vessel be put into any port other than those instructed by the Charterers by reason of dry-dock, accident or breakdown or for the purpose of landing any injured or sick Officer, including the Master or members of the Crew, the port charges, pilotages, bunkers consumption and other expenses, including loss of time, shall be borne by the Owners and also should the vessel be put back whilst on voyage by any act of the above mentioned reasons, the hire shall be suspended from the time of her putting back until she is again in the same or equidistant position, and the voyage resumes therefrom.

60.  Deleted

61.  Deleted





62.    Slow Steam

Charterers have option to slow steam vessel at any time during the course of the Charter Party on the basis of
speeds and consumption which to be advised, but always within a range of safe, operable and harmless to
the engine.

63.    Compliance with International Convention

In the event of the vessel being prevented from or unable to perform in accordance with the terms of this
Charter Party, by reason of :

A.    Action on the part of relevant Authorities resulting from non-compliance with any compulsory
      applicable enactments enforcing all or part of any of the International Conventions in force.

B.    Labour stoppages in services essential to the operation of the vessel owing to her flag or ownership
      or management or the conditions of employment on board.

Any loss of time in the event A and/or B, shall result in the vessel being off-hire and shall be dealt with in
accordance with the off-hire clause.

It is understood that, if necessary, vessel will comply with any safety regulations and/or requirements in effect
at ports of loading and/or discharging.   Although other provisions of this Charter make it the responsibility of
the Owners, it is agreed that should the vessel not meet safety rules and regulations, Owners will make
immediate corrective measures and any stevedores standby time and other expenses involved, including off-
hire, will be for Owners' account.

Vessel to be delivered with valid Deratization Certificate on board and same to remain valid throughout the
currency of this Charter Party.

64.    Vessel's Suitability and Description

M.V. C.MARCH
Korea flag 1995 SDBC,
151,053 MT DWT on 17.419 M SSW 106.3 TPC
147,197 MT DWT ON 17.056 M WSW
HO/HA   9/9
167,883 GR
16668.2/19225.9/19384.4/19369.4/19151.5/18974.0/19213.7/18974.9/16980.9
Hatch size No.1. 14.195 x 18.400, No.2-8.   14.195 x 19.800, No9.   14.195 x 14.000
GRT-77,255 / NRT-48,170
LOA / beam 273/43
14.75B/13.25L knot on abt 48MTS IFO CST 380 + about 0.1MT MDO at sea
in port idle about 2.2 MT IFO + about 0.5 MT MDO
working about 4.0 MT IFO + about 0.5 MT MDO





- 8 -

(Speed/Consumption is always under good weather conditions with no adverse/negative influence of swell upto and including Beaufort scale 4 Douglas Sea State 3)

IFO Specification to be 380CST as per RMG35, MDO to be as per DMB
– all details about –

## 65.   BIMCO Double Banking Clause

(a) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the Vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transhipment, loading or discharging of cargo and/or bunkering.

(b) The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(c) Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do.

(d) The Owners shall be entitled to insure any deductible under the Vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the Vessel's Underwriters and/or the cost of insuring any deductible under the Vessel's hull policy.

(e) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The Vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

## 66.   Pilot's and Hold's Ladders

Vessel to be equipped with pilot's and hold's ladders in accordance with Australian Regulations.

## 67.   Deleted

## 68.   War Cancellation

In the event of any warlike operation involving vessel's flag country, U.S.A., United Kingdom, C.I.S., The People's Republic of China, France, Germany, South Korea, Japan, Taiwan directly affecting vessel's trading under this Charter Party, both parties shall mutually discuss as to cancel or continue this Charter Party

## 69.   Rightship Clause

Without limiting Owners obligation under clause (this relates to Owners normal obligations), Owners shall maintain the vessel at all times during the term of this charter party in the condition in which it was delivered to

- 9 -



the Charterers under clause fair wear and tear excepted and shall at all times be acceptable and approved by the rightship vetting system. During any period where vessel is not acceptable/approved by Rightship, then vessel shall be off hire until such time as it is again acceptable/approved by Rightship. It is acknowledged that both Charterers and Owners have policies to ensure continuous improvement in shipboard performance and safety standards.

Owners shall ensure that the Master shall report in detail to Charterers as soon as possible after the occurrence of any incident that adversely impacts or has the potential to adversely impact the safety of the vessel, its crew and or other personnel operating with the vessel, the environment, property or the performance of the vessel and which may result in Rightship withdrawing its acceptable/approved status

Specifically the Owner/Master shall report to Charterers at quarterly intervals on the following incidents.

- Fatalities,
- Lost Time Injuries,
- Pollution and environmental damage,
- Damage to Property
- Port State Control deficiencies
- First aid cases,

When the vessel is not acceptable/approved by Rightship, Charterers always has an obligation of proper explanation for the reason of such failure to the Owners. Also, Charterers has an obligation to the Owners to instruct proper way of taking necessary step of recovery/maintenance of the vessel to be accepted/approved by Rightship.

## 70.  Smuggling

Any delay, expenses and/or fines incurred on account of smuggling to be for Charterers' account, if cause by Charterers and/or persons appointed by Charterers, and to be for Owners' account if caused by Owners' Officers and/or crew and/or persons appointed by Owners.

## 71.  Mobile Crane/Cavaletto Clause

Owners to allow Charterers to place Mobile cranes or Cavalletto on deck subject to space as available at Charterers' risk and expense, and sufficient dunnage (if required) to be placed underneath the cranes to spread the weight and not to exceed permissible weight per square meter according to vessel's design on deck. Should any cutting or welding or reinforcement be necessary on vessel's structures/outfitting to accommodate the placement of such cranes or Cavalletto, then expenses and time of such work to be for Charterers' account and such work to be carried out to Classification Society Surveyor's and Master's satisfaction.

Charterers will be responsible for any and all damage, direct consequences, time, expenses and costs resulting from the operations of these equipment and all operations to be under Master's/Officers' supervision.

Charterers guarantee that at the end of their Mobile crane or Cavalletto operation, to restore and bring back vessel to the original condition at their time and expense. Such restoration should meet classification



- 10 -

requirements and Master's full satisfaction.

Charterers have liberty to use Mobile crane at Yantai, China.

### 72.    Release of Cargo without Bill of Lading

If the Original Bills of Lading cannot be presented at discharge port, Owners/Master agree to discharge/ release the entire cargo without presentation of the Original Bills of Lading only against Charterers' Letter of Indemnity signed by Charterers only in Owners' standard P and I Form and without Bank Guarantee or Bank Endorsement

### 73.    Communication with Crew

The Master, the Chief Engineer and all deck officers, including the Bosun, are able to speak and understand English.

### 74.    Communication/Victualling/Entertainment

The vessel to be equipped with Inmarsat (telex) and facsimile transceiver.  Charterers to pay Owners a lumpsum of USD 1,250.- per month or pro-rata to cover communications, victualling and entertainment expenses.

### 75    Lightening

With regard to lightening, the following to apply :

A.    Vessel to lie alongside another vessel/coasters/lighters floating cranes at a safe dock or wharf or place (including safe anchorage) for trans-shipment and/or loading and/or discharge of the cargo and/or for bunkering, if so ordered by the port authority or when such operation is customarily carried out at the port.  Such operation to be carried out always subject to good weather, smooth and calm sea, slight wind and current when Master thinks fit under the supervision of Master regarding the general safety, who may at any time order the other vessel/coasters/lighters floating cranes away from his vessel or remove his own vessel at Charterers' time and expense including tug services if Master considers the double banking by ship's own propelling is risky, meanwhile Charterers to take normal customary precaution to Master's satisfaction for such operation.

B.    Charterers to have the privilege of ordering vessel to come alongside another vessel or vice versa, in order to transship load or discharge the cargo or to supply bunkers at their convenience.  However, Charterers to supply extra fenders and/or securing materials, if necessary, and indemnify Owners/vessel against all cargo claims subsequent to such operation.  Charterers also to indemnify Owners from any additional insurance premium as charged by vessel insurers to cover additional risks for vessel, loss of hire and/or Shipowners liabilities if not well covered by Owners' ordinary coverage under P & I Club arising from such operation, and Charterers to give Owners due advance notice of their intention to perform such operation advising approximate type and quantity of cargo involve



the other vessel concerned, destination of cargo and location of operation.

Charterers, however to indemnify Owners from any damages to vessel, claim from the other alongside vessel and/or loss of hire resultantly incurred from the unsafety of the operation and/or any omission occasioned by crew members of both vessels, unless such loss(es) and/or damage(s) are recoverable from the Owners' Underwriters, in which case Charterers are paying Owners the same amount of deductible as stipulated in their insurance policies to cover the financial loss to Owners.

Any delay occasioned due to operation of ship–to–ship transfer of cargo which is not attributable to the vessel/Owners shall not be counted as off–hire.

## 76.  BIMCO U.S. Customs Advance Notification/AMS Clause for Time Charter Parties

(a)  If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i)  Have in place a SCAC (Standard Carrier Alpha Code);
ii)  Have in place an ICB (International Carrier Bond);
iii)  Provide the Owners with a timely confirmation of i) and ii) above; and
iv)  Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b)  The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub–clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c)  If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d)  The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

## 77.  Rate of Hire

With reference to Clause 4, the rate of hire (including overtime) is provided in Standard Time Charter Clause 2 to this Charter Party.

## 78.  BIMCO Bunker Quality Control Clause for Time Chartering

(1) The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and auxiliaries



- 12 -

and which conform to the specification(s) mutually agreed under this Charter.

(2) At the time of delivery of the Vessel the Owners shall place at the disposal of the Charterers, the bunker delivery note(s) and any samples relating to the fuels existing on board.

(3) During the currency of the Charter the Charterers shall ensure that bunker delivery notes are presented to the Vessel on the delivery of fuel(s) and that during bunkering representative samples of the fuel(s) supplied shall be taken at the Vessel's bunkering manifold and sealed in the presence of competent representatives of the Charterers and the Vessel.

(4) The fuel samples shall be retained by the Vessel for 90 (ninety) days after the date of delivery or for whatever period necessary in the case of a prior dispute and any dispute as to whether the bunker fuels conform to the agreed specification(s) shall be settled by analysis of the sample(s) by (...) or by another mutually agreed fuels analyst whose findings shall be conclusive evidence as to conformity or otherwise with the bunker fuels specification(s).

(5) The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s) Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the ship's engines or auxiliaries the Owners shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker consumption nor for any time lost and any other consequences.

79.    Tax Clause

A.. All taxes and/or dues on the vessel and/or cargo and freight arising out of cargoes carried or ports visited under this Charter Party shall be for Charterers' account.

B. U.S. Tax Reform 1986 Clause

Any U.S. Gross Transportation tax as enacted by the U.S. Public Law 99-514 (also referred to as the U.S. Tax Reform Act of 1986) including later changes or amendments levied on income attributable to transportation under this Charter Party which begins or ends in the U.S. source transportation gross income, shall be reimbursed by the Charterers. U.S.A. and which income under the laws of the U.S.A. is treated as

80.    SURVEY CLAUSE

A joint hull and bunker (full on-hire) survey to be held by an independent surveyor formally agreed by both parties at the port of delivery or if mutually agreed at most convenient and proximate time/place/port to delivery time/place/port.

Time actually lost by Owners due to this survey to be for Charterers' account, but the cost of the survey to be equally shared between Owners and Charterers.

A joint full off-hire survey to be held by an independent surveyor formally agreed by both parties at the port of



redelivery or if mutually agreed at the most convenient and proximate time/place/port to redelivery time/place/port.

Time actually lost by Charterers due to this survey to be for Owners' account, but the costs of the survey to be equally shared between Owners and Charterers.

## 81. U.S. Trade – Unique Bill of Lading Identifier Clause

The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a unique Bill of Lading Identifier as required by the Customs regulations (19 CFR Part 4 Section 4.7 A) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non-compliance with provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

Furthermore all time lost and all expenses incurred including fines as a result of this Charterers' breach of the provisions of this Clause shall be for the Charterers' account.

## 82. Seaway B/L Clause

In case of discharging cargo in Japan, Charterers and/or their agents may issue and sign non-negotiable sea waybills in lieu of Bill(s) of Lading with Owners' prior written authority and always in conformity with Mate's Receipt for those Shippers with whom Charterers have contracts allowing or required Seaway Bills to be used. Seaway Bills only allowed for Japanese Charterers for coal or sinter ore or Iron ore cargo.

Charterers shall indemnify and keep Owners, the vessel and Owners' servants and agents harmless in respect of any liability, loss, damage or expense they may sustain by reason of delivering the cargo under the Sea Waybill, and/or by the use of Sea Waybill, in accordance with Charterers' request.

Furthermore, the following steps shall be taken :
In case the Master is requested to authorize agents to sign Sea Waybill, the copy of Sea Waybill shall be sent on fax to the Master and the Owners soonest possible, latest before arrival at the discharging port.

Charterers shall give written discharging instruction including name of receivers, discharging port to the Master in time for arrival at the discharging port.

## 83. BIMCO Paramount Clause General

The International Convention for the Unification of Certain Rules of Law relating to Bills of Lading signed at Brussels on 25 August 1924 ("the Hague Rules") as amended by the Protocol signed at Brussels on 23 February 1968 ("the Hague-Visby Rules") and as enacted in the country of shipment shall apply to this Contract. When the Hague-Visby Rules are not enacted in the country of shipment, the corresponding legislation of the country of destination shall apply, irrespective of whether such legislation may only regulate



outbound shipments.

When there is no enactment of the Hague-Visby Rules in either the country of shipment or in the country of destination, the Hague-Visby Rules shall apply to this Contract save where the Hague Rules as enacted in the country of shipment or if no such enactment is in place, the Hague Rules as enacted in the country of destination apply compulsorily to this Contract.

The Protocol signed at Brussels on 21 December 1979 ("the SDR Protocol 1979") shall apply where the Hague-Visby Rules apply, whether mandatorily or by this Contract.

The Carrier shall in no case be responsible for loss of or damage to cargo arising prior to loading, after discharging, or while the cargo is in the charge of another carrier, or with respect to deck cargo and live animals."

### 84. Grab Discharge

Vessel is guaranteed suitable for grab discharge and bulldozer operation in holds.   No cargo to be loaded in any place not suitable for discharge by mean of mechanical grabs.

### 85. Deleted

### 86. Deviation Due to Accident/Breakdown

Should the vessel be put into any port other than those instructed by the Charterers by reason of accident or breakdown or for the purpose of landing any injured or sick officer, including Master, or members of crew, the port charges, pilotages and any other expenses including loss of time shall be borne by Owners, also should the vessel be put back whilst on voyage by way of the above mentioned reasons, the hire shall be suspended from the time of her putting back until she is again in the same position and the voyage resume therefrom.

### 87. Vaccination

Owners to arrange at their expense that the Master, Officers and crew of the vessel hold valid vaccination certificates against cholera and the yellow fever and smallpox if and where required throughout Time Charter period.

Owners to comply for their account with all sanitary regulations at ports of call including water treatment of cholera where required.

### 88. Ocean Routes Clause

In order to maximize vessel's performance Master is to follow Ocean Routes suggestions concerning routing, but Master at his reasonable discretion may depart from Ocean Routes due safety of the vessel duly advising Ocean Routes and entering in log book.  Should Master use his discretion as above unreasonable, the Charterers to have title for claiming the eventual underperformance.



For these purposes evidence of weather conditions are to be taken from the vessel's deck log and Ocean Routes' report, in the event of consistent discrepancy between the deck log and Ocean Routes' report, then Ocean Routes' report shall be taken as ruling and binding.

If Ocean Routes to be arranged, such expenses to be for Charterers' account.

However, in case Owners does not satisfy ocean routes service report, Owners at their expenses to arrange another independent weather route service company.

Then, if any discrepancy in vessel's performance between C/P and actual one, average result between Owners and charterers arranged weather route service company's report to be used for settlement of performance claim.

89.    Deleted.

90.    The fixture shall be kept strictly private and confidential.





- 16 -

BIMCO Standard War Risk Clauses for Time Charters 1993
Code Name "CONWARTIME 1993"

1    For the purpose of this Clause the words:

   a)  "Owners" shall include the shipowners, bareboat Charterers, disponent Owners, managers or other operators who are charged with the management of the vessel, and the Master ; and

   b)  "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crew or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master &/or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

2    The vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea) or any waterway or canal, where it appears that the vessel, her cargo, crew or other persons on board the vessel, in the reasonable judgement of the Master &/or the Owners, may be, or are likely to be, exposed to War Risks.  Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

3    The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search &/or confiscation.

4

   a)  The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risk), and the premiums &/or calls therefore shall be for their account.

   b)  If the Underwriters of such insurance should require payment of premiums &/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

5    If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms,



- 17 -

then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

6    The Vessel shall have liberty: –

a) To comply with all orders, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

b) To comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

c) To comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supernational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject and to obey the orders and directions of those who are charged with their enforcement;

d) To divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier :

e) To divert and call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

7    If in accordance with their rights under the foregoing provisions of this Clause the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

8    If in Compliance with any of the provisions of sub–clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

## NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the goods, shippers, Consignees Owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices,

- 18 -



losses, or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, Shippers, Consignees or Owners of the goods to the Carrier before delivery."

## NEW BOTH-TO-BLAME COLLISION CLAUSE

"If the vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the vessel, the Owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying vessel or Carrier."

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact

## GENERAL CLAUSE PARAMOUNT (1982) IN BILLS OF LADING ONLY

With respect to the shipment, carriage and discharge of the cargo, whether or not this Bill of Lading regulates the relations between the carrier and holder of same, this Bill of Lading shall have effect subject to the provisions of any legislation incorporating the Rules contained in the International Convention for the Unification of Certain rules of Law relating to Bills of Lading dated Brussels, August 25th, 1924 (the Hague rules) or those rules as amended by the Protocol signed at Brussels, February 23rd, 1968 (The Hague Visby rules) and which is compulsorily applicable to the contract of carriage contained herein, if no such legislation is compulsorily applicable, the Hague rules or, if applicable, the Hague Visby rules as enacted in the country of the port of loading shall apply. When no such enactment is in force in the country of the port of loading, the corresponding legislation of the country of the port of discharge shall apply and in the absence of any such legislation, the terms of the 1924 Convention as amended by the 1968 Protocol shall apply.

## BIMCO STANDARD YEAR 2000 CLAUSE

"Year 2000 conformity" shall mean that neither performance nor functionality of computer systems, electronic and electro-mechanical or similar equipment will be affected by dates prior to or during the year 2000.



- 19 -

Without prejudice to their other rights, obligations and defences under this Charter-Party including, where applicable, those of the Hague or Hague-Visby Rules, the Owners and the Charterers, and in particular the Owners in respect of the Vessel, shall exercise due diligence in ensuring year 2000 conformity in so far as this has a bearing on the performance of this Charter-Party.

## BIMCO STANDARD I.S.M. CLAUSE

From the date of coming into force of the International Safety Management (ISM) code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that the vessel and "the Company" (as defined by the ISM code) shall comply with the requirements of the ISM code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of "the Company" to comply with the ISM Code shall be for the Owners' account.

## BIMCO ISPS CLAUSE FOR TIME CHARTER PARTIES

(a)     (i)  From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii)  Except as otherwise provided in this Charter Party, loss damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b)     (i)  The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision :

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners."

(ii)  Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.



(c)   Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence.   All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d)   If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.



## STANDARD TIME CHARTER CLAUSE

1. Bunker Clause
On Delivery
Bunkers on delivery as on board about 700 − 900 metric tons for IFO and
About 120 − 140 metric tons for MDO

Charterers are to pay the value of bunkers on delivery together with the first hire payment in full and non deductible within three (3) banking days after vessel's delivery. See also Clause 2 below.

Charterers/ Owners have liberty to supply bunkers prior to vessel's delivery / redelivery respectively provided same does not interfere vessel's normal discharging / loading operation.

On Redelivery
Bunkers on redelivery about same quantities as on delivery.

Prices Both Ends
Same prices of bunkers on delivery and redelivery to be US$ 380.00 per metric ton for IFO and US$ 650.00 per metric ton for MDO.

Charterers are entitled to deduct the value of estimate bunkers on redelivery and estimated Owners expenses, from last sufficient hire payments with vouchers.

2. Hire Clause
Hire : US$ 38,000.00 (Thirty Eight Thousand Dollars) daily including overtime per day/ prorate including overtime payable every fifteen (15) days in advance. See also Clause 5 of the Charter party.

Charterers to pay first hire and value of bunkers on delivery within three (3) banking days after vessel's delivery and receipt of Owners' invoice by fax or telex or email, thereafter payable every fifteen (15) days in advance. Hire calculation basis GMT.

A. Payment shall be made by Charterers to :

    THE KOREA DEVELOPMENT BANK
    GANGNAM BRANCH, SEOUL, KOREA
    SWIFT CODE : KODBKRSE
    ACCOUNT NO. 093 − 2400 − 1220 − 702
    IN FABOUR OF CHANG MYUNG SHIPPING CO., LTD.

B. Evidence of receipt of funds by Owners' bank shall constitute compliance of Charterers' obligation to pay hire in accordance with Clause 5.

C. Failing payment of full hire due, less any specifically agreed amount, the Owners will have the right



withdraw the vessel without prejudice to any claim the Owners may have against the Charterers under this Charter. Further, so long that the full hire due less any specifically agreed amount remains unpaid, Owners will be entitled to suspend the performance of any and all of their obligations under this Charter Party, in port or at sea, and shall have no responsibility whatsoever for any direct or indirect consequences thereof in respect of which the Charterers hereby indemnify the owners and hire shall continue to accrue and any extra expenses resulting from such suspension shall be for Charterers' account.

D. Where there is any failure to make "punctual and regular payment" due to oversight, negligence or error or omission of Charterers or their agents, employees or otherwise for any reason where there is absence of intention to fail to make payment as set out, Charterers shall be granted 3 (three) banking days grace to rectify the failure, after which delay, should conditions of Paragraph B above be not satisfied, after which delay, should conditions of Paragraph B above be not satisfied, provisions of Paragraph C above would apply.

### 3. Tax Clause

All taxes and/or dues on the vessel and/or cargo and freight arising out of cargoes carried or ports visited under this Charter Party shall be for Charterers' account.

### 4. Survey Clause

A joint full on hire-survey to be held by an independent surveyor formally agreed by both parties at the port of delivery or if mutually agreed at a most convenient and proximate time / place / port to delivery time / place / port.

Time actually lost by Charterers due to this survey to be for Owners' account but the costs of the survey to be equally shared between Owners and Charterers.

A joint full off-hire survey to be held by an independent surveyor formally agreed by both parties, at the port of redelivery or if mutually agreed at the most convenient and proximate time / place / port to redelivery time / place / port. Time actually lost by Owners due to this survey to be for Charterers' account but the costs of the survey to be equally shared between Owners and Charterers.

### 5. U.S. Trade-Unique Bill of Lading Identifier Clause
See Clause 81.

### 6. Drugs

In the event that prohibited drugs are found in cargo, equipment or other property loaded by Charterers, their servants or Agents, or are found on the person or in possession of or effects of Charterers' servants or Agents, Charterers shall remain responsible for all and any consequential fines and expenses due to the detention of the ship. The ship shall not go off-hire as a result of any delay or stoppage associated with or as a result of the presence of the drugs whether this be real or suspected unless such delay or detention is directly attributed to the Owners, Master or crew.

### 7. Paramount Clause in Bills of Lading
See Clause 83.

### 8. Financial Responsibility in Respect Of Pollution





1) Owners warrant that throughout the currency of this Charter they will provide the vessel with the following certificates :

   A) certificates issued pursuant to the civil liability convention 1969 (C.L.C.) (if applicable).
   B) Certificates issued pursuant to Section 311 (P) of the U.S. Federal Water Pollution Control Act, as amended (Title 33 U.S. Code, Section 1321 (P)).

2) notwithstanding any thing whether printed or typed herein to the contrary :

   A) Save as required for compliance with paragraph 1 hereof, Owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter.

   B) Charterers shall indemnify Owners and hold them harmless is respect of any loss, damage, liability or expense (including but not limited to the cost of any delay incurred by the vessel as a result of any failure by Charterers promptly to give alternative voyage orders whatsoever and howsoever arising which Owners may sustain by reason of the vessel's inability to perform as aforesaid.

   C) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any Bill of lading issued pursuant to this Charter may sustain by reason of the vessel's inability to perform as aforesaid.

3) Charterers warrant that the terms of this Clause will be incorporated effectively into any Bill of Lading issued pursuant to this Charter.



- 24 -



EXHIBIT "2" TO
TSE DECLARATION

CP-06-16V3

# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1 **This Charter Party**, made and concluded in *Lausanne* .................... *on the 26th* day of *February* .......... 19 *2007*

2 Between *Messrs. Transfield ER Cape Ltd. of B.V.I.* ................................

3 Owners of the good *Korea Flag* ...... Steamship/Motorship *C.MARCH* .......... *al for vessel's description See Clause 64*

4 of ............................ tons gross register, and .......................... tons net register, having engines of ............................ indicated horse power

5 and with hull, machinery and equipment in a thoroughly efficient state, and classed.

6 at ............ of about ............ cubic feet bale capacity, and about ............................ tons of 2240 lbs.

7 deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,

8 allowing a minimum of fifty tons) on a draft of ............ feet .............. inches on ............ Summer Freeboard, inclusive of permanent bunkers,

9 which are of the capacity of about ............................ tons of fuel, and capable of steaming, fully laden, under good weather

10 conditions about ............................ knots on a consumption of about ............................ tons of best Welsh coal - best grade fuel oil - best grade Diesel oil,

11 now *ETA Mujishan 28th February 2007/ETCD 4th March 2007, ETA Luojing 5th March 2007/ETCD 7th - 8th March 2007*

12 *subject weather permitting / all going well / unforeseen circumstance excepted* and *Messrs. SwissMarine Services SA* . Charterers of

12 the City of *Geneva* ....................

13 **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14 about *a time charter period of minimum 3months to maximum about 7months (about =15 days more or less in Charterers*

15 *option) exact period in Charterers option via safe anchorage(s), safe berth(s), safe port(s) always afloat always within Institute*

15 *Warranty Limits with harmless iron ore/coal in bulk always excluding DRI/DRIP/HBI/sponge iron. Cargo to be loaded,*

15 *transported and discharged in accordance with IMO recommendations* within below mentioned trading limits.

16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17 the fulfillment of this Charter Party. Acceptance of delivery of the vessel shall not constitute a waiver of Owners' obligations under this

17 charter-party

18 Vessel to be placed at the disposal of the Charterers, at *on dropping last outward sea pilot one safe port People's Republic of China at any*

19 *time day or night Sundays and holidays included pioo See Clause No. 36*

20 in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6, as

21 the Charterers may direct. If such dock, wharf or place be not available time to commence as provided for in clause No. 5. Vessel on her delivery to be

22 ready to receive cargo with clean swept holds and tight, staunch, strong and in every way fitted for the service, *and shall remain so for the currency of*

22 *this time-charter* having water ballast, winches and

23 donkey-boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same

24 time (and with full complement of officers, seamen, engineers and firemen *according to regulations* for a vessel of her tonnage), to be employed, in carrying

24 lawful merchan-

25 dise, including petroleum or its products, in proper containers, excluding *See Clause 34* ....................

26 (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,

27 all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports *safe berth(s), safe*

27 *anchorage(s) - See Clause 37* in British North

28 America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or

29 Mexico, and/or South America, ........................ and/or Europe

30 and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

31 October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,

32 ....................

33 ....................

34 ....................

35 as the Charterers or their Agents shall direct, on the following conditions:

36 1. That the Owners shall provide and pay for all provisions, *including overtime except as provided in clauses 23 and 23A*, immigration

36 wages and consular shipping and discharging fees of the Crew; *and gangway watchmen (except compulsory)* shall pay for the

37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler *fresh* water *and lubricating oil* and maintain

37 her class and keep

38 the vessel in a thoroughly efficient state in hull, machinery and equipment *with inspection certificates necessary to comply with Safety and*

38 *Health regulations and with current requirements at all ports of call* for and during the service.

39 2. That *whilst on hire* the Charterers shall provide and pay for all fuel except as otherwise agreed, Port Charges, *compulsory/and Skaw,*

39 *Bosphorus, Dardanelles Magelan Strait, Massena Strait* Pilotages, Agencies, Commissions,

40 Consular Charges (except those pertaining to the Crew *or Flag of the vessel*), and all other usual expenses except those before stated, but when the vessel puts

40 into

41 a port for causes for which Owners is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42 illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43 charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period

44 of six months or more. Owners to provide and keep on board valid deratization certificate throughout the time-charter period.

45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46  Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47  for dunnage, they making good any damage thereto.
48  ~~3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~
49  ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ........................ tons and not more than~~
50  ~~.............................. tons and to be re-delivered with not less than .................................. tons and not more than ..................................... tons.~~
51  4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *(See Standard Time Charter Clause 2)*
52  ~~.................................................................~~ United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and
53  stores, etc. ~~......................................................~~ summer freeboard, per Calendar Month, commencing on and from the *time of the* day of her delivery, as aforesaid, and at
54  and after the same rate for any part of a *day* month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55  wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot one safe port Singapore / South Japan range*
56  *including People's Republic of China at any time day or night Sundays and holidays included* unless otherwise mutually agreed.
57  Charterers are to give Owners not less than *See Clause 31* days
57  notice of vessels expected date of re-delivery, and probable port.
58  5. Payment of said hire to be made in New York in each in United States Currency, semi-monthly *every fifteen (15) days* in advance, and for the last
58  *fifteen (15) days* half month or
59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day
63  following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they
64  to have the privilege of using vessel at once, such time used to count as hire.
65  Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67  of such advances.
68  6. That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe place or such safe open roadstead*
68  *anchorage, however, if such anchorage place is not customary for same size of vessel Owners' prior consent to be necessary,*
68  *which shall not be unreasonably withheld* that Charterers or their Agents may
69  direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely
70  lie aground.
71  7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73  tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers so far as accommodations allow, Charterers
74  paying Owners ........................ per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are
75  incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.
76  8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
77  agency, and Charterers are to load, stow, and trim *and discharge* the cargo at their expense under the supervision *and responsibility* of the Captain, *in*
78  *respect of safety and seaworthiness of the vessel*, who is to sign Bills of Lading for
79  cargo as presented, in conformity with Mate's or Tally Clerk's receipts *without prejudice to this C/P*.
80  9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
82  10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84  rate of *US$ 10.00* $1.90 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
85  Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling. *See Clause 74.*
86  11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-
89  sumption of fuel.
90  12. That the Captain shall use diligence in caring for *the care, custody and* the ventilation of the cargo.
91  ~~13. That the Charterers shall have the option of continuing this charter for a further period of ...........................................................................~~
92  ~~.......................................................................................................................................................................................................................................~~
93  ~~on giving written notice thereof to the Owners or their Agents ...............................~~ days previous to the expiration of the first named term, or any declared option.
94  14. That if required by Charterers, time not to commence before *00.01 hours 5th March 2007 local time* and should vessel
95  not have given written notice of readiness on or before 23.59 *on the 20th of March 2007 local time* but not later than 4 p.m. Charterers or
96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
97  15. That in the event of the loss of time from deficiency *and/or default of crew or Officers and/or deficiency* of men or stores, fire, breakdown
97  or damage to hull, machinery or equipment,
98  grounding, detention by average accidents *or all pollution only due to ship' fault* to ship or cargo, drydocking for the purpose of examination or painting
98  bottom, or by any other cause *not excepted in this charter-party*,
99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
100  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101  thereof, and all extra expenses shall be deducted from the hire.
102  16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106  purpose of saving life and property.

107    17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London* New York,
107    *according to the London arbitration rules and laws,*

108    one to be appointed by each of the parties hereto, and the third by the two so chosen; their *the* decision *being* or that of any two of them, shall be final, and for
109    the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial *shipping* men and *LMMA*
109    *members. This charter party shall be governed by and construed in accordance with English law.*

110    18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-
111    age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112    deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113    might have priority over the title and interest of the owners in the vessel.

114    19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115    Crew's proportion. General Average shall be adjusted, stated and settled, *in London, English Law to apply* according to Rules 1 to 15, inclusive, 17 to 22,
115    inclusive, and Rule F of

116    York-Antwerp Rules *1994 and any subsequent amendments.* 1924, at such port or place in the United States as may be selected by the carrier, and as to
116    matters not provided for by these

117    Rules, according to the laws and usages of the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into
118    United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at
119    the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or
120    bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
121    or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
122    required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the
123    carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the
124    place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balance, if any, shall be paid in
125    United States money.

126    In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,
127    whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the
128    goods, the shippers and the consignees, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,
129    losses, or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the
130    goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or
131    ships belonged to strangers. *(New Jason clause as attached)* Hire not to contribute to General Average.
132    Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

133    20. *Bunkers* Fuel used by the vessel while off hire *to be for Owners' account.* also for cooking, condensing water, or for grate and stoves to be
133    agreed to as to quantity, and the
134    cost of replacing same, to be allowed by Owners.

135    21. That at the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a
136    convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from
137    time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.
132    *See Clause 46.*

139    _____

140    22. Owners shall maintain the gear of the ship as fixed, providing gear (for all derricks) capable of handling lifts up to three tons, also
141    providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for
142    same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for
143    night-work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The
144    Charterers to have the use of any gear on board the vessel.

145    23. Vessel to work night and day, if required by Charterers, *See Clause 23.A* and all winches to be at Charterers' disposal during loading and
145    discharging.
146    Matter to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,
147    deck hands and donkeyman for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the
148    port or labor unions prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or
149    insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
150    thereby.

151    24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152    in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
153    etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both
154    of which are to be included in all bills of lading issued hereunder:

155                                          U. S. A. Clause Paramount *as attached*

156    This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157    16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158    any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
159    be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

160                                          Both-to-Blame Collision Clause *as attached.*
161    If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
162    Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
163    hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
164    or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
165    carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her
166    owners as part of their claim against the carrying ship or carrier.

167    25. The vessel shall not be required to *force ice nor follow ice-breakers nor to* enter any ice-bound port, or any port where lights or light-ships have
167    been or are about to be with-
168    drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169    port or to get out after having completed loading or discharging.

170    26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171    navigation of the vessel, *acts of pilots and tugboats except strike and/or boycott not directed against Owners* insurance, crew, and all other

171  matters, same as when trading for their own account.

172      27. A commission of *1.25* 2-1/2 per cent is payable by the Vessel and Owners to *Messrs. Ifchor Capes S.A. Lausanne*

173  ──────────────────────────────────────────────────────────────────────────────────────────────

174  on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175      28. An address commission of *3.75* 2-1/2 per cent payable to *Charterers*................. on the hire earned and paid under this Charter.

175

175

175  *Clauses no. 29 to 90 and Standard Time-Charter clauses as attached are to form part of this charter-party.*

175

175

175              *Charterers:*

175

175

175



For and on behalf of
Transfield ER Cape Limited

*Authorized Signature(s)*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07

### Clause 29.
#### I.T.F. and ISM.
The Owners of the vessel guarantee that vessel is certified with ITF or Bona Fide Trade Union agreement and the minimum terms and conditions of employment of the crew of the vessel are now or will be prior to presentation of the vessel for delivery and will remain for the period of this Charter Party covered by an I.T.F. Agreement or a Bona Fide Trade Union Agreement acceptable to I.T.F.

In the event that the vessel is delayed by reason of boycotts, strikes, labour stoppages or other actions by the ITF against the vessel due to employment conditions, time so lost shall be considered as off-hire, and proven costs directly resulting therefrom are to remain for Owners' account.

During the currency of this Charter Party, the Owners shall procure that both the vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC), Safety Management Certificate (SMC) and vetting questionnaire with Shippers' forms to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the BIMCO ISM Code shall be for the Owners' account.

### Clause 30.
#### Notice of Delivery.
Owners to give Charterers 14 day(s) notices of approximate delivery and 7/5/3/2/1 day(s) notices of definite delivery. Vessel to be delivered onto Charterers upon completion of purchase.

### Clause 31.
#### Notices of Redelivery.
Charterers to give Owners 30/20/15/10 day(s) notice of approximate redelivery and 7/5/3/2/1 day(s) of definite redelivery notices.

### Clause 32.
#### Charterers' Inspection.
Charterers to have the option of holding an inspection of the vessel before delivery, at any time, without interfering with the progress of the vessel's construction, at their risk and expenses, Charterers to have the option of holding an inspection of the vessel, at any time between delivery and redelivery, at their risk and expenses. In all cases, Charterers shall tender at least three (3) days advance notice. In all cases, Owners and Master to give every facility and assistance to carry out this Inspection.

M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

Clause 33.
Grain Loading.
Non applicable.

Clause 34.
Loading Condition.
Owners warrant the vessel can load a full cargo of following cargoes in bulk to full
deadweight capacity in all holds, safety of vessel permitting.

Harmless coal, iron ore, iron ore pellets, iron ore concentrates, iron ore lumps, iron
ore fines to be allowed. DRI/DRIP/HBI always to be excluded.

The vessel is a self-trimming bulk-carrier. Owners represent that the whole space of
the vessel's holds and hatches is free from obstructions, available for cargo.

Clause 35.
Agents.
Charterers undertake to keep Owners informed during the period of this Charter as
regards the itinerary of vessel and the names of their Agents at ports of call. Owners
to appoint Owners' Agents to attend all Owners' matters. In case Owners unable to
arrange same, Charterers to agree to have their Agents to attend such matters with
Owners setting with Agents according to Agents' usual husbanding tariff or rate
mutually agreed beforehand.

Clause 36.
Sea Water in Double-Bottom.
Owners to permit sea water to be placed in any double- bottom tanks except Fuel
Oil, Diesel Oil and fresh water tanks in order to press tanks up to full capacity to
give maximum stability.

Clause 37.
Trading Limits.
Vessel to be employed always afloat in world-wide trading, always via safe port(s),
safe berth(s), or safe anchorage(s), always within Institute Warranty Limits, always
excluding war, warlike areas as declared by Owners' Underwriters and/or countries
excluded by authorities of the vessel's flag.

Trading to be always via ice free ports and vessel not to follow ice breakers nor to
force ice. Master to have absolute discretion to refuse to proceed if and when he
considers same to be dangerous.

Notwithstanding the above, no trading to/from following countries : Cuba, Former
Yugoslavia (but Koper and Bakar to be allowed), Lebanon, Syria, Iran, Iraq, North
Korea, any Pacific ports where US Et Canadian APHIS Asian Gypsy Moth policy
applied, Somalia, Ethiopia, Nicaragua, Sudan, Yemen, Algeria, Et Salvador, Honduras,

2

M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

Liberia, Zaire, Vietnam, Kampuchea, Angola, Orinoco River, Amazon River to be excluded. No direct trading between Taiwan and People's Republic of China. Should the present political situation change whereby the vessel is in danger of being blacklisted by a major nations or international organization, then the Owners have right to request Charterers that Israel should again be included in the vessel's trade exclusions.

## Clause 38.
### Certificates.
Owners guarantee vessel holding valid Certificate of Financial Responsibility / International Tonnage Certificate during the entire Charter-Party period.

Owners warrant vessel is in all respects eligible for trading to the ports, places or countries specified in Charter-party and that at all necessary times the vessel and/or Owners shall have valid certificates, records or other documents required for such trade.

All documents/certificates to be valid/kept on board by Owners including compliance with ISM regulations carrying an accredited SMC/DOC Certificate issued by international recognized Classification Society. See also BIMCO ISPS clause as attached.

## Clause 39.
### Suez Canal Tonnage Certificate.
Charterers have right to sail vessel via Suez. Vessel to provide a valid Suez canal tonnage measurement certificate. All other necessary documents, if requires to be valid at any time.

## Clause 40.
### Calling at U.S. Ports/Australian.
It is understood that the vessel has full bunkering privileges with maximum quantity of 92% tank capacity at U.S. ports.

The vessel to have USCG Certificate of financial Responsibility as necessary to comply with the Oil Pollution Act 1990 obligations or any subsequent amendments.

Owners guarantee that the vessel suitable to trade Australian/USA ports in every respects.

## Clause 41.
### War Risk Insurance.
Any additional war risk insurance premium over and above Owners' basic/normal war risk insurance premium for vessel and crew, if any, resulting from Charterers' trading of the vessel to be for the Charterers' account. War bonus to crew if required to meet Charterers' trade also to be for the Charterers' account. The vess

M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

shall not be required to proceed to a war risk area unless insurance is available on payment of an additional premium and unless permitted by country of vessels registry. The Conwartime 1993, as attached, to be considered as part of this Time Charter Party.

### Clause 42.
#### Bills of Lading.
If required by the Charterers, Master to authorize their agents or nominees to sign Bills of Lading on his behalf, as presented, but Charterers agree to remain responsible for any consequences should these not conform the Mate's receipts and Tatty Clerk's records irregularities of Bill(s) of Lading signed by Charterers or their Agents.

All Bills of Lading issued are to be claused so as to incorporate all terms and conditions of this Charter Party.

All Bills of Lading shall be without prejudice to this Charter and Charterers shall indemnity Owners from all consequences arising from Charterers and/or their agents signing Bills of Lading not in conformity with the remarks in Mate's receipts, also against all consequences or liabilities which may arise from any inconsistency between this Charter and any Bill of Lading signed by Charterers or their agents under this Charter.

### Clause 43.
#### Cargo Holds Cleaning.
Vessel's holds on delivery, in Charterers' option on arrival at first load port to be clean/swept/washed down by fresh water and dried and in every respect fit and ready to receive Charterers' intended cargo, being free of rust scale and previous cargo residues to the satisfaction of Charterers' Surveyors, should vessels not to be ready or approved by relevant Surveyors as being fit and suitably clean for Charterers' intended cargo, the vessel to be off-hire from time of rejection until the vessel is fully accepted/re-inspection being passed and any additional cleaning expenses directly incurred because of rejection and/or whilst vessel off-hire to be for Owners' account.

### Clause 44.
#### Arrest.
Should the vessel be arrested during the currency of this Charter Party at the suit of any party having or purporting to have a claim against or any interest in the vessel, hire under this Charter Party shall not be payable in respect of any period during which the vessel is not fully at Charterers' disposal, and any consequential expenses whatsoever shall be for Owners' account, unless such arrest is due to action against Charterers or sub-Charterers or their Agents or the contractors or the cargo Shippers or Consignees.

4

M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

**Clause 45.**
Deleted.

**Clause 46.**
**Dry- Docking.**
Vessel's drydock is due by June 2007.

Vessel to be placed off-hire for the time the vessel puts back to a port or departs from or interrupts the voyage or is withdrawn from the service of Charterers for dry docking, repairs or other Owners purposes, until the vessel is again in the same position or at any point equivalent thereto. Charterers don't have the option to add dry docking period.

Charterers undertake to trade the vessel back to Singapore Japan range for dry-docking within June 2007 without extensions.

**Clause 47.**
**Cargo Claims.**
Cargo claims shall be settled in accordance with the Inter Club New York Produce Exchange Agreement of September 1996 and any subsequent amendments.

Owners are to confirm to Charterers the name of P a I Club into which the vessel is entered and shall remain throughout the whole period of the charter, unless/until notice is given if there is a change. Upon Charterers' request, confirmation of entry to be faxed by P a I Club to Charterers directly, provided the Club agrees to do so. Otherwise Owners shall provide a copy of general confirmation of entry issued by the Club.

**Clause 48.**
Deleted.

**Clause 49.**
**BIMCO Stevedore Damage Clause for Time Chartering.**
Any damage caused by stevedores during the currency of this Charter Party shall be reported by the Master to the Charterers or their agents, in writing, within 24 hours of the occurrence or as soon as possible thereafter but latest when the damage could have been discovered by the exercise of due diligence. The Master shall use his best efforts to obtain written acknowledgement by responsible parties causing damage unless damage should have been made good in the meantime.

Stevedore damage affecting seaworthiness or the proper working of the Vessel and/or her equipment, shall be repaired without delay to the Vessel after each occurrence in the Charterers' time and shall be paid for by the Charterers. Other repairs shall be done at the same time, but if this is not possible, same shall be repaired whilst Vessel is in dry-dock in the Owners' time, provided this does not

5

M/V C. MARCH– SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

interfere with the Owners' repair work, or by Vessel's crew at the Owners'
convenience. All costs of such repairs shall be for the Charterers' account. Any time
spent over Owners work for repairing stevedore damage shall be for the Charterers'
account.
The Charterers shall pay for stevedore damage whether or not payment has been
made by stevedores to the Charterers.

Clause 50.
Insurance for Hull and Machinery.
Owners warrant that the vessel is covered by a reputable First Class insurance for
Hull and Machinery and shall remain fully insured throughout the terms of the
Charter.
Hull and Machinery value: USD 60.0 Million.
As long as the vessel is on hire to Charterers, Charterers to have the benefit of any
return insurance premium receivable by Owners from their Underwriters (as and
when received from Underwriters) after expiry of the relevant Policy Year by
reason of the vessel being in port for extended period qualifying for such returns.

Clause 51.
P & I Club.
Charterers to have the benefit of Owners' P & I Club cover so far as Club rules
permit.

Clause 52.
Charterers shall be free from responsibility in respect of any loss damage, liability
or expenses by Oil pollution and/or other pollution unless otherwise it's clause by
Charterers.

Clause 53.
BIMCO Oil Pollution Charter Party Clause (Non Tankers)
Financial responsibility in respect of pollution (all ships other than self propelled
tank vessels and non self propelled tank vessels carrying more than 2,000 tons of
persistent oil in bulk as cargo)

(1) Owners warrant that throughout the currency of this charter they will provide
the vessel, with the following certificates:
Certificates issued pursuant to Section 1016 (a) of the Oil Pollution Act 1990, and
Section 108 (a) of the Comprehensive Environmental Response, Compensation and
Liability Act 1980, as amended, in accordance with Part 138 of Coast Guard
Regulations 33 CFR, from (indicate the earliest date upon which the owners may be
required to deliver the vessel into the charter), so long as these can be obtained by
the owners from or by (identify the applicable scheme or schemes).

(2) Notwithstanding anything whether printed or typed herein to the contrary,

6

M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

(a)    save as required for compliance with paragraph (1) hereof, owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this charter.

(b)    Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(c)    Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any bill of lading issued pursuant to this charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(3) Charterers warrant that the terms of this clause will be incorporated effectively into any bill of lading issued pursuant to this charter.

## Clause 54.
### Redelivery Conditions.
Vessel is to be redelivered with all cargo holds clean-swept and washed-down. Charterers to have the option of redelivering the vessel with un-cleaned holds, against paying lumpsum US$5,500.00 in lieu of hold cleaning.

## BIMCO CLEANING OF CARGO COMPARTMENTS CLAUSE
Upon completion of discharge of each cargo, the crew shall render customary assistance in clearing all cargo compartments in preparation for the next cargo, if required by the Charterers and if not prevented by any regulations or agreement whatsoever. Such cleaning work shall be performed while the Vessel is en route to next loading port, provided that this can be safety done and that the duration of voyage is sufficient. The Charterers shall pay to the Owners (US$500.00 per each cleaned hold) each time such cleaning is performed. The Owners will endeavor to effect such cleaning as best possible, but without any guarantee that the cargo holds will be sufficiently cleaned and accepted on arrival at the loading port and the Owners shall not be responsible for any consequences arising from the fact that the crew has been employed in cleaning.

## Clause 55.
Deleted.

7

M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

### Clause 56.
### Time Zone.
For the purpose of computing hire payments, GMT to apply on delivery and redelivery.

However, actual, time of delivery and redelivery as per local time.

### Clause 57.
### Clause Paramount and Others.
Clause Paramount, New Both-to-Blame Collision, New Jason Clause, Conwartime 1993, Bimco ISPS Clause, as attached hereto, are to be considered part of this Time Charter Party and same are to be incorporated in the Bills of Lading issued hereunder.

### Clause 58
### Metric Tons.
Wherever tons are referred to in this Charter Party, same are understood to be metric tons unless otherwise stated.

### Clause 59.
### Deviation.
Vessel has the liberty to deviate for the purpose of saving life and/or property and to tow and assist vessel(s) in distress. Such operations not to be deemed a deviation under this Charter Party, but all salvage attribution thus payable to the vessel to be equally divided with Charterers, after proper deduction of expenses, if any, including Captain's and Crew's shares incurred in this respect.
Should the vessel be put into any port other than those instructed by the Charterers by reason of dry-dock, accident or breakdown or for the purpose of landing any injured or sick Officer, including the Master or members of the Crew, the port charges, pilotages, bunkers consumption and other expenses, including loss of time, shall be borne by the Owners and also should the vessel be put back whilst on voyage by any act of the above mentioned reasons, the hire shall be suspended from the time of her putting back until she is again in the same or equidistant position, and the voyage resumes therefrom.

### Clause 60.
Deleted.

### Clause 61.
Deleted.



8

M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

Clause 62.
Slow Steam.
Charterers have option to slow steam vessel at any time during the course of the
Charter Party on the basis of speeds and consumption which to be advised, but
always within a range of safe, operable and harmless to the engine.

Clause 63.
Compliance with international Convention.
In the event of the vessel being prevented from or unable to perform in accordance
with the terms of this Charter Party, by reason of:

A.  Action on the part of relevant Authorities resulting from non-compliance with
any compulsory applicable enactments enforcing all or part of any of the
International Conventions in force.

B.  Labour stoppages in services essential to the operation of the vessel owing to
her flag or ownership or management or the conditions of employment on board.
Any loss of time in the event A and/or B, shall result in the vessel being off-hire
and shall be dealt with in accordance with the off-hire clause.

It is understood that, if necessary, vessel will comply with any safety regulations
and/or requirements in effect at ports of loading and/or discharging. Although
other provisions of this Charter make it the responsibility of the Owners, it is
agreed that should the vessel not meet safety rules and regulations, Owners will
make immediate corrective measures and any stevedores standby time and other
expenses involved, including off-hire, will be for Owners' account.
Vessel to be delivered with valid Deratization Certificate on board and same to
remain valid throughout the currency of this Charter Party.

Clause 64.
Vessel's Suitability and Description.
MV C.MARCH
KOREA FLAG 1995 Bc
151,053 MT DWT ON 17.419 M ssw 106.3 `IRE
147,197 MT DWT ON 17.056 M wsw
167,883 GR
9 Ho 9 HA
14.75B /13.25L KNOT ON ABT 48MTS IF0 Cst380 + ABT 0.1MT MDO AT SEA IN PORT
IDLE ABT 2.2MT + ABT 0,5MT MOO
WORKING ABT 4.0 MT + ABT 0.5mts MDO
(Speed/consumption is always under good weather conditions with no
adverse/negative influence of swell upto and including Beaufort scale 4 and Douglas
Sea State 3)
IFO spec to be 380CST as per RMG35, MDO to be as per DMB
LOA 273 BM 43

9

M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

16668.2/19225.9/19384.4/19369.4/19151.5/18974.0/19213.7/18914.7/16980.9
HA SZ NO1. 14.195X18.400, NO2-8. 14.195X19.800, NO9. 14.195X14.000 HA-SR
GRT-77,255 / NRT-48,170
ALL DETAILS ABOUT.

### Clause 65.
### BIMCO Double Banking Clause.
(a)  The Charterers shall have the right, where and when it is customary and safe
for vessels of similar size and type to do so, to order the Vessel to go, lie or remain
alongside another vessel or vessels of any size or description whatsoever or to
order such vessels to come and remain alongside at such safe dock, wharf,
anchorage or other place for transhipment, loading or discharging of cargo and/or
bunkering.

(b)  The Charterers shall pay for and provide such assistance and equipment as
may be required to enable any of the operations mentioned in this clause safely to
be completed and shall give the Owners such advance notice as they reasonably can
of the details of any such operations.

(c)  Without prejudice to the generality of the Charterers' rights under (a) and
(b), it is expressly agreed that the Master shall have the right to refuse to
allow the Vessel to perform as provided in (a) and (b) if in his reasonable opinion it
is not safe so to do.

(d)  The Owners shall be entitled to insure any deductible under the Vessel's hull
policy and the Charterers shall reimburse the Owners any additional premium(s)
required by the Vessel's Underwriters and/or the cost of insuring any deductible
under the Vessel's hull policy.

(e)  The Charterers shall further indemnify the Owners for any costs, damage and
liabilities resulting from such operation. The Vessel shall remain on hire for any
time lost including periods for repairs as a result of such operation.

### Clause 66.
### Pilot's and Hold's Ladders.
Vessel to be equipped with pilot's and hold's ladders in accordance with Australian
Regulations.

### Clause 67
Deleted.

### Clause 68.
### War Cancellation.



M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

In the event of any warlike operation involving vessel's Flag country, U.S.A., United Kingdom, CIS, The People's Republic of China, France, Germany, South Korea, Japan, Taiwan directly affecting vessel's trading under this Charter Party, both parties shall mutually discuss as to cancel or continue this Charter Party.

### Clause 69.
### Rightship Clause.

Without limiting Owners obligation under clause (this relates to Owners normal obligations), Owners shall maintain the vessel at all times during the term of this charter party in the condition in which it was delivered to the Charterers under clause fail wear and tear excepted and shall at all times be acceptable and approved by the Rightship vetting system. During any period where vessel is not acceptable / approved by Rightship, then vessel shall be off hire until such time as it is again acceptable/approved by Rightship. It is acknowledged that both Charterers and Owners have policies to ensure continuous improvement in shipboard performance and safety standards.

Owners shall ensure that the Master shall report in detail to Charterers as soon as possible after the occurrence of any incident that adversely impacts or has the potential to adversely impact the safety of the vessel, its crew and or other personnel operating with the vessel, the environment, property or the performance of the vessel and which may result in Rightship withdrawing its acceptable/approved status.

Specifically the Owner/Master shall report to Charterers at quarterly intervals on the following incidents:
Fatalities,
Lost Time Injuries,
First aid cases,
Pollution and environmental damage,
Damage to Property
Port State Control deficiencies

When the vessel is not acceptable/approved by Rightship, Charterers always has an obligation of proper explanation for the reason of such failure to the Owners. Also, Charterers has an obligation to the Owners to instruct proper way of taking necessary step of recovery/maintenance of the vessel to be accepted/approved by Rightship.

### Clause 70.
### Smuggling.

Any delay, expenses and/or fines incurred on account of smuggling to be for Charterers' account, if cause by Charterers and/or persons appointed by Charterers and to be for Owners' account if caused by Owners' Officers and/or crew and/or

11

M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

persons appointed by Owners.

### Clause 71.
### Mobile Crane/Cavalletto Clause.

Owners to allow Charterers to place Mobile cranes or Cavalletto on deck subject to space as available at Charterers' risk and expense, and sufficient dunnage (if required) to be placed underneath the cranes to spread the weight and not to exceed permissible weight per square meter according to vessel's design on deck. Should any cutting or welding or reinforcement be necessary on vessel's structures/outfitting to accommodate the placement of such cranes or Cavalletto, then expenses and time of such work to be for Charterers' account and such work to be carried out to Classification Society Surveyor's and Master's satisfaction. Charterers will be responsible for any and all damage, direct consequences, time, expenses and costs, resulting from the operations of these equipment and all operations to be under Master's/Officers' supervision.
Charterers guarantee that at the end of their Mobile crane or Cavalletto operation, to restore and bring back vessel to the original condition at their time and expense. Such restoration should meet classification requirements and Master's full satisfaction.

Charterers have liberty to use Mobile crane at Yantai, China.

### Clause 72.
### Release of Cargo Without Bill of Lading.

If the Original Bills of Lading cannot be presented at discharge port, Owners / Master agree to discharge/ release the entire cargo without presentation of the Original Bills of Lading only against Charterers' Letter of Indemnity signed by Charterers' only in Owners' standard P and I Form and without Bank Guarantee or Bank Endorsement.

### Clause 73.
Communication With Crew.
The Master, the Chief Engineer and all deck Officers, including the Bosun, are able to speak and understand English.

### Clause 74.
### Communication/Victualling/Entertainment.
The vessel to be equipped with Inmarsat (telex) and facsimile transceiver.
Charterers to pay Owners a lumpsum of US$1,250.00 per month or pro-rata to cover communications, victualling and entertainment expenses.

### Clause 75.
### Lightening.
With regard to lightening, the following to apply:



12

M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

A.  Vessel to lie alongside another vessel/coasters/lighters floating cranes at a safe dock or wharf or face (including safe anchorage) for trans-shipment and/or loading and/or discharge of the cargo and/or for bunkering, if so ordered by the port authority or when such operation is customarily carried out at the port. Such operation to be carried out always subject to good weather, smooth and calm sea, slight wind and current when Master thinks fit under the supervision of Master regarding the general safety, who may at any time order the other vessel / coasters / lighters floating cranes away from his vessel or remove his own vessel at Charterers' time and expense including tug services if Master considers the double banking by ship's own propelling is risky, meanwhile Charterers to take normal customary precaution to Master's satisfaction for such operation.

B.  Charterers to have the privilege of ordering vessel to come alongside another vessel or vice versa, in order to transship load or discharge the cargo or to supply bunkers at their convenience. However, Charterers to supply extra fenders and/or securing materials, if necessary, and indemnify Owners/vessel against all cargo claims subsequent to such operation. Charterers also to indemnify Owners from any additional insurance premium as charged by vessel insurers to cover additional risks for vessel, loss of hire and/or Shipowners liabilities if not well covered by *Owners' ordinary coverage under P & I Club arising from such* operation, and Charterers to give Owners due advance notice of their intention to perform such operation advising approximate type and quantity of cargo involved, the other vessel concerned, destination of cargo and location of operation.

Charterers, however to indemnify Owners from any damages to vessel, claim from the other alongside vessel and/or loss of hire resultantly incurred from the unsafety of the operation and/or any omission occasioned by crew members of both vessels, unless such loss(es) and/or damage(s) are recoverable from the Owners' Underwriters, in which case Charterers are paying Owners the same amount of deductible as stipulated in their insurance policies to cover the financial loss to Owners.
Any delay occasioned due to operation of ship-to-ship transfer of cargo which is not attributable to the vessel / Owners shall not be counted as off-hire.

### Clause 76.
### BIMCO U.S. Customs Advance Notification/ AMS Clause for Time Charter Parties.

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CPR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i)       Have in place a SCAC (Standard Carrier Alpha Code);



13

M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

ii)     Have in place an ICB (International Carrier Bond);

iii)    Provide the Owners with a timely confirmation of i) and ii) above; and

iv)    Submit a cargo declaration by AMS (Automated Manifest System) to the US
Customs and provide the Owners at the same time with a copy thereof.

(b)The Charterers assume liability for and shall indemnify, defend and hold
harmless the Owners against any loss and/or damage whatsoever (including
consequential loss and/or damage) and/or any expenses, fines, penalties and all other
claims of whatsoever nature, including but not limited to legal costs, arising from
the Charterers' failure to comply with any of the provisions of sub-clause (a).
Should such failure result in any delay then, notwithstanding any provision in this
Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers ICB is used to meet any penalties, duties, taxes or other charges
which are solely the responsibility of the Owners, the Owners
shall promptly reimburse the Charterers for those amounts.

(d)The assumption of the rote of carrier by the Charterers pursuant to this Clause
and for the purpose of the US Customs Regulations (19 CPR 4.7) shall be without
prejudice to the identity of carrier under any bat of lading, other contract, law or
regulation,

### Clause 77.
### Rate of Hire.

With reference to Clause 4, the rate of hire (including overtime) is provided in
Standard Time Charter Clause 2 to this Charter Party,

### Clause 78.
### BIMCO Bunker Quality Control Clause for Time Chartering.

(1) The Charterers shall supply bunkers of a quality suitable for burning in the
Vessel's engines and auxiliaries and which conform to the specification(s) mutually
agreed under this Charter.

(2) At the time of delivery of the Vessel the Owners shall place at the disposal of
the Charterers, the bunker delivery note(s) and any samples relating to the fuels
existing on board.

(3) During the currency of the Charter the Charterers shall ensure that bunker
delivery notes are presented to the Vessel on the delivery of fuel(s) and that during
bunkering representative samples of the fuel(s) supplied shall be taken at the
Vessel's bunkering manifold and sealed in the presence of competent
representatives of the Charterers and the Vessel.

14

M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

(4) The fuel samples shall be retained by the Vessel for 90 (ninety) days after the date of delivery or for whatever period necessary in the case of a prior dispute and any dispute as to whether the bunker fuels conform to the agreed specification(s) shall be settled by analysis of the sample(s) by (...) or by another mutually agreed fuels analyst whose findings shall be conclusive evidence as to conformity or otherwise with the bunker fuels specification(s).

(5) The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the ship's engines or auxiliaries the Owners shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker consumption nor for any time lost and any other consequences.

## Clause 79.
## Tax Clause.

A. All taxes and/or dues on the vessel and/or cargo and freight arising out of cargoes carried or ports visited under this Charter Party shall be for Charterers' account.

B. U.S. Tax Reform 1986 Clause
Any U.S. Gross Transportation tax as enacted by the U.S. Public Law 99-514 (also referred to as the U.S. Tax Reform Act of 1986) including later changes or amendments levied on income attributable to transportation under this Charter Party which begins or ends in the U.S.A. and which income under the laws of the U.S.A. is treated as U.S. source transportation gross income, shall be reimbursed by the Charterers.

## Clause 80.
## Survey Clause.

A joint hull and bunker (full on-hire) survey to be held by an independent surveyor formally agreed by both parties at the port of delivery or if mutually agreed at most convenient and proximate time/place/port to delivery time/place/port.
Time actually lost by Owners due to this survey to be for Charterers' account, but the costs of the survey to be equally shared between Owners and Charterers.
A joint full off-hire survey to be held by an independent surveyor formally agreed by both parties at the port of redelivery or if mutually agreed at the most convenient and proximate time/place/port to redelivery time/place/port.
Time actually lost by Charterers due to this survey to be for Owners' account, but

15

M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

the costs of the survey to be equally shared between Owners and Charterers.

## Clause 81.
### U.S. Trade-Unique Bill of Lading identifier Clause.
The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a unique Bill of Lading Identifier as required by the Customs regulations (19 CPR Part 4 Section 4.7 A) including subsequent changes, amendments or modifications thereto, not later than the first port of call. Non-compliance with provisions of this Clause shaft amount to breach of warranty for the consequences of which the Charterers shall be liable and shaft hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.
Furthermore all time lost and all expenses incurred including fines as a result of this Charterers' breach of the provisions of this Clause shall be for the Charterers' account.

## Clause 82.
### Seaway B/L Clause.
In case of discharging cargo in Japan, Charterers and/or their agents may issue and sign non-negotiable sea waybills in lieu of Bill(s) of Lading with Owners' prior written authority and always in conformity with Mate's Receipt for those Shippers with whom Charterers have contracts allowing or required Seaway Bills of be used. Seaway bills only allowed for Japanese Charterers for coat or sinter ore or Iron ore cargo.
Charterers shall indemnify and keep Owners, the vessel and Owners' servants and agents harmless in respect of any liability, toss, damage or expense they may sustain by reason of delivering the cargo under the Sea Waybill, and/or by the use of Sea Waybill, in accordance with Charterers' request.

Furthermore, the following steps shall be taken:

In case the Master is requested to authorize agents to sign Sea Waybill, the copy of Sea Waybill shall be sent on fax to the Master and the Owners soonest possible, latest before arrival at the discharging port.
Charterers shall give written discharging instruction including name of receivers, discharging port to the Master in time for arrival at the discharging port.

## Clause 83.
### BIMCO Paramount Clause General.
The International Convention for the Unification of Certain Rules of Law relating to Bills of Lading signed at Brussels on 25 August 1924 ("the Hague Rules") as amended by the Protocol signed at Brussels on 23 February 1968 ("the Hague-Visby Rules") and as enacted in the country of shipment shall apply to this Contract. When the Hague-Visby Rules are not enacted in the country of shipment, the

M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

corresponding legislation of the country of destination shall apply, irrespective of
whether such legislation may only regulate outbound shipments.

When there is no enactment of the Hague-Visby Rules in either the country of
shipment or in the country of destination, the Hague-Visby Rules shall apply to this
Contract save where the Hague Rules as enacted in the country of shipment or if no
such enactment is in place, the Hague Rules as enacted in
country of destination apply compulsorily to this Contract.

The Protocol signed at Brussels on 21 December 1979 ("the SDR Protocol 1979")
shall apply where the Hague-Visby Rules apply, whether mandatorily or by this
Contract.

The Carrier shall in no case be responsible for loss of or damage to cargo arising
prior to loading, after discharging, or while the cargo is in the charge of another
carrier, or with respect to deck cargo and live animals."

## Clause 84.
### Grab Discharge.
Vessel is guaranteed suitable for grab discharge and bulldozer operation in holds.
No cargo to be loaded in any place not suitable for discharge by mean of
mechanical grabs.

## Clause 85.
Deleted.

## Clause 86.
### Deviation Due to Accident/Breakdown.
Should the vessel be put into any port other than those instructed by the Charterers
by reason of accident or breakdown or for the purpose of landing any injured or
sick officer, including Master, or members of crew, the port charges, pilotages and
any other expenses including loss of time shall be borne by Owners, also should the
vessel be put back whilst on voyage by way of the above mentioned reasons, the
hire shall be suspended from the time of her putting back until she is again in the
same position and the voyage resume therefrom.

## Clause 87.
### Vaccination.
Owners to arrange at their expense that the Master, Officers and crew of the vessel
hold valid vaccination certificates against cholera and the yellow fever and
smallpox if and where required throughout Time Charter period.

Owners to comply for their account with all sanitary regulations at ports of call
including water treatment of cholera where required.

## Clause 88.
### Ocean Routes Clause.
In order to maximize vessel's performance Master is to follow Ocean Routes
suggestions concerning routing, but Master at his reasonable discretion may depart

17

M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

from Ocean Routes due safety of the vessel duty advising Ocean
Routes and entering in tog book. Should Master use his discretion as above
unreasonable, the Charterers to have title for claiming the eventual under-
performance.

For these purposes evidence of weather conditions are to be taken from the vessel's
deck tog and Ocean Routes' report, in the event of consistent discrepancy between
the deck log and Ocean Routes' report, then Ocean Routes' report shall be taken as
ruling and binding.

If Ocean Routes to be arranged, such expenses to be for Charterers' account.
However, in case Owners does not satisfy ocean routes service report, Owners at
their expenses to

arrange another independent weather route service company. Then, if any
discrepancy in vessel's performance between C/P and actual one, average result
between Owners and Charterers arranged weather route service company's report
to be used for settlement of performance claim.

**Clause 89.**
Deleted.

**Clause 90.**
The fixture shall be kept strictly private and confidential.

## BIMCO STANDARD WAR RISK CLAUSES FOR TIME CHARTERS 1993
## CODE NAME "CONWARTIME 1993"

1. For the purpose of this Clause the words:

a)      "Owners" shall include the Shipowners, Bareboat Charterers, Disponent
Owners, managers or other operators who are charged with the management of the
vessel, and the Master ; and

b)      "War Risks" shall include any war (whether actual or threatened), act of war,
civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the
laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts
of hostility or malicious damage, blockades (whether imposed against all vessels or
imposed selectively against vessels of certain Flags or Ownership, or against certain
cargoes or crew or otherwise howsoever), by any person, body, terrorist or political
group, or the Government of any state whatsoever, which, in the reasonable
judgement of the Master &/or the Owners, may be dangerous or are likely to be or to
become dangerous to the vessel, her cargo, crew or other persons on board the
vessel.

2. The vessel, unless the written consent of the Owners be first obtained, shall not
be ordered to or required to continue to or through, any port, place, area or zone
(whether of land or sea) or any waterway or canal, where it appears that the vessel,
her cargo, crew or other persons on board the vessel, in the reasonable judgement
of the Master &/or the Owners, may be, or are likely to be, exposed to War Risks.

18

M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

3. The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search Et/or confiscation.

4 a) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risk), and the premiums Et/or calls therefore shall be for their account.

b) If the Underwriters of such insurance should require payment of premiums and / or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

5. If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shaft be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

6.    The Vessel shall have liberty: -
a)    To comply with all orders, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;
b)    To comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;
c)    To comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supernational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject

19

M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

and to obey the orders and directions of those who are charged with their
enforcement;

d)    To divert and discharge at any other port any cargo or part thereof which
may render the Vessel liable to confiscation as a contraband carrier ;

e)    To divert and call at any other port to change the crew or any part thereof or
other persons on board the Vessel when there is reason to believe that they may be
subject to internment, imprisonment or other sanctions.

7. If in accordance with their rights under the foregoing provisions of this Clause the
Owners shall refuse to proceed to the loading or discharging ports, or any one or more
of them, they shall immediately inform the Charterers. No cargo shall be discharged at
any alternative port without first giving the Charterers notice of the Owners'
intention to do so and requesting them to nominate a safe port for such discharge.
Failing such nomination by the Charterers within 48 hours of the receipt of such
notice and request, the Owners may discharge the cargo at any safe port of their
own choice.

8. If in Compliance with any of the provisions of sub-clauses (2) to (7) of this
Clause anything is done or not done, such shall not be deemed a deviation, but
shall be considered as due fulfillment of this Charter Party.

## NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after the
commencement of the voyage, resulting from any cause whatsoever, whether due to
negligence or not, for which, or for the consequence of which, the Carrier is not
responsible, by statute, contract or otherwise, the goods, shippers, Consignees or
Owners of the goods shall contribute with the Carrier in general average to the
payment of any sacrifices, losses, or expenses of a general average nature that may
be made or incurred and shall pay salvage and special charges incurred in respect
of the goods.

If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully
as if the said salving ship or ships belonged to strangers. Such deposit as the
Carrier or his agents may deem sufficient to cover the estimated contribution of the
goods and any salvage and special charges thereon shall, if required, be made by
the goods, Shippers, Consignees or Owners of the goods to the Carrier before
delivery."

## NEW BOTH-TO-BLAME COLLISION CLAUSE

"If the vessel comes into collision with another ship as a result of the negligence of the
other ship and any act, neglect or default of the Master, Mariner, Pilot or the servants of
the Carrier in the navigation or in the management of the vessel, the Owners of the
cargo carried hereunder will indemnify the Carrier against all loss or liability to the
other or non-carrying ship or her Owners in so far as such loss or liability represents
loss of, or damage to, or any claim whatsoever of the Owners of the said goods, paid

20

M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying vessel or Carrier."

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

## GENERAL CLAUSE PARAMOUNT (1982)  IN BILLS OF LADING ONLY

With respect to the shipment, carriage and discharge of the cargo, whether or not this Bill of Lading regulates the relations between the carrier and holder of same, this Bill of Lading shall have effect subject to the provisions of any legislation incorporating the Rules contained in the International Convention for the Unification of Certain rules of Law relating to Bills of Lading dated Brussels, August 25th, 1924 (the Hague rules) or those rules as amended by the Protocol signed at Brussels, February 23th, 1968 (The Hague Visby rules) and which is compulsorily applicable to the contract of carriage contained herein, if no such legislation is compulsorily applicable, the Hague rules or, if applicable, the Hague Visby rules as enacted in the country of the port of loading shall apply. When no such enactment is in force in the country of the port of loading, the corresponding legislation of the country of the port of discharge shall apply and in the absence of any such legislation, the terms of the 1924 Convention as amended by the 1968 Protocol shall apply.

## BIMCO STANDARD YEAR 2000 CLAUSE

"Year 2000 conformity" shall mean that neither performance nor functionality of computer systems, electronic and electro-mechanical or similar equipment will be affected by dates prior to or during the year 2000.
Without prejudice to their other rights, obligations and defenses under this Charter-Party including, where applicable, those of the Hague or Hague-Visby Rules, the Owners and the Charterers, and in particular the Owners in respect of the Vessel, shall exercise due diligence in ensuring year 2000 conformity in so far as this has a bearing on the performance of this Charter-Party.

## BIMCO STANDARD I.S.M. CLAUSE

From the date of coming into force of the International Safety Management (ISM) code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that the vessel and "the Company" (as defined by the ISM code) shall comply with the requirements of the ISM code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of "the Company" to comply with the ISM Code shall be for the Owners' account.

## BIMCO ISPS CLAUSE FOR TIME CHARTER PARTIES

(a) (i) From the date of coming into force of the International Code for the Security

21

M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

of Ships and of Port Facilities and the relevant amendments to Chapter XI of
SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of
this Charter Party, the Owners shall procure that both the Vessel and "the
Company" (as defined by the ISPS Code) shall comply with the requirements of the
ISPS Code relating to the Vessel and "the Company". Upon request the Owners
shall provide a copy of the relevant international Ship Security Certificate (or the
Interim International. Ship Security Certificate) to the Charterers. The Owners shall
provide the Charterers with the full style contact details of the Company Security
Officer (CSO).
(ii) Except as otherwise provided in this Charter Party, loss damage, expense or
delay, excluding consequential loss, caused by failure on the part of the Owners or
"the Company" to comply with the requirements of the ISPS Code or this Clause
shall be for the Owners' account.
(b) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO) /
Master with their full style contact details and, where sub-letting is permitted
under the terms of this Charter Party, shall ensure that the contact details of all
sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore,
the Charterers shall ensure that all sub-charter parties they enter into during the
period of this Charter Party contain the following provision:
"The Charterers shall provide the Owners with their full style contact details and,
where sub-letting is permitted under the terms of the charter party, shall ensure
that the contact details of all sub-Charterers are likewise provided to the Owners."

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or
delay, excluding consequential loss, caused by failure on the part of the Charterers
to comply with this Clause shall be for the Charterers' account.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or
expenses whatsoever arising out of or related to security regulations or measures
required by the port facility or any relevant authority in accordance with the ISPS
Code including, but not limited to, security guards, launch services, tug escorts,
port security fees or taxes and inspections, shall be for the Charterers' account,
unless such costs or expenses result solely from the Owners' negligence. All
measures required by the Owners to comply with the Ship Security Plan shall be for
the Owners' account.

(d) If either party makes any payment which is for the other party's account
according to this Clause, the other party shall indemnify the paying party. 

22

## STANDARD TIME CHARTER CLAUSE

### 1. Bunker Clause

On Delivery

Bunkers on delivery as on board about 1.400 metric tons IFO and about 120 metric tons MDO.

Charterers are to pay the value of bunkers on delivery together with the first hire payment in full and non-deductible within 2 working days after vessel's delivery and receipt of Owners invoice via fax or e-mail. See also Clause 2 below.
Charterers/Owners have liberty to supply bunkers prior to vessel's delivery / redelivery respectively provided same does not interfere vessel's normal discharging / loading operation.

On Redelivery

Bunkers on redelivery about same quantities as on delivery.

Prices Both Ends

Same prices of bunkers on delivery and redelivery to be US$310 per metric ton for IFO and US$550 per metric ton for MDO.

Charterers are entitled to deduct the value of estimated bunkers on redelivery and estimated Owners expenses from last sufficient hire payments with vouchers.

### 2. Hire Clause

Hire: US$ 55,500 daily including overtime per day/prorata including overtime payable every fifteen (15) days in advance. See also Clause 5 of the Charter Party.
Charterers to pay first hire and value of bunkers on delivery within three (3) banking days after vessel's delivery and receipt of Owners' invoice by fax or telex or email, thereafter payable every fifteen (15) days in advance. Hire calculation basis GMT.

A. Payment shall be made by Charterers to :
   THE HONGKONG AND SHANGHAI BANKING CORP. LTD., HONGKONG
   SUN HUNG KAI CENTRE BRANCH, HONGKONG SWIFT
   CODE: HSBCHKHHHKH
   IN FAVOUR OF: TRANSFIELD ER LIMITED USD A/C NO.:499-397248-274
   VIA BANK: HSBC BANK USA, NEW YORK USD A/C NO.: 000-0-4441-5
   SWIFT CODE: MRMDUS33

B. Evidence of receipt of funds by Owners' bank shall constitute compliance of Charterers' obligation to pay hire in accordance with Clause 5.

C. Failing payment of full hire due, less any specifically agreed amount, the Owners will have the right to withdraw the vessel without prejudice to any claim the Owners may have against the Charterers under this Charter. Further, so long that the full hire due less any specifically agreed amount remains unpaid, Owners will be entitled to suspend the performance of any and all of their obligations under this Charter Party, in port or at sea, and shall have no responsibility

23

M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

whatsoever for any direct or indirect consequences thereof in respect of which the Charterers hereby indemnify the Owners and hire shall continue to accrue and any extra expenses resulting from such suspension shall be for Charterers' account.

D.  Where there is any failure to make "punctual and regular payment" due to oversight, negligence or error or omission of Charterers or their agents, employees or otherwise for any reason where there is absence of intention to fail to make payment as set out, Charterers shall be granted 3 (three) banking days grace to rectify the failure, after which delay, should conditions of Paragraph B above be not satisfied, provisions of Paragraph C above would apply.

3.  Tax Clause.
All taxes and/or dues on the vessel and/or cargo and freight arising out of cargoes carried or ports visited under this Charter Party shall be for Charterers' account.

4.  Survey Clause.
A joint full on hire-survey to be held by an independent surveyor formally agreed by both parties at the port of delivery or if mutually agreed at a most convenient and proximate time/place/port to delivery time/place/port.
Time actually lost by Charterers due to this survey to be for Owners' account but the costs of the survey to be equally shared between Owners and Charterers.
A joint full off-hire survey to be held by an independent surveyor formally agreed by both parties, at the port of redelivery or if mutually agreed at the most convenient and proximate time/place/port to redelivery time/place/ port. Time actually lost by Owners due to this survey to be for Charterers' account but the costs of the survey to be equally shared between Owners and Charterers'

5.  U.S. Trade – Unique Bill of Lading Identifier Clause
See Clause 81.

6.  Drugs

In the event that prohibited drugs are found in cargo, equipment or other property loaded by Charterers, their servants or Agents, or are found on the person or in possession of or effects of Charterers' servants or Agents, Charterers shall remain responsible for all and any consequential fines and expenses due to the detention of the ship. The ship shall not go off-hire as a result of any delay or stoppage associated with or as a result of the presence of the drugs whether this be real or suspected unless such delay or detention is directly attributed to the Owners, Master or crew.

7.  Paramount Clause In Bills Of Lading.
See Clause 83.



24

M/V C. MARCH- SWISSMARINE (TRANSFIELD) C/P DATED 26.02.07 LAUSANNE

### 8.   Financial Responsibility In Respect Of Pollution

1) Owners warrant that throughout the currency of this Charter they will provide the vessel with the following certificates:

A)     Certificates issued pursuant to the civil liability convention 1969 (C.LC.) (if applicable).

B)     Certificates issued pursuant to Section 311 (P) of the U.S. Federal Water Pollution Control Act, as amended (Title 33 U.S. Code, Section 1321 (P)).

2) Notwithstanding anything whether printed or typed herein to the contrary:

A)     Save as required for compliance with paragraph 1 hereof, Owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter.

B)     Charterers shall indemnify Owners and hold them harmless is respect of any loss, damage, liability or expense (including but not limited to the cost of any delay incurred by the vessel as a result of any failure by Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of the vessel's inability to perform as aforesaid.

C) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any Bilt of lading issued pursuant to this Charter may sustain by reason of the vessel's inability to perform as aforesaid.

3) Charterers warrant that the terms of this Clause will be incorporated effectively into any Bill of Lading issued pursuant to this Charter.

# EXHIBIT "3 TO
# TSE DECLARATION

User:    Steve Tse

 Brian Taylor <postfix@ssy.co.uk> on 02/20/2007 20:04:08

Please respond to Brian Taylor <postfix@ssy.co.uk>

To:       <postfix@ssy.co.uk>
cc:
bcc:

Subject:  TRANSFIELD/FRONT CARRIERS - C. MARCH
Ref. No:  0702202002

BWT44612821

FROM: SIMPSON, SPENCE & YOUNG LTD
DATE: 20/02/2007
TIME: 12:04:08

NEWMAN/BRIAN

FOLLOWING FROM FRONT CARRIERS.

FSubject: TRANSFIELD/FRONT COA - C.MARCH

Transfield TBN / Front Carriers CoA 09.08.05 voy 4

Charterers refer to previous communications whereby owners refuse to

perform the requested voyage from Newcastle NSW to a discharge port(s)

within the options/alternatives described in Section 4 of the COA.

Based on yesterday's message, owners have reconfirmed that they will
not

perform the voyage. Charterers take the view that this conduct amounts

to a repudiatory breach of owner's obligations in relation to the 4th

lifting under the COA. As indicated before, charterers will do their

best to mitigate, but they reserve all rights under the COA, including

the right to claim damages for the losses suffered as a consequence of

Page 1 - TRANSFIELD/FRONT CARRIERS - C. MARCH

owner's breach.

For the sake of good order, charterers wish to remind owners that a

further component of their potential losses and consequent claim for

damages relates to owner's unwillingness to move the laycan date for

this 4th lifting to May 10-25. The losses arising therefrom will only
be

established in May. Charterers thus reserve all rights under the COA.

Charterers will revert with a statement of claim and notice of

arbitration in due course."

Regards

REGARDS  - BRIAN TAYLOR
DIRECT PH.  020 7977 7424
FAX      020 7488 2833
I-MAIL    POSTFIX@SSY.CO.UK